**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF MATTHEW HENRY,**
**CHIEF TRANSFORMATION OFFICER OF SUNPOWER CORPORATION, IN**
**SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Matthew Henry, hereby declare under penalty of perjury:

1.      I am the Chief Transformation Officer of SunPower Corporation (collectively, with its Debtor affiliates, the "Debtors" and, together with their non-Debtor affiliates "SunPower" or the "Company").[2]  SunPower is a publicly-traded company based in Richmond, California, organized under the laws of Delaware, and a debtor and debtor in possession in the above-captioned cases along with nine of its direct and indirect subsidiaries.

2.      As a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), I began working with SunPower in November 2023 and was appointed Chief Transformation Officer in August 2024.  I have spent over sixteen years at A&M advising distressed companies in their restructuring efforts.  I also spent nearly three years with a middle-market investment bank,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]     Capitalized terms used but not immediately defined herein have the meanings given to them in other sections herein.

where I advised on acquisitions by private equity groups and publicly-traded conglomerates.  I hold a bachelor's degree in finance from the University of Nevada and an MBA from the W.P. Carey School of Business at Arizona State University.

3.      Each of the Debtors filed a voluntary petition contemporaneously herewith for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") on August 5, 2024 (the "<u>Petition Date</u>").  To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "<u>First Day Motions</u>").  I submit this declaration (the "<u>Declaration</u>") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions (the "<u>Petitions</u>") and the First Day Motions.

4.      As Chief Transformation Officer of SunPower, I am familiar with the day-to-day operations, business and financial affairs, and books and records of SunPower.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided by other members of the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

**Introduction**

5.      SunPower has been a leader in the residential solar energy and storage market in North America for over 30 years, with over half a million homes in the United States having been retrofitted or constructed with a SunPower solar energy system.  In recent months, however, SunPower has faced a severe liquidity crisis caused by a sharp decline in demand in the solar market and SunPower's inability to obtain new capital.  While the Company, along with its advisors and stakeholders, worked diligently to address its liquidity crisis, SunPower has been left with no choice but to effectuate a value-maximizing sale process through chapter 11, followed by a winddown of its businesses, for the benefit of all parties in interest.  Despite the current downturn in the solar market, and the unique challenges facing the Company, SunPower, its advisors, and stakeholders believe in the value of the Company's business model and assets.

6.      SunPower offers complete solar energy solutions to its customers—from the sale and installation of solar and energy storage systems to existing or new homes, to the integration of easy-to-use interfaces, plug-and-play power stations, and cable management systems to allow customers to monitor their home energy system in real time, to financing programs and offerings to support customers.  As part of this solutions-based approach, SunPower offers its customers a true "one stop shop" for all of their home's solar panel system needs.

7.      While nearly eighty-five million homes in the United States are suitable for solar energy systems, only about four million homes have solar energy systems installed.[3]  As the cost of solar energy declines, this nascent market is expected to continue growing.[4]

---

[3]    *How Many Americans Have Solar Panels in 2024?*, SolarInsure, (July 2, 2024), https://www.solarinsure.com/how-many-americans-have-solar-panels#how-many-homes-in-the-usa-have-solar-panels.

[4]    Max Roser, *Why Did Renewables Become So Cheap So Fast?*, Our World in Data (December 1, 2022), https://ourworldindata.org/cheap-renewables-growth.

3

8.     The solar industry's potential was further invigorated by the passing of the Inflation Reduction Act ("IRA") in 2022, which provides for a 10-year extension of the tax credit for solar and battery storage and bonus tax credits for leasing arrangements.  Companies like SunPower are poised to monetize these benefits while making solar energy accessible to more Americans across socio-economic lines.

9.     Despite growth trends in the solar energy market, SunPower is facing various macroeconomic headwinds, as well as certain Company-specific challenges.  Recent increases in U.S. inflation and corresponding increases in interest rates have led to reduced demand across the entire solar power industry, which hindered the Company's financial performance.  The reduced demand has caused liquidity to deteriorate, further straining the Company's financial flexibility and limiting the Company's ability to access capital.

10.     Since October 2023, the Company has been grappling with constrained liquidity and corresponding business challenges, including potential defaults under its various financing arrangements.  The Company has taken a proactive approach to addressing these issues, including by retaining a team of restructuring advisors and engaging with its stakeholders on potential solutions.  Between October and December 2023, the Company retained A&M as financial advisor, Kirkland & Ellis LLP ("K&E") as counsel, and Moelis & Company ("Moelis") as investment banker.  In December 2023, the Company obtained $50 million of bridge financing under its First Lien Facilities, comprising $25 million provided by existing first lien lenders and $25 million provided by the Company's largest equity holder, Sol Holding, LLC ("Sol Holding"), as a new lender under the First Lien Credit Agreement.  This new money infusion allowed the Company to rework its go-forward business plan and further engage with its stakeholders on the terms of a comprehensive solution.  In January 2024, Sol Holding provided an additional

4

$20 million commitment to the Company under the First Lien Credit Agreement; and in February 2024, the Company and Sol Holding entered into a $175 million second lien term loan facility, with Sol Holding as the sole lender.  In connection with the February 2024 financing, Sol Holding converted its $45 million in first lien loans into an equal amount of second lien loans, funded $80 million of new money second lien loans to the Company at closing, and committed to extend an additional $50 million of new money second lien loans upon the satisfaction of certain conditions, which the Company accessed in May 2024.  This new money infusion provided the Company with critical liquidity support amid ongoing discussions with stakeholders regarding a potential comprehensive solution.

11.     While this incremental financing allowed the Company to weather near-term challenges, the Company was also affected by delays in filing certain of its financial reports with the Securities and Exchange Commission ("SEC"), caused in part by misstatements in previously filed reports.  As detailed below, these delays put the Company at risk of breaching various financial reporting covenants in their prepetition financing documents and corresponding events of default.

12.     Throughout spring 2024, the Company and its advisors actively pursued various alternatives to address the Company's liquidity challenges.  Given the issues with the Company's financial statements, however, the Company was unable to obtain any incremental new capital, resulting in an acute liquidity crisis for the Company.  Despite good faith discussions with the Company's prepetition secured lenders and significant equity holders, the parties were unable to reach agreement on a comprehensive long-term liquidity and business solution.

13.     While these discussions failed, the Company was successful in negotiating a going-concern sale transaction for certain of its core business lines to Complete Solaria, Inc.

(the "Stalking Horse"), setting the floor for other potential bids to acquire certain assets during these chapter 11 cases.  Under the August 5, 2024 asset purchase agreement between the Debtors and the Stalking Horse (as modified from time to time, the "Stalking Horse APA"), the Stalking Horse has committed, subject to Court approval, to acquire the assets of the Company's Blue Raven and New Homes businesses and a portion of the Debtors' dealer network business in exchange for a purchase price of $45 million cash.[5]

14.      The Company filed these chapter 11 cases with the goal of completing the going-concern sale to the Stalking Horse (or a potential topping bidder) and monetizing any other assets.  To that end, the Debtors plan to continue their prepetition marketing and sale process, which will include a market check of the sale transaction contemplated by the Stalking Horse APA. But time is of the essence.  Given the Debtors' inability to obtain additional financing, the Debtors must rely on cash collateral (including asset sale proceeds) to fund these chapter 11 cases, and the limited liquidity available to the Debtors cannot support a protracted chapter 11 process.  To preserve liquidity and thereby maximize the Company's value for the benefit of all stakeholders, the Company made the difficult, but necessary, decision to significantly reduce the size of its workforce. The Company's remaining workforce will support ongoing operations in key business lines—including the Blue Raven and New Homes businesses—and the Company's sale process more generally, with the goal of completing a value-maximizing sale (or sales) of the Company's assets.

---

[5]     The Stalking Horse APA is attached as Exhibit 2 to the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "Bidding Procedures Order") filed contemporaneously herewith.  Any description of the Stalking Horse APA in this Declaration is qualified in its entirety by the provisions of the Stalking Horse APA.

15.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;

- **Part IV** describes the Debtors' proposed restructuring transaction;

- **Part V** describes the Debtors' proposed use of cash collateral; and

- **Part VI** and **Exhibit A** hereto provides the factual support for the Petitions and the First Day Motions.

**Discussion**

**I.      The Debtors' Corporate History, Structure, and Business Operations.**

16.     SunPower has been at the forefront of the drive to adapt to solar energy technology since its founding nearly forty years ago.  Beginning in the 1970s, SunPower co-founder Dr. Richard Swanson, a professor of electrical engineering at Stanford University, researched and experimented ways to make the solar cells used on satellites more cost-effective and accessible to residential consumers.  By 1985, Dr. Swanson was awarded grants from the Electric Power Research Institute and the U.S. Department of Energy to support his solar power research and development.  These grants, along with support from two venture capital firms, allowed Dr. Swanson to incorporate SunPower in April of 1985.

17.     In the years following its incorporation, the Company continued to obtain financing to research and develop innovative new uses for solar technology.  In the 1990s and early 2000s SunPower's solar cells powered race cars to victory and National Aeronautics and Space Administration airplanes to record breaking heights.  The Company's first manufacturing facility

7

opened in the Philippines in 2004, the same year that the Company's first utility-scale power plant commenced operations in Germany.  Building upon its growth and technological breakthroughs, SunPower successfully went public in 2005 and has been listed on the NASDAQ ever since.

18.    In the nearly two decades following its initial public offering, SunPower has worked towards its goal to make home solar energy attainable for all Americans.  Since going public, SunPower-enabled solar projects have generated approximately 173 terawatt-hours (TWh), the equivalent of reducing 123 million metric tons of carbon dioxide equivalent.  For perspective, this is equivalent to negating greenhouse gas emissions from roughly 26 million passenger vehicles driven for one year, 24 million homes' electricity use for one year, or 136 billion pounds of coal burned.

19.    In August 2020, SunPower consummated a transaction to split off its solar manufacturing business, creating a new solar-panel manufacturer named Maxeon Solar Technologies, Ltd. ("Maxeon").  In October 2021, SunPower acquired Blue Raven Solar, which expanded the Company's geographic footprint, particularly outside of California, in the U.S. residential solar and battery storage space, including in the Northwest, Midwest, and Atlantic regions.[6]  A few months later, in December 2021, SunPower debuted SunPower Financial, a financial services institution whose sole focus would be making solar power affordable for American homeowners.  In May 2022, SunPower sold off its commercial and industrial businesses to become a residential-only solar energy business.

---

[6]    *See generally SunPower Corp.*, Annual Report (Form 10-K) (Feb. 25, 2022) at 6.

20.    As discussed above, SunPower provides all-in-one residential solar power solutions ("Home Energy Solutions") to its customers.    The products offered generally fall into four categories:

- *Solar Panels*.  SunPower offers high quality mainstream and premium solar panel products with reliable performance.  The solar panels are equipped with microinverters to maximize the power production of each panel and best-in-class mounting hardware to balance aesthetics and flexibility.

- *PV Supervisor*.  The photovoltaic supervisor is a critical component of a complete home solar energy system.  This device collects data and generates reports about the customer's system and enables the Company to provide better customer support.

- *Storage Batteries*.  SunPower's batteries enable the customer to store the energy collected by the solar panels giving the customer the ability to shift between energy sources if needed and become resilient to outages.

- ***mySunPower Web & Mobile Apps***.  mySunPower is an easy to use, intuitive application available both on desktop and mobile phone.  This application offers customers real-time insights to manage their home energy system and view usage and savings, among other metrics, in one place.



21.    SunPower provides and sells Home Energy Solutions through three main business segments: Blue Raven, New Homes, and the SunPower dealer network.    Blue Raven is the Company's direct-to-consumer business segment.    Through Blue Raven, SunPower acts as both dealer and installer:  a customer can purchase Home Energy Solutions from Blue Raven, and Blue Raven will install the Home Energy Solution for the customer.    Through New Homes, SunPower collaborates with homebuilders to serve as the exclusive solar provider for new home construction

projects.  The homebuilders contract with SunPower and offer customers the option to include SunPower's Home Energy Solutions as part of their new home construction.  If a customer chooses to include SunPower's Home Energy Solution, SunPower then contracts with the homebuilders, including roofers, to install SunPower's Home Energy Solutions on the customer's new home. Finally, as part of the SunPower dealer network, SunPower collaborates with solar product dealers to provide certain business products and services.  Specifically, through (and to) the dealers, SunPower sells solar panel equipment, offers marketing services, and provides financing services for customer leases and loans, which are used to purchase the Home Energy Solution.

22.     Where SunPower sells equipment to an individual consumer, SunPower offers a range of purchase options in addition to traditional cash sales.  Specifically, qualifying customers may choose loan sales, whereby the customer obtains financing from SunPower Financial and can choose payment plans best suited to them, or lease sales, whereby a customer leases a solar panel system from SunPower with the ability to renew the lease or purchase the equipment at the end of the lease.

23.     It is difficult to quote a standard price for solar panels or a full home solar energy system as pricing depends on a variety of factors, including the model of the solar panel system, household energy needs, local weather, available roof space, shading, and the financing option selected (cash, loan, or lease).  Very broadly, the national average price for owning a 5 kW home solar energy system ranges from $13,250 to $21,000 before considering the benefits of available tax credits and incentives.  SunPower is committed to making solar energy as accessible as possible.  The Company is one of the only solar energy providers on the market to offer both loans to purchase and leases of solar panel systems (as opposed to one or the other), in addition to outright cash purchases.  SunPower also offers the "SunPower Complete Confidence Warranty,"

which covers the entire solar panel system, removal of defective parts, installation of new parts, shipping, and peak system AC power for twenty-five years (ten years for monitoring hardware).

24.      As set forth on the corporate structure chart attached as **Exhibit B**, Debtor SunPower Corporation is the ultimate parent company of the nine other Debtors in these chapter 11 cases, along with a number of other non-Debtor affiliates.  Sol Holding, which is indirectly owned by TotalEnergies Renewables USA, LLC ("TotalEnergies") and GIP Sol Acquisition, LLC ("GIP"), owns approximately 65% of SunPower Corporation's outstanding common stock. SunPower Corporation is a publicly traded company, and its common stock is listed on NASDAQ under the ticker symbol "SPWR".

## II.      The Debtors' Prepetition Capital Structure.

25.      As of the Petition Date, the Company has approximately $2.01 billion in principal amount of total funded debt obligations, comprising $483 million of Debtor funded debt obligations and $1.53 billion of non-Debtor funded debt obligations, and approximately $32.6 million in cash in Debtor and non-Debtor bank accounts.

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| First Lien Credit Agreement:  Revolving Credit Facility | $200 million |
| First Lien Credit Agreement:  Term Loan Facility | $93 million |
| Standby Letter of Credit Facility | $5 million |
| Second Lien Credit Agreement:  Term Loan Facility | $185 million |
| **Total Debtor Funded Debt Obligations** | **$483 million** |
| Non-Debtor Funded Debt Obligations | $1.531 billion |
| **Total Company Funded Debt Obligations** | **$2.01 billion** |

RLF1 31316570v.1

A.    **First Lien Credit Agreement: Revolving Credit Facility and Term Loan Facility.**

26.    Debtor SunPower Corporation is party to that certain Credit Agreement, dated as of September 12, 2022 (as amended, the "<u>First Lien Credit Agreement</u>"),[7] by and among SunPower Corporation, as borrower; each of the other Debtors, as guarantors, the lenders and issuers of letters of credit party thereto from time to time, and Bank of America, N.A., as administrative agent and collateral agent (Bank of America, N.A., in such capacities, the "<u>First Lien Agent</u>," and together with the other secured parties under the First Lien Credit Agreement, the "<u>First Lien Parties</u>"). The First Lien Credit Agreement provides for a $200 million revolving credit facility (the "<u>First Lien Revolving Credit Facility</u>") and a $100 million term loan credit facility (the "<u>First Lien Term Loan Facility</u>," and together with the First Lien Revolving Credit Facility, the "<u>First Lien Facilities</u>").

27.    Under the documents governing the First Lien Facilities, the First Lien Facilities are secured on a first-priority basis by liens on substantially all of the assets of the Debtors (subject to customary exceptions).  The maturity date of the First Lien Facilities is February 13, 2029, subject to a springing maturity date if certain indebtedness has a maturity date prior to ninety-one days after such date.  As of the Petition Date, approximately $200 million and $93 million of principal remain outstanding under the First Lien Revolving Credit Facility and the First Lien Term Loan Facility, respectively.

---

[7]    As amended by the First Amendment, dated as of January 26, 2023, as amended by the Second Amendment and Waiver to Credit Agreement, dated as of December 8, 2023, as modified by the Extension Agreement, dated as of January 18, 2024, as modified by the Waiver Agreement, dated as of January 30, 2024, as modified by the Extension Agreement, dated as of January 31, 2024, as amended by the Third Amendment Agreement, dated as of January 31, 2024, as amended by the Fourth Amendment Agreement, dated as of February 14, 2024, as amended by the Fifth Amendment Agreement, dated as of February 21, 2024, as amended by the Sixth Amendment Agreement, dated June 30, 2024.

B.       **Standby Letter of Credit.**

28.      Bank of the West, as succeeded by BMO Bank N.A. (the "L/C Secured Party"), has issued several letters of credit for the Debtors pursuant to that certain Standby Letter of Credit Agreement, dated as of October 4, 2021, as amended, which provides for a letter of credit facility in favor of the Debtors in an aggregate amount not to exceed $5.0 million.  The Standby Letter of Credit Facility is fifty percent cash secured via a cash collateral account.  As of the Petition Date, letters of credit issued and outstanding under the Standby Letter of Credit Facility totaled approximately $5 million.

C.       **Second Lien Credit Agreement.**

29.      Debtor SunPower Corporation is party to that certain Credit Agreement, dated as of February 14, 2024 (the "Second Lien Credit Agreement"), by and among SunPower Corporation, as borrower; each of the other Debtors, as guarantors, the lenders party thereto from time to time and GLAS USA LLC, as administrative agent and collateral agent (GLAS USA LLC, in such capacities, the "Second Lien Agent," and together with the other secured parties under the Second Lien Credit Agreement, the "Second Lien Parties," and together with the First Lien Parties and the L/C Secured Party, the "Prepetition Lenders").  The Second Lien Credit Agreement provides for a $175 million second-lien term loan facility (the "Second Lien Facility," and together with the First Lien Facilities and the Standby Letter of Credit Facility, the "Prepetition Facilities").

30.      Under the documents governing the Second Lien Facility, the Second Lien Facility is secured on a second-priority basis (subject to customary exceptions) by liens on substantially all of the assets of the Debtors.  The maturity date of the Second Lien Facility is May 16, 2029.  As of the Petition Date, approximately $185 million of principal remains outstanding under the Second Lien Credit Agreement.

D.     **Non-Debtor Structured Financings.**

31.     In addition to the Prepetition Facilities to which the Debtors are party, certain non-Debtor affiliates of SunPower—the majority of which are owned by SunStrong Capital Holdings, LLC, a joint venture owned by Debtor SunPower Corporation and Hannon Armstrong Sustainable Infrastructure Capital, Inc. ("Hannon") at 51% and 49%, respectively—are parties to a number of senior and mezzanine credit facilities with Hannon and other financial institutions, as lenders, and recipients of equity contributions used to finance the loan and lease financing solutions offered to SunPower's customers (the "Non-Debtor Credit Facilities," and the lenders thereunder, the "Silo Lenders").

32.     Specifically, when a qualifying customer decides to purchase SunPower's equipment using a loan or lease, the Debtors in turn sell such leases and loans and the underlying solar projects (collectively, the "Solar Assets") to certain non-Debtor affiliates (the "Non-Debtor Owners") organized in specific "project silos." These Non-Debtor Owners then enter into senior and mezzanine credit facilities with the Silo Lenders and receive debt and equity financing secured by such Solar Assets. Over the life of the lease or loan, the Non-Debtor Owners receive the lease and loan payments from customers and use this stream of income to pay back the financing received over time.[8]   Under these arrangements, the financings received by the Non-Debtor Owners are usually unlocked progressively as solar equipment is installed at customers' residences. As a result, the purchase price owed to the Debtors for the Solar Assets is transferred on the same timeline. Usually, approximately 70% of the financing is unlocked as ownership of the Solar Assets is received by the applicable Non-Debtor Owner, 20% is received

---

[8]     For the avoidance of doubt, no Debtor entity is an obligor nor guarantor under any of these financing facilities.

upon installation of the Solar Assets, and the remaining balance is received once the Solar Assets are connected to the grid.[9]

### E.    SunPower's Equity.

33.    Debtor SunPower Corporation is publicly traded and has 175,361,088 shares of common stock issued and outstanding as of December 15, 2023.  Sol Holding is the largest shareholder, owning approximately 65% of SunPower Corporation's outstanding common stock.

## III.    Events Leading to the Commencement of the Chapter 11 Cases.

34.    Prior to commencing these chapter 11 cases, the Debtors, with the assistance of their advisors, explored various out-of-court restructuring alternatives, all with a view to maximizing value for all stakeholders.  While the Debtors have faced continual headwinds throughout 2023 and 2024, the need to commence these chapter 11 cases can largely be attributed to two main factors:  (a) a sharp decline in demand in the solar market due to volatile market conditions; and (b) the Company's inability to obtain additional financing.

35.    While experts predict further growth in the solar market, customer demand has declined due to nationwide and global inflationary pressures in 2022 and 2023.  Rising interest rates have made it more difficult for customers to borrow money to finance their home energy system.  This predicament has hit home solar companies especially hard, as most customers do not pay for their home solar panel systems outright with cash.  As a result, loan and lease sales have all slowed.  The slowdown in sales, among other factors, has been reflected in the Company's stock price, which has tumbled approximately 82% since the start of 2024.

---

[9]    The intercompany transactions involving the Debtors that are entered into in connection with such structured financings are described in further detail in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transaction, and (II) Granting Related Relief* filed contemporaneously herewith.

36.     Due to this decreased demand, the Debtors confronted liquidity obstacles in 2023 and 2024.    Confident that SunPower would once again become profitable, the Debtors' stakeholders worked diligently to overcome these unique obstacles by engaging with various funding sources.    Given the challenges with completing the audit of the Debtors' financial statements, however, the Debtors were unable to obtain new capital.

37.     Notwithstanding these and other business challenges, the Debtors, with the assistance of their advisors, have engaged with their stakeholders every step of the way on potential out-of-court solutions, and now come to this Court only at the conclusion of (a) an exhaustive review of available pathways, (b) a sharp decline in demand in the solar market due to volatile market conditions, and (c) the Debtors' inability to obtain new capital.    The Debtors have now reached the end of their liquidity runway.    Simply put, these chapter 11 cases are the Debtors' best opportunity to fully and fairly resolve their liabilities in a manner that maximizes value and allows significant components of the Company to continue as a going concern.

A.      **Events Leading to the Second Lien Credit Agreement.**

38.     On October 24, 2023, the Company filed a form 8-K with the SEC reporting that the Company's 10-K for the period ended January 1, 2023, 10-Q for the period ended April 2, 2023, and 10-Q for the period ended July 2, 2023 (the "First Restatement Financials") had to be restated because the value of certain inventory had been overstated and, therefore, could no longer be relied upon (the "First Restatement").

39.     In late 2023, the Company engaged Kirkland, Moelis, and A&M to assess its options with respect to a breach of a financial reporting covenant on its Revolving Credit Facility as a result of the First Restatement and to diligence its business plan.    On December 8, 2023, following good-faith, arm's length negotiations with the First Lien Parties, the Company was able to secure an amendment to the Credit Agreement and waiver of the covenant breaches

16

(the "Revolver Amendment"), such that the covenant breaches were not considered an event of default. Among other key terms, the Revolver Amendment provided for a temporary waiver of existing and anticipated defaults related to financial and reporting covenants until January 19, 2024.

40. On December 8, 2023, pursuant to the Revolver Amendment, the Debtors received access to $50 million in total additional revolving commitments, with $25 million provided by existing first lien lenders and $25 million provided by Sol Holding, as a new lender under the First Lien Revolving Credit Facility.

41. On December 18, 2023, the Company filed a form 8-K with the SEC notifying the public of an event of default under the Loan and Security Agreement, dated June 30, 2022, by and among SPWR RIC Borrower 2022-1, the lenders party thereto from time to time, Atlas Securitized Products Holdings, L.P. ("Atlas"), as administrative agent and Computershare Trust Company, National Association, as paying agent (the "Atlas Credit Agreement"). A few days prior, the Company became aware of a breach of the covenant under the Atlas Credit Agreement requiring delivery of unaudited financial statements within forty-five days following the end of the third quarter of 2023 (the "Q3 Financials"). Due to the Company's delay in delivery of Q3 Financials, an event of default was triggered under the Atlas Credit Agreement.

42. On December 22, 2023, following extensive negotiations with existing lenders and equity sponsors, SunPower publicly announced that it entered a waiver and amendment with Atlas (the "Atlas Amendment"). The terms of the Atlas Amendment were intended to mirror the terms of the Revolver Amendment insofar as it too provided for a temporary waiver of the reporting default until January 19, 2024.

### B.    The Second Lien Credit Agreement.

43.    To weather the weakened market and cover working capital expenses as well as operating losses, the Company drew $85 million on its First Lien Revolving Credit Facility at the end of Q2 2023.  While this allowed the Company to continue its operations uninterrupted, the Company entered Q3 2023 having drawn 90% of its First Lien Revolving Credit Facility.  That same quarter, the Company announced that it expected FY2023 losses to be between $165 and $175 million, roughly double its prior projected losses of $70 - $90 million.

44.    Throughout Q1 of 2024, the Company and its advisors engaged with GIP and TotalEnergies in the hopes of consummating a capital raise that would bridge SunPower into Q4 2024, when SunPower projected the Company would become profitable again.  The Company also explored third-party capital raises through Moelis' marketing efforts.  To give the Debtors additional time to close a capital raise with their sponsors and/or a third-party financing institution, the Debtors sought extensions of the January 19, 2024 waiver deadlines under the Atlas Amendment and the Revolver Amendment, which were agreed upon by the parties prior to that deadline.  Additionally, at this time, Sol Holding provided an additional $20 million of commitments under the First Lien Credit Agreement.

45.    In February 2024, the Debtors successfully negotiated and entered into the Second Lien Credit Agreement with Sol Holding, which provided the Debtors much-needed liquidity and additional runway to find a more comprehensive solution.  Specifically, in connection with the Second Lien Credit Agreement, Sol Holding converted its $45 million in first lien loans into an equal amount of second lien loans, funded $80 million of second lien loans to the Company at closing, and committed to fund an additional $50 million of second lien loans upon the satisfaction of certain conditions.  In May 2024, the Company accessed the additional $50 million of new money.

C.    **The Second Restatement.**

46.    On December 18, 2023, the Company filed an Amended 10-K with the SEC, amending and restating the First Restatement Financials and resolving the First Restatement. However, on April 23, 2024, the Company filed a form 8-K with the SEC reporting that the First Restatement Financials and the Company's 10-Q for the period ended Oct 1, 2024 (the "Second Restatement Financials") had to be restated because of (a) the capitalization of certain deferred costs that did not qualify for capitalization, (b) the classification of certain sales commissions as cost of revenue rather than sales, general and administrative expense, and (c) certain other individually immaterial adjustments (the "Second Restatement").  Consequently, the Company's auditor determined that its reports on the Company's financial statements and internal control over financial reporting included in the Second Restatement Financials should no longer be relied upon.

47.    On February 29, 2024, the Company filed a form NT 10-K with the SEC notifying that their form 10-K for the period ended December 31, 2023 would be submitted late (the "2023 10-K").  Additionally, on May 13, 2024, the Company filed a form NT 10-Q with the SEC notifying that their form 10-Q for Q1 would be submitted late (the "Q1 10-Q").  On May 17, 2024, SunPower received a notification of deficiency from the Nasdaq Stock Market LLC, indicating the Company was not in compliance with Nasdaq listing rules.  Following this, on May 20, 2024, the Company filed a form 8-K with the SEC detailing that the Second Restatement caused the late filing of the 2023 10-K and Q1 10-Q.  The Company executed a series of amendments and waivers to the Credit Facilities in an effort to stay in compliance with its financial reporting obligations under the Credit Facilities.

**D.      Obstacles to Growth.**

48.      Despite the additional capital secured by the Second Lien Credit Agreement, the Company continued to face extensive obstacles to growth throughout the spring of 2024.  In early 2024, the Company commenced an extensive internal investigation in response to a SEC subpoena issued to the Company and its auditor.

49.      In an effort to reduce liquidity burn, in April 2024, the Company began winding down its SunPower Residential Installation (SPRI) locations and announced layoffs of approximately 1,000 employees.  After announcing the layoffs, SunPower's publicly traded common stock dropped to their lowest recorded price since the Company went public in 2005.  In response, a key Silo Lender stopped funding certain Non-Debtor Credit Facilities, as it believed that the conditions precedent to drawing were not satisfied.  That same Silo Lender also declined to extend the availability period under one Non-Debtor Credit Facility, while another Silo Lender limited the availability for drawdowns under the same Non-Debtor Credit Facility as a condition to a waiver in connection with the delay in audited financial statements.

50.      Additionally, during this time, consumer demand for solar energy products continued to lag.  In response, the Company and its advisors worked to obtain further funding to bolster the Second Lien Credit Agreement and bridge the gap to liquidity stability and profitability.

**E.      The Auditor Resignation.**

51.      On June 27, 2024, the Company's auditor notified the Company of its decision to resign as independent registered public accounting firm.  The auditor resigned prior to completion of the 2023 10-K, the Q1 Financials, and the Second Restatement (the "Financial Reports").  On July 3, 2024, the Company filed a form 8-K with the SEC reporting the auditor's resignation.  To

20

avoid any further defaults, the Company obtained waivers in an effort to stay in compliance with financial reporting obligations under the Credit Facilities.

## IV.    The Proposed Restructuring Transaction.

52.    Despite the Company's efforts to raise additional capital throughout the spring of 2024, the Company reached an inflection point in summer 2024.  Because of the delayed Financial Reports, investors were no longer willing to provide additional liquidity needed for the Company to continue its turnaround plan.  Given the absence of a comprehensive long-term liquidity and business solution for the Company, it became clear to the Company that conducting a sale process through chapter 11 was the best option available to maximize the Company's value for the benefit of all stakeholders.

53.    The Company filed these chapter 11 cases with the goal of timely completing a value-maximizing sale (or sales) of the Company's assets.  The Stalking Horse APA provides a backstop for the sale of the Company's Blue Raven and New Homes businesses and a portion of its dealer network business, which will be subject to a market check.  As to the Company's other assets, the Company will undertake to sell certain assets for the highest or otherwise best value available.  Liquidity is limited, and time is of the essence.  Accordingly, the Debtors' proposed chapter 11 timeline contemplates an expeditious process that is necessary under these circumstances to maximize value for the Debtors' estates.

## V.    The Proposed Use of Cash Collateral.

54.    Leading up to the Petition Date, the Debtors, their advisors, and the Prepetition Lenders worked diligently and negotiated in good faith regarding potential postpetition financing to extend the Debtors' liquidity runway and fund these chapter 11 cases.  In parallel, the Debtors worked with Moelis to conduct a marketing process to identify other possible sources of postpetition financing.  Despite the Debtors' best efforts, however, the Debtors did not obtain

21

actionable postpetition financing proposals.   The Prepetition Lenders would not provide postpetition financing, nor consent to being primed by a third party.  No third party presented a viable postpetition financing option with junior debt or otherwise.

55.    While the Debtors were not able to obtain postpetition financing, the Prepetition Lenders agreed to provide the Debtors access to prepetition cash collateral (the "Cash Collateral"). Access to Cash Collateral will provide the Debtors with the necessary liquidity to pursue the asset sale (or sales) and maximize the value of the estate for the benefit of all stakeholders.

56.    Specifically, pursuant to the Cash Collateral Motion,[10] the Debtors seek the continued use of the Prepetition Lenders' Cash Collateral to provide sufficient liquidity for their operations during these chapter 11 cases.  Without access to Cash Collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result.  Authorization to use Cash Collateral during the duration of these chapter 11 cases will provide the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key vendors and personnel, continue to provide products and services to their customers, and pay wages to employees, all while working toward a value-maximizing sale of the Debtors' assets.

57.    In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the Prepetition Lenders with adequate protection as set forth in the Cash Collateral Motion and the accompanying proposed interim order (the "Interim Order").  The Debtors' use of Cash Collateral will also be subject to the following milestones:

---

[10]    *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (filed contemporaneously herewith).

- One calendar day after Petition Date: File Bidding Procedures Motion;[11]

- Three calendar days after Petition Date:  Entry of interim cash collateral order;

- Twenty-eight calendar days after Petition Date: Entry of the Bidding Procedures Order;

- Twenty-eight calendar days after Petition Date: File chapter 11 plan, disclosure statement, and motion to approve disclosure statement;

- Thirty calendar days after Petition Date: Entry of final cash collateral order;

- September 6, 2024:  Bid deadline under the Bidding Procedures Order;

- September 10, 2024:  Auction (if necessary);

- September 10, 2024:  Notice of successful bidder;

- September 18, 2024: Entry of order approving sale under to winning bidder(s) ("Sale Order");

- September 18, 2024: Entry of order approving disclosure statement;

- By September 30, 2024:  Consummation of sale pursuant to entered Sale Order;

- October 18, 2024: Entry of order confirming chapter 11 plan; and

- October 31, 2024: Occurrence of chapter 11 plan effective date.

## VI.   Evidence in Support of First Day Motions.

58.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.

---

[11]    *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (filed contemporaneously herewith).

59.     The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

60.     I am familiar with the information contained in each First Day Motions and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element for the Debtors to successfully implement a chapter 11 strategy, and (c) best serves the Debtors' estates and creditors' interests.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

*[Remainder of Page Intentionally Left Blank]*

24

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 5, 2024                         _/s/ Matthew Henry_____
            Richmond, California              Name: Matthew Henry
                                              Title:   Chief Transformation Officer,
                                                          SunPower Corporation

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

**I.   Administrative and Procedural Motions.**

   **A.     Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

   1.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, or multiple hearings on common issues.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

   2.     Moreover, joint administration will not adversely affect the Debtors' constituencies because this motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the (a) cost reductions associated with the joint administration of these chapter 11 cases and (b) ease of reference to one main case docket of SunPower Corporation throughout

---

[1]   Capitalized terms used but not defined have the meanings ascribed to them in the applicable First Day Motion filed contemporaneously herewith.  All exhibits attached to the applicable First Day Motion or interim or final order thereof are incorporated by reference herein.

the chapter 11 cases.  Accordingly, I believe that the joint administration of these chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.      Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial reports and (II) Granting Related Relief (the "SOFA Motion").**

3.      Pursuant to the SOFA Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs as required by section 521 of the Bankruptcy Code and rule 1007 of the Bankruptcy Rules  by thirty days, in addition to the extension provided by rule 1007-1(b) of the Local Rules, for a total of fifty-eight days from the Petition Date, to and including October 2, 2024, without prejudice to the Debtors' ability to request additional extensions for cause shown, (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3, or to file a motion with the Court seeking a modification of such reporting requirements for cause, to the later of (i) thirty days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code  or (ii) forty-four days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions, and (c) granting related relief.

4.      Good and sufficient cause exists for granting an extension of time to file the Schedules and Statements.  The ordinary operation of the Debtors' business requires the Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to myriad claims of their creditors, many of whom are customers, and the

Debtors' many assets and contracts.  This information is extensive and located in numerous places throughout the Debtors' organization.  Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term.

5.      The requested extension will enhance the accuracy of the Schedules and Statements when filed and help avoid the potential necessity of substantial subsequent amendments.  The Debtors request such an extension without prejudice to their rights to seek further extensions or waivers from the Court for cause shown.  Moreover, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these chapter 11 cases.

6.      Further, certain of the Debtors maintain an interest in a non-debtor subsidiary that is subject to Bankruptcy Rule 2015.3 and, as such, are required to file 2015.3 Reports.  The Debtors are not in a position to complete the initial 2015.3 Report within the time required under Bankruptcy Rule 2015.3 due to (a) the size, complexity, and geographic scope of the Debtors' businesses, (b) the substantial burdens imposed by complying with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases, and (c) the same considerations supporting an extension of the date by which to file the Schedules and Statements.  Cause accordingly exists to extend the deadline for filing the initial 2015.3 Report as requested in the SOFA Motion.

7.      Extending the deadline to file the initial 2015.3 Report will enable the Debtors to work with their advisors and the United States Trustee for the District of Delaware  to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.  Accordingly, the Debtors respectfully request that the Court grant an extension of the time by which the Debtors must file their initial

2015.3 Reports to the later of (a) thirty days after the 341 Meeting, or (b) forty-four days from the Petition Date pursuant to Bankruptcy Rule 2015.3(d).

8.      Accordingly, I believe that the relief sought in the SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**C.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by Email, (D) Approve the Form and Manner of Service of the Notice of Commencement, (E) Redact or Withhold Certain Confidential Information of Customers, and (F) Redact Certain Personally Identifiable Information of Individuals; and (II) Waiving the Requirement to File a List of Equity Security Holders and Provide Notices Directly to Equity Security Holders; and (III) Granting Related Relief (the "Creditor Matrix Motion").**

9.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor, (iii) serve certain parties in interest via email, (iv) approve the form and manner of service of the notice of commencement of these chapter 11 cases, (v) redact or withhold certain confidential information of customers, and (vi) redact certain personally identifiable information of individuals; (b) waiving the requirement to file a list of, and to provide notice directly to, the equity security holders of Debtor SunPower Corporation; and (c) granting related relief.

10.      I believe that serving notices by traditional mail is cost-prohibitive given the size of the Debtors' creditor matrix and the total amount of cash collateral available to fund these chapter 11 cases.  Further, serving notices by traditional mail would drain a material amount of the Debtors' available cash at a time when such funds could instead be used to support the Debtors' restructuring efforts.  Therefore, the Debtors seek authority to serve all required notice (and other

4

documents) by email, or, where a customer's email address is unavailable to the Debtors, serve a one page notice of the bankruptcy by first class mail.

11.     Because the Top 20 Lists of the Debtors could overlap, and certain Debtors may have fewer than thirty significant unsecured creditors, filing separate Top 20 Lists for each Debtor would be of limited utility.  In addition, compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the Debtors' and their advisors' limited time and resources. Therefore, I believe that the consolidated Top 30 List will better aid the U.S. Trustee in its efforts to communicate with these creditors and form an official committee of general unsecured creditors.

12.     The Debtors' customer list, and related customer data, is an important and valuable asset of the Debtors, and it is vital that the Debtors maintain their customer list in strict confidence. In addition, privacy and data protection regulations have been enacted in key jurisdictions in which the Debtors and their non-Debtor affiliates do business.  Accordingly, cause exists to authorize the Debtors to redact from any paper filed or to be filed the names, home addresses, and email addresses of the Debtors' customers.  Therefore, the Debtors request authority to redact from any paper filed or to be filed with the Court in these chapter 11 cases, including, but not limited to, the Creditor Matrix, Schedules and Statements, and any related affidavits of service, the home and email addresses of natural persons.

13.     The Debtors and I believe that using Epiq to promptly provide notices to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Additionally, Epiq will assist the Debtors in preparing creditor lists and mailing initial notices, and, therefore, it is more efficient to authorize Epiq to mail the Notices.  Accordingly, Epiq should undertake such mailings and email service.

5

14.    I believe that the relief sought in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**D.    Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief (the "<u>Epiq Retention Application</u>").**

15.    Pursuant to the Epiq Retention Application, the Debtors seek entry of an order appointing Epiq Corporate Restructuring, LLC as claims, noticing, and solicitation agent for the Debtors in their chapter 11 cases, effective as of the Petition Date to, among other things, (i) prepare and serve required notices and documents in these chapter 11 cases; (ii) maintain an official copy of the Debtors' schedules of assets and liabilities and statements of financial affairs; (iii) furnish a notice to all potential creditors of the last date for filing proofs of claim and a form for filing a proof of claim, after such notice and form are approved by the Court, and notify such potential creditors of the existence, amount and classification of their respective claims as set forth in the Schedules; (iv) maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received; (v) prepare and file, or cause to be filed, with the Clerk an affidavit or certificate of service; (vi) process all proofs of claim received; and (vii) maintain the official claims register for each Debtor, in each case, pursuant to the terms of the engagement agreement, effective July 23, 2024, between the Debtors and Epiq.

16.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances, is in the best interests of the estates, and satisfies the Claims Agent Protocol.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and comparable to the rates charged by their competitors for similar services.

17.     The Debtors anticipate that there will be hundreds of thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the appointment of a claims and noticing agent is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.

**E.     Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "<u>NOL Motion</u>").**

18.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing Procedures related to certain transfers of, and/or declarations of worthlessness with respect to Debtor SunPower Corporation's existing class(es) (or series) of Common Stock or any Beneficial Ownership therein; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*; and  (c) granting related relief.

19.     The Debtors currently estimate that, as of December 31, 2023, they had approximately $168.7 million of federal NOLs, approximately $648.5 million of California state NOLs, approximately $74.0 million of federal tax credit carryforwards, and approximately $2.4 million of California state credit carryforwards.[2]  The Debtors may generate additional Tax Attributes in the 2024 tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset any taxable income, including any such taxable

---

[2]     Amounts are estimates and subject to change.  The Tax Attributes may include certain amounts subject to limitations on use as a result of prior ownership changes under section 382 of the IRC.

RLF1 31316570v.1

income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets).  Additionally, depending on the structure utilized in any chapter 11 plan of the Debtors, in the event any of the Debtors' Tax Attributes were to survive, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years.  The relief requested is expected to preserve the value of the Tax Attributes to the benefit of the Debtors' stakeholders.

20.     Additionally, the Debtors seek to establish procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to sections 382 and 383 of the IRC and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes.  Because the Tax Attributes are of significant value to the Debtors and their estates, an ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes.  Accordingly, it is necessary to closely monitor certain transfers of Beneficial Ownership of Common Stock so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes.  By establishing and implementing such Procedures, the Debtors will be in a position to object to "ownership changes" that threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

21.     For all of these reasons, I believe the relief in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## II.     Operational Motions.

A.     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and; (II) Granting Related Relief (the "<u>Wages Motion</u>").**

8

22.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to:  (i) pay all prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Employee Compensation and Benefits (as defined in the Wages Motion) and (ii) continue to administer the Employee Compensation and Benefits Programs in the ordinary course, including payment of prepetition obligations related thereto; and (b) granting related relief.

23.     Prior to the Petition Date, the Company employed approximately 4,700 total workers.  The Debtors have been grappling with various macroeconomic headwinds, as well as certain Company-specific challenges.  In response, after exhausting all available options, in careful consultation with their advisors, the Company made the difficult decision to terminate the employment of approximately 15% of its workforce prior to the filings of these chapter 11 cases.

24.     As of the Petition Date, the Debtors' workforce comprises 4,000 employees (the "Employees") whose skills and knowledge are essential to the Debtors' assets, operations, and ability to pursue a value maximizing sale or sales in these chapter 11 cases.  The Debtors historically sourced, and will continue to source, critical labor support from various agencies and periodically retain specialized individuals as independent contractors or temporary workers (the "Temporary Staff") to complete discrete projects on an as- needed basis.  The Temporary Staff were, and will continue to be, an important supplement to the efforts of the Debtors' Employees. Together, the Employees and Temporary Staff perform a variety of critical functions including accounting, administration, finance, human resources, management, security, and other tasks that are essential to the Debtors' limited operations for purposes of implementing a value-maximizing sale or sales of all or substantially all assets.

25.    The Debtors offer certain health and welfare benefits programs to eligible Employees and Former Employees, including the Health Insurance Programs, vision and dental insurance, HSA and FSA medical savings accounts, life and AD&D insurance, and disability benefits.  Additionally, the Debtors offer Employee Assistance Programs that pair Employees and/or their family members with professional counselors who may also provide referrals and follow-ups for individuals, couples, families, and groups regarding personal or work-related issues such as stress, marital, family, and relationship problems, anger management, substance abuse, work performance issues, emotional difficulties, or other related concerns that become a problem in an Employee's (or their immediate family member's) life.

26.    In many instances, the Debtors' Employees and Temporary Staff rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Employees and Temporary Staff will be exposed to significant financial hardship and may leave the employ of the Company to the detriment of the estates in the event the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining existing employee programs in the ordinary course of business.

27.    In addition, the Debtors also seek to pay all costs incidental to the Employee Compensation and Benefits Programs.  As set forth below, the Debtors seek authority, but not direction, to pay, remit, or reimburse, as applicable, the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs set forth in the table below:

| Employee Compensation and Benefits Programs | Approximate Interim Amount | Approximate Final Amount |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages | $4,800,000 | $4,800,000 |
| Unpaid Temporary Staff Obligations | $2,500,000 | $2,500,000 |
| Withholdings Obligations | $1,725,000 | $1,725,000 |
| Accrued PTO | $965,000 | $965,000 |
| Unpaid Commissions | $1,470,000 | $1,470,000 |
| Severance Obligations | $3,716,000 | $3,716,000 |
| Non-Insider Incentive Plans | $0 | $1,505,000 |
| **Benefits and Entitlements** | | |
| Health and Welfare Programs | $838,000 | $838,000 |
| Workers' Compensation Program | $2,400,000 | $2,400,000 |
| **Other** | | |
| Miscellaneous Benefits | $30,000 | $30,000 |
| Payroll Fees | $23,000 | $23,000 |
| Reimbursable Expenses | $40,000 | $40,000 |
| Total | **$18,507,000** | **$20,012,000** |

28.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Wages Motion.  The Debtors' Employees are critical to the Debtors' efforts to pursue a value maximizing sale or sales.  Accordingly, I believe the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

11

**B.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

29.      Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date), without regard to whether such obligations accrued or arose before or after the Petition Date; and (b) granting related relief.

30.      In the ordinary course of business, the Debtors collect, withhold, and incur: (a) sales and use taxes; (b) withholding, income, and franchise taxes; (c) property taxes; (d) customs duties and fees; (e) business and regulatory fees, and license, permit, annual report, and limited liability company fees; (f) assessments, interests, penalties, and other fees as a result of audits; and (g) fees owed to various tax service providers on account of tax consulting services provided to the Debtors.[3]  The Debtors pay or remit the Taxes and Fees to various federal, state, local, and foreign governments, including taxing authorities, identified in a schedule attached as Exhibit C to the Taxes Motion.[4]  Taxes and Fees are generally remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.   From time to time, the Debtors may also receive tax credits for overpayments or refunds with respect to Taxes and Fees.  The Debtors generally use these credits

---

[3]      By the Taxes Motion, the Debtors do not seek the authority to collect and remit state and federal employee-related taxes and withholdings.  Such relief is instead requested in the Wages Motion.

[4]      Although Exhibit C is intended to be comprehensive, the Debtors may have inadvertently omitted Taxing Authorities from Exhibit C.  By the Taxes Motion, the Debtors request relief with respect to Taxes and Fees payable to all Taxing Authorities, regardless of whether such Authority is specifically identified on Exhibit C.  In the event the Debtors pay any Taxing Authority not included on Exhibit C, the Debtors will file a notice with the Court listing such Taxing Authority within fifteen days of such payment.

Case 24-11649-CTG    Doc 9    Filed 08/05/24    Page 39 of 61

in the ordinary course of business to offset against future Taxes and Fees or cause the amount of such credits to be refunded to the Debtors. The Debtors estimate that approximately $14.15 million in Taxes and Fees are outstanding as of the Petition Date, of which approximately $6.5 million is currently payable or will become due and owing to the Taxing Authorities within the first twenty-one days of these chapter 11 cases in the ordinary course.[5]

31.     Additionally, the Debtors are subject to, and may become subject to further, routine audit investigations on account of tax returns and/or tax obligations during these chapter 11 cases, including as a result of any voluntary disclosure agreements or similar procedural mechanisms (if applicable). Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors, including late payment of Taxes and Fees.[6] Accordingly, the Debtors seek authority, but not direction, to pay or remit tax obligations on account of the Assessments as they arise in the ordinary course of business and consistent with prepetition practice, including as a result of any resolutions of issues addressed in an Audit, including with respect to the kinds of Taxes and Fees otherwise addressed in the Wages Motion.

32.     The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis, remitting them monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of the particular category of Taxes and Fees, each of which is further discussed below.

---

[5]     As described in further detail in the Cash Management Motion, the Debtors also partially and indirectly own a number of Non-Debtor Silos (as defined in the Cash Management Motion). Historically, the Debtors have also prepared tax returns on behalf of the Non-Debtor Silos. During these Chapter 11 Cases, certain of Non-Debtor Silos may prepare their own tax returns (the "Non-Debtor Silo Tax Returns"). The Debtors seek, for the avoidance of doubt, authorization to provide access to the Debtors' books and records necessary to prepare the Non-Debtor Tax Returns to the Non-Debtor Silos and the Project Owners thereof (as defined in the Cash Management Motion) (together, the "Non-Debtor Silo Tax Parties").

[6]     Nothing in the Taxes Motion or any related order constitutes, or should be construed, as an admission of liability by the Debtors with respect to any Audit or Assessment. The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

13

RLF1 31316570v.1

The Debtors seek authority pursuant to this motion to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees, including where:  (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases, including as a result of Audits.  In addition, for the avoidance of doubt, the Debtors seek authority, but not direction, to pay Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).[7]

33.     Finally, subject to the Final Order, the Debtors seek authority to undertake certain typical activities related to tax planning, including (a) converting Debtor entities from one form to another (*e.g.*, converting an entity from a corporation to a limited liability company) via conversion, merger, or otherwise; (b) making certain tax elections (including with respect to the tax classification of Debtor entities); (c) changing the position of Debtor entities within the Debtors' corporate structure; and (d) modifying or resolving intercompany motions and moving assets or liabilities among Debtor entities, in each case, if doing so will not alter the substantive rights of the Debtors' stakeholders in these chapter 11 cases.

34.     In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.

35.     The Taxes and Fees are summarized as follows:

---

[7]    The Debtors reserve their rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek reimbursement of any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Sales and Use Taxes** | Taxes imposed on the sale and use of certain goods and services. | $10,030,000[8] | $4,111,000 |
| **Income and Franchise Taxes** | Taxes imposed on the Debtors' income and taxes imposed upon the Debtors to operate their business pursuant to state laws. | $ 1,305,000 | $0 |
| **Property Taxes** | Taxes and obligations related to real and personal property holdings. | $550,000 | $110,000 |
| **Customs Duties, and Customs Brokers' Fees** | Customs duties, import and export-related taxes, and other incidental import and export expenses. | $1,204,000 | $1,204,000 |
| **Business License and Other Taxes and Fees** | Fees related to compliance with state licensing and registration related to teleservice, including permits, surety bonds,[9] reporting, and other fees paid to state and local agencies. | $36,000 | $18,000 |
| **Tax Service Providers** | The Debtors pay Taxes and Fees related to their use of third-party tax service providers in the ordinary course of business. | $1,020,000 | $1,020,000 |
| **Total** | | **$14,145,000** | **$6,463,000** |

36.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Taxes Motion.  Accordingly, I believe such relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

---

[8]     A portion of this amount relates to a potential Assessment resulting from the state of Hawaii's Sales and Use Taxes Audit.

[9]     For the avoidance of doubt, the Debtors seek relief in connection with such surety bonds solely to the extent not duplicative of the relief sought on account of surety bonds in favor of certain Taxing Authorities, as set forth in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered Into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief* (the "Insurance Motion"), filed concurrently herewith.

**C.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

37.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) maintain coverage under the Insurance Policies and Surety Bonds and pay any related obligations and (ii) renew, supplement, modify, or purchase insurance and surety coverage in the ordinary course of business and (b) granting related relief.

38.     The Debtors' ability to maintain the Insurance Policies and Surety Bonds, to renew, supplement, and modify the same as needed, and to enter into new insurance policies and surety bonds as needed in the ordinary course of business, is essential to preserving the value of the Debtors' estates.  Moreover, in many instances, insurance or surety coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee for the District of Delaware that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  The Debtors are required to maintain the Surety Bonds under certain state law in order to lawfully conduct their business and operations in the applicable jurisdictions.

39.     In the ordinary course of business, the Debtors maintain approximately sixty Insurance Policies administered by various third-party insurance carriers, as well as 386 Surety Bonds.  The Insurance Policies provide the Debtors and non-Debtor entities[10] coverage for, among other things, the Debtors' property, general liability, employee benefits liability, foreign

---

[10]     In some instances, the Debtors are insured under an insurance policy that also provides coverage to a certain non-Debtor entity as well.  Intercompany transactions are described, and relief is requested, in the Cash Management Motion.

liability, automobile liability, cyber liability, workers' compensation,[11] umbrella coverage, crime, aircraft liability, and directors' and officers' liability. The Surety Bonds are issued in favor of various federal, state, and industry regulatory agencies to guarantee certain obligations related to various state licenses and permits.

40.     The Insurance Policies and Surety Bonds are essential to the ongoing operation of the Debtors' business. The Insurance Policies generally are one year in length, with no affirmative obligation to renew upon expiration. The annual premiums for the Insurance Policies total approximately $27 million in the aggregate for the 2024-2025 term, not including applicable deductibles or self-insured retentions.[12] The total annual premiums for the Surety Bonds is approximately $265,000 in the aggregate. The premiums for the Insurance Policies are generally paid in monthly installments pursuant to Premium Financing Agreements, or in a single lump sum shortly after the Insurance Policy inception date or renewal date. The auto insurance maintained with Fairmatic and the workers' compensation policy maintained with Hartford are paid in monthly installments. Additionally, the premiums associated with the Debtors' workers' compensation policy are subject to adjustments at the end of the term. The Debtors estimate that,

---

[11]   For the avoidance of doubt, the Debtors' workers' compensation policies are reflected on <u>Exhibit C</u> to the Insurance Motion and throughout the Insurance Motion to the extent the relief requested in the Wages Motion is not coextensive with the relief sought in the Insurance Motion. The Insurance Motion asks the Court to authorize, but not direct, the Debtors' payment of any prepetition obligations on account of the related Insurance Policies.

[12]   Some of the Insurance Policies require the Debtors to pay a per-incident deductible. Generally, if a claim is made against such Insurance Policies, the applicable Insurance Carrier will administer the claim and make payments in connection therewith in accordance with the terms of such policy, and the Insurance Carrier will have a claim against the Debtors in the amount of the applicable Deductible. Alternatively, certain of the Insurance Policies use self-insured retentions on a per-claim basis instead of Deductibles. If a claim is made under such Insurance Policies, the Debtors must make payments in the first instance (whether related to defense costs or on account of the underlying liability) up to the amount of the SIR and, once the Debtors have made payments to satisfy such amount, the carrier becomes obligated to cover remaining costs in accordance with the terms of such policy. Out of an abundance of caution, the Debtors seek authority, but not direction, to pay all prepetition amounts that may be due and owing on account of the Deductibles and to continue honoring all payment obligations under the Deductibles in the ordinary course of business to ensure uninterrupted coverage thereunder.

as of the Petition Date, there are approximately $2.3 million in outstanding premiums due on account of the Insurance Policies.  The Debtors seek authority, but not direction, to pay any prepetition amounts due and owing in connection with the Insurance Policies, and the Surety Bonds in the ordinary course of business.  The Debtors further seek authority to enter into new Insurance Policies, including ancillary policies in the ordinary course of business on a postpetition basis and consistent with prepetition practices, without further Court approval to ensure uninterrupted coverage.

41.    The Debtors obtain most of their Insurance Policies and Surety Bonds through Marsh, Aon, Moreton, and CAC.[13]  The Brokers, among other things:  (a) assist the Debtors in obtaining comprehensive insurance and surety coverage for their operations in a cost-effective manner; (b) manage renewal data; and (c) provide ongoing support throughout the applicable policy periods for the Insurance Policies and the Surety Bonds.  In exchange for these services, the Debtors pay broker commissions and brokerage fees, usually at the same time the Debtors pay their premiums.

42.    In the twelve-month period prior to the Petition Date, the Debtors paid approximately $810,000 on account of Broker Fees.  As of the Petition Date, the Debtors believe that they owe approximately $280,000 to the Brokers on account of Broker Fees.  The Debtors seek authority, but not direction, to pay any prepetition obligations owed to the Brokers and to continue to pay the Broker for services rendered in the ordinary course of business to ensure uninterrupted coverage under their Insurance Policies and Surety Bonds.

---

[13]    For the avoidance of doubt, Moreton is the broker for the Debtors' workers' compensation policy.  Relief to compensate Moreton is requested separately in the Wages Motion.

43.     In the ordinary course, the Debtors finance the premium payments for certain of their Insurance Policies pursuant to premium financing agreements with AFCO and First Ins. Funding.  The Premium Financing Agreements allow the Debtors to spread their insurance payment over the term of the policy rather than paying the entire payment upfront.  Specifically, the Debtors are currently party to five PFAs with the Premium Financing Providers.  As of the Petition Date, the Debtors owe approximately $7.9 million in outstanding obligations under the PFAs.  The Debtors expect that approximately $7.9 million owed in connection with the PFAs will come due postpetition in the ordinary course, in monthly installments of approximately $1,060,000.  The Debtors seek the authority, but not direction, to pay related prepetition obligations under the PFAs and any related postpetition obligations due in the ordinary course.

44.     Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**D.     Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief (the "Utilities Motion").**

45.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders, (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) approving the Debtors' proposed procedures for resolving additional adequate assurance requests, (c) prohibiting utility providers from altering, refusing, or discontinuing services, and (d) granting related relief.

46.     In the ordinary course of their business, the Debtors obtain electricity, gas, water, waste management (including sewer and trash), internet, and other similar services from a number of utility providers.  Pursuant to the leases for several of the Debtors' rental properties, certain

19

Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements. The Debtors pay approximately $127,050 each month for Utility Services, calculated as a historical average payment for the twelve-month period ended June 30, 2024, excluding Utility Services billed directly to the Debtors' landlords. The Debtors are not in default or arrearages with respect to their obligations for prepetition Utility Services.

47.    The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. Cash held by the Debtors, cash generated in the ordinary course of business, and the Debtors' anticipated access to cash collateral will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with their prepetition practice during the pendency of these chapter 11 cases. To provide additional assurance of payment, the Debtors propose to deposit $63,525 into a segregated account. The Adequate Assurance Deposit represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, as of the Petition Date, calculated as the historical average payment for the twelve-month period ending June 30, 2024.

48.    I submit that the Debtors' proposed Adequate Assurance Procedures will provide a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted. Further, I believe uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases. The Debtors' business operations require uninterrupted electricity, internet, heat, water, and other utility services to operate. Specifically, the Debtors must maintain constant communication with their customers to properly serve their needs, which requires a dependable provision of Utility Services.

20

Additionally, the Utility Services are essential for the Debtors to operate their corporate offices and other facilities, including their sales offices and installation and warehouse facilities.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  Such disruption would adversely affect customer goodwill and employee and salesperson relations, which, in turn, would jeopardize the Debtors' sale and fulfillment efforts.

49.    I believe such relief sought in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**E.    Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (the "Cash Management Motion").**

50.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) continue to operate their Cash Management System, illustrated on Exhibit 1 annexed to the Interim Order and Final Order of the Cash Management Motion, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing business forms in the ordinary course of business, (iv) continue to perform intercompany transactions consistent with historical practice, and (v) grant administrative expense status to postpetition intercompany balances; and (b) granting related relief.

51.    In the ordinary course of business, the Debtors, together with their non-Debtor affiliates, maintain the Cash Management System to facilitate the efficient operation of their business, as illustrated on Exhibit 1 annexed to the Interim Order and Final Order attached to the Cash Management Motion.  The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units

21

in a cost-effective manner and ensure the availability of adequate funds at each Debtor entity.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.

52.    As of the Petition Date, the Company's Cash Management System consists of sixty-two Bank Accounts, forty-six of which are Debtor Bank Accounts and sixteen of which are Non-Debtor Bank Accounts.

The Debtor Bank Accounts are held at the following institutions:

- Sixteen Bank Accounts held at BoA;

- Fifteen Bank Accounts held at Wells Fargo;

- Six Bank Accounts held at JPMorgan;

- Four Bank Accounts held at KeyBank;

- One Bank Account held at CitiBank;

- One Bank Account held at BoW;

- One Bank Account held at TCU;

- One Bank Account held at Schwab; and

- One Bank Account held at BMO.

The Non-Debtor Bank Accounts are held at the following institutions:

- Five Bank Accounts held at BoA;

- Five Bank Accounts held at Wells Fargo;

- Two Bank Accounts held at BPI;

- Two Bank Accounts held at SANT;

- One Bank Account held at JPMorgan; and

- One Bank Account held at Credit Bank.

As of the Petition Date, there is an aggregate amount of approximately $28.5 million in cash in the Bank Accounts.

53.     ***Bank Fees***.  The Debtors pay the Cash Management Banks approximately $24,000 per month in the aggregate on account of Bank Fees.  The Debtors estimate that they do not owe any Bank Fees as of the Petition Date.  However, out of an abundance of caution, and to maintain the integrity of their Cash Management System, the Debtors request authority to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition and to continue to pay the Bank Fees in the ordinary course of business on a postpetition basis.

54.     ***Corporate Credit Card Programs***.  As part of the Cash Management System, the Debtors provide certain employees with access to the Purchase Cards, the Ramp Cards, the Credit Cards, the WEX Fuel Cards, and the Coast Fuel Cards all on arm's-length terms.  The Debtors only provide Corporate Credit Cards to employees if there is a justifiable business need.

55.     The SunPower Entities currently maintain 103 Purchase Cards, which are reimbursed from the Master Concentration Account.  The monthly credit limit for each Purchase Card is $5 million, with an additional unassigned $3.4 million available to the Debtors to spread across any and all Purchase Cards as necessary.  The SunPower Entities also maintain 249 WEX Fuel Cards with a total credit limit of $60,000 as well as 225 Coast Fuel Cards with a total credit limit of $25,000, both also reimbursed from the Master Concentration Account.

56.     In addition, the Blue Raven Entities maintain 130 Credit Cards with a total credit limit of $450,000, reimbursed from Bank Account 8801.  The Blue Raven Entities also maintain 190 WEX Fuel Cards with a total credit limit of $90,000, reimbursed from Bank Account 6319. Furthermore, the Blue Raven Entities issued approximately 200 pre-paid Ramp Cards for certain of its employees for payment of critical expenses such as fuel, permitting, materials, and other

critical items.  Each Ramp Card is prefunded with approximately $100,000 to $150,000 through Bank Accounts 8801 and 3730.

57.    The Corporate Credit Cards issued under the Corporate Credit Card Programs are used by the Debtors' employees to pay for certain work-related expenses, such as work-related travel expenses including meals, accommodations, ground transportation, fuel, and all other business-related expenses incurred while traveling, as well as office supplies, vendor payments, and small, non-recurring purchases made on behalf of the Debtors.  On average, the Debtors spend approximately $2.1 million in the aggregate per month on account of the Corporate Credit Card Programs.  The Debtors estimate that there is $2.2 million outstanding on account of the Corporate Credit Card Programs as of the Petition Date.

58.    The Corporate Credit Card Programs are an integral part of the Debtors' Cash Management System.  Employees' continued use of the Corporate Credit Cards for travel, office supplies, vendor payments, and other work-related purposes, and the Debtors' ability to reimburse expenses incurred through the Corporate Credit Card Programs, is essential to the Debtors' postpetition asset sale efforts.  Accordingly, the Debtors seek authority, but not direction, to issue Corporate Credit Cards pursuant to the Corporate Credit Card Programs, subject to any terms and conditions thereof, and to pay any amount due and owing thereunder in the ordinary course of business on a postpetition basis, including, without limitation, making payments on account of charges that were made under the Corporate Credit Card Programs both prior to and after the Petition Date.

59.    ***Intercompany Transactions***.  In the ordinary course of business, the Debtors regularly engage in routine business relationships with each other and their non-Debtor affiliates resulting in Intercompany Claims.  The Intercompany Claims are reflected as journal entry

24

receivables and payables, as applicable, in the Debtors' accounting and treasury systems, and no settlement of these Intercompany Claims is typically made in cash.

60.     Intercompany Transactions occur as part of the ordinary course operation of the Cash Management System, and at any given time, there may be Intercompany Claims owing by one Debtor to another Debtor or non-Debtor affiliate.  Specifically, as described in the Wages Motion, the Debtors employ a number of their employees in the Philippines.  Because the Debtors do not generate revenues in the Philippines, the Debtors regularly transfer funds from the Master Concentration Account to Bank Accounts 0442 and 3414 held by non-Debtor affiliate SunPower Philippines Ltd. to pay for the Debtors' employees located there and for various other operational expenses.

61.     Further, the Debtors offer certain qualifying customers the ability to finance their solar panel installation through leasing or loan options.  For regulatory, tax, and other reasons, the Company, in the ordinary course of business, utilizes Non-Debtor Silos.  The majority of such Non-Debtor Silos—none of which include any of the Debtors—are indirectly owned by the Debtors and Hannon Armstrong Sustainable Infrastructure, L.P., the Debtors' long-term joint venture partner.  Each Non-Debtor Silo is treated as a separate lease or loan financing facility, each with its own lenders that finance the underlying packaged customer leases or loans in that Non-Debtor Silo.  Generally, once a customer enters into a lease or loan with the Debtors, such lease or loan (as well as the underlying solar panel assets that are financed thereby) is sold under Purchase Agreements by Debtors SunPower Capital Services, LLC and SunPower Capital, LLC, respectively, to the Project Owners, which generally consist of at least two members who own such non-Debtor tax equity partnership and receive federal tax credits in return.  Pursuant to the Purchase Agreements, the Debtors generally receive the purchase price for these assets in

installments or lump sums after the solar panel projects are installed at the customers' residence. The Debtors use the Master Concentration Account to receive the proceeds of such Purchase Agreements that may be temporarily held in Bank Accounts 0319 and 2317, except for the Blue Raven Entities, which use the Blue Raven Accounts to receive the proceeds of their respective Purchase Agreements.

62.     In connection with such leases and loans, the Servicers also regularly enter into the Servicing Agreements pursuant to which SunPower Capital Services, LLC and SunPower Capital, LLC collect from customers all monies due under the lease agreements or loan agreements for a fee.  Pursuant to the Servicing Agreements, customers are directed by the Servicers to deposit all monies due under their respective agreements to a bank account owned by the non-Debtor Project Owner.  However, to the extent any such sums are received by the Servicers, the Servicing Agreements provide that the Servicers hold any such funds in trust for the Project Owners and are obligated to deliver such funds to the Project Owners.  The Debtors use Bank Account 6192 to receive the proceeds of such Servicing Agreements and to deliver funds held in trust for the Project Owners.

63.     In addition, Debtor Systems regularly enters into the Maintenance Agreements with the Project Owners pursuant to which Debtor Systems maintains all parts of the Project Owners' solar panel assets in good repair and working order and replaces any part of a project for a fee, in accordance with the Maintenance Agreements.  The Debtors use both Bank Account 6192 and the Master Concentration Account to receive the proceeds of such Maintenance Agreements.

64.     Pursuant to certain guarantee agreements, Debtor SunPower Corporation guarantees the performance by the Servicers of their obligations under certain Servicing Agreements and by the Debtors and their non-Debtor affiliates under certain Purchase Agreements.

In the ordinary course and dependent on the services required, the Debtors may also be party to other intercompany agreements with their Debtor and non-Debtor affiliates in connection with these customer loans and leases, including certain transaction management agreements and backup and successor servicing agreements, pursuant to which the Debtors receive a fee for services provided to their non-Debtor affiliates based on the specific terms set forth in such intercompany agreement.

65.      Although most funds generally flow from non-Debtor affiliates to the Debtors, funds may sometimes flow from the Debtors to their non-Debtor affiliates in connection with these Intercompany Transactions.  The Intercompany Transactions are an essential component of the Debtors' operations and centralized Cash Management System.  I believe that any interruption of the Intercompany Transactions would disrupt the Debtors' operations and harm the Debtors' estates and, by extension, their stakeholders.  Accordingly, to the extent necessary, the Debtors seek authority to engage in Intercompany Transactions in the ordinary course of business on a postpetition basis, in a manner substantially consistent with the Debtors' past practices.

66.      ***Customer Deposits***.  In the ordinary course of the Debtors' business, the Debtors participate in certain projects for the installation of solar panels whereby customers advance deposits to the Debtors that are held as deferred revenue on the Debtors' books until the projects are completed.  Upon the Debtors' completion of such projects, customers pay the remaining costs for the projects, excluding the deposit amounts already paid by such customers to the Debtors.  If, however, the Debtors do not complete certain solar projects, the Debtors must remit Customer Deposits in the ordinary course of business to the customers.

67.      Certain outstanding Customer Deposits and the associated solar project contracts may be assumed as part of the sale of the Debtors' assets during these chapter 11 cases, subject to

confirmation of a chapter 11 plan.  However, in the event that any purchaser of the Debtors' assets chooses not to assume the Customer Deposits and the associated solar project contracts, the Debtors will have an obligation to repay to customers the total amount of the Customer Deposits for any and all Incomplete Solar Projects.

68.     As of the Petition Date, the Debtors estimate that they hold an aggregate amount of approximately $9.7 million on account of the Customer Deposits for Incomplete Solar Projects. The Debtors' failure to return the Customer Deposits for Incomplete Solar Projects to customers would damage the Debtors' standing with their customers throughout the chapter 11 cases. Accordingly, in connection with all Incomplete Solar Projects that have not been assumed as part of the Debtors' sale process, the Debtors request authorization to honor all prepetition obligations with respect to the related Customer Deposits and to continue to honor such Customer Deposits in the ordinary course of business on a postpetition basis consistent with past practice.

69.     ***Business Forms***.  As part of the Cash Management System, the Debtors utilize the Business Forms in the ordinary course of their business.  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.  With respect to any checks that are generated electronically after the Petition Date, the Debtors will update such checks to indicate their status as "Debtor in Possession" and the bankruptcy case numbers.  However, out of an abundance of caution, the Debtors request that, to the extent there are any pre-printed checks and other Business Forms, the Court authorize the Debtors' continued use of all such Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession to minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases.

28

70.     For the foregoing reasons, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.

**F.     Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9)Claimants, and Lien Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "<u>Critical Vendors Motion</u>").**

71.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to pay Critical Vendors Claims, 503(b)(9) Claims, and Lien Claims in an amount not to exceed $19,740,139 on an interim basis, (b) confirming administrative expense priority to all undisputed obligations on account of goods ordered by the Debtors prior to the date hereof that will not be delivered until after the Petition Date and authorizing the Debtors to satisfy such obligations in the ordinary course of business, and (c) granting related relief.

72.     Prior to the Petition Date, the Debtors, with the assistance of their advisors, spent significant time reviewing their accounts payable and vendor lists and consulted with the Debtors' purchasing and facility managers to identify those vendors central to the Debtors' Business Segments that will be critical to maximizing the value of their estates (the "<u>Critical Vendors</u>").  In this process, the Debtors considered a variety of factors, including:

- whether a vendor is a sole- or limited-source of services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining services from alternative sources; and

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to provide critical services on a postpetition basis.

73.    In addition, the Debtors may have received goods from certain vendors within the twenty-day period immediately preceding the Petition Date (collectively, the "503(b)(9) Claimants").  If the Debtors are not able to satisfy prepetition claims of the 503(b)(9) Claimants, the 503(b)(9) Claimants may refuse to supply new orders, which would negatively affect the value of the Business Segments.

74.    The Debtors also rely on a number of third-party warehousemen (collectively, the "Warehousemen") and various freight vendors, ocean carriers, truckers, common or contract carriers, customs brokers, and other shipping services providers (the "Shippers," and together with the Warehousemen, the "Lien Claimants") for the receipt, distribution, and delivery of the Debtors' products.  The Lien Claimants regularly have possession of the Debtors' inventory and other goods and may refuse to release such inventory and other goods, disrupting the Debtors' supply chain an distribution network, unless the claims of such Lien Claimants are satisfied.

75.    Finally, prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  If the Debtors are not able to pay for the Outstanding Orders in the ordinary course, certain suppliers may refuse to ship or transport such goods unless the Debtors issue substitute purchase orders postpetition, which would potentially disrupt the Debtors' sale process.  Because the Outstanding Orders are likely administrative expenses of the Debtors' estates, the Debtors request that the Court confirm the administrative expense priority of the Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the ordinary course of business.

30

76.     The Debtors estimate that approximately $24,007,860 is due and owing to the Critical Vendors, 503(b)(9) Claimants, and Lien Claimants, $19,740,139 of which will come due prior to the final hearing on the Critical Vendors Motion.

| Relief Requested | | |
|---|---|---|
| *Prepetition Claim Type* | *Interim* | *Final* |
| Critical Vendor Claims | $15,693,942 | $19,675,694 |
| 503(b)(9) Claims | $- | $285,969 |
| Lien Claims | $4,046,197 | $4,046,197 |
| **Total** | **$19,740,139** | **$24,007,860** |

77.     The Debtors submit that the relief requested in the Critical Vendors Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  Failure to pay these counterparties would result in a severe negative effect on the value of the Debtors' estates and the recoveries available to stakeholders.  Moreover, the relief requested is necessary because many of the vendors have no obligation to continue providing services under the relevant contracts, if any exist.  Additionally, the Debtors do not seek authorization to honor prepetition obligations arising under any contract, except where the Debtors determine, in their business judgment, that such parties may be capable of terminating their contracts notwithstanding section 362(a) of the Bankruptcy Code or may otherwise inflict immediate and irreparable harm on the Debtors by their refusal to comply with their contractual obligations.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

78.     I believe the Debtors' estates could be materially, if not irreparably, harmed if they were to lose access to the services provided by the Critical Vendors, 503(b)(9) Claimants, and Lien Claimants.  The relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to preserve the value of the Business Segments.  The Debtors therefore seek authority,

but not direction, to honor prepetition obligations to Critical Vendors, 503(b)(9) Claimants, and Lien Claimants.

**G.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "<u>Cash Collateral Motion</u>").**

79.      Pursuant to the Cash Collateral Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to use cash collateral, grant adequate protection to prepetition lenders, modify the automatic stay, and schedule a final hearing to consider entry of the Final Order.

80.      Given the Debtors' anticipated go-forward funding needs, in the time leading up to Petition Date, the Debtors and their advisors, including Moelis, evaluated and explored various new-money financing options, including potential debtor-in-possession financing provided by the Debtors' prepetition secured lenders.  In addition, the Debtors, with the assistance of Moelis, approached thirteen additional lenders.  Despite the best efforts of the Debtors and their advisors, however, the Debtors did not obtain any actionable postpetition financing proposals.  The Prepetition Lenders were unwilling to provide any new-money financing, whether through a debtor-in-possession financing facility or otherwise, and also would not consent to any "priming" third-party financing.  And no third parties presented any viable postpetition financing proposals, whether on a junior debt basis or otherwise.

81.      The Debtors subsequently engaged with the Prepetition Lenders on the consensual use of Cash Collateral and have reached agreement on the terms of the Debtors' use of Cash Collateral during these chapter 11 cases.  This agreement, as reflected in the proposed Interim Order, will enable the Debtors to fund necessary operations to bridge to a value-maximizing sale (or sales) and pay chapter 11 administrative costs.  The Debtors require immediate access to

32

liquidity to ensure that they can continue operating during these chapter 11 cases, preserve the value of their estates for the benefit of all stakeholders, and pursue a value-maximizing sale. Without prompt access to Cash Collateral, the Debtors would be unable to, among other things, make payroll, satisfy vendor expenses incurred in the ordinary course of business, including certain payments that are essential for the ongoing operations of the Debtors' business, and fund the administration of these chapter 11 cases. In such event, the Debtors would be forced into a near-term value-destructive liquidation and winddown of the business, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

82.     The Debtors propose to provide the Prepetition Secured Parties with several forms of adequate protection including:    (a) granting the Prepetition Secured Parties allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code; (b) providing adequate protection liens to the Prepetition Secured Parties; (c) paying the Prepetition First Lien Secured Parties' reasonable and documented fees and expenses; (d) providing certain financial and other reporting; and (e) complying with certain milestones applicable to the Debtors' chapter 11 cases.

83.     The use of cash collateral is critical to the Debtors' ability to fund their operations and the marketing process while providing sufficient liquidity at the outset of these chapter 11 cases. The use of cash collateral is an essential component to providing a successful path forward while the Debtors expeditiously conduct their chapter 11 sale process. The proposed use of cash collateral is therefore in the best interests of the Debtors, is necessary to avoid irreparable harm to the Debtors and their estates. Additionally, I believe that the use of cash collateral reflects an exercise of the Debtors' sound business judgment and therefore should be approved.

**Exhibit B**

**Corporate Structure Chart**

