# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF DEBTORS FOR
ENTRY OF AN ORDER (I) APPROVING BIDDING
PROCEDURES AND BID PROTECTIONS, (II) SCHEDULING
CERTAIN DATES AND DEADLINES WITH RESPECT THERETO,
(III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(IV) APPROVING THE COMPLETE SOLARIA STALKING HORSE APA,
(V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES, (VII)
APPROVING THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion:[2]

## Preliminary Statement

1.     The Debtors commenced these chapter 11 cases to implement one or more value maximizing transactions for some or substantially all of their assets.  To that end, the Debtors file this motion with a "stalking horse" asset purchase agreement in hand with Complete Solaria, Inc.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Henry, Chief Transformation Officer of SunPower Corporation, in Support of the Chapter 11 Filing and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith on August 5, 2024 (the "<u>Petition Date</u>"), and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Polhemus Declaration (as defined below), or the Bidding Procedures, as applicable.

or a new entity to be formed thereby ("Complete Solaria" and such purchase agreement, the "Complete Solaria Stalking Horse APA") for the sale of three of the Debtors' core businesses: (1) New Homes, (2) Blue Raven Solar ("Blue Raven"), and (3) the Dealer Network (collectively, the "Going-Concern Assets").    Importantly, the Complete Solaria Stalking Horse APA contemplates a *going-concern* transaction with respect to the Going-Concern Assets, which will inure to the benefit of all stakeholders and minimize any disruption to those businesses.

2.    Time is of the essence.  As set forth in the First Day Declaration and the Polhemus Declaration,[3] to capitalize on the opportunity presented by the Complete Solaria Stalking Horse Bid and avoid the value-destructive consequences of a protracted sale process for the Going-Concern Assets, the Debtors believe it is critical that the sale process be consummated on the expedited timeline set forth below, which is (a) consistent with the milestones that the Debtors must meet to maintain access to cash collateral[4] and (b) provides the Debtors with sufficient runway to conduct a robust marketing process to secure the highest or otherwise best purchase price possible.  To the extent that the Debtors and their advisors secure a higher or otherwise better offer, they reserve their rights, as provided in the Complete Solaria Stalking Horse APA, to pursue an alternate sale transaction, in accordance with their fiduciary duties.

---

[3]    In further support of this motion, the Debtors filed the *Declaration of Rick Polhemus in Support of the Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "Polhemus Declaration") contemporaneously herewith.

[4]    *See Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Lenders; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, filed contemporaneously herewith.

3.     By this motion, the Debtors additionally seek authority to sell all or a portion of their other miscellaneous assets, separate from the Going-Concern Assets (the "Remaining Assets").  The Remaining Assets include, by way of example, accounts receivable, intellectual property patents and trademarks, PP&E, and an industrial research and development facility in Davis, California.

4.     The bidding procedures attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures")[5] provide the Debtors with significant flexibility to market the Going-Concern Assets and the Remaining Assets (collectively, the "Assets").  If approved, the Bidding Procedures will provide sufficient time for the Debtors to market the Assets, receive and evaluate bids, select one or more stalking horse bidder(s) to serve as a committed buyer for the Remaining Assets, and hold an auction to determine the highest or otherwise best bids for the Assets.  The Debtors will consider all viable options in accordance with the Bidding Procedures before determining if selling the Assets will, in their business judgment, maximize value for the estate.  A thorough yet expedited bidding process and consummation of one or more sale transactions (the "Sale Transactions") are vitally important to the Debtors' efforts to maximize value.  Conversely, if the Bidding Procedures are not approved or there is any material delay to the proposed sale timeline, then the Debtors' ability to maximize value for the benefit of all stakeholders will be jeopardized.

5.     The Bidding Procedures and the related relief requested in this motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this motion.

---

[5]    All references to the Bidding Procedures herein are qualified in their entirety to the Bidding Procedures themselves.

RLF1 31316667v.1

## Relief Requested

6.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order"):

(a)      authorizing and approving the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order;

(b)      approving the terms of the Complete Solaria Stalking Horse APA, attached to the Bidding Procedures Order as Exhibit 2, including the Going-Concern Bid Protections (as defined below);

(c)      authorizing the Debtors to enter into one or more additional asset purchase agreements (each, an "Additional Stalking Horse Agreement," and together with the Complete Solaria Stalking Horse APA, the "Stalking Horse Agreements," and each a "Stalking Horse Agreement"), including Remaining Assets Bid Protections (as defined below), with one or more other bidders that the Debtors designate to serve as a stalking horse bidder (the "Additional Stalking Horse Bidder,") for the Remaining Assets (or for the Going-Concern Assets solely in the event the Complete Solaria Stalking Horse APA is terminated in its entirety);

(d)      establishing certain dates and deadlines related thereto and scheduling an auction, if any (the "Auction");

(e)      approving the form and manner of notice of the Auction, if any, and the Sale Transactions, attached to the Bidding Procedures Order as Exhibit 3 (the "Sale Notice"), the notice of Winning Bidder (as defined below), attached to the Bidding Procedures Order as Exhibit 4 (the "Notice of Winning Bidder"), and the notice of designation of the Additional Stalking Horse Bidder, if applicable (the "Additional Stalking Horse Notice"), attached to the Bidding Procedures Order as Exhibit 5;

(f)      approving procedures for the assumption and assignment of the Assigned Contracts (as defined below) in connection with the Sale Transactions (the "Assumption and Assignment Procedures"), and approving the form and manner of the notice thereof, attached as Exhibit 6 to the Bidding Procedures Order (the "Cure Notice"); and

(g)      granting related relief.

## Jurisdiction and Venue

7.      The United States District Court for the District of Delaware has jurisdiction over

this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy

Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9013-1.

## Background

10.     SunPower Corporation, together with its Debtor and non-Debtor affiliates (collectively, the "Company"), is a leading provider of solar technology and energy products offering all-in-one residential solar and energy storage solutions to customers located primarily in the United States and Canada. Headquartered in Richmond, California, the Company's mission since its inception has been to reduce greenhouse gas emissions by making home solar energy more accessible for historically underserved communities.

11.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### The Proposed Sale Process

**I.      The Proposed Schedule.**

12.      Pursuant to the Bidding Procedures, the Debtors will solicit the highest or otherwise best proposals according to the following proposed schedule, subject to Court approval and availability:

| Date and Time (all times in Eastern Daylight Time) | Event or Deadline |
|---|---|
| August 30, 2024, at 5:00 p.m. | The deadline by which the Debtors may designate an Additional Stalking Horse Bidder only in relation to the Remaining Assets |
| September 2, 2024 | Serve Cure Notice |
| September 6, 2024, at 5:00 p.m. | Bid Deadline |
| September 10, 2024, at 10:00 a.m. | Auction (if necessary) |
| September 11, 2024 (or as soon as reasonably practicable thereafter) | Notice of Winning Bidder |
| September 12, 2024, at 5:00 p.m. | Sale Objection Deadline for Winning Bids |
| September 16, 2024, at 5:00 p.m. | Cure Notice Objection Deadline |
| September [17], 2024, at [●] [a/p].m. (subject to Court availability) | Sale Hearing |

13.      The Debtors believe that this timeline provides the Debtors with an opportunity to conduct a thorough process to market test the Complete Solaria Stalking Horse Bid, solicit bids for the Remaining Assets, and ultimately maximize the value of their Assets for the benefit of all stakeholders.  The Debtors will utilize the time prior to, and after, entry of the Bidding Procedures Order to actively market the Assets to expedite the solicitation of bids for the Assets in advance of

6

the Bid Deadline (as defined herein).  In light of the foregoing, the Debtors have determined that the proposed schedule is in the best interests of the Debtors' estates, will assist in establishing whether and to what extent a market exists for the Assets, provide interested parties with sufficient opportunity to participate in the Sale Transactions, and ultimately will result in the highest and best bid for the Assets under the circumstances.

II.     **The Complete Solaria Stalking Horse Bid and Material Terms of the Complete Solaria Stalking Horse APA.**

14.     The Debtors also request (a) approval of the terms of the Complete Solaria Stalking Horse APA, including the Going-Concern Bid Protections, and (b) authorization to enter into an additional asset purchase agreement with an Additional Stalking Horse Bidder for the Remaining Assets (or for any of the Going-Concern Assets solely in the event the Complete Solaria Stalking Horse APA is terminated in its entirety), including Remaining Assets Bid Protections, the extent the Debtors determine that provision of such Remaining Assets Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates.

15.     Having the flexibility to designate the Complete Solaria Stalking Horse Bidder for the Going-Concern Assets and one or more Additional Stalking Horse Bidders for the Remaining Assets and provide Going-Concern Bid Protections and Remaining Assets Bid Protections, respectively will give the Debtors the ability to maximize the value of the Assets for creditors and other stakeholders by setting the floor at the Auction, if any, and prompt an efficient marketing process.  The ability to designate the Complete Solaria Stalking Horse Bidder and Additional Stalking Horse Bidders and offer the respective Going-Concern Bid Protections and Remaining Assets Bid Protections to each such bidder is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

16.     The following chart summarizes the terms and conditions of the Complete Solaria

Stalking Horse APA attached to the Bidding Procedures Order as <u>Exhibit 2</u> and discloses certain

information required pursuant to Local Rule 6004 1:[6]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Stalking Horse APA Parties**<br>*See* **Preamble** | <u>Seller</u>:  SunPower Corporation and certain of its subsidiaries.<br><br><u>Purchaser</u>:  Complete Solaria, Inc. |
| **Purchase Price**<br>*See* § 2.1 | $45,000,000 |
| **Assets of SunPower**<br>*See* § 1.1 | "<u>Acquired Assets</u>" means all of each Seller's right, properties, title and interest in and to, as of the Closing, to all assets relating to the (i) New Homes Business, (ii) Non-Installing Dealer Business and (iii) the Blue Raven Business, in each case, as presently conducted (collectively the "<u>Acquired Businesses</u>"), including, solely to the extent relating to the Acquired Businesses, the following assets of such Seller, but excluding in all cases the Excluded Assets (as defined below):<br><br>(a)     Subject to modification in accordance with <u>Section 1.5</u>, all Contracts listed on <u>Schedule 1.1(a)</u>, including any backup data maintained by Sellers in connection therewith (collectively, the "<u>Assigned Contracts</u>") and all rights and benefits thereunder;<br><br>(b)     copies of the Transferred Employee Records, but excluding from the foregoing any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by Law;<br><br>(c)     the Transferred Intellectual Property set forth on <u>Schedule 1.1(c)</u>;<br><br>(d)     the name "SunPower" or any derivation thereof;<br><br>(e)     all prepositioned Inventory associated with the New Homes Business set forth on <u>Schedule 1.1(e)</u> and held by certain of its installer partners as set forth therein;<br><br>(f)     all goodwill associated with the Acquired Assets and Acquired Businesses; |

---

[6]     This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Complete Solaria Stalking Horse APA, the Complete Solaria Stalking Horse APA shall govern in all respects.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Complete Solaria Stalking Horse APA.  Terms used but not defined in this summary description have the meaning ascribed to such term as in the Complete Solaria Stalking Horse APA.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | (g)     to the extent transferable, all benefits, proceeds and other amounts payable under any policy of insurance relating to the Acquired Assets and all rights and benefits thereunder, which shall be Assigned Contracts; |
| | (h)     the Leases set forth on Schedule 1.1(h) (the "Assumed Leases"), together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements, including tenant improvements, located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases; |
| | (i)     all prepaid expenses (other than prepaid insurance), including certain deposits, of any Seller, which are related to the Acquired Businesses and are set forth on Schedule 1.1(i); |
| | (j)     all Computer Systems set forth on Schedule 1.1(j); |
| | (k)     all information technology systems and applications set forth on Schedule 1.1(k); |
| | (l)     to the extent transferable, the Permits issued to, or for the benefit of, any Seller, all rights and benefits thereunder, and all pending applications or filings therefor and renewals thereof, which are related to the Acquired Businesses and that are set forth on Schedule 1.1(l); |
| | (m)    the list of each non-installing dealer relating to the Non-Installing Dealer Business and select information regarding such non-installing dealer, in each case, as set forth on Schedule 1.1(m); |
| | (n)     all Accounts Receivable related solely to the Acquired Businesses and Acquired Assets; |
| | (o)     a copy of the books and records of any Seller related solely to the Acquired Assets or the Assumed Liabilities; and |
| | (p)     other assets of the Sellers (other than Excluded Assets and Excluded Liabilities) that related solely to the operation of the Acquired Assets and Acquired Businesses which are identified after the date hereof and mutually agreed in writing by Purchaser and Sellers prior to the Closing. |
| **Assumed Liabilities**<br>*See* § 1.3 | On the terms and subject to the conditions set forth herein and in the Sale Order effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and such Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication (collectively, the "Assumed Liabilities"):<br><br>(a)     all Liabilities arising out of or relating to the ownership and operation of the Acquired Assets, Assigned Contracts or Acquired Businesses, arising at or after |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | the Petition Date that are due and payable after the Closing (including, for the avoidance of doubt, accounts payable due and payable after the Closing);<br><br>(b)    all Liabilities (i) in respect of Transferred Employees arising at or after the Closing and (ii) assumed by Purchaser pursuant to <u>Section 5.9</u>;<br><br>(c)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");<br><br>(d)    any Liability for Taxes (including the payment thereof) attributable to the Acquired Assets for a taxable period (or portion thereof) beginning after the Closing Date (as determined pursuant to <u>Section 5.11</u>);<br><br>(e)    transfer Taxes; and<br><br>(f)    subject to Purchaser's further review, certain customer deposits to be identified by the Parties in good faith prior to the Closing. |
| **Excluded Assets**<br>*See* § 1.2 | Notwithstanding anything to the contrary in this Agreement, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and such Seller shall retain all right, title and interest to, in and under any properties, rights interests or other assets of such Seller other than the Acquired Assets (collectively, the "<u>Excluded Assets</u>") which shall include:<br><br>(a)    all Accounts Receivable of the Sellers to the extent not related to the Acquired Assets or Acquired Businesses;<br><br>(b)    all Equity Interests of any of the Sellers' direct or indirect Subsidiaries;<br><br>(c)    all of the Sellers' rights under this Agreement;<br><br>(d)    all of the Sellers' rights under any Excluded Asset;<br><br>(e)    all Contracts to which any Seller is a party other than the Assigned Contracts, including independent contractor agreements;<br><br>(f)    all payments for the purchase of goods, including but not limited to customer deposits and prepaid amounts;<br><br>(g)    all Leases to which any Seller is a party other than the Assumed Leases;<br><br>(h)    all assets of Albatross Software;<br><br>(i)    all Tax Returns or Tax refunds of a Seller Tax Group or any Seller or Affiliate thereof;<br><br>(j)    all Tax refunds with respect to the Acquired Assets (excluding, for the avoidance of doubt, any Tax refund described in Section 1.2(i) and any Tax refunds received by the Seller in relation a Tax attributable to the Acquired Assets and paid by |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | the Purchaser after Closing) allocable to a Pre-Closing Tax Period, as determined pursuant to Section 5.11;

(k)    all software, Intellectual Property Rights, Computer Systems, and information technology systems and applications, including the PVS6 gateway and related technology, that are owned, used in, relate to, or are necessary for the conduct and performance of (i) services to all lease customers under the existing maintenance services agreements pursuant to which Sellers provide certain operating and maintenance services to those subsidiaries of SunStrong Capital Holdings, LLC who own PV and storage systems (each, an "Owner"), (ii) the existing lease and loan services agreements, pursuant to which SunPower Capital Services, LLC provides certain lease and loan services to the Owners, and (iii) the existing transaction management and asset management agreements pursuant to which SunStrong Capital Holdings, LLC and SunPower Capital Services, LLC provide certain administrative and management services, provided, however, the Sellers shall (A) subject to the entry of an Order by the Bankruptcy Court, provide the purchaser with a license to utilize the PVS6 gateway and related technology with respect to the Acquired Assets and (B) use commercially reasonable efforts to transfer the servicing of the Acquired Assets to a go-forward servicer; and

(l)    all computers of Sellers' employees that are ultimately hired by Purchaser; provided, however that at such time that the Sellers no longer need to maintain and/or preserve the computers and it is determined that the computers may be transferred, all computers of Sellers will be transferred to Purchaser at no additional cost. |
| **Excluded Liabilities**

*See* § 1.4 | Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing before or on the Closing Date (as defined below) or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing (collectively, the "Excluded Liabilities"), including the following Liabilities of any of the Sellers or of any predecessor of any of the Sellers, whether incurred or accrued by any of the Sellers before or after the Closing Date:

(a)    all Cure Costs for Contracts or Leases to which any Seller is a party that are not Assigned Contracts or Assumed Leases;

(b)    any Liability of the Sellers or of any of their predecessors associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of the Sellers' or any of their respective Affiliates' obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with the Sellers' Affiliates;

(c)    all Liability of the Sellers or of any of their predecessors associated with payments for the purchase of goods, including but not limited to customer deposits and prepaid amounts; |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | (d)    all Retained Taxes; |
| | (e)    all Liabilities of the Sellers or of any of their predecessors under this Agreement and the transactions contemplated hereby or thereby; |
| | (f)    any Liabilities in respect of any Contracts or Leases to which any Seller is a party that are not Assigned Contracts or Assumed Leases, including any Liabilities arising out of the rejection of any such Contracts or Leases pursuant to Section 365 of the Bankruptcy Code; |
| | (g)    except for Liabilities expressly identified as Assumed Liabilities, all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by the Sellers or of any of their predecessors in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by the Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by the Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith; and (ii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of the Sellers or of any of their predecessors payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith; |
| | (h)    except for Liabilities expressly identified as Assumed Liabilities, all employment-related Liabilities of the Sellers, including (i) Liabilities for any action resulting from the Sellers' employees' separation of employment with the Sellers, including any severance or separation pay, (ii) employment-related Liabilities resulting from the transactions contemplated hereby whether before, on or after the Closing, (iii) Liabilities arising out of or relating to any collective bargaining Contract, labor negotiation, employment Contract, and consulting Contract with the Sellers, (iv) any Liabilities arising from or related to payroll and payroll Taxes for the current and former employees or independent contractors or other service providers of the Sellers to such person at any time on or prior to the Closing, (v) Liabilities of the Sellers for vacation, sick leave, parental leave, and other paid-time off accrued by the Sellers on and prior to Closing, (vi) all Liabilities with respect to any current or former employee of the Sellers including the Executive Employment Contracts, and (vii) all Liabilities for any failure to comply with applicable Laws or obligations under any Contract, in each case arising out of or related to employment of employees of the Sellers or engagement of independent contractors of the Sellers; |
| | (i)    all Liabilities related to the WARN Act, to the extent applicable, with respect to the Sellers' termination of employment of the Sellers' employees on or prior to Closing (for the avoidance of doubt reference to the Sellers in clause (h) and (i) shall refer to the Sellers and its Affiliates); |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | (j)     all Liabilities arising under or relating to Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto); |
| | (k)     all Liabilities of the Sellers or of any of their predecessors to their respective equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any Liability of the Sellers or of any of their predecessors pursuant to any Contract or Lease set forth on <u>Schedule 1.1(a)</u>, or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, any Seller or, to the Knowledge of the Sellers, any actual competitor, vendor or licensor of any Seller that is not an Assigned Contract; |
| | (l)     all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers as of the date hereof; |
| | (m)    all Liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Acquired Businesses, the Sellers, any of their Affiliates or predecessors, or any assets or properties of the Sellers or of any of their predecessors, in each case arising out of the ownership or operation of the Acquired Businesses or any Acquired Asset prior to the Closing; |
| | (n)     all Liabilities arising under Environmental Laws, other than to the extent arising out of the ownership or operation of the Acquired Businesses or any Acquired Asset from and after the Closing, whether or not yet booked as accounts payable by Sellers as of or prior to the Closing; |
| | (o)     all accounts payable of the Sellers or of any of their predecessors existing as of or prior to the Closing; |
| | (p)     all Liabilities outstanding as of and arising after the Closing for any contract for delivery of or returns of products previously sold to customers, whether or not any customer has provided a deposit for the sale except for under any Assigned Contract; |
| | (q)     all Liabilities of the Sellers or of any of their predecessors arising out of any Contract, Permit, or claim that is not transferred to Purchaser hereunder; and |
| | (r)     all Liabilities for all Professional Fees Amounts. |
| **Representations and Warranties**<br>*See* **Art. III, IV** | Customary representations and warranties by Purchaser and Seller, including but not limited to a representation by Purchaser that it has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Sale to Insider**<br><br>**Local Bankr. R. 6004-1(b)(iv)(A)** | N/A. |
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(B)**<br>*See* § 5.9 | Prior to Closing, Sellers shall use commercially reasonable efforts to make available to Purchaser for interviews certain employees as requested in writing by Purchaser. Purchaser may extend to any employee employed by the applicable Seller a written offer of employment, for employment effective as of the Closing Date, in Purchaser's sole discretion ("Transfer Offer"); provided that Purchaser shall, and shall cause its Affiliates to, comply will all employment Laws, including anti-discrimination Laws, in connection with making such offers of employment. Employees who accept such Transfer Offers and begin employment with Purchaser or an Affiliate of Purchaser shall be collectively referred to herein as "Transferred Employees."  Each of the Transferred Employees, shall be collectively referred to herein as "Continuing Employees."  Purchaser shall notify such Seller (i) with respect to: each employee to whom it made a Transfer Offer (no later than three Business Days after making such Transfer Offer), and (ii) in a reasonable timeframe (but in any event within three Business Days of receiving a response from the applicable Transferred Employee and no later than immediately prior to the Closing) with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by such Seller or any of its Affiliates that any or all employees employed by such Seller will accept the Transfer Offer, or that any Continuing Employee will continue in employment with Purchaser or any of its Affiliates following the Closing for any period of time. Purchaser shall provide the Seller with a list of the Transferred Employees three (3) days prior to the Auction. Purchaser shall carry out all necessary actions to effect the timely (as of the Closing Date) employment by it of each Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee previously employed by such Seller shall cease to be an employee of such Seller and become an employee of the Purchaser on comparable terms. |
| **Releases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(C)** | N/A. |
| **Private Sale / No Competitive Bidding**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | N/A.  The Debtors have proposed an open Auction and sale process. |
| **Closing and Other Deadlines**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)**<br>*See* § 2.3 | The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of at 9:00 a.m. Central Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other place, time and date as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date." |

RLF1 31316667v.1

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)**<br><br>*See* § 2.2 | <u>Deposit</u>.<br><br>(a)    Purchaser has or will within two (2) Business Days of the date hereof, made an earnest money deposit with Epiq Corporate Restructuring, LLC (the "<u>Escrow Agent</u>") in a cash amount equal to 10% of the Cash Consideration (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate, segregated, interest bearing escrow account maintained by the Escrow Agent in accordance with the Bidding Procedures Order. The Deposit shall not be subject to any Encumbrance, attachment, trustee process, or any other judicial process of any creditor of any Sellers or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.<br><br>(b)    If, prior to the Closing, this Agreement has been terminated by Sellers pursuant to <u>Section 7.1(d)</u> or <u>Section 7.1(f)</u> (or by Purchaser pursuant to <u>Section 7.1(b)</u> or <u>Section 7.1(c)</u>, in each case in circumstances where Sellers would be entitled to terminate this Agreement pursuant to <u>Section 7.1(d)</u> or <u>Section 7.1(f)</u>), then Sellers shall retain the Deposit together with all received investment income, if any.<br><br>(c)    If, prior to the Closing, this Agreement has been terminated by any Party, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.<br><br>(d)    The Parties agree that Sellers' right to retain the Deposit, as set forth in <u>Section 2.2(b)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.<br><br>(e)    If the Closing occurs, at the Closing the Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Sellers. |
| **Interim Arrangements with Proposed Buyer**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | N/A. |
| **Use of Proceeds**<br><br>**Local Bankr. R. 6004-1(b)(iv)(H)** | N/A. |
| **Tax Exemption**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)** | N/A. |
| **Record Retention** | N/A. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| Local Bankr. R. 6004-1(b)(iv)(J) | |
| Sale of Avoidance Actions<br><br>Local Bankr. R. 6004-1(b)(iv)(K) | N/A. |
| Requested Findings as to Successor Liability<br><br>Local Bankr. R. 6004-1(b)(iv)(L)<br><br>See § 5.5 | The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liabilities. |
| Sale of Unexpired Leases Free and Clear<br><br>Local Bankr. R. 6004-1(b)(iv)(M)<br><br>See § 1.1, 3.4 | Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order at the Closing (as defined below), each Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from such Seller, all of such Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances.<br><br>Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Sellers have good and valid title to, or, in the case of leased or subleased Acquired Assets, valid and subsisting leasehold interests in, all Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances). Pursuant to the Sale Order, the Sellers will convey such title to or rights to use, all of the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances). |
| Credit Bid<br><br>Local Bankr. R. 6004-1(b)(iv)(N) | N/A. |
| Relief from Bankruptcy Rule 6004(h)<br><br>Local Bankr. R. 6004-1(b)(iv)(O) | The Debtors have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). |

16

III.    **The Bidding Procedures**

17.    The Debtors developed and proposed the Bidding Procedures, attached as <u>Exhibit 1</u> to the Bidding Procedures Order, to optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner.  The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Assets.  In January 2024, the Debtors retained Moelis & Company LLC ("<u>Moelis</u>") as investment banker to assist with such process.

18.    The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Auction, if any.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, effectuate an expeditious, value-maximizing process with minimal disruption, and create a path towards consummation of the Sale Transactions and the highest or otherwise best available recoveries for the Debtors' stakeholders.  The proposed Bidding Procedures are in the best interests of all stakeholders and should be approved.

19.    The following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[7]

---

[7]    The following summary is provided for convenience purposes only and is qualified in its entirety by the Bidding Procedures.  Because the Bidding Procedures are attached as <u>Exhibit 1</u> to the Bidding Procedures Order, they are not restated in their entirety herein.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.  Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.

| Requirement | Description |
|---|---|
| **Submissions to the Debtors; Consultation Parties** | All submissions to the Debtors required or permitted to be made under the Bidding Procedures must be directed to each of the following persons or entities unless otherwise provided: |
| | A. <u>Debtors</u>:  SunPower Corporation, Attn.: Chief Legal Officer and Chief Transformation Officer (mhenry@alvarezandmarsal.com). |
| | B. <u>Debtors' Proposed Counsel</u>:  (i) Kirkland & Ellis LLP, Attn.:  Chad J. Husnick, P.C. (chad.husnick@kirkland.com), Jeffrey Michalik (jeff.michalik@kirkland.com), and Robert Jacobson (rob.jacobson@kirkland.com) and Kirkland & Ellis LLP, Attn.: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com) and Zachary R. Manning (zach.manning@kirkland.com); and (ii) Richards, Layton & Finger, P.A., Attn.: Mark D. Collins (collins@rlf.com) and Jason M. Madron (madron@rlf.com). |
| | C. <u>Debtors' Proposed Investment Banker</u>:  Moelis & Company, LLC, Attn.: Rick Polhemus (rick.polhemus@moelis.com), Patrick Layton (patrick.layton@moelis.com), Bassam J. Latif (bassam.latif@moelis.com), Jared Dermont (jared.dermont@moelis.com), and Dave McGuiness (dave.mcguiness@moelis.com). |
| | D. Creditors' Committee's Proposed Counsel:  [●]. |
| | E. Creditors' Committee's Proposed Investment Banker:  [●]. |
| | F. Creditors' Committee's Proposed Financial Advisor:  [●]. |
| | The "<u>Consultation Parties</u>" are the (A) Prepetition First Lien Secured Parties, and (B) Creditors' Committee; *provided* that to the extent that any Consultation Party, including any member of the Creditors' Committee submits (or indicates its intent to submit) a bid, including a credit bid, for any Assets in connection with the Bidding Procedures, or is a participant in any active or prospective Bid with respect to any Asset(s), such applicable Consultation Party shall immediately no longer be a Consultation Party unless and until such party unequivocally revokes its Bid and waives its right to continue in the bidding process; *provided*, *further*, that immediately upon any Consultation Party's secured debt (as applicable) being paid in full in cash, such Consultation Party shall immediately no longer be a Consultation Party under the Bidding Procedures.[8]  Materials and information provided by the Debtors or their advisors |

---

[8]   If any Prepetition First Lien Secured Party submits a Bid or otherwise is a participant with respect to any active or prospective Bid, the other Prepetition First Lien Secured Parties shall remain Consultation Parties; provided that such bidding Prepetition First Lien Secured Party shall be precluded from receiving or reviewing information or documentation not otherwise available to all Acceptable Bidders, and the other Prepetition First Lien Secured

| Requirement | Description |
|---|---|
| | to the advisors to any Consultation Party may be shared with such Consultation Party, subject in all respects to the Bidding Procedures, the Bidding Procedures Order, and the respective confidentiality agreement entered into by and among or otherwise agreed to between each such Consultation Party and the Debtors.<br><br>The Debtors shall consult with the Consultation Parties in good faith regarding the sale process for the Assets and the Sale Transactions, including evaluation of any and all bids, designation of any Stalking Horse Bidder, only in relation to the Remaining Assets, other than the Complete Solaria Stalking Horse Bidder, if applicable (each, an "Additional Stalking Horse Bidder"), scheduling and operation of the Auction (if applicable), selection of a winning bid, and negotiation of the purchase agreement, as well as any modifications of the Bidding Procedures. The Debtors shall also provide to the Consultation Parties and their advisors regular reports concerning the sale process, including parties contacted, proposals received, and any due diligence requested by potential purchasers. |
| **Potential Bidders & Acceptable Bidders** | To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a Sale Transaction (a "Potential Bidder") must deliver or have previously delivered to the Debtors and each of their advisors the following documents and information (unless the Debtors, in their reasonable business judgment after consultation with the Consultation Parties, choose to waive any of the requirements set forth in Section 3 of the Bidding Procedures for any Potential Bidder):<br><br>A. an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"); and<br><br>B. sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of the targeted assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;<br><br>C. a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint bid to the extent reasonably practicable; and |

---

Parties shall not share or otherwise discuss such information with the bidding Prepetition First Lien Secured Party.

| Requirement | Description |
|---|---|
| | D. any other information or documentation that the Debtors reasonably request. <br><br> The Debtors, in their reasonable business judgment, following consultation with the Consultation Parties, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (as defined below) (such Potential Bidder, an "Acceptable Bidder").  The Debtors shall promptly inform the Consultation Parties of any entity that becomes an Acceptable Bidder. <br><br> The Debtors may, in their reasonable business judgment, conduct a process for the sale of unsold assets that are not included in any Winning Bid(s) (as defined below), subject to the terms of the Liquidator Motion. |
| **Due Diligence** | The Debtors, with their advisors, have established an electronic data room (the "Data Room") that provides standard and customary diligence materials, including information to allow Acceptable Bidders to submit a Qualified Bid (as defined below). <br><br> Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Data Room and to additional non-public information regarding the Debtors.  Subject to the other terms herein, the Debtors may provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request.  The due diligence period for any Additional Stalking Horse Bidder will end prior to execution of the applicable Additional Stalking Horse Agreement, unless otherwise agreed pursuant to the applicable Additional Stalking Horse Agreement. For all Acceptable Bidders other than any Additional Stalking Horse Bidder, the due diligence period will end on the Bid Deadline.  The Debtors may, in their reasonable business judgment after consultation with the Consultation Parties, but shall have no obligation to, furnish any additional due diligence information to any person following execution of a Stalking Horse Agreement or the Bid Deadline, as applicable. <br><br> The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale Transactions to any person except to an Acceptable Bidder or to such Acceptable Bidder's duly authorized representatives subject to the applicable Confidentiality Agreement.  The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, have not established, or who have |

| Requirement | Description |
|---|---|
| | raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a Sale Transaction. |
| | Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (a) to any person or entity who is not an Acceptable Bidder or (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure or privacy or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (provided, that, in case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation, or law). |
| | The Debtors, in consultation with the Consultation Parties, also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure, including to an Acceptable Bidder whom the Debtors determine in consultation with the Consultation Parties is a competitor of the Debtors, a potential competitor of the Debtors, or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder. |
| | **All due diligence requests directed to the Debtors must be directed to: Patrick Layton (patrick.layton@moelis.com), Dave McGuiness (dave.mcguiness@moelis.com) and the Moelis deal team (Project_Sunroof_Ext@moelis.com).** |
| | **Each Potential Bidder or Acceptable Bidder shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Potential Bidder or Acceptable Bidder, as applicable, and its contemplated Sale Transaction.** |
| **Bid Requirements** | Any proposal, solicitation, or offer to consummate a Sale Transaction (each, a "<u>Bid</u>") must be submitted in writing and must satisfy the following requirements (collectively, the "<u>Bid Requirements</u>"): |
| |     A. **<u>Proposed Sale Transaction.</u>**  Each Bid must clearly propose a Sale Transaction as to the Assets.  Each Bid must specify (1) which of such Assets – with as much specificity as is possible – are to be included in the |

| Requirement | Description |
|---|---|
|  | proposed Sale Transaction (the "Acquired Assets"), (2) to the extent such Bid is for substantially all of the Assets, which Assets, if any, are to be excluded from the proposed Sale Transaction (the "Excluded Assets"), (3) the liabilities and obligations, including any debt and cure costs to be assumed (the "Assumed Liabilities"), and (4) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.  For the avoidance of doubt, all Assets held by non-Debtor subsidiaries primarily related to the non-U.S. businesses of the Debtors shall be presumed to be Excluded Assets.<br><br>B.  **Purchase Price.**  Each Bid must (a) clearly specify the purchase price to be paid, assuming a purchase of the applicable Assets and assumption of the Assumed Liabilities (the "Purchase Price"), (b) identify separately any cash and non-cash components (which non-cash components shall be limited only to credit bids and Assumed Liabilities) of the Purchase Price in United States Dollars, and (c) indicate the allocation of the Purchase Price among the applicable Assets.  If the Debtors select a Stalking Horse Bidder for such assets, then such Purchase Price shall exceed such Stalking Horse Bid by at least the aggregate sum of (1) the Bid Protections for such assets, and (2) such additional amount as determined by the Debtors in their reasonable business judgment after consultation with the Consultation Parties.<br><br>C.  **Deposit.**  Each Bid must be accompanied by a cash deposit equal to ten percent (10%) of the applicable aggregate Purchase Price (the "Deposit"), to be held in one or more escrow accounts on terms acceptable to the Debtors and the Consultation Parties; *provided*, *however*, that the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may elect to waive or modify the requirement of a Deposit on a case-by-case basis.  For the avoidance of doubt, each credit bid must also be accompanied by the Deposit to the extent of any cash component of such Credit Bid.  For the avoidance of doubt, to the extent the Purchase Price of a Bid is increased, at any time or from time to time, whether prior to commencement of the Auction or during the Auction, the amount of the Deposit shall automatically increase accordingly (to be equal to 10% of any increased Purchased Price) and the corresponding Potential Bidder will pay into escrow the amount of such increase, as promptly as practicable, and in any event within one business day, following such increase.  Without limiting the foregoing, if a Purchase Price is increased in order to make a bid into a Qualified Bid, the Debtors may condition participation of the applicable Potential Bidder at the Auction on such Potential Bidder paying the then full amount of the Deposit into escrow prior to commencement of the Auction or such participation. |

| Requirement | Description |
|---|---|
| | D. **Transaction Documents.**  Each Bid must be accompanied by an executed form of purchase agreement, which the Debtors shall make available to Acceptable Bidders via the Debtors' electronic data room pursuant to the due diligence process, with respect to the proposed Sale Transaction, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid.  In addition, (1) the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to the form purchase agreement provided by the Debtors and (2) if one or more Stalking Horse Bidders have been designated for the applicable Assets, the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked against each applicable Stalking Horse Agreement. |
| | E. **Back-Up Bidder Commitment.**  Each Bid must include a written commitment by the applicable Potential Bidder to serve as a Back-Up Bidder (as defined below) in the event that such Potential Bidder's Bid is not selected as the Winning Bid; *provided* that the foregoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party (as defined below) and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code; or (2) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement. |
| | F. **Proof of Financial Ability to Perform.**  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has:  (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the applicable Assets and the proposed Sale Transaction. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties. |

RLF1 31316667v.1

| Requirement | Description |
|---|---|
| | G. **Contingencies; No Financing or Diligence Outs.** Each Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence. |
| | H. **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid— including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction contemplated by such Bid—and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid. Each Bid should also include contact information for the specific person(s) and counsel whom the Debtors (and their advisors) should contact regarding such Bid. |
| | I. **Authorization.** Each Bid must contain evidence acceptable to the Debtors that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Sale Transaction contemplated by such Bid. |
| | J. **Contracts and Leases.** Each Bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "<u>Assigned Contracts</u>"). Each Bid must be accompanied by adequate assurance of future performance under all Assigned Contracts, which shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtors may request (the "<u>Adequate Assurance Package</u>"). The Adequate Assurance Package should be submitted in its own compiled PDF document. |
| | K. **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that: (1) the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Sale Transaction prior to making its offer; (2) the Potential Bidder has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid; (3) except as may be set forth in Definitive Sale |

24

| Requirement | Description |
|---|---|
| | Documents (as defined below) concerning such Bid, the Potential Bidder did not rely, and is not relying upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Sale Transaction, the completeness of any information provided in connection therewith or the Auction, if any, or otherwise; and (4) the Potential Bidder did not engage in any collusive conduct and acted in good faith in submitting its Bid. |

L. **No Break-Up Fee or Reimbursement of Expenses.** Each Bid, with the exception of the Complete Solaria Stalking Horse Bid and any Additional Stalking Horse Bid, must expressly state and acknowledge that such Potential Bidder shall not be entitled to, and shall not seek, any transaction break-up fee, termination fee, expense reimbursement, working fee, or similar type of payment; *provided*, that the Debtors are authorized in their reasonable business judgment, in consultation with the Consultation Parties, subject to Section 6 of the Bidding Procedures, to offer Bid Protections to one or more Stalking Horse Bidders in accordance with the Bidding Procedures and the Bidding Procedures Order; *provided*, *further*, that each Bid must expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the sale process.

M. **Transition Services.** Each Bid must state or otherwise estimate the types of transition services, if any, the Potential Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Potential Bidder's Bid were selected as the Winning Bid for the applicable Assets.

N. **Commitment to Close.** Each Bid must include a commitment to close as soon as practicable and state the expected date of closing of the Sale Transaction, which for the avoidance of doubt must be either on or before the date specified in the Bidding Procedures.

O. **Irrevocable Bid.** Each Bid must contain a statement by the applicable Potential Bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the Potential Bidder and irrevocable in all respects.

| Requirement | Description |
|---|---|
| | P. **Compliance with Bidding Procedures.**   Each Bid must contain a covenant that the applicable Potential Bidder will comply with the terms of the Bidding Procedures and the Bidding Procedures Order. |
| | Q. **Combination Bids.**   For Bids that contemplate a purchase of multiple categories of Assets, each Bid must specify: (i) allocation of the Purchase Price across each Asset; (ii) for Bids that include real estate and sale-leaseback equity specifically, the Purchase Price must be allocated across each individual property included in the Bid; and (iii) Bids must indicate whether the offer is on an "all or none" basis in the event that the Potential Bidder is outbid for certain Assets contemplated in the Bid. |
| | R. **Initial Going-Concern Assets Overbid.**   Any Overbid (as defined below) regarding all or substantially all of the Going-Concern Assets must have a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, Consultation Parties, and the Committee and its advisors, that is at least the sum of (i) five-hundred thousand United States Dollars ($500,000.00) more than the value offered under the Complete Solaria Stalking Horse APA *plus* (ii) the aggregate amount of Going-Concern Bid Protections (as defined below) (the "Initial Going-Concern Assets Overbid"). |
| | By submitting a Bid, each Potential Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and to refrain from (A) submitting a Bid after conclusion of the Auction (if any) or (B) seeking to reopen the Auction (if any) once closed.  **The submission of a Bid shall constitute a <u>binding and irrevocable</u> offer (a) for the Winning Bidder, until consummation of the proposed Sale Transaction, (b) for the Back-Up Bidder (if any), as provided in the Bidding Procedures, including Section 11 thereof, and (c) for any bidder other than the Winning Bidder and Back-Up Bidder, until two (2) business days after entry of the Court's order approving the Winning Bid and (if applicable) the Back-Up Bid for the applicable Assets (each, as applicable, a "<u>Sale Order</u>"), and each Bid must include a written acknowledgment and representation to such effect.** |
| **Complete Solaria Stalking Horse Bidder** | In connection with the Complete Solaria Stalking Horse APA and in recognition of the Complete Solaria Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors are authorized and directed to (i) provide a breakup fee in the amount of 3% of the purchase price under the Complete Solaria Stalking Horse APA (the "Going-Concern Breakup Fee") and (ii) reimburse the Complete Solaria Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with the preparation and negotiation of the Complete Solaria Stalking Horse APA and prosecution of the related pleadings with the Court, up to a maximum of seven-hundred and fifty thousand United States Dollars |

| Requirement | Description |
|---|---|
| | ($750,000.00) (the "Going-Concern Expense Reimbursement" and together with the Going-Concern Breakup Fee, the "Going-Concern Bid Protections").  For the avoidance of doubt, no other Qualified Bidder for the Going-Concern Assets shall be entitled to any form of bid protections, except to the extent the Complete Solaria Stalking Horse APA is terminated in its entirety and with the consent of the First Lien Agent. |
| **Additional Stalking Horse Bidders** | Solely with respect to the Remaining Assets, the Debtors are and shall be authorized, but not obligated, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties and with the consent of the First Lien Agent, to: (A) select one or more Acceptable Bidders to act as an Additional Stalking Horse Bidder (and such Acceptable Bidder's Bid, an "Additional Stalking Horse Bid") and enter into an Additional Stalking Horse Agreement; and (B) in recognition of such Additional Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors may, in consultation with the Consultation Parties, determine to (i) provide a breakup fee (other than with respect to an Additional Stalking Horse Bidder that is a Secured Party) (the "Remaining Assets Breakup Fee") and/or (ii)  reimburse such Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with preparation and negotiation of the Stalking Horse Agreement (the "Remaining Assets Expense Reimbursement," and together with the Remaining Assets Breakup Fee, the "Remaining Assets Bid Protections"); *provided* that the aggregate of the Remaining Assets Breakup Fee and the total Remaining Assets Expense Reimbursement shall in no event exceed three percent (3%) of the applicable purchase price.  To the extent the Remaining Assets Bid Protections do not otherwise comply with the Bidding Procedures, the Debtors reserve the right, in consultation with the Consultation Parties, to seek Court approval of such Remaining Assets Bid Protections.<br><br>No later than one business day after selecting an Additional Stalking Horse Bidder, the Debtors shall file with the Court and serve a notice that (A) identifies the Additional Stalking Horse Bidder and the material terms of the applicable Additional Stalking Horse Bid, including the Purchase Price and the Assets to which such Additional Stalking Horse Bid relates; and (B) attaches a copy of the corresponding Additional Stalking Horse Agreement. |
| **Bid Deadline** | Any Bid for the Assets must be transmitted via email (in .pdf or similar format) to the Debtors and their advisors (as specified in Section 2 of the Bidding Procedures) so as to be **actually received by such parties** on or before **September 6, 2024, by 5:00 p.m. (Eastern Daylight Time)** (the "Bid Deadline"). |

| Requirement | Description |
|---|---|
| | The Debtors shall promptly provide to the Consultation Parties copies of all Bids received by the Debtors, but in no event later than the next business day following receipt. |
| **Qualified Bids & Qualified Bidders** | A Bid is a "Qualified Bid" if the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, determine that such Bid (A) satisfies the Bid Requirements set forth above; and (B) is reasonably likely to be consummated if selected as the Winning Bid (or Back-Up Bid, as applicable) for the applicable Assets; *provided* that any Stalking Horse Bid shall constitute and be deemed a Qualified Bid.  For the avoidance of doubt, Combination Bids may constitute a Qualified Bid.<br><br>An Acceptable Bidder that submits a Qualified Bid is a "Qualified Bidder" with respect to the Assets to which such Qualified Bid relates; *provided* that any Stalking Horse Bidder shall constitute and be deemed a Qualified Bidder.  For the avoidance of doubt, to the extent that any Prepetition Secured Party submits a credit bid in accordance with section 9 herein, such bid shall be a Qualified Bid, and such Prepetition Secured Party shall be a Qualified Bidder with respect to such Bid.<br><br>As soon as reasonably practicable after the applicable Bid Deadline, the Debtors will notify each Acceptable Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid. If an Acceptable Bidder's Bid is determined not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit (if any) on the date that is three business days after the Bid Deadline.<br><br>Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors following consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.<br><br>Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (A) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any).  The Debtors, in consultation with the Consultation Parties, |

| Requirement | Description |
|---|---|
| | reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors, in consultation with the Consultation Parties, may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple Qualified Bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)). |
| **Right To Credit Bid** | Any Qualified Bidder that has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Party") shall be entitled to credit bid all or a portion of the face value of such Secured Party's claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid; *provided* that a Secured Party shall be entitled to credit bid its claim(s) only with respect to Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claim(s).  Notwithstanding anything to the contrary herein, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, subject to section 363(k) of the Bankruptcy Code, may submit a credit bid of all or any portion of the aggregate amount of their respective secured claims.  Any credit bid submitted by any Prepetition First Lien Secured Party or any Prepetition Second Lien Secured Party, subject to section 363(k) of the Bankruptcy Code, shall be deemed a Qualified Bid regardless of whether it meets the requirements set forth herein, including the deposit requirements; *provided* that any credit bid by the Prepetition Second Lien Secured Parties (including the Second Lien Agent) shall (i) provide payment in full in cash of all First Lien Debt and all First Lien Adequate Protection Claims and (ii) otherwise be permitted by the terms of the Intercreditor Agreement.

Notwithstanding the foregoing, following the submission of a credit bid by any Prepetition First Lien Secured Party or any Prepetition Second Lien Secured Party, the Debtors may sell a portion of the Assets that are subject to such credit bid with the prior written consent of such Prepetition First Lien Secured Party or Prepetition Second Lien Secured Party, as applicable, and the amount of such credit bid shall be adjusted accordingly.

The rights and defenses of the Debtors and any other party in interest with respect to whether any assertion that any liens, claims, encumbrances, or interests, if any, will attach to the proceeds of the Sale Transactions are expressly preserved. |
| **Auction** | If the Debtors receive two or more Qualified Bids with respect to the same Assets, the Debtors may, in consultation with the Consultation Parties, conduct an auction (the "Auction") to determine the Winning Bidder (or Back-Up Bidder, as applicable) with respect to such Assets.  In such event, the Debtors will (A) notify all Qualified Bidders of the highest or otherwise best Qualified Bid with respect to the applicable Assets, as determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties |

29

| Requirement | Description |
|---|---|
| | (each such Qualified Bid, a "Baseline Bid") and (B) provide copies of the documents setting forth the terms of the Baseline Bid to all Qualified Bidders, in each case, as soon as reasonably practicable after the Bid Deadline and in any event no later than prior to the commencement of the Auction. The Debtors' determination of which Qualified Bid constitutes the Baseline Bid shall consider any factors the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, deem relevant to the value of the Qualified Bid to the Debtors' estates and the Debtors' patient care mandate and related regulatory requirements. |

If the Debtors, in consultation with the Consultation Parties, determine that they have received no Qualified Bids other than any Stalking Horse Bid or they have received only a single Qualified Bid, then the Auction will not occur, and the Stalking Horse Bid(s) or the Qualified Bid will be deemed to be the Winning Bid(s) for the Assets to which such Stalking Horse Bid(s) or Qualified Bid relates. If the Debtors make such a determination, the Debtors shall file a notice with the Court within one business day of making such determination.

If the Debtors receive two or more Qualified Bids for the same Assets, the Auction shall take place on or after **September 10, 2024,** at a time to be announced by the Debtors in consultation with the Consultation Parties, via remote video and/or in person at the Debtors' election, and shall be conducted in a timely fashion according to the procedures set forth below (the "Auction Procedures").

AUCTION PROCEDURES

A. **The Debtors Shall Conduct the Auction; General Provisions.** The Debtors, with the assistance of their advisors, shall direct and preside over any Auction and shall consult with the Consultation Parties throughout the Auction process. At the commencement of the Auction, the Debtors, in consultation with the Consultation Parties, (1) may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit any successive Bid(s); and (2) shall describe the terms of the Baseline Bid. Only incremental Bids that comply with the terms set forth in Section 10(ii) of the Bidding Procedures shall be considered "Overbids." Overbids shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors, in consultation with the Consultation Parties, shall determine in their reasonable business judgment whether an incremental Bid is an Overbid. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid (or Back-Up Bid, as applicable) (as defined below).

| Requirement | Description |
|---|---|
| | Only Qualified Bidders, the Debtors, the Consultation Parties and each of their respective legal and financial advisors, and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Except as otherwise permitted by the Debtors in consultation with the Consultation Parties, only Qualified Bidders shall be entitled to bid at the Auction. |

The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

The Debtors may, subject to Section 15 of the Bidding Procedures, announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify the Bidding Procedures.

B.  **Terms of Overbids.**  Each Overbid must comply with the following terms:

1.  Minimum Overbid Increment.  At the commencement of the initial solicitation of Overbids, the Debtors, in consultation with the Consultation Parties, shall announce the minimum increment by which any Overbid must exceed the applicable Baseline Bid, which amount shall not be lower than one-hundred thousand United States Dollars ($100,000.00); *provided* that the first Overbid with regard to the Going-Concern Assets shall be the Initial Going-Concern Assets Overbid.  At the commencement of each subsequent round of solicitation of Overbids, the Debtors shall announce the minimum increment by which any Overbid must exceed the Prevailing Highest Bid (as defined below) at such time.  The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to the applicable minimum Overbid increment at any time during the Auction.  Any Overbid made by a Stalking Horse Bidder shall be deemed to have been made in an amount equal to the Overbid plus, if applicable, the Expense Reimbursement and the Breakup Fee, to the extent provided in the applicable Stalking Horse Agreement.

31

| Requirement | Description |
|---|---|
| | 2.    <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors (an "<u>Overbid Round Deadline</u>"); *provided* that the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may extend any Overbid Round Deadline. |
| | 3.    <u>Overbid Alterations</u>. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of the Bidding Procedures. |
| | 4.    <u>Announcing Highest Bid</u>. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Consultation Parties, have identified an Overbid as being higher or otherwise better than, in the initial Overbid round, the Baseline Bid or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all applicable Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid. |
| | C.   **<u>Consideration of Overbids</u>.** The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient and sufficiently unconditional financing commitments to consummate the proposed Sale Transaction at the prevailing Overbid amount. |
| | D.   **<u>Closing the Auction</u>.** The Auction shall continue until there is only one Qualified Bid for a particular group of Assets that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the applicable Assets. Such Qualified Bid shall be designated the |

| Requirement | Description |
|---|---|
| | "Winning Bid" (or Back-Up Bid, as applicable, and the Qualified Bidder who submitted the Winning Bid, the "Winning Bidder") with respect to its proposed Acquired Assets, at which time the Auction with respect to such Assets shall be closed; *provided* that (1) such Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid; and (2) the Debtors' designation of a Qualified Bid as a Winning Bid (or Back-Up Bid, as applicable) shall be subject to and conditioned on finalization of definitive documentation and the Court's approval of such Winning Bid (or Back-Up Bid, as applicable), applicable regulatory and third-party approvals, and the consummation of the Sale Transaction contemplated thereby.  As soon as reasonably practicable after the designation of a Winning Bid (or Back-Up Bid, as applicable), the Debtors, in consultation with the Consultation Parties, shall finalize definitive documentation to implement the terms of such Winning Bid (or Back-Up Bid, as applicable) and cause such definitive documentation to be filed with the Court.<br><br>E.  **No Collusion; Good Faith Offer.**  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (1) such Qualified Bidder has not engaged in any collusion with respect to the bidding process (2) such Qualified Bidders' Qualified Bid is a good faith and irrevocable offer and such Qualified Bidder intends to consummate the Sale Transaction contemplated by its Qualified Bid if such Qualified Bid is the Winning Bid (or Back-Up Bid, as applicable) with respect to the applicable Acquired Assets, and (3) will serve as Back-Up Bid.<br><br>F.  **Rejection of Bids.**  The Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Winning Bid (or Back-Up Bid, as applicable), any Bid that the Debtors determine, after consultation with the Consultation Parties, is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code and/or the Bidding Procedures, or (3) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders. |
| **Designation of a Back-Up Bidder** | If for any reason the Winning Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Winning Bidder, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid (each, a "Back-Up Bidder"), as determined by the Debtors after consultation with the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein and as set forth in the Sale Order, will automatically be |

| Requirement | Description |
|---|---|
| | deemed to have submitted the highest or otherwise best Bid or Bids (each, a "Back-Up Bid"), and the Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four hours advance notice, which notice will be filed with the Court; *provided* that the forgoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code; or (2) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement.<br><br>Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open and irrevocable until the earlier of (1) the closing of the transactions contemplated by the Winning Bid notwithstanding any outside date set forth in such Back-Up Bidder's proposed purchase agreement and (2) the date that is four months following the conclusion of the Auction. |
| **Fiduciary Out** | Notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, nothing in the Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to the Sale Transactions or the Bidding Procedures solely to the extent such Debtor or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.<br><br>Further, notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, until the entry of the Sale Order, the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (A) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each, an "Alternate Proposal"); (B) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (C) maintain or continue discussions or negotiations with respect to Alternate Proposals; (D) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (E) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal. |

| Requirement | Description |
|---|---|
| **"As Is, Where Is"** | Consummation of the Sale Transactions will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted and agreed to by the Debtors in the executed definitive written documentation for the Sale Transactions (the "Definitive Sale Documents").  Unless otherwise specifically accepted and agreed to by the Debtors in Definitive Sale Documents, all of the Debtors' right, title, and interest in and to the Assets disposed of in the Sale Transaction will be transferred to the Winning Bidder (or Back-Up Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code.<br><br>By submitting a Bid, each bidder will be deemed to acknowledge and represent that it (A) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (B) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (C) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Transaction or the completeness of any information provided in connection with the Sale Transaction or the Auction (if any), except as may be set forth in Definitive Sale Documents. |
| **Commissions** | The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any Potential Bidder's agent, advisor, or broker.  All commissions, fees, or expenses for any such agents, advisors, or brokers shall be paid by the applicable Potential Bidder at such Potential Bidder's discretion.  In no case shall any commissions, fees, or expenses for any Potential Bidder's agent, advisor, or broker be deducted from any proceeds derived from any Sale of the Assets.  This section shall not apply to any Bid Protections that become payable pursuant to the terms of a Stalking Horse Agreement. |
| **Reservation of Rights** | The Debtors may, in Consultation with the Consultation Parties, be entitled to modify the Bidding Procedures in their reasonable business judgment in consultation with the Consultation Parties in any manner that will best promote the goals of the Bidding Procedures, or impose, at or prior to the Auction (if any), additional customary terms and conditions on a Sale Transaction, including:  (A) extending the deadlines set forth in the Bidding Procedures; (B) adjourning the Auction at the Auction; (C) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if any); (D) canceling the Auction; and (E) rejecting any or all Bids or Qualified Bids; *provided*, *however*, that the Debtors may not amend the Bidding Procedures or the bidding process to (i) reduce or otherwise modify their obligations to consult |

| Requirement | Description |
|---|---|
| | with any Consultation Party or alter any other rights of any Consultation Party without the consent of such Consultation Party or further order of the Court, or (ii) reduce or otherwise modify their obligations to obtain consent from any Consultation Party pursuant to the Bidding Procedures. All such modifications and additional rules will be communicated to each of the Consultation Parties, Potential Bidders, and Qualified Bidders; *provided* that, to the extent such modifications occur at the Auction, disclosure of such modifications is limited to those in attendance at the Auction.<br><br>Each reference in the Bidding Procedures and the Bidding Procedures Order to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith. |
| **Consent to Jurisdiction** | All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of the Bidding Procedures. |
| **Sale Hearing** | The Court shall hold a hearing to consider approval of the Winning Bid(s) (and Back-Up Bid(s), as applicable) and the Sale Transactions contemplated thereby (the "Sale Hearing"). **The Sale Hearing shall be held on September 17, 2024, subject to the availability of the Court. The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending written notice to all Qualified Bidders and Consultation Parties prior to, or by making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any bidder or other party.** |
| **Return of Deposit** | Any Deposits provided by Qualified Bidders shall be held in one or more escrow accounts on terms acceptable to the Debtors. Any such Deposits will be returned to Qualified Bidders that are not Winning Bidders (or Back-Up Bidders, as applicable) on the date that is three business days after the Auction (if any). Any Deposit provided by a Winning Bidder (or Back-Up Bidder, as applicable) shall be applied to the Purchase Price of the applicable Sale Transaction at closing.<br><br>If a Winning Bidder (or Back-Up Bidder, as applicable) fails to consummate the Sale Transaction contemplated by its Winning Bid (or Back-Up Bid, as applicable) because of a breach by such Winning Bidder (or Back-Up Bidder, as applicable), the Debtors will not have any obligation to return any Deposit provided by such Winning Bidder (or Back-Up Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates. |

20.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

### A.     Form and Manner of Sale Notice.

21.     As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as Exhibit 3 to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined below); (b) counsel to the Complete Solaria Stalking Horse Bidder; (c) counsel to any Additional Stalking Horse Bidder; (d) all parties to executory contracts and leases to be assumed and assigned as part of a proposed Sale Transaction; (e) all parties who have expressed a written interest in the Assets; (f) all known holders of liens, Encumbrances, and other claims secured by the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i)  each governmental agency that is an interested party with respect to a Sale Transaction; (j) all known creditors of the Debtors; (k) all registered holders of equity securities in the Debtors; and (l) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

22.     In addition, as soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will provide notice of the Auction, if any, and the Sale Hearing through the publication of the Sale Notice on the website of the Debtors' proposed noticing and claims agent to be retained in the chapter 11 cases, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/SunPower (the "Case Website") and will also publish the Sale Notice, with any modifications necessary for ease of publication (the "Publication Notice"), once in *The New*

*York Times* (national edition) and the *Los Angeles Times*, to provide notice to any other potential interested parties.

23.     The Debtors respectfully submit that the Sale Notice and Publication Notice are reasonably calculated to provide interested parties with timely and proper notice of the proposed Sale Transactions and Sale Hearing and an opportunity to respond accordingly.

### B.     Summary of the Assumption and Assignment Procedures.

24.     The Debtors seek entry of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts in connection with the Sale Transactions.  Because the Cure Notice, attached as <u>Exhibit 6</u> to the Bidding Procedures Order, sets forth the Assumption and Assignment Procedures in detail, they are not restated herein. Generally, however, the Assumption and Assignment Procedures:  (a) outline the process by which the Debtors will serve notice to all counterparties to the Assigned Contracts regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assigned Contracts to the extent necessary.

### <u>Basis for Relief</u>

### I.     The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

25.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound

business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999));  *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

26.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir.  2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

27.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Dura Auto, Sys.,* No. 06-11202(KJC), 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (bidding procedures "enhance[ing] competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

28.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will allow the Debtors to conduct the Sale Transactions in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Debtors' Assets and who can demonstrate the ability to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

29.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale Transactions. In addition, entry into the Complete Solaria Stalking Horse

APA, or any Additional Stalking Horse APA, will further ensure that the Debtors obtain fair market value by setting a minimum purchase price for the Debtors' assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

30. Accordingly, for all of the foregoing reasons, the Debtors believe that the Bidding Procedures will encourage robust bidding for the Assets, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by courts in this District. *See, e.g.*, *In re Vyaire Medical, Inc.*, No, 24-11217 (BLS) (Bankr. D. Del. July 11, 2024); *In re Sientra, Inc.,* No. 24-10245 (JTD) (Bankr. D. Del. Mar. 5, 2024); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 17, 2023); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 04, 2023); *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. April 25, 2023).[9]

**A.      The Form and Manner of Service of the Sale Notice Should Be Approved.**

31. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty-one days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction (if any) and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

32. As noted above, as soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the Notice Parties; (b) counsel to Complete Solaria; (c) counsel

---

[9]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

to the Additional Stalking Horse Bidder (if any); (d) all parties to executory contracts and leases to be assumed and assigned as part of a proposed Sale Transaction; (e) all parties who have expressed a written interest in the Assets; (f) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) each governmental agency that is an interested party with respect to a Sale Transaction; (j) all known creditors of the Debtors; (k) all registered holders of equity securities in the Debtors; and (l) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

33.     In addition, as soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors will provide notice of the Sale Hearing through the publication of the Sale Notice on the Case Website and will also publish the Publication Notice once in *The New York Times* (national edition) and *Los Angeles Times*, to provide notice to any other potential interested parties.

34.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Publication Notice, and the Cure Notice as provided for herein, constitutes good and adequate notice of the Sale Transactions and any proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice and Cure Notice.

**B.     The Going-Concern Bid Protections and the Remaining Assets Bid Protections Each Have a Sound Business Purpose and Should Be Approved.**

35.     With respect to the Complete Solaria Stalking Horse Bidder and the purchase and sale of the Going-Concern Assets, the Debtors request approval to offer the Going-Concern Bid Protections, which are customary for transactions of this type.  As discussed above, the

42

Going-Concern Bid Protections comprise a breakup fee of 3% of the purchase price under the Complete Solaria Stalking Horse APA and expense reimbursement up to seven-hundred and fifty thousand United States Dollars ($750,000.00).   Additionally, with respect to any Additional Stalking Horse Bidder and the purchase and sale of the Remaining Assets, the Debtors request approval of the Remaining Assets Bid Protections, which, as discussed above, comprise an aggregate amount not to exceed three percent (3%) of the applicable purchase price.

36.     The use of a stalking horse in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Off. Comm. Of Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).

37.     Generally, stalking horse expense reimbursements and breakup fees are a normal, and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code.  For example, courts have found that because a "corporation [has] a duty to encourage bidding, [bid protections] can be ***necessary*** to discharge [such] duties to maximize value. . . . [Bid protections] may 'be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.'"  *In re Integrated Res., Inc.*, 147 B.R. at 660–61 (emphasis added).  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "the allowability of [bid protections] . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal

quotations omitted); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same); *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) (same); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121–23 (Bankr. D. Del. 2005) (same). The Debtors believe that the allowance of the Bid Protections is in the best interests of their estates and their creditors, as any Stalking Horse Bidder, such as Complete Solaria, will establish a floor for further bidding that may increase the consideration given in exchange for the applicable Assets for the benefit of the Debtors' estates.

38.     In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); *Women First Healthcare, Inc.*, 332 B.R. at 121–23 (holding that the general standard used for all administrative expenses applies to expense reimbursements). Thus, the allowability of expense reimbursements, "like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

39.     Similar bid protections have been approved by this Court. *See, e.g., In re Vyaire Medical, Inc.*, No, 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $250,000); *In re Sientra, Inc.,* No. 24-10245 (JTD) (Bankr. D. Del. Mar. 5, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $500,000); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov.

44

17, 2023) (authorizing stalking horse break-up fee of 3% inclusive of expense reimbursement); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (same).[10]

40.     Accordingly, for the reasons set forth above, the Debtors respectfully request (i) that the Court grant the Debtors the authority and direction to incur and pay, as applicable, the Going-Concern Bid Protections to the Complete Solaria Stalking Horse Bidder and (ii) that the Court grant the Debtors the authority, but not direction, to grant the Remaining Assets Bid Protections to one or more Additional Stalking Horse Bidders, to the extent such Remaining Assets Bid Protections are necessary to preserve the value of the Debtors' estates.

**C.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

41.     As set forth above, the Sale Transactions may contemplate the assumption and assignment of contracts to the Winning Bidders arising from the Auction, if any.  In connection with this process, the Debtors believe it is necessary to establish the Assumption and Assignment Procedures by which:  (a) the Debtors and contract counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of contracts and/or related cure amounts.

42.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the contract notice.  *See, e.g.*, *In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again,

---

[10]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

permissible under § 363(f)(2).”); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

43.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

**D.     The Sale Transactions Should Be Approved as an Exercise of Sound Business Judgment.**

44.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, “after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate.”  11 U.S.C. § 363(b)(1).  The sale of a debtor’s assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (“Under Section 363, the debtor in possession can sell property of the estate . . . if he has an ‘articulated business justification’ . . . .”); *see also In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (same); *In re Telesphere Commc’s, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999) (same).

45.     Once the Debtors articulate a valid business justification, the business judgment rule “is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.” *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12

(Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").

### 1.     A Sound Business Purpose Exists for the Sale Transactions.

46.     The Debtors believe that the Sale Transactions will maximize the value of their Assets after exposing them to the market as part of a competitive, arms' length process. Consequently, after being subject to a "market check" in the form of the Auction, the bid that is ultimately successful, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

47.     Thus, the Debtors submit that the Winning Bid(s) will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an auction process and subsequently to enter into a purchase agreement with the Winning Bidder(s) will be a valid and sound exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

48.     The Debtors have demonstrated that a sound business purpose exists for the sale free and clear of all encumbrances, due and adequate notice has been provided, the purchase price

47

reflects fair value, and the Sale Transactions have been proposed in good faith without collusion or undue influence.  The Debtors reserve the right to submit supplemental materials, including declarations, in connection with the Sale Transactions.

2.      **Adequate and Reasonable Notice of the Sale Transactions Will Be Provided.**

49.      The Sale Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Auction, if any, and the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale Transactions or the assumption and assignment of contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transactions.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

50.      Additionally, the Debtors will file the Additional Stalking Horse Notice within one business day of the designation of any such Additional Stalking Horse Bidder or as soon as reasonably practicable thereafter.  The Additional Stalking Horse Notice will include, among other things, the identity of the Additional Stalking Horse Bidder, key terms of the Additional Stalking Horse Bidder's Bid, any Bid Protections, and the proposed Stalking Horse Agreement attached as an exhibit.

3.      **The Sale Transactions and Purchase Price Will Reflect a Fair Value Transaction.**

51.      It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, \*4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not

48

require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

52.     As described herein, prior to the Bid Deadline, Moelis will continue to market the Assets in order to solicit other offers consistent with the Bidding Procedures.  For example, Moelis may contact presumably interested parties as well as previously solicited parties, continue to provide acceptable bidders with data room access and requested information, consider a variety of alternative transaction structures, and otherwise assist the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized.

> **4.**     **The Bidding Procedures Ensure that the Sale Transactions Will Be Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder(s) or Winning Bidder(s) Will Be "Good-Faith Purchasers."**

53.     The Debtors request that the Court find the Winning Bidder(s) (including, for the avoidance of doubt, any Stalking Horse Bidder whose bid is the Winning Bid), arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the assets.

54.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

55.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

56.    Accordingly, the Debtors believe that the Winning Bidder(s) arising from the Auction, if any, should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**5.    The Sale Transactions Should Be Approved "Free and Clear" Under Section 363(f).**

57.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

58.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances), except with respect to any interests that may constitute an assumed liability under the applicable purchase agreement.

*See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

59.    The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale Transactions, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the assets to the Winning Bidder(s) arising from the Auction, if any, free and clear of all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances, with any such liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances to attach to the proceeds of the Sale Transactions.

### 6.    Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

60.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

61.     In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  *See, e.g.*, *In re Sientra, Inc.,* No. 24-10245 (JTD) (Bankr. D. Del. Mar. 5, 2024) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 17, 2023) (same); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (same); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 04, 2023) (same); *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023) (same). [11]

62.     Accordingly, the Debtors' prepetition secured lenders should be entitled to credit bid some or all of the claims secured by their collateral pursuant to section 363(k) of the Bankruptcy Code.

### 7.     The Assumption and Assignment of Contracts Reflects the Debtors' Reasonable Business Judgment.

63.     To facilitate and effectuate the sale of the Assets, the Debtors seek authority to assign or transfer executory contracts to the Winning Bidder(s) arising from the Auction, if any, to the extent required by such bidders.

64.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Grp. of Inst'l*

---

[11]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

*Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule").

65.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale Transactions as a sound exercise of the Debtors' business judgment.  First, the Assigned Contracts may be necessary to operate certain assets and, as such, they are essential to inducing the best offer for those assets.  And second, it is unlikely that any purchaser would want to acquire certain assets unless a significant number of the contracts and leases needed to operate such assets, if applicable, are included in the transaction.

66.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

### 8.    Defaults Under the Assigned Contracts Will Be Cured Through the Sale Transactions.

67.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code,

specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

68.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied.  Because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### 9.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

69.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code section 2-609" and is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty."  *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned. *See Dura Auto.*, 2007 WL 7728109, at *97 (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding); *In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (same).

70.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Winning Bidder(s) arising from the Auction, if any, will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Winning Bidder(s) arising from the Auction.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Winning Bidder(s) arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts.

**E.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

71.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that any sale order, if necessary, entered in connection with a Sale Transaction be

55

effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

72.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."   10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

73.     To maximize the value received for the Assets, the Debtors seek to close the Sale Transactions as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**Notice**

74.     The Debtors will provide notice of this motion to:  (a) the office of the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the First Lien Agent and counsel thereto; (i) the Second Lien Agent and counsel thereto; (j) the L/C Secured Party; and (k) the Complete Solaria

Stalking Horse Bidder and counsel thereto; (l) any Additional Stalking Horse Bidders and counsel thereto; (m) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b) (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

75.     No prior request for the relief sought in this motion has been made to this or any other court.

57

WHEREFORE, the Debtors request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:    August 6, 2024
         Wilmington, Delaware

/s/ Jason M. Madron

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.** | **KIRKLAND & ELLIS LLP** |
| Kevin Gross (DE Bar No. 209) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Mark D. Collins (DE Bar No. 2981) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Jason M. Madron (DE Bar No. 4431) | Zachary R. Manning (*pro hac vice* pending) |
| 920 N. King Street | 601 Lexington Avenue |
| Wilmington, Delaware 19801 | New York, New York 10022 |
| Telephone:    (302) 651-7700 | Telephone:    (212) 446-4800 |
| Facsimile:    (302) 651-7701 | Facsimile:    (212) 446-4900 |
| Email:    gross@rlf.com | Email:    joshua.sussberg@kirkland.com |
|    collins@rlf.com |    zach.manning@kirkland.com |
|    madron@rlf.com | |
| | - and - |
| | Chad J. Husnick, P.C. (*pro hac vice* pending) |
| | Jeffrey Michalik (*pro hac vice* pending) |
| | Robert Jacobson (*pro hac vice* pending) |
| | 333 West Wolf Point Plaza |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |
| | Email:    chad.husnick@kirkland.com |
| |    jeff.michalik@kirkland.com |
| |    rob.jacobson@kirkland.com |
| *Proposed Co-Counsel to the Debtors and Debtors in Possession* | *Proposed Co-Counsel to the Debtors and Debtors in Possession* |

**<u>Exhibit A</u>**

**Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (II) SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING THE COMPLETE SOLARIA STALKING HORSE APA, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES, (VII) APPROVING THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the Bidding Procedures attached hereto as **Exhibit 1**, (b) approving the terms of the Complete Solaria Stalking Horse APA attached as **Exhibit 2**, (c) establishing certain related dates and deadlines, (d) approving the form and manner of notice of the Auction and the Sale Transactions, attached hereto as **Exhibit 3** (the "Sale Notice"), (e) approving the form and manner of notice of the Winning Bidder(s) attached hereto as **Exhibit 4** (the "Notice of Winning Bidder"), (f) approving the form and manner of the notice of designation of any Additional Stalking Horse Bidder attached hereto as **Exhibit 5** (the "Additional Stalking Horse Notice"), (g) approving the Assumption and

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

1

Assignment Procedures, including the notices of potential assumption and proposed cure amounts attached hereto as **Exhibit 6** (the "Cure Notice"), and (h) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and upon the *Declaration of Rick Polhemus in Support of the Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof; (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "Polhemus Declaration"); and the United States District Court for the District of Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate  and no other or further notice need or shall be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court on [●], 2024 (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT**:[3]

1.       <u>Jurisdiction and Venue</u>.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       <u>Statutory and Legal Predicates</u>.    The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rules 2002-1, 6004-1, and 9006-1(c).

3.       <u>Sale Process</u>. The Debtors and their advisors have been engaging with a number of potential interested parties to solicit and develop the highest and otherwise best offers for the Assets.

4.       <u>Bidding Procedures</u>.    The Debtors have articulated good and sufficient business reasons for the Court to approve the bidding procedures attached hereto as **<u>Exhibit 1</u>** (the "<u>Bidding Procedures</u>").    The Bidding Procedures are fair, reasonable and appropriate and are designed to maximize the value of the proceeds of one or more sales (the "<u>Sale Transactions</u>") of the Debtors' assets (the "<u>Assets</u>").    The Bidding Procedures were negotiated in good faith and at

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.    To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

arm's-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets.   The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

5.  <u>Stalking Horse Bidder</u>.  The Bid Protections payable under the Complete Solaria Stalking Horse APA, or any Additional Stalking Horse Agreement, shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code and treated as an allowed administrative expense claim against the Debtors' estates pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, and in each case, with the exception of the Complete Solaria Stalking Horse APA authorized herein, solely as approved in an order approving any Additional Stalking Horse Notice (as defined below).

6.  <u>Sale Notice</u>.   The Sale Notice, substantially in the form attached hereto as **<u>Exhibit 3</u>**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction (if any) and any Sale Transaction with respect to the Going-Concern Assets and the Remaining Assets, including, without limitation:  (a) the date, time, and place of the Auction; (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale Transactions and entry of an order approving any Sale Transactions; and (d) notice of the proposed assumption and assignment of Contracts to the Winning Bidder(s), if any.

7.  <u>Assumption and Assignment Provisions</u>.  The Debtors have articulated good and sufficient business reasons for the Court to approve the assumption and assignment procedures set forth herein (the "<u>Assumption and Assignment Procedures</u>"), which are fair, reasonable, and appropriate.   The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

4

8.      <u>Notice of Winning Bidder</u>.  The Notice of Winning Bidder, substantially in the form attached hereto as **Exhibit 4**, is reasonably calculated to provide interested parties with timely and proper notice of any proposed Sale Transaction with respect to the Going-Concern Assets and the Remaining Assets, including, without limitation: (a) the Winning Bidder(s) for the Going-Concern Assets and the Remaining Assets, (b) the Back-Up Bidder(s), if applicable, (c) the key terms of the proposed Sale Transaction, and (d) the date, time, and place of the Sale Hearing.

9.      <u>Cure Notice</u>.  The Cure Notice, the form of which is attached hereto as **Exhibit 6**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein (including the Assumption and Assignment Procedures), except as expressly required herein.

10.     <u>Notice</u>.  Notice of the Motion, the proposed Bidding Procedures, the proposed Assignment and Assumption Procedures, and the Hearing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and (iii) adequate and sufficient under the circumstances of the Debtors' chapter 11 cases, such that no other or further notice need or shall be required or provided except as set forth in the Bidding Procedures and the Assumption and Assignment Procedures.  A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

11.     The Motion is GRANTED as set forth herein.

12.     All objections to the relief granted in this order (the "Order") that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

A.     **The Bidding Procedures**

13.     The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved, are incorporated herein by reference, and shall govern the Bids and proceedings related to any sale of the Going-Concern Assets or the Remaining Assets and the Auction (if any) in all respects.   The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a "Qualified Bid," are fair, reasonable, and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interests.   The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

14.     The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.

15.     Subject to this Order and the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, shall have the right to, in each case with respect to any Going-Concern Assets or Remaining Assets being sold pursuant to the Bidding Procedures, (a) determine which Qualified Bid is the highest or otherwise best offer for the applicable Going-Concern Assets or Remaining Assets, (b) reject any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or

(iii) contrary to the best interests of the Debtors' estates and their creditors, and (c) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases.

16.     Subject to this Order and the Bidding Procedures, the Debtors shall have the right, in their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, to modify the Bidding Procedures, including to, among other things, (a) extend or waive deadlines or other terms and conditions set forth therein, (b) adopt new rules and procedures for conducting the bidding and the Auction process, (c) provide reasonable accommodations to the Complete Solaria Stalking Horse Bidder or any Additional Stalking Horse Bidder, or (d) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the value of the Going-Concern Assets or Remaining Assets, as applicable; *provided* that such extensions, waivers, new rules and procedures, accommodations, and modifications (except as are consented to or otherwise approved or permitted in accordance with the Bidding Procedures) (i) do not conflict with and are not inconsistent with this Order, the Bidding Procedures, the Bankruptcy Code or any order of the Court and (ii) are as promptly as practicable communicated to each Qualified Bidder or at the Auction (if any).

17.     If the Debtors determine not to conduct an Auction for the Going-Concern Assets or Remaining Assets, then the Debtors shall file a notice with the Court of such determination within one (1) business day of making such determination.

18.     The Debtors shall consult with the Consultation Parties in good faith regarding the sale process for the Going-Concern Assets and Remaining Assets and the Sale Transactions, including evaluation of any and all bids, designation of any Additional Stalking Horse Bidder,

7

scheduling and operation of the Auction (if applicable), and selection of a winning bid, as well as any modifications of the Bidding Procedures.

**B.      The Complete Solaria Stalking Horse Bid and Going-Concern Bid Protections.**

19.    The Debtors are authorized to enter into the Complete Solaria Stalking Horse APA with Complete Solaria for the purchase and sale of the Going-Concern Assets, and the terms of the Complete Solaria Stalking Horse APA are hereby approved.  Complete Solaria shall be deemed the Complete Solaria Stalking Horse Bidder and a Qualified Bidder, and Complete Solaria's Bid contemplated by the Complete Solaria Stalking Horse APA shall be deemed a Qualified Bid.

20.    The Going-Concern Bid Protections for the Complete Solaria Stalking Horse Bidder are approved in their entirety, and the amount of such Going-Concern Bid Protections as to Complete Solaria shall be an allowed administrative expense claim under section 503(b) of the Bankruptcy Code.  The Debtors are authorized and directed to pay any amounts that may become due to the Complete Solaria Stalking Horse Bidder on account of the Bid Protections on the terms set forth in the Complete Solaria Stalking Horse APA.  For the avoidance of doubt, no other Qualified Bidder for the Going-Concern Assets shall be entitled to any form of bid protections, except if the Complete Solaria Stalking Horse APA is terminated in its entirety.

**C.      Additional Stalking Horse Bidders and Remaining Asset Bid Protections.**

21.    The Debtors shall be authorized, but not obligated, in an exercise of their reasonable business judgment (a) to select one or more Qualified Bidders to act as Additional Stalking Horse Bidders in connection with a Sale Transaction solely involving the Remaining Assets (or involving any Going-Concern Assets solely to the extent the Complete Solaria Stalking Horse APA is terminated in its entirety) and enter into an Additional Stalking Horse Agreement with respect to any such Sale Transaction with such Additional Stalking Horse Bidder for the purchase and sale

8

of the Remaining Assets; and (b) in connection with any Additional Stalking Horse Agreement with an Additional Stalking Horse Bidder, to agree to the Remaining Assets Bid Protections; *provided* that the aggregate of the Remaining Assets Breakup Fee and the total Remaining Assets Expense Reimbursement shall in no event exceed three percent (3%) of the applicable Purchase Price; *provided*, *further*, that all expenses to be reimbursed to the Additional Stalking Horse Bidder from the Debtors' estates must be documented, with such documentation provided to the Debtors and the U.S. Trustee, who will have a ten-day review period upon receipt of such expense documentation.  If there is an objection to any portion of the expenses by such parties during that time, such disputed portion of the expenses shall not be paid until the objection is resolved consensually or by the Court, with the remaining undisputed portion of the expenses paid as otherwise set forth herein.

22.     Except for the Going-Concern Bid Protections provided to the Complete Solaria Stalking Horse Bidder or Remaining Assets Bid Protections provided to any Additional Stalking Horse Bidder, no person or entity participating in the Debtors' sale process under the Bidding Procedures shall be entitled to any expense reimbursement, break-up fees, "topping" fees, termination fees, or other fees, payments, or reimbursements whatsoever in connection with any Bid, preparation thereof, or participation at the Auction (if any) or generally under the Bidding Procedures; and, by submitting a Bid, such person or entity shall be deemed to have forever waived its right to request or to file with the Court any request for allowance or payment of any such expense reimbursement or fee(s), whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

23.     Any deposit provided by the Complete Solaria Stalking Horse Bidder, an Additional Stalking Horse Bidder, or other Qualified Bidder (as required under the Bidding

Procedures, the Complete Solaria Stalking Horse APA, or any Additional Stalking Horse Agreement) shall be held in escrow by the Debtors or their agent and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the Bidding Procedures, the applicable escrow agreement, or an order of the Court.

24.    Solely with respect to the Remaining Assets (or with respect to the Going-Concern Assets solely to the extent the Complete Solaria Stalking Horse APA is terminated in its entirety), the Debtors may select an Additional Stalking Horse Bidder (or Additional Stalking Horse Bidders, as applicable).  In such instance(s), the Debtors shall file a notice of designation of an Additional Stalking Horse Bidder (the "Additional Stalking Horse Notice") within one (1) business day of such designation seeking approval of the same, providing no less than three (3) business days' notice of the deadline to object to the approval of the Additional Stalking Horse Bid (including any proposed Bid Protections) to the Notice Parties (as defined below) with no other or further notice regarding the Additional Stalking Horse Bidder, the Additional Stalking Horse Bid, or the Remaining Assets Bid Protections being required; *provided* that any Additional Stalking Horse Notice will (a) set forth the identity of the Additional Stalking Horse Bidder (and if the Additional Stalking Horse Bidder is a newly formed entity, then the Additional Stalking Horse's parent company or sponsor), (b) set forth the amount of the Additional Stalking Horse Bid, and, if the Additional Stalking Horse Bidder is a credit bidder, what portion of its bid is a credit bid and what portion (if any) is cash; (c) state whether the Additional Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Additional Stalking Horse Bid, (d) specify any proposed Remaining Assets Bid Protections, (e) attach the purchase agreement finalized with the Additional Stalking Horse Bidder or otherwise summarize the material terms thereof; and (f) set

10

forth the deadline to object to the Additional Stalking Horse Bidder designation and any related Bid Protections.

25.     Objections to the designation of an Additional Stalking Horse Bidder or any of the terms of an Additional Stalking Horse Bid (including any proposed Remaining Assets Bid Protections for such Additional Stalking Horse Bidder) (an "Additional Stalking Horse Objection") shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, (c) state, with specificity, the legal and factual bases thereof and (d) be filed with the Court and served on the Notice Parties (as defined below) within three (3) business days after the service of the Additional Stalking Horse Notice.

26.     If a timely Additional Stalking Horse Objection is filed, the Debtors will schedule a hearing regarding such Additional Stalking Horse Objection as soon as reasonably practicable seeking approval of such Additional Stalking Horse Bid and in accordance with this Order and the Bidding Procedures.  If no timely Additional Stalking Horse Objection is filed and served with respect to the Additional Stalking Horse Bid, upon the expiration of the objection deadline, the Debtors will submit a proposed order to the Court approving the Additional Stalking Horse Bid (including the Additional Stalking Horse Agreement and the related Remaining Assets Bid Protections), which the Court may enter without a hearing and any further or other notice except as required herein or under the Bidding Procedures, including with respect to any Remaining Assets Bid Protections set forth in the Additional Stalking Horse Notice.

RLF1 31316668v.1

**D.      Important Dates and Deadlines.**

27.      The following dates and deadlines are hereby approved:

| **Date and Time**<br>(all times in Eastern Daylight Time) | **Event or Deadline** |
|---|---|
| August 30, 2024, at 5:00 p.m. | The deadline by which the Debtors may designate an Additional Stalking Horse Bidder only in relation to the Remaining Assets |
| September 2, 2024 | Serve Cure Notice |
| September 6, 2024, at 5:00 p.m. | Bid Deadline |
| September 10, 2024, at 10:00 a.m. | Auction (if necessary) |
| September 11, 2024 (or as soon as reasonably practicable thereafter) | Notice of Winning Bidder |
| September 12, 2024, at 5:00 p.m. | Sale Objection Deadline for Winning Bids |
| September 16, 2024, at 5:00 p.m. | Cure Notice Objection Deadline |
| September [17], 2024, at [●] [a/p].m. (subject to Court availability) | Sale Hearing |

28.      The deadline by which Bids for any Going-Concern Assets or Remaining Assets, as applicable, must be ***actually received*** by the Debtors and their advisors (as set forth in the Bidding Procedures) is **September 6, 2024, at 5:00 p.m. (Eastern Daylight Time)** (the "Bid Deadline").

29.      Each Qualified Bidder participating in the Auction, if any, shall be required to confirm that it has not engaged in any collusion with respect to any bidding (including preparing or submitting its Bid(s)) or the Sale Transactions, as set forth in the Bidding Procedures; and the Auction, if any, shall be transcribed or otherwise recorded.

30.      The Debtors shall file with the Court the Notice of Winning Bidder, identifying the identity of the Winning Bidder(s) (as applicable), the amount of the Winning Bid(s) (as applicable) and, if the Winning Bidder (as applicable) is a credit bidder, what portion of its bid is a credit bid

and what portion (if any) is cash, by:  **September 11, 2024**, or as soon as reasonably practicable thereafter.  If the Winning Bidder is a special purpose entity, the notice shall also identify the entity or entities that are its primary equity holders, or otherwise control, the special purpose entity.

31.    Objections to the proposed order approving any Winning Bid(s) (and/or designation of a Back-Up Bid(s), as applicable) (the "<u>Sale Order</u>," and such objections, "<u>Sale Objections</u>") must be made on or before:  **September 12, 2024, at 5:00 p.m. (Eastern Daylight Time)** (the "<u>Sale Objection Deadline</u>").  All Sale Objections must:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the Sale Objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** by the following parties (the "<u>Notice Parties</u>") no later than the Sale Objection Deadline:

| Proposed Co-Counsel to the Debtors | Proposed Co-Counsel to the Debtors |
|---|---|
| Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Joshua A. Sussberg, P.C.<br>(joshua.sussberg@kirkland.com)<br>Zachary R. Manning (zach.manning@kirkland.com)<br><br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Chad J. Husnick, P.C. (chad.husnick@kirkland.com)<br>Jeffrey Michalik (jeff.michalik@kirkland.com)<br>Robert Jacobson (rob.jacobson@kirkland.com) | Richards, Layton & Finger, P.A.<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Kevin Gross (gross@rlf.com)<br>Mark D. Collins (collins@rlf.com)<br>Jason M. Madron (madron@rlf.com) |
| **The Prepetition First Lien Lenders and Counsel Thereto** | **The Prepetition Second Lien Lenders and Counsel Thereto** |
| Davis Polk & Wardell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Brian M. Resnick (brian.resnick@davispolk.com)<br>Angela M. Libby (angela.libby@davispolk.com)<br>Jarret Erickson (jarret.erickson@davispolk.com)<br><br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, DE 19899<br>Robert J. Dehney, Sr. (rdehney@morrisnichols.com)<br>Tamara K. Mann (tmann@morrisnichols.com)<br>Matthew Talmo (mtalmo@morrisnichols.com) | White & Case LLP<br>555 South Flower Street, Suite 2700<br>Los Angeles, California 90071<br>Aaron Colodny (acolodny@whitecase.com)<br>Robert Kampfner (rkampfner@whitecase.com) |
| **Office of the United States Trustee (Region 3)** ||
| The Office of the United States Trustee<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, Delaware 19801<br>Richard L. Schepacarter Richard.schepacarter@usdoj.gov ||

32.     If any party fails to timely file with the Court and serve a Sale Objection by the Sale Objection Deadline or otherwise abide by the procedures set forth in the Bidding Procedures regarding an objection to the Sale Transaction, such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Sale Transaction, including the transfer of the applicable Asset(s) to the applicable Winning Bidder(s) free and clear of all liens, claims, interests, and

14

encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to the Sale Transaction for purposes of section 363(f) of the Bankruptcy Code.

33.     The Court will hold a hearing to consider approval of the Sale Transaction(s) on **September [17], 2024 at [●] [a/p].m. (Eastern Daylight Time)**, subject to Court availability (the "Sale Hearing").  The Sale Hearing may be adjourned by announcement in open court or on the Court's calendar without any further notice required.

**E.     Credit Bidding**

34.     Any bidder holding a perfected security interest in any of the Going-Concern Assets or the Remaining Assets may seek to credit bid all, or a portion of, such bidder's claims for its respective collateral in accordance with section 363(k) of the Bankruptcy Code (each such bid, a "Credit Bid"); *provided*, that such Credit Bid complies with the terms of the Bidding Procedures.

**F.     Notice of Sale Transactions**

35.     The Sale Notice, substantially in the form attached to this Order as **<u>Exhibit 3</u>**, is approved with respect to the Auction which may be held under the Bidding Procedures.  Within three (3) business days of the entry of this Order, the Debtors shall cause the Sale Notice, the Motion, this Order, and all of this Order's exhibits and schedules to be served upon parties in interest    and    posted    on    the    Debtors'    restructuring    webpage    at https://dm.epiq11.com/SunPower (or such other applicable URL) (the "Case Webpage").

36.     Within three (3) business days after entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall place a publication version of the Sale Notice for one day in *The New York Times* (national edition) and *The Los Angeles Times* and post it onto the Case Webpage.  Such notice shall be deemed sufficient and proper notice of the Bidding Procedures,

the Sale Transactions, and the Auction (if any) with respect to known interested parties and no other or further notice shall be required.

37.    Within one (1) business day after the conclusion of the Auction (if any), or as soon as reasonably practicable thereafter and in accordance with the Bidding Procedures, the Debtors will file on the docket the Notice of Winning Bidder substantially in the form attached to this Order as **Exhibit 3**.

G.    **Assumption and Assignment Procedures.**

38.    The Assumption/Assignment Procedures below are hereby approved in all respects and shall be the procedures by which the Debtors will notify any counterparties (the "Contract Counterparties") to executory contracts and unexpired leases with the Debtors (the "Contracts") of proposed cure amounts in the event the Debtors determine to assume and assign such Contracts in connection with the Sale Transactions.  Within two (2) days of the Auction, if any, for any Sale Transaction, to the extent the Debtors seek to assume and assign an executory contract and/or unexpired lease, the Debtors will provide via first class mail and/or email (to the extent email is reasonably known) information of all proposed forms of adequate assurance of future performance they have received from the Complete Solaria Stalking Horse Bidder or each Winning Bidder and Back-up Bidder, as applicable, to Contract Counterparties and their counsel, if known.  Requests by contract or lease counterparties to receive adequate assurance information via e-mail may be made to Debtors' counsel at: rob.jacobson@kirkland.com, zach.manning@kirkland.com, and lauren.diss@kirkland.com.

39.    Nothing in this Order shall be deemed to limit the Debtors' or the Winning Bidder's ability to negotiate partial assumption and/or assumption and assignment of Contracts with Contract Counterparties on a consensual basis.

a.    **Cure Notice**.  No later than fourteen (14) days prior to the Cure Objection Deadline, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notices, attached hereto as **Exhibit 6**, on the Contract Counterparties, and post the Cure Notice to the Case Website.

b.    **Content of Cure Notice**.  The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information:  (i) a list of the applicable Contracts that may be assumed or assumed and assigned in connection with the Sale (the "Assigned Contracts," and each individually, an "Assigned Contract"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the proposed amount necessary to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Winning Bid.

c.    **Cure Objections**.  Cure Objections, if any, to a Cure Notice must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

d.    **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Sale Order.

e.    **Dispute Resolution**.  Any Cure Objection to the assumption or assumption and assignment of an Assigned Contract or Cure Costs that remains unresolved after the Sale Hearings shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Winning Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Winning Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Winning Bidder may determine that such Contract should not be assumed and assigned, in which case

the Winning Bidder(s) will not be responsible for any Cure Costs in respect of such contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.    **Supplemental Cure Notice**.  If the Debtors discover Contracts inadvertently omitted from the Cure Notice or a Winning Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the sale, the Debtors may, after consultation with such Winning Bidder, at any time before the closing of the sale, supplement the Cure Notice with previously omitted Contracts, or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice").

g.    **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs, if any, modified by the Supplemental Cure Notice.  All Supplemental Cure Objections must:  (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 5:00 p.m. (Eastern Daylight Time) on the date that is twenty-one days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h.    **Dispute Resolution of Supplemental Cure Objection**.  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice.  Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Assigned Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

**H.    Miscellaneous.**

40.    All persons and entities that participate in the applicable Auction (if any) or bidding for any Going-Concern Assets or Remaining Assets during the sale process under the Bidding Procedures shall be deemed to have knowingly and voluntarily (i) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction (if any) or any other relief requested in the Motion or granted in this Order, and (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction or any other relief requested in the Motion or granted in this Order.

41.    This Order shall be binding on the Debtors and its successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

42.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

43.    To the extent any provisions of this Order are inconsistent with the Motion, the terms of this Order shall control.  To the extent any provisions of this Order are inconsistent with the Bidding Procedures, the terms of this Order shall control.

44.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief (including any payment made in accordance with this Order), nothing in this Order is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in

19

this Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

45.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

46.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

47.     The Debtors are authorized to make non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without

further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

48.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

49.    This Court shall retain jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

21

## **Exhibit 1**

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## BIDDING PROCEDURES

On August 5, 2024 (the "Petition Date"), SunPower Corporation and the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

Thereafter, on August [29], 2024, the Court entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"), by which the Court approved the bidding procedures set forth herein (these "Bidding Procedures").[2]

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing and sale process (including pursuant to an Auction (as defined below), if any) for the sale or sales of some, all, or substantially all of the Debtors' assets (collectively, the "Assets" and the sale or sales thereof, the "Sale Transactions").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]    Unless otherwise specified herein, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order, its respective motion filed at [Docket No. [●]] (the "Bidding Procedures Motion"), the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief*, or its respective motion, filed at Docket. No. [●].

The ability of the Debtors to undertake and consummate any Sale Transaction shall be subject to competitive bidding as set forth in these Bidding Procedures and approval of any Sale Transaction by the Court.

In addition to the Sale Transactions, the Debtors seek to sell the remainder of their Assets that are not the Going-Concern Assets or the Remaining Assets pursuant to the *Motion of Debtors for Entry of an Order (I) Approving Agency Agreement with [●] Effective as of the Petition Date; (II) Authorizing the Sale of Remaining Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; and (III) Granting Related Relief* [Docket No. [●]] (the "Liquidator Motion").

## 1.  KEY DATES AND DEADLINES

| **Date and Time**<br>(all times in Eastern Daylight Time) | **Event or Deadline** |
| --- | --- |
| August 30, 2024, at 5:00 p.m. | The deadline by which the Debtors may designate an Additional Stalking Horse Bidder only in relation to the Remaining Assets |
| September 2, 2024 | Serve Cure Notice |
| September 6, 2024, at 5:00 p.m. | Bid Deadline |
| September 10, 2024, at 10:00 a.m. | Auction (if necessary) |
| September 11, 2024 (or as soon as reasonably practicable thereafter) | Notice of Winning Bidder |
| September 12, 2024, at 5:00 p.m. | Sale Objection Deadline for Winning Bids |
| September 16, 2024, at 5:00 p.m. | Cure Notice Objection Deadline |
| September [17], 2024, at [●] [a/p].m. (subject to Court availability) | Sale Hearing |

## 2.    SUBMISSIONS TO THE DEBTORS; CONSULTATION PARTIES

All submissions to the Debtors required or permitted to be made under these Bidding Procedures must be directed to each of the following persons or entities unless otherwise provided:

2.1.  Debtors:  SunPower Corporation, Attn.: Chief Legal Officer and Chief Transformation Officer (mhenry@alvarezandmarsal.com).

2.2.  Debtors' Proposed Counsel:  (i) Kirkland & Ellis LLP, Attn.:  Chad J. Husnick, P.C.  (chad.husnick@kirkland.com),  Jeffrey  Michalik (jeff.michalik@kirkland.com), and Robert Jacobson (rob.jacobson@kirkland.com) and  Kirkland  &  Ellis  LLP,  Attn.:  Joshua  A.  Sussberg,  P.C. (joshua.sussberg@kirkland.com)  and  Zachary  R.  Manning (zach.manning@kirkland.com);  and  (ii)  Richards,  Layton  &  Finger,  P.A.,

Attn.: Mark D. Collins (collins@rlf.com) and Jason M. Madron (madron@rlf.com).

2.3.    <u>Debtors' Proposed Investment Banker</u>: Moelis & Company, LLC, Attn.: Rick Polhemus (rick.polhemus@moelis.com), Patrick Layton (patrick.layton@moelis.com), Bassam J. Latif (bassam.latif@moelis.com), Jared Dermont (jared.dermont@moelis.com), and Dave McGuiness (dave.mcguiness@moelis.com).

2.4.    <u>Creditors' Committee's Proposed Counsel</u>: [●].

2.5.    <u>Creditors' Committee's Proposed Investment Banker</u>: [●].

2.6.    <u>Creditors' Committee's Proposed Financial Advisor</u>: [●].

The "<u>Consultation Parties</u>" are the (A) Prepetition First Lien Secured Parties, and (B) Creditors' Committee; *provided* that to the extent that any Consultation Party, including any member of the Creditors' Committee submits (or indicates its intent to submit) a bid, including a credit bid, for any Assets in connection with these Bidding Procedures, or is a participant in any active or prospective Bid with respect to any Asset(s), such applicable Consultation Party shall immediately no longer be a Consultation Party unless and until such party unequivocally revokes its Bid and waives its right to continue in the bidding process; *provided, further*, that immediately upon any Consultation Party's secured debt (as applicable) being paid in full in cash, such Consultation Party shall immediately no longer be a Consultation Party under these Bidding Procedures.[3] Materials and information provided by the Debtors or their advisors to the advisors to any Consultation Party may be shared with such Consultation Party, subject in all respects to these Bidding Procedures, the Bidding Procedures Order, and the respective confidentiality agreement entered into by and among or otherwise agreed to between each such Consultation Party and the Debtors.

The Debtors shall consult with the Consultation Parties in good faith regarding the sale process for the Assets and the Sale Transactions, including evaluation of any and all bids, designation of any Stalking Horse Bidder, only in relation to the Remaining Assets, other than the Complete Solaria Stalking Horse Bidder, if applicable (each, an "<u>Additional Stalking Horse Bidder</u>"), scheduling and operation of the Auction (if applicable), selection of a winning bid, negotiation of the purchase agreement, as well as any modifications of these Bidding Procedures. The Debtors shall also provide to the Consultation Parties and their advisors regular reports concerning the sale process, including parties contacted, proposals received, and any due diligence requested by potential purchasers.

---

[3]    If any Prepetition First Lien Secured Party submits a Bid or otherwise is a participant with respect to any active or prospective Bid, the other Prepetition First Lien Secured Parties shall remain Consultation Parties; *provided* that such bidding Prepetition First Lien Secured Party shall be precluded from receiving or reviewing information or documentation not otherwise available to all Acceptable Bidders, and the other Prepetition First Lien Secured Parties shall not share or otherwise discuss such information with the bidding Prepetition First Lien Secured Party.

3.    **POTENTIAL BIDDERS & ACCEPTABLE BIDDERS**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale Transaction (a "Potential Bidder") must deliver or have previously delivered to the Debtors and each of their advisors the following documents and information (unless the Debtors, in their reasonable business judgment after consultation with the Consultation Parties, choose to waive any of the requirements set forth in this Section 3 for any Potential Bidder):

3.1.    an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

3.2.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of the targeted assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;

3.3.    a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable; and

3.4.    any other information or documentation that the Debtors reasonably request.

The Debtors, in their reasonable business judgment, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (as defined below) (such Potential Bidder, an "Acceptable Bidder"). The Debtors shall promptly inform the Consultation Parties of any entity that becomes an Acceptable Bidder.

The Debtors may, in their reasonable business judgment, conduct a process for the sale of unsold assets that are not included in any Winning Bid(s) (as defined below), subject to the terms of the Liquidator Motion.

4.    **DUE DILIGENCE**

The Debtors, with their advisors, have established an electronic data room (the "Data Room") that provides standard and customary diligence materials, including information to allow Acceptable Bidders to submit a Qualified Bid (as defined below).

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Data Room and to additional non-public information regarding the Debtors. Subject to the other terms herein, the Debtors may provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request. The due diligence period for any Additional Stalking Horse Bidder will end prior to execution of the applicable Additional Stalking Horse Agreement, unless otherwise agreed pursuant to the applicable Additional Stalking Horse Agreement. For all Acceptable Bidders other than any Additional Stalking Horse Bidder, the due diligence period will end on the Bid Deadline. The Debtors may, in their reasonable business judgment after consultation with the Consultation

Parties, but shall have no obligation to, furnish any additional due diligence information to any person following execution of a Stalking Horse Agreement or the Bid Deadline, as applicable.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale Transactions to any person except to an Acceptable Bidder or to such Acceptable Bidder's duly authorized representatives subject to the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a Sale Transaction.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (a) to any person or entity who is not an Acceptable Bidder or (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure or privacy or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (provided, that, in case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation, or law).

The Debtors, in consultation with the Consultation Parties, also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure, including to an Acceptable Bidder whom the Debtors determine in consultation with the Consultation Parties is a competitor of the Debtors, a potential competitor of the Debtors, or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder.

**All due diligence requests directed to the Debtors must be directed to: Patrick Layton (patrick.layton@moelis.com), Dave McGuiness (dave.mcguiness@moelis.com) and the Moelis deal team (Project_Sunroof_Ext@moelis.com).**

**Each Potential Bidder or Acceptable Bidder shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Potential Bidder or Acceptable Bidder, as applicable, and its contemplated Sale Transaction.**

5.      **BID REQUIREMENTS.**

Any proposal, solicitation, or offer to consummate a Sale Transaction (each, a "<u>Bid</u>") must be submitted in writing and must satisfy the following requirements (collectively, the "<u>Bid Requirements</u>"):

5.1.    **Proposed Sale Transaction.**  Each Bid must clearly propose a Sale Transaction as to the Assets.  Each Bid must specify (1) which of such Assets – with as much specificity as is possible – are to be included in the proposed Sale Transaction (the "<u>Acquired Assets</u>"), (2) to the extent such Bid is for substantially all of the Assets, which Assets, if any, are to be excluded from the proposed Sale Transaction (the "<u>Excluded Assets</u>"), (3) the liabilities and obligations, including any debt and cure costs to be assumed (the "<u>Assumed Liabilities</u>"), and (4) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.  For the avoidance of doubt, all Assets held by non-Debtor subsidiaries primarily related to the non-U.S. businesses of the Debtors shall be presumed to be Excluded Assets.

5.2.    **Purchase Price.**  Each Bid must (a) clearly specify the purchase price to be paid, assuming a purchase of the applicable Assets and assumption of the Assumed Liabilities (the "<u>Purchase Price</u>"); (b) identify separately any cash and non-cash components (which non-cash components shall be limited only to credit bids and Assumed Liabilities) of the Purchase Price in US dollars; and (c) indicate the allocation of the Purchase Price among the applicable Assets.  If the Debtors select a Stalking Horse Bidder for such assets, then such Purchase Price shall exceed such Stalking Horse Bid by at least the aggregate sum of (1) the Bid Protections for such assets, and (2) such additional amount as determined by the Debtors in their reasonable business judgment after consultation with the Consultation Parties.

5.3.    **Deposit.**  Each Bid must be accompanied by a cash deposit equal to ten percent (10%) of the applicable aggregate Purchase Price (the "<u>Deposit</u>"), to be held in one or more escrow accounts on terms acceptable to the Debtors and the Consultation Parties; *provided*, *however*, that the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may elect to waive or modify the requirement of a Deposit on a case-by-case basis.  For the avoidance of doubt, each credit bid must also be accompanied by the Deposit to the extent of any cash component of such Credit Bid.  For the avoidance of doubt, to the extent the Purchase Price of a Bid is increased, at any time or from time to time, whether prior to commencement of the Auction or during the Auction, the amount of the Deposit shall automatically increase accordingly (to be equal to 10% of any increased Purchased Price) and the corresponding Potential Bidder will pay into escrow the amount of such increase, as promptly as practicable, and in any event within one business day, following such increase.  Without limiting the foregoing, if a Purchase Price is increased in order to make a bid into a Qualified Bid, the Debtors may condition participation of the applicable Potential Bidder at the Auction on such Potential Bidder paying the then full amount of the Deposit into escrow prior to commencement of the Auction or such participation.

5.4.    **Transaction Documents.**  Each Bid must be accompanied by an executed form of purchase agreement, which the Debtors shall make available to Acceptable Bidders via the Debtors' electronic data room pursuant to the due diligence process, with respect to the proposed Sale Transaction, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid.   In addition, (1) the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to the form purchase agreement provided by the Debtors and (2) if one or more Stalking Horse Bidders have been designated for the applicable Assets, the executed purchase agreement accompanying such Potential Bidder's Bid must be further accompanied by a redline copy marked against each applicable Stalking Horse Agreement.

5.5.    **Back-Up Bidder Commitment.**  Each Bid must include a written commitment by the applicable Potential Bidder to serve as a Back-Up Bidder (as defined below) in the event that such Potential Bidder's Bid is not selected as the Winning Bid; *provided* that the foregoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party (as defined below) and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code; or (2) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement.

5.6.    **Proof of Financial Ability to Perform.**   To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the applicable Assets and the proposed Sale Transaction.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

5.7.    **Contingencies; No Financing or Diligence Outs.**   Each Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

5.8.    **Identity.**  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid—including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction contemplated by such Bid—and the complete terms of any such participation.  Each Bid must also fully disclose whether any current or former

officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors.  Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid.  Each Bid should also include contact information for the specific person(s) and counsel whom the Debtors (and their advisors) should contact regarding such Bid.

5.9.    **Authorization.**  Each Bid must contain evidence acceptable to the Debtors that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Sale Transaction contemplated by such Bid.

5.10.    **Contracts and Leases.**  Each Bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "Assigned Contracts").  Each Bid must be accompanied by adequate assurance of future performance under all Assigned Contracts, which shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtors may request (the "Adequate Assurance Package").  The Adequate Assurance Package should be submitted in its own compiled PDF document.

5.11.    **As-Is, Where-Is.**  Each Bid must include a written acknowledgement and representation that:  (1) the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Sale Transaction prior to making its offer; (2) the Potential Bidder has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid; (3) except as may be set forth in Definitive Sale Documents (as defined below) concerning such Bid, the Potential Bidder did not rely, and is not relying upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Sale Transaction, the completeness of any information provided in connection therewith or the Auction, if any, or otherwise; and (4) the Potential Bidder did not engage in any collusive conduct and acted in good faith in submitting its Bid.

5.12.    **No Break-Up Fee or Reimbursement of Expenses.**  Each Bid, with the exception of the Complete Solaria Stalking Horse Bid and any Additional Stalking Horse Bid, must expressly state and acknowledge that such Potential Bidder shall not be entitled to, and shall not seek, any transaction break-up fee, termination fee, expense reimbursement, working fee, or similar type of payment; *provided*, that the Debtors are authorized in their reasonable business judgment, in consultation with the Consultation Parties, subject to Section 6 of these Bidding Procedures, to offer Bid Protections to one or more Stalking Horse Bidders in accordance with these

Bidding Procedures and the Bidding Procedures Order; *provided*, *further*, that each Bid must expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the sale process.

5.13.    **Transition Services**.  Each Bid must state or otherwise estimate the types of transition services, if any, the Potential Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Potential Bidder's Bid were selected as the Winning Bid for the applicable Assets.

5.14.    **Commitment to Close.**  Each Bid must include a commitment to close as soon as practicable and state the expected date of closing of the Sale Transaction, which for the avoidance of doubt must be either on or before the date specified in <u>Section 1</u>.

5.15.    **Irrevocable Bid**.  Each Bid must contain a statement by the applicable Potential Bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the Potential Bidder and irrevocable in all respects.

5.16.    **Compliance with Bidding Procedures**.  Each Bid must contain a covenant that the applicable Potential Bidder will comply in all respects with the terms of these Bidding Procedures and the Bidding Procedures Order.

5.17.    **Combination Bids.**  For Bids that contemplate a purchase of multiple categories of Assets, each Bid must specify: (i) allocation of the Purchase Price across each Asset; (ii) for Bids that include real estate and sale-leaseback equity specifically, the Purchase Price must be allocated across each individual property included in the Bid; and (iii) Bids must indicate whether the offer is on an "all or none" basis in the event that the Potential Bidder is outbid for certain Assets contemplated in the Bid.

5.18.    **Initial Going-Concern Assets Overbid.**  Any Overbid (as defined below) regarding all or substantially all of the Going-Concern Assets must have a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, Consultation Parties, and the Committee and its advisors, that is at least the sum of (i) five-hundred thousand dollars ($500,000.00) more than the value offered under the Complete Solaria Stalking Horse APA *plus* (ii) the aggregate amount of Going-Concern Bid Protections (as defined below) (the "<u>Initial Going-Concern Assets Overbid</u>").

By submitting a Bid, each Potential Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and to refrain from (A) submitting a Bid after conclusion of the Auction (if any) or (B) seeking to reopen the Auction (if any) once closed.  **The submission of a Bid shall constitute a <u>binding and irrevocable</u> offer (a) for the Winning Bidder, until consummation of the proposed Sale Transaction, (b) for the Back-Up Bidder (if any), as provided in these Bidding Procedures, including Section 11 hereof, and**

**(c) for any bidder other than the Winning Bidder and Back-Up Bidder, until two (2) business days after entry of the Court's order approving the Winning Bid and (if applicable) the Back-Up Bid for the applicable Assets (each, as applicable, a "<u>Sale Order</u>"), and each Bid must include a written acknowledgment and representation to such effect.**

6.    **STALKING HORSE BIDDER(S).**

**Complete Solaria Stalking Horse Bidder**

In connection with the Complete Solaria Stalking Horse APA and in recognition of the Complete Solaria Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors are authorized and directed to (i) provide a breakup fee in the amount of 3% of the purchase price under the Complete Solaria Stalking Horse APA (the "<u>Going-Concern Breakup Fee</u>") and (ii) reimburse the Complete Solaria Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with the preparation and negotiation of the Complete Solaria Stalking Horse APA and prosecution of the related pleadings with the Court, up to a maximum of seven-hundred and fifty thousand United States Dollars ($750,000.00) under the Complete Solaria Stalking Horse APA (the "<u>Going-Concern Expense Reimbursement</u>") and together with the Going-Concern Breakup Fee, the "<u>Going-Concern Bid Protections</u>").  For the avoidance of doubt, no other Qualified Bidder for the Going-Concern Assets shall be entitled to any form of bid protections, except to the extent the Complete Solaria Stalking Horse APA is terminated in its entirety and with the consent of the First Lien Agent.

**Additional Stalking Horse Bidders**

Solely with respect to the Remaining Assets, the Debtors are and shall be authorized, but not obligated, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties and with the consent of the First Lien Agent, to:  (A) select one or more Acceptable Bidders to act as an Additional Stalking Horse Bidder (and such Acceptable Bidder's Bid, an "<u>Additional Stalking Horse Bid</u>") and enter into an Additional Stalking Horse Agreement; and (B) in recognition of such Additional Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors may, in consultation with the Consultation Parties, determine to (i) provide a breakup fee (other than with respect to an Additional Stalking Horse Bidder that is a Secured Party) (the "<u>Remaining Assets Breakup Fee</u>") and/or (ii)  reimburse such Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with preparation and negotiation of the Stalking Horse Agreement (the "<u>Remaining Assets Expense Reimbursement</u>," and together with the Remaining Assets Breakup Fee, the "<u>Remaining Assets Bid Protections</u>"); *provided* that the aggregate of the Remaining Assets Breakup Fee and the total Remaining Assets Expense Reimbursement shall in no event exceed three percent (3%) of the applicable purchase price.  To the extent the Remaining Assets Bid Protections do not otherwise comply with the Bidding Procedures, the Debtors reserve the right, in consultation with the Consultation Parties, to seek Court approval of such Remaining Assets Bid Protections.

No later than one business day after selecting an Additional Stalking Horse Bidder, the Debtors shall file with the Court and serve a notice that (A) identifies the Additional Stalking

Horse Bidder and the material terms of the applicable Additional Stalking Horse Bid, including the Purchase Price and the Assets to which such Additional Stalking Horse Bid relates; and (B) attaches a copy of the corresponding Additional Stalking Horse Agreement.

## 7.    BID DEADLINE.

Any Bid for the Assets must be transmitted via email (in .pdf or similar format) to the Debtors and their advisors (as specified in Section 2 hereof) so as to be **actually received** by such **parties** on or before **September 6, 2024, by 5:00 p.m. (Eastern Daylight Time)** (the "Bid Deadline").

The Debtors shall promptly provide the Consultation Parties copies of all Bids received by the Debtors, but in no event later than the next business day following receipt.

## 8.    QUALIFIED BIDS & QUALIFIED BIDDERS.

A Bid is a "Qualified Bid" if the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, determine that such Bid (A) satisfies the Bid Requirements set forth above; and (B) is reasonably likely to be consummated if selected as the Winning Bid (or Back-Up Bid, as applicable) for the applicable Assets; *provided* that any Stalking Horse Bid shall constitute and be deemed a Qualified Bid. For the avoidance of doubt, Combination Bids may constitute a Qualified Bid.

An Acceptable Bidder that submits a Qualified Bid is a "Qualified Bidder" with respect to the Assets to which such Qualified Bid relates; *provided* that any Stalking Horse Bidder shall constitute and be deemed a Qualified Bidder. For the avoidance of doubt, to the extent that any Prepetition Secured Party submits a credit bid in accordance with section 9 herein, such bid shall be a Qualified Bid, and such Prepetition Secured Party shall be a Qualified Bidder with respect to such Bid.

As soon as reasonably practicable after the applicable Bid Deadline, the Debtors will notify each Acceptable Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid. If an Acceptable Bidder's Bid is determined not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit (if any) on the date that is three business days after the Bid Deadline.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors following consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (A) Potential Bidders and Acceptable Bidders

to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any). The Debtors, in consultation with the Consultation Parties, reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors, in consultation with the Consultation Parties, may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple Qualified Bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)).

## 9.    RIGHT TO CREDIT BID.

Any Qualified Bidder that has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Party") shall be entitled to credit bid all or a portion of the face value of such Secured Party's claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid; *provided* that a Secured Party shall be entitled to credit bid its claim(s) only with respect to Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claim(s). Notwithstanding anything to the contrary herein, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, subject to section 363(k) of the Bankruptcy Code, may submit a credit bid of all or any portion of the aggregate amount of their respective secured claims. Any credit bid submitted by any Prepetition First Lien Secured Party or any Prepetition Second Lien Secured Party, subject to section 363(k) of the Bankruptcy Code, shall be deemed a Qualified Bid regardless of whether it meets the requirements set forth herein, including the deposit requirements; *provided* that any credit bid by the Prepetition Second Lien Secured Parties (including the Second Lien Agent) shall (i) provide payment in full in cash of all First Lien Debt and all First Lien Adequate Protection Claims and (ii) otherwise be permitted by the terms of the Intercreditor Agreement.

Notwithstanding the foregoing, following the submission of a credit bid by any Prepetition First Lien Secured Party or any Prepetition Second Lien Secured Party, the Debtors may sell a portion of the Assets that are subject to such credit bid with the prior written consent of such Prepetition First Lien Secured Party or Prepetition Second Lien Secured Party, as applicable, and the amount of such credit bid shall be adjusted accordingly.

The rights and defenses of the Debtors and any other party in interest with respect to whether any assertion that any liens, claims, encumbrances, or interests, if any, will attach to the proceeds of the Sale Transactions are expressly preserved.

## 10.    AUCTION.

If the Debtors receive two or more Qualified Bids with respect to the same Assets, the Debtors may, in consultation with the Consultation Parties, conduct an auction (the "Auction") to determine the Winning Bidder (or Back-Up Bidder, as applicable) with respect to such Assets. In such event, the Debtors will (A) notify all Qualified Bidders of the highest or otherwise best Qualified Bid with respect to the applicable Assets, as determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties (each such Qualified Bid, a "Baseline Bid") and (B) provide copies of the documents setting forth

the terms of the Baseline Bid(s) to all Qualified Bidders, in each case, as soon as reasonably practicable after the Bid Deadline and in any event no later than prior to the commencement of the Auction.  The Debtors' determination of which Qualified Bid constitutes the Baseline Bid shall consider any factors the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, deem relevant to the value of the Qualified Bid to the Debtors' estates and the Debtors' patient care mandate and related regulatory requirements.

If the Debtors, in consultation with the Consultation Parties, determine that they have received no Qualified Bids other than any Stalking Horse Bid or they have received only a single Qualified Bid, then the Bid Deadline will not occur, and the Stalking Horse Bid(s) or the Qualified Bid will be deemed to be the Winning Bid(s) for the Assets to which such Stalking Horse Bid(s) or Qualified Bid relates.  If the Debtors make such a determination, the Debtors shall file a notice with the Court within one business day of making such determination.

If the Debtors receive two or more Qualified Bids for the same Assets, the Auction shall take place on or after **September 10, 2024,** at a time to be announced by the Debtors in consultation with the Consultation Parties, via remote video and/or in person at the Debtors' election, and shall be conducted in a timely fashion according to the procedures set forth below (the "<u>Auction Procedures</u>").

## AUCTION PROCEDURES

(i)    **The Debtors Shall Conduct the Auction(s); General Provisions.**  The Debtors, with the assistance of their advisors, shall direct and preside over any Auction and shall consult with the Consultation Parties throughout the Auction process.  At the commencement of the Auction, the Debtors, in consultation with the Consultation Parties (1) may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit any successive Bid(s); and (2) shall describe the terms of the Baseline Bid.  Only incremental Bids that comply with the terms set forth in Section 10(ii) of these Bidding Procedures shall be considered "Overbids."  Overbids shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors, in consultation with the Consultation Parties, shall determine in their reasonable business judgment whether an incremental Bid is an Overbid.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid (or Back-Up Bid, as applicable) (as defined below).

Only Qualified Bidders, the Debtors, the Consultation Parties and each of their respective legal and financial advisors, and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Except as otherwise permitted by the Debtors in consultation with the Consultation Parties, only Qualified Bidders shall be entitled to bid at the Auction.

The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

The Debtors may, subject to Section 15 of these Bidding Procedures, announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

(ii)    <u>**Terms of Overbids.**</u>  Each Overbid must comply with the following terms:

(a)    <u>Minimum Overbid Increment</u>.  At the commencement of the initial solicitation of Overbids, the Debtors, in consultation with the Consultation Parties, shall announce the minimum increment by which any Overbid must exceed the applicable Baseline Bid, which amount shall not be lower than one-hundred thousand United States Dollars ($100,000.00); *provided* that the first Overbid with regard to the Going-Concern Assets shall be the Initial Going-Concern Assets Overbid.  At the commencement of each subsequent round of solicitation of Overbids, the Debtors shall announce the minimum increment by which any Overbid must exceed the Prevailing Highest Bid

(as defined below) at such time. The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to the applicable minimum Overbid increment at any time during the Auction. Any Overbid made by a Stalking Horse Bidder shall be deemed to have been made in an amount equal to the Overbid plus, if applicable, the Expense Reimbursement and the Breakup Fee, to the extent provided in the applicable Stalking Horse Agreement.

(b) <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors (an "<u>Overbid Round Deadline</u>"); *provided* that the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may extend any Overbid Round Deadline.

(c) <u>Overbid Alterations</u>. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(d) <u>Announcing Highest Bid</u>. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Consultation Parties, have identified an Overbid as being higher or otherwise better than, in the initial Overbid round, the Baseline Bid or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all applicable Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid.

(iii) **Consideration of Overbids.** The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient and sufficiently unconditional financing commitments to consummate the proposed Sale Transaction at the prevailing Overbid amount.

(iv) **Closing the Auction.** The Auction shall continue until there is only one Qualified Bid for a particular group of Assets that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties, to

be the highest or otherwise best Qualified Bid for the applicable assets. Such Qualified Bid shall be designated the "<u>Winning Bid</u>" (or Back-Up Bid, as applicable, and the Qualified Bidder who submitted the Winning Bid, the "<u>Winning Bidder</u>") with respect to its proposed Acquired Assets, at which time the Auction with respect to such Assets shall be closed; *provided* that (1) such Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid; and (2) the Debtors' designation of a Qualified Bid as a Winning Bid (or Back-Up Bid, as applicable) shall be subject to and conditioned on finalization of definitive documentation and the Court's approval of such Winning Bid (or Back-Up Bid, as applicable), applicable regulatory and third-party approvals, and the consummation of the Sale Transaction contemplated thereby. As soon as reasonably practicable after the designation of a Winning Bid (or Back-Up Bid, as applicable), the Debtors, in consultation with the Consultation Parties, shall finalize definitive documentation to implement the terms of such Winning Bid (or Back-Up Bid, as applicable) and cause such definitive documentation to be filed with the Court.

(v)  **<u>No Collusion; Good Faith Offer.</u>**  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (1) such Qualified Bidder has not engaged in any collusion with respect to the bidding process (2) such Qualified Bidders' Qualified Bid is a good faith and irrevocable offer and such Qualified Bidder intends to consummate the Sale Transaction contemplated by its Qualified Bid if such Qualified Bid is the Winning Bid (or Back-Up Bid, as applicable) with respect to the applicable Acquired Assets, and (3) will serve as Back-Up Bid.

(vi)  **<u>Rejection of Bids</u>**.  The Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Winning Bid (or Back-Up Bid, as applicable), any Bid that the Debtors determine, after consultation with the Consultation Parties, is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code and/or these Bidding Procedures, or (3) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

## 11.  DESIGNATION OF A BACK-UP BIDDER.

If for any reason the Winning Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Winning Bidder, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid (each, a "<u>Back-Up Bidder</u>"), as determined by the Debtors after consultation with the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein and as set forth in the Sale Order, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, a "<u>Back-Up Bid</u>"), and the Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four hours advance notice, which notice will be filed with the Court; *provided* that the forgoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party and

(b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code; or (2) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement.

Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open and irrevocable until the earlier of (1) the closing of the transactions contemplated by the Winning Bid notwithstanding any outside date set forth in such Back-Up Bidder's proposed purchase agreement and (2) the date that is four months following the conclusion of the Auction.

## 12.    FIDUCIARY OUT.

Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to the Sale Transactions or these Bidding Procedures solely to the extent such Debtor or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, until the entry of the Sale Order, the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (A) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each, an "Alternate Proposal"); (B) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (C) maintain or continue discussions or negotiations with respect to Alternate Proposals; (D) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (E) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

## 13.    "AS IS, WHERE IS."

Consummation of the Sale Transactions will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted and agreed to by the Debtors in the executed definitive written documentation for the Sale Transactions (the "Definitive Sale Documents").  Unless otherwise specifically accepted and agreed to by the Debtors in Definitive Sale Documents, all of the Debtors' right, title, and interest in and to the Assets disposed of in the Sale Transaction will be transferred to the Winning Bidder (or Back-Up Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code.

By submitting a Bid, each bidder will be deemed to acknowledge and represent that it (A) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (B) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and

unexpired leases, in making its Bid, and (C) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Transaction or the completeness of any information provided in connection with the Sale Transaction or the Auction (if any), except as may be set forth in Definitive Sale Documents.

14. **COMMISSIONS.**

The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any Potential Bidder's agent, advisor, or broker. All commissions, fees, or expenses for any such agents, advisors, or brokers shall be paid by the applicable Potential Bidder at such Potential Bidder's discretion. In no case shall any commissions, fees, or expenses for any Potential Bidder's agent, advisor, or broker be deducted from any proceeds derived from any Sale of the Assets. This Section 14 shall not apply to any Bid Protections that become payable pursuant to the terms of a Stalking Horse Agreement.

15. **RESERVATION OF RIGHTS.**

The Debtors may, in consultation with the Consultation Parties, be entitled to modify these Bidding Procedures in their reasonable business judgment in consultation with the Consultation Parties in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction (if any), additional customary terms and conditions on a Sale Transaction, including: (A) extending the deadlines set forth in these Bidding Procedures; (B) adjourning the Auction at the Auction; (C) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if any); (D) canceling the Auction; and (E) rejecting any or all Bids or Qualified Bids; provided, however, that the Debtors may not amend these Bidding Procedures or the bidding process to (i) reduce or otherwise modify their obligations to consult with any Consultation Party or alter any other rights of any Consultation Party without the consent of such Consultation Party or further order of the Court, or (ii) reduce or otherwise modify their obligations to obtain consent from any Consultation Party pursuant to these Bidding Procedures. All such modifications and additional rules will be communicated to each of the Consultation Parties, Potential Bidders, and Qualified Bidders; provided that, to the extent such modifications occur at the Auction, disclosure of such modifications is limited to those in attendance at the Auction.

Each reference in these Bidding Procedures and the Bidding Procedures Order to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.

16. **CONSENT TO JURISDICTION.**

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

17.    **SALE HEARING.**

The Court shall hold a hearing to consider approval of the Winning Bid(s) (and Back-Up Bid(s), as applicable) and the Sale Transactions contemplated thereby (the "Sale Hearing"). **The Sale Hearing shall be held on September 17, 2024, subject to the availability of the Court. The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending written notice to all Qualified Bidders and Consultation Parties prior to, or by making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any bidder or other party.**

18.    **RETURN OF DEPOSIT.**

Any Deposits provided by Qualified Bidders shall be held in one or more escrow accounts on terms acceptable to the Debtors. Any such Deposits will be returned to Qualified Bidders that are not Winning Bidders (or Back-Up Bidders, as applicable) on the date that is three business days after the Auction (if any). Any Deposit provided by a Winning Bidder (or Back-Up Bidder, as applicable) shall be applied to the Purchase Price of the applicable Sale Transaction at closing.

If a Winning Bidder (or Back-Up Bidder, as applicable) fails to consummate the Sale Transaction contemplated by its Winning Bid (or Back-Up Bid, as applicable) because of a breach by such Winning Bidder (or Back-Up Bidder, as applicable), the Debtors will not have any obligation to return any Deposit provided by such Winning Bidder (or Back-Up Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates.

**Exhibit 2**

**Complete Solaria Stalking Horse APA**

**Execution Version**
**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF AUGUST 5, 2024**

**BY AND AMONG**

**COMPLETE SOLARIA, INC., AS PURCHASER,**

**AND**

**SUNPOWER CORPORATION**

**AND ITS SUBSIDIARIES NAMED HEREIN,**

**AS SELLERS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES** ......................................................................................................1
Section 1.1      Purchase and Sale of the Acquired Assets ......................................1
Section 1.2      Excluded Assets ..............................................................................3
Section 1.3      Assumption of Certain Liabilities ...................................................4
Section 1.4      Excluded Liabilities ........................................................................5
Section 1.5      Assumption/Rejection of Certain Contracts ...................................7

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING**.............................................9
Section 2.1      Consideration; Payment ..................................................................9
Section 2.2      Deposit.............................................................................................9
Section 2.3      Closing ...........................................................................................10
Section 2.4      Closing Deliveries by Sellers ........................................................10
Section 2.5      Closing Deliveries by Purchaser ...................................................11
Section 2.6      Withholding ...................................................................................11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ..........................11
Section 3.1      Organization and Qualification......................................................11
Section 3.2      Authorization of Agreement ..........................................................11
Section 3.3      Conflicts; Consents .......................................................................12
Section 3.4      Title to Assets; Sufficiency of Assets ...........................................12
Section 3.5      Assigned Contracts and Assumed Leases ......................................13
Section 3.6      Real Property .................................................................................13
Section 3.7      Employees......................................................................................13
Section 3.8      Litigation; Decrees ........................................................................14
Section 3.9      Data Privacy...................................................................................14
Section 3.10     Environmental Matters ..................................................................15
Section 3.11     Taxes..............................................................................................15
Section 3.12     Intellectual Property ......................................................................16
Section 3.13     Compliance with Laws; Permits....................................................20
Section 3.14     Brokers...........................................................................................21
Section 3.15     No Other Representations or Warranties ........................................21

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ......................22
Section 4.1      Organization and Qualification......................................................22
Section 4.2      Authorization of Agreement ..........................................................22
Section 4.3      Conflicts; Consents .......................................................................22
Section 4.4      Financing........................................................................................23
Section 4.5      Brokers...........................................................................................23
Section 4.6      Solvency.........................................................................................23
Section 4.7      SEC Reports; Undisclosed Liabilities............................................23
Section 4.8      No Additional Representations or Warranties ................................25
Section 4.9      No Outside Reliance ......................................................................25

i

**ARTICLE V C**OVENANTS AND **A**GREEMENTS..............................................................**26**
    Section 5.1    Conduct of Sellers ...........................................................26
    Section 5.2    Bankruptcy Actions .........................................................27
    Section 5.3    Alternative Transactions ..................................................27
    Section 5.4    Cure Costs .......................................................................28
    Section 5.5    Sale Order .......................................................................28
    Section 5.6    Bankruptcy Court Milestones ..........................................29
    Section 5.7    Approval ..........................................................................29
    Section 5.8    Access to Information ......................................................29
    Section 5.9    Employee Matters ............................................................30
    Section 5.10   Further Assurances ..........................................................31
    Section 5.11   Tax Matters .....................................................................31
    Section 5.12   Seller Guarantees ............................................................33

**ARTICLE VI C**ONDITIONS TO **C**LOSING.......................................................................**34**
    Section 6.1    Conditions Precedent to the Obligations of Purchaser and Sellers...........34
    Section 6.2    Conditions Precedent to the Obligations of Purchaser .............34
    Section 6.3    Conditions Precedent to the Obligations of Sellers .................34
    Section 6.4    Waiver of Conditions ......................................................35

**ARTICLE VII T**ERMINATION.........................................................................................**35**
    Section 7.1    Termination of Agreement ...............................................35
    Section 7.2    Effect of Termination ......................................................37

**ARTICLE VIII M**ISCELLANEOUS ..................................................................................**38**
    Section 8.1    Non-Survival of Representations and Warranties and Certain
                Covenants; Certain Waivers ............................................38
    Section 8.2    Expenses .........................................................................38
    Section 8.3    Notices ............................................................................38
    Section 8.4    Binding Effect; Assignment.............................................39
    Section 8.5    Amendment and Waiver ...................................................39
    Section 8.6    Third Party Beneficiaries .................................................40
    Section 8.7    Non-Recourse ..................................................................40
    Section 8.8    Severability .....................................................................40
    Section 8.9    Construction ....................................................................40
    Section 8.10   Complete Agreement .......................................................40
    Section 8.11   Specific Performance .......................................................41
    Section 8.12   Jurisdiction and Exclusive Venue ....................................41
    Section 8.13   Governing Law; Waiver of Jury Trial ..............................42
    Section 8.14   No Right of Set-Off .........................................................42
    Section 8.15   Counterparts and PDF......................................................42
    Section 8.16   Publicity .........................................................................43
    Section 8.17   Bulk Sales Laws..............................................................43
    Section 8.18   Fiduciary Obligations......................................................43
    Section 8.19   Sellers' Representative.....................................................43
    Section 8.20   Schedules ........................................................................43

**ARTICLE IX ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ...................................44**

Section 9.1    Certain Definitions..................................................................................44

Section 9.2    Rules of Interpretation .............................................................................56

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of August 5, 2024, is made by and among, (a) Complete Solaria, Inc., a Delaware corporation ("<u>Purchaser</u>"), and (b)(i) SunPower Corporation, a Delaware corporation ("<u>SunPower Corporation</u>"), and (ii) the direct and indirect subsidiaries of SunPower Corporation as set forth in the signature pages attached hereto[1] (together with SunPower Corporation, each a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>"). Purchaser and Sellers are referred to herein individually as a "<u>Party</u>" and together as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein including <u>Article IX</u>.

WHEREAS, on or shortly following the date of this Agreement, each Seller intends to file a voluntary petition and commence cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

WHEREAS, Purchaser desires to purchase the Acquired Assets (as defined below) and assume the Assumed Liabilities (as defined below) from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order; and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding the Purchaser as the Successful Bidder at the Auction, Sellers shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire from Sellers, pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, the Acquired Assets, and the Purchaser shall assume from Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, the Parties hereby agree as follows:

## ARTICLE I
### PURCHASE AND SALE OF ACQUIRED ASSETS;
### ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1    <u>Purchase and Sale of the Acquired Assets</u>**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order at the Closing (as defined below), each Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from such Seller, all of such Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of

---

[1]    <u>Note to Draft</u>: This is intended to include all entities that will be party to the Chapter 11 Cases.

each Seller's right, properties, title and interest in and to, as of the Closing, to all assets relating to the (i) New Homes Business, (ii) Non-Installing Dealer Business and (iii) the Blue Raven Business, in each case, as presently conducted (collectively the "Acquired Businesses"), including, solely to the extent relating to the Acquired Businesses, the following assets of such Seller, but excluding in all cases the Excluded Assets (as defined below):

(a)    Subject to modification in accordance with Section 1.5, all Contracts listed on Schedule 1.1(a), including any backup data maintained by Sellers in connection therewith (collectively, the "Assigned Contracts") and all rights and benefits thereunder;

(b)    copies of the Transferred Employee Records, but excluding from the foregoing any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by Law;

(c)    the Transferred Intellectual Property set forth on Schedule 1.1(c);

(d)    the name "SunPower" or any derivation thereof;

(e)    all prepositioned Inventory associated with the New Homes Business set forth on Schedule 1.1(e) and held by certain of its installer partners as set forth therein;

(f)    all goodwill associated with the Acquired Assets and Acquired Businesses;

(g)    to the extent transferable, all benefits, proceeds and other amounts payable under any policy of insurance relating to the Acquired Assets and all rights and benefits thereunder, which shall be Assigned Contracts;

(h)    the Leases set forth on Schedule 1.1(h) (the "Assumed Leases"), together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements, including tenant improvements, located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(i)    all prepaid expenses (other than prepaid insurance), including certain deposits, of any Seller, which are related to the Acquired Businesses and are set forth on Schedule 1.1(i);

(j)    all Computer Systems set forth on Schedule 1.1(j);

(k)    all information technology systems and applications set forth on Schedule 1.1(k);

(l)    to the extent transferable, the Permits issued to, or for the benefit of, any Seller, all rights and benefits thereunder, and all pending applications or filings therefor and renewals thereof, which are related to the Acquired Businesses and that are set forth on Schedule 1.1(l);

(m)    the list of each non-installing dealer relating to the Non-Installing Dealer Business and select information regarding such non-installing dealer, in each case, as set forth on Schedule 1.1(m);

(n)    all Accounts Receivable related solely to the Acquired Businesses and Acquired Assets;

(o)    a copy of the books and records of any Seller related solely to the Acquired Assets or the Assumed Liabilities; and

(p)    other assets of the Sellers (other than Excluded Assets and Excluded Liabilities) that related solely to the operation of the Acquired Assets and Acquired Businesses which are identified after the date hereof and mutually agreed in writing by Purchaser and Sellers prior to the Closing.

**Section 1.2    Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and such Seller shall retain all right, title and interest to, in and under any properties, rights interests or other assets of such Seller other than the Acquired Assets (collectively, the "Excluded Assets") which shall include:

(a)    all Accounts Receivable of the Sellers to the extent not related to the Acquired Assets or Acquired Businesses;

(b)    all Equity Interests of any of the Sellers' direct or indirect Subsidiaries;

(c)    all of the Sellers' rights under this Agreement;

(d)    all of the Sellers' rights under any Excluded Asset;

(e)    all Contracts to which any Seller is a party other than the Assigned Contracts, including independent contractor agreements;

(f)    all payments for the purchase of goods, including but not limited to customer deposits and prepaid amounts;

(g)    all Leases to which any Seller is a party other than the Assumed Leases;

(h)    all assets of Albatross Software;

(i)    all Tax Returns or Tax refunds of a Seller Tax Group or any Seller or Affiliate thereof;

(j)    all Tax refunds with respect to the Acquired Assets (excluding, for the avoidance of doubt, any Tax refund described in Section 1.2(i) and any Tax refunds received by the Seller in relation a Tax attributable to the Acquired Assets and paid by the Purchaser after Closing) allocable to a Pre-Closing Tax Period, as determined pursuant to Section 5.11; and

3

(k)    all software, Intellectual Property Rights, Computer Systems, and information technology systems and applications, including the PVS6 gateway and related technology, that are owned, used in, relate to, or are necessary for the conduct and performance of (i) services to all lease customers under the existing maintenance services agreements pursuant to which Sellers provide certain operating and maintenance services to those subsidiaries of SunStrong Capital Holdings, LLC who own PV and storage systems (each, an "Owner"), (ii) the existing lease and loan services agreements, pursuant to which SunPower Capital Services, LLC provides certain lease and loan services to the Owners, and (iii) the existing transaction management and asset management agreements pursuant to which SunStrong Capital Holdings, LLC and SunPower Capital Services, LLC provide certain administrative and management services, provided, however, the Sellers shall (A) subject to the entry of an Order by the Bankruptcy Court, provide the purchaser with a license to utilize the PVS6 gateway and related technology with respect to the Acquired Assets and (B) use commercially reasonable efforts to transfer the servicing of the Acquired Assets to a go-forward servicer; and

(l)    all computers of Sellers' employees that are ultimately hired by Purchaser; *provided*, however that at such time that the Sellers no longer need to maintain and/or preserve the computers and it is determined that the computers may be transferred, all computers of Sellers will be transferred to Purchaser at no additional cost.

**Section 1.3    Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and in the Sale Order effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and such Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication (collectively, the "Assumed Liabilities"):

(a)    all Liabilities arising out of or relating to the ownership and operation of the Acquired Assets, Assigned Contracts or Acquired Businesses, arising at or after the Petition Date that are due and payable after the Closing (including, for the avoidance of doubt, accounts payable due and payable after the Closing);

(b)    all Liabilities (i) in respect of Transferred Employees arising at or after the Closing and (ii) assumed by Purchaser pursuant to Section 5.9;

(c)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(d)    any Liability for Taxes (including the payment thereof) attributable to the Acquired Assets for a taxable period (or portion thereof) beginning after the Closing Date (as determined pursuant to Section 5.11);

(e)    Transfer Taxes; and

(f)    subject to Purchaser's further review, certain customer deposits to be identified by the Parties in good faith prior to the Closing.

**Section 1.4    Excluded Liabilities**. Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing before or on the Closing Date (as defined below) or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing (collectively, the "Excluded Liabilities"), including the following Liabilities of any of the Sellers or of any predecessor of any of the Sellers, whether incurred or accrued by any of the Sellers before or after the Closing Date:

(a)    all Cure Costs for Contracts or Leases to which any Seller is a party that are not Assigned Contracts or Assumed Leases;

(b)    any Liability of the Sellers or of any of their predecessors associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of the Sellers' or any of their respective Affiliates' obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with the Sellers' Affiliates;

(c)    all Liability of the Sellers or of any of their predecessors associated with payments for the purchase of goods, including but not limited to customer deposits and prepaid amounts;

(d)    all Retained Taxes;

(e)    all Liabilities of the Sellers or of any of their predecessors under this Agreement and the transactions contemplated hereby or thereby;

(f)    any Liabilities in respect of any Contracts or Leases to which any Seller is a party that are not Assigned Contracts or Assumed Leases, including any Liabilities arising out of the rejection of any such Contracts or Leases pursuant to Section 365 of the Bankruptcy Code;

(g)    except for Liabilities expressly identified as Assumed Liabilities, all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by the Sellers or of any of their predecessors in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by the Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by the Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith; and (ii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of the Sellers or of any of their predecessors payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(h)    except for Liabilities expressly identified as Assumed Liabilities, all employment-related Liabilities of the Sellers, including (i) Liabilities for any action resulting from the Sellers' employees' separation of employment with the Sellers, including any severance or separation pay, (ii) employment-related Liabilities resulting from the transactions contemplated hereby whether before, on or after the Closing, (iii) Liabilities arising out of or relating to any collective bargaining Contract, labor negotiation, employment Contract, and consulting Contract with the Sellers, (iv) any Liabilities arising from or related to payroll and payroll Taxes for the current and former employees or independent contractors or other service providers of the Sellers to such person at any time on or prior to the Closing, (v) Liabilities of the Sellers for vacation, sick leave, parental leave, and other paid-time off accrued by the Sellers on and prior to Closing, (vi) all Liabilities with respect to any current or former employee of the Sellers including the Executive Employment Contracts, and (vii) all Liabilities for any failure to comply with applicable Laws or obligations under any Contract, in each case arising out of or related to employment of employees of the Sellers or engagement of independent contractors of the Sellers;

(i)    all Liabilities related to the WARN Act, to the extent applicable, with respect to the Sellers' termination of employment of the Sellers' employees on or prior to Closing (for the avoidance of doubt reference to the Sellers in clause (h) and (i) shall refer to the Sellers and its Affiliates);

(j)    all Liabilities arising under or relating to Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto);

(k)    all Liabilities of the Sellers or of any of their predecessors to their respective equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any Liability of the Sellers or of any of their predecessors pursuant to any Contract or Lease set forth on Schedule 1.1(a), or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, any Seller or, to the Knowledge of the Sellers, any actual competitor, vendor or licensor of any Seller that is not an Assigned Contract

(l)    all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers as of the date hereof;

(m)    all Liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Acquired Businesses, the Sellers, any of their Affiliates or predecessors, or any assets or properties of the Sellers or of any of their predecessors, in each case arising out of the ownership or operation of the Acquired Businesses or any Acquired Asset prior to the Closing;

(n)    all Liabilities arising under Environmental Laws, other than to the extent arising out of the ownership or operation of the Acquired Businesses or any Acquired Asset from and after the Closing, whether or not yet booked as accounts payable by Sellers as of or prior to the Closing;

6

(o)    all accounts payable of the Sellers or of any of their predecessors existing as of or prior to the Closing;

(p)    all Liabilities outstanding as of and arising after the Closing for any contract for delivery of or returns of products previously sold to customers, whether or not any customer has provided a deposit for the sale except for under any Assigned Contract;

(q)    all Liabilities of the Sellers or of any of their predecessors arising out of any Contract, Permit, or claim that is not transferred to Purchaser hereunder; and

(r)    all Liabilities for all Professional Fees Amounts.

**Section 1.5    <u>Assumption/Rejection of Certain Contracts</u>.**

(a)    Sellers shall provide timely and proper written notice of a proposed Sale Order to all parties to any executory Contracts or unexpired leases to which Sellers or any of their respective Subsidiaries or Affiliates is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at the Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Sellers shall assign or cause to be assigned to Purchaser or an Affiliate of Purchaser designated by Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court the Bankruptcy Court (the "<u>Cure Notice</u>"). The Cure Notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Sellers to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code.

(b)    Sellers shall transfer and assign, or shall cause to be transferred or assigned, all Assigned Contracts to Purchaser or an Affiliate of Purchaser designated by Purchaser, and Purchaser or such designated Affiliate of Purchaser shall assume all Assigned Contracts, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order. As promptly as practicable following the date hereof, Purchaser and Sellers shall use commercially reasonable efforts to cooperate and determine the Cure Costs under each Assigned Contract, if any, so as to permit the assumption and assignment of each such Assigned Contract pursuant to section 365 of the Bankruptcy Code in connection with the Transaction.

(c)    Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than purchase orders) that it does not wish to assume or a Contract that is related to the Acquired Assets to which any Seller is a party that Purchaser wishes to add

as an Assigned Contract up to two (2) Business Days prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Excluded Assets, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Contract that is related to the Acquired Assets that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Excluded Assets, and assumed by Sellers to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(d)      Notwithstanding anything to the contrary in this Agreement, a Contract shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by any Seller or its Affiliates or terminated by such Seller, its Affiliates or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(e)      Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires any consent or approval from any party, including any Governmental Body (other than, and in addition to and determined after giving effect to any Order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such consent or approval has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser hereunder, such asset shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this clause (e), the Closing shall nonetheless take place subject to the other terms and conditions set forth herein and, thereafter, through the earlier of (x) such time as such consent or approval from the applicable party, including any Governmental Body, is obtained and (y) six (6) months following the Closing (or the closing of the Chapter 11 Cases or dissolution of Sellers, if earlier), Sellers and Purchaser shall (A) use reasonable best efforts to secure such consents or approvals as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Sellers' rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Sellers or their respective Affiliates) with respect to such Acquired Asset with respect to which such consent or approval has not been obtained and (2) Purchaser shall assume and timely discharge all related burdens and obligations with respect to such Acquired Asset. Upon satisfying any requisite consent or approval requirement applicable to such Acquired Asset after the Closing, the applicable Seller's right, title and interest in

and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

(f)        If at any time after the Closing, any Seller or Purchaser becomes aware that such Seller continues to hold any Acquired Asset, including an Assigned Contract, or any asset necessary for the operation of the Acquired Businesses that should have been conveyed in accordance with this Agreement, such Party will promptly notify the other Party and such Seller shall use its commercially reasonable efforts to transfer (or cause to be transferred) such Acquired Asset or asset to Purchaser. Following written confirmation from the Purchaser, the Purchaser will assume any Assumed Liabilities associated therewith upon receipt, in each case, without further consideration being due or paid from Purchaser to such Seller. If at any time after the Closing, Purchaser becomes aware that it holds any Excluded Asset, Purchaser will promptly notify Sellers and use its commercially reasonable efforts to transfer (or cause to be transferred) such Excluded Asset to the applicable Seller, without further consideration being due or paid from any Seller to Purchaser.

## ARTICLE II
### CONSIDERATION; PAYMENT; CLOSING

**Section 2.1    Consideration; Payment**. The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment in an amount equal to forty five million United States Dollars ($45,000,000) (the "Cash Consideration"). At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers Cash Consideration less the Deposit (the "Closing Date Payment") and shall assume the Assumed Liabilities. The Cash Consideration and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

**Section 2.2    Deposit.**

(a)        Purchaser has or will within two (2) Business Days of the date hereof, made an earnest money deposit with Epiq Corporate Restructuring, LLC (the "Escrow Agent") in a cash amount equal to 10% of the Cash Consideration (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, interest bearing escrow account maintained by the Escrow Agent in accordance with the Bidding Procedures Order. The Deposit shall not be subject to any Encumbrance, attachment, trustee process, or any other judicial process of any creditor of any Sellers or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)        If, prior to the Closing, this Agreement has been terminated by Sellers pursuant to Section 7.1(d) or Section 7.1(f) (or by Purchaser pursuant to Section 7.1(b) or Section 7.1(c), in each case in circumstances where Sellers would be entitled to terminate this Agreement pursuant to Section 7.1(d) or Section 7.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)    If, prior to the Closing, this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)    The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, at the Closing the Parties shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds 100% of the Deposit (together with any and all investment interest thereon, if any) to such account(s) as may be designated by Sellers.

**Section 2.3    Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of at 9:00 a.m. Central Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other place, time and date as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

**Section 2.4    Closing Deliveries by Sellers**. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A attached hereto (the "Assignment and Assumption Agreement") duly executed by each applicable Seller, in each case, with respect to the applicable Acquired Assets;

(b)    an IRS Form W-9 executed by each Seller or its regarded owner;

(c)    an Intellectual Property Assignment Agreement and such other documents that may be reasonably requested by Purchaser to transfer the Transferred Intellectual Property, each in a form and substance mutually agreed by Purchaser and Seller Representative prior to the Closing;

(d)    To the extent Sellers are able, using commercially reasonable efforts to provide any post-Closing transition services and as may be requested by the Purchaser for market rate with all costs to be borne by Purchaser or as otherwise determined after the date hereof by the Parties, a duly executed transition services agreement, in form and substance to be mutually agreed by Purchaser and Seller Representative prior to the Closing (the "TSA"); and

(e)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied.

**Section 2.5      Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)      payment of the Cash Consideration as set forth in Section 2.1;

(b)      the Assignment and Assumption Agreement duly executed by Purchaser;

(c)      a duly executed TSA, to the extent necessary;

(d)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied; and

(e)      countersigned Intellectual Property Assignment Agreement.

**Section 2.6      Withholding**. Purchaser shall not be entitled to deduct or withhold any Taxes from any amounts payable pursuant to this Agreement.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in any forms, statements or other documents filed with the Bankruptcy Court, as disclosed in any public filings of Sellers, or as set forth in the Schedules delivered by Sellers concurrently herewith and as updated from time to time, each Seller represents and warrants to Purchaser as of the date hereof and solely with respect to each such Seller and the applicable Acquired Assets as follows:

**Section 3.1      Organization and Qualification**. Such Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the Laws of the jurisdiction of its incorporation or formation. Such Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the business conducted by it makes such licensing or qualification necessary, except where failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.2      Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a)      such Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which such Seller is a party and to perform its obligations hereunder and to consummate the Transactions;

(b)      the execution, delivery and performance by such Seller of this Agreement and the other Transaction Agreements to which Seller is a party, and the consummation by

such Seller of the Transactions, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)     this Agreement and the other Transaction Agreements to which such Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

**Section 3.3    Conflicts; Consents**. Except as related to, or as a result of, the filing or pendency of the Bankruptcy Cases, as set forth on Schedule 3.3 and assuming that requisite Bankruptcy Court approvals are obtained and, neither the execution and delivery by such Seller of this Agreement or the other Transaction Agreements, nor the consummation by such Seller of the Transactions, nor performance or compliance by such Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of such Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any assigned contract or accelerate such Seller's obligations under any such assigned contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.4    Title to Assets; Sufficiency of Assets**.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Sellers have good and valid title to, or, in the case of leased or subleased Acquired Assets, valid and subsisting leasehold interests in, all Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances). Pursuant to the Sale Order, the Sellers will convey such title to or rights to use, all of the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or as set forth on Schedule 3.4(b), all tangible assets of the Acquired Assets and the Acquired Businesses are (i) in good working order and condition in all material respects, ordinary wear and tear excepted, (ii) have been

reasonably maintained, (iii) are suitable in all material respects for the uses for which they are being utilized in the Acquired Assets and the Acquired Businesses as conducted by Sellers as of the date hereof, (iv) do not require more than regularly scheduled maintenance in the Ordinary Course consistent with past practice and the established maintenance policies of Sellers, as applicable, in order to keep them in good operating condition, and (v) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Acquired Assets constitute the material properties, assets and rights reasonably necessary, and are sufficient in all material respects, for the conduct of the Acquired Assets and the Acquired Businesses as currently conducted, taking into account the fact that the Excluded Assets shall not be acquired by Purchaser pursuant to the terms of this Agreement.

**Section 3.5**    **Assigned Contracts and Assumed Leases**. Schedule 3.5 sets forth a complete list, as of the date hereof, of all (i) Assigned Contracts and (ii) Assumed Leases.

**Section 3.6**    **Real Property**. Schedule 3.6(b)(i) sets forth a list of each Assumed Lease and the real property location which is the subject thereof (together, the "Leased Real Property"). The Sellers have made available to Purchaser, prior to the date of this Agreement, a true, correct and complete copy of each Assumed Lease. With respect to each Assumed Lease, (a) assuming due authorization and delivery by the other party thereto, such Assumed Lease constitutes the valid and legally binding obligation of the Sellers party thereto and, to the Sellers' Knowledge, the counterparty thereto, enforceable against such Sellers and, to the Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity, and (b) except as set forth in Schedule 3.6(ii) neither such Sellers nor, to the Sellers' Knowledge, the counterparty thereto is in breach or default under such Assumed Lease, and to the Sellers' Knowledge no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by any Seller or, to the Sellers' Knowledge, by any other party thereto, except (i) for those defaults that will be cured by the payment of Cure Costs in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect. To the Sellers' Knowledge, no Person that is not a Seller has any right to possess, use or occupy any of the Leased Real Property except as set forth on Schedule 3.6 (iii). The leasehold interests of the Sellers in the Assumed Leases are subject to no Encumbrances other than Permitted Encumbrances.

**Section 3.7**    **Employees**.

(a)    No Seller (with respect to the Transferred Employees) or the Acquired Businesses or the Acquired Assets is party to any collective bargaining agreements or similar labor-related Contracts with any labor union representing any Continuing Employees. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) there is no written demand from any labor union seeking recognition as the exclusive bargaining representative of any Continuing Employees by such Seller or any Acquired Businesses or the Acquired Assets and (ii) there

is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by any Continuing Employees.

(b)     Each Seller (with respect to Transferred Employees) and the Acquired Businesses and the Acquired Assets are in compliance with all applicable Laws respecting employment practices and labor, including those related to wages and hours, collective bargaining, unemployment insurance, workers' compensation, immigration, harassment and discrimination, disability rights and benefits, affirmative action, and employee layoffs except where the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

(c)     There is no Action pending or, to the Knowledge of Sellers, threatened in writing against such Seller (with respect to Transferred Employees) or any Acquired Business or Acquired Asset alleging a violation of any applicable labor or employment Law brought by any Continuing Employee before any Governmental Body, except for such Actions (or threatened Actions) that, if adversely determined, would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.8     Litigation; Decrees**. Except as set forth in <u>Schedule 3.8</u> or arising in connection with, or out of, the Bankruptcy Cases (or any actions which are the subject matter thereof), there is no Litigation pending that (a) would reasonably be expected to be material to the Acquired Assets or (b) challenges the validity or enforceability of this Agreement or that seeks to enjoin or prohibit consummation of the transactions contemplated hereby and thereby. Other than the Bankruptcy Case, no Seller is subject to any outstanding Decree that would (i) reasonably be expected to be material to the Acquired Assets or Acquired Businesses or (ii) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or by the Related Agreements or perform in any material respect its obligations hereunder.

**Section 3.9     Data Privacy**. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and except as set forth on <u>Schedule 3.9</u>, in connection with its collection, storage, transfer, marketing, sales, security, and/or use of any Personal Information, each Seller is and, during the last twelve (12) months, has been in compliance in all material respects with applicable Laws that regulate the privacy and/or security of Personal Information (the "Privacy Laws"). Except as set forth on <u>Schedule 3.9</u>, neither the execution, delivery, or performance of this Agreement, nor the consummation of any of the transactions contemplated under this Agreement will violate applicable Privacy Laws in any material respects. Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place that are designed to protect all Personal Information collected by it or on its behalf from and against material unauthorized access, loss, modification, destruction, use or disclosure, and all such measures are in accordance with applicable Privacy Laws in all material respects. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and to the Knowledge of Sellers, since June 30, 2024 there has been no unauthorized access, use, modification, or disclosure of Personal Information, or any event that constitutes a security breach or similar term under applicable Law, in the possession or control of each Seller or any.

14

**Section 3.10   Environmental Matters**. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and solely with respect to the Assumed Leases:

(a)     The Sellers are, and to the Knowledge of the Sellers, during the twelve (12) months prior to the date hereof have been, in compliance in all material respects with all Environmental Laws, which compliance has included obtaining, maintaining, and making required filings for issuance or renewal of all Material Permits, licenses and authorizations required under Environmental Laws for the operations of the Sellers and their respective Subsidiaries as currently conducted.

(b)     The Sellers have not, during the twelve (12) months prior to the date hereof, received, nor is there any pending or, to the Knowledge of the Sellers, any threatened, written notice or Litigation regarding any actual or alleged violation of, or liability or obligation under, Environmental Laws that would reasonably be expected to be material to the Sellers and their respective Subsidiaries taken as a whole.

(c)     Except for a Release that would not reasonably be expected to be material to the Sellers and their Subsidiaries taken as a whole, there has been no Release of a Hazardous Substance (x) at, on, about, under or from the corporate offices, or (y) arising from or relating to the operations of the Sellers or their respective Subsidiaries.

(d)     None of the Sellers or any of their respective Subsidiaries, has manufactured, distributed, treated, stored, arranged for or permitted the disposal of, transported, handled, or exposed any Person to, any Hazardous Substance, except for such action that was taken in compliance in all material respects with applicable Environmental Law or would not reasonably be expected to be material to the Sellers and their respective Subsidiaries taken as a whole.

(e)     None of the Sellers or any of their respective Subsidiaries has contractually assumed, pursuant to any acquisition, divestiture, or merger, any obligation of another Person under any Environmental Law that could reasonably be expected to result in material liability or any other material obligation to the Sellers or their respective Subsidiaries under any applicable Environmental Law.

(f)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will require any investigation or remediation activities or notice to, filing or registration with, or consent of any Governmental Authority or other third party pursuant to any transaction-triggered Environmental Law, including with respect to the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq.

(g)     The Sellers have made available to Purchaser copies and results of any material reports, studies, analyses, tests, or monitoring and any other material documents or correspondence in the Sellers' possession relating to environmental conditions or Liabilities under Environmental Law with respect to the operations of the Sellers and their respective Subsidiaries, corporate offices.

**Section 3.11   Taxes**.

(a)    The Sellers have timely filed all material Tax Returns required to be filed by the Sellers with respect to the Acquired Assets or the Acquired Businesses with the appropriate Governmental Authorities (taking into account any extension of time to file granted or to be obtained on behalf of the Sellers); and all such Tax Returns are true, complete, and correct in all material respects;

(b)    All material Taxes imposed on the Sellers with respect to the Acquired Assets or the Acquired Businesses that are due and owing (taking into account applicable extensions) have been paid (other than any Taxes (i) the nonpayment of which is permitted or required by the Bankruptcy Code, or (ii) that are being contested in good faith and for which appropriate reserves have been made in accordance with GAAP);

(c)    There are no material pending (or threatened) audits, examinations, investigations or other proceedings, in each case for which a Seller has received written notice or to the Knowledge of the Sellers, relating to a material amount of Taxes with respect to the Acquired Assets or the Acquired Businesses;

(d)    There are no Encumbrances relating to material Taxes (other than Permitted Encumbrances) on any Acquired Assets; and

(e)    In the last twelve (12) months and other than as set forth in public filings of SunPower Corporation, no claim has been made in writing by a Governmental Authority in a jurisdiction where a Seller does not currently file Tax Returns with respect to an Acquired Asset that such Seller may be subject to Tax by that jurisdiction with respect to such Acquired Asset.

(f)    Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed, with respect to the Acquired Assets.

(g)    None of the Acquired Assets constitutes stock, partnership interests or any other equity interest in any Person for U.S. federal income Tax purposes.

(h)    Notwithstanding anything herein to the contrary, this Section 3.11 contains the sole and exclusive representations and warranties with respect to Taxes, and no representation or warranty is made in this Section 3.11 regarding (i) any taxable period (or portion thereof) beginning after the Closing Date, or (ii) the availability or unavailability of any tax attribute or tax refund.

**Section 3.12    Intellectual Property**.

(a)    Except as set forth on Schedule 3.12(a), the Sellers own all right, title and interest in and to the Transferred Intellectual Property that is owned or purported to be owned by the Sellers (the "Owned Intellectual Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and to the Knowledge of the Sellers, except as set forth in Schedule 3.12(a) or as otherwise contemplated by this Agreement, the Transferred Intellectual Property constitutes all Intellectual Property Rights owned or held for use by the Sellers in the conduct of the

Acquired Businesses. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers own all right, title and interest in, or have a valid and enforceable written license or other permission to use, all Transferred Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and to the Knowledge of the Sellers, the Transferred Intellectual Property is sufficient to conduct the Acquired Businesses as presently conducted. Except as set forth in Schedule 3.12(a), all Owned Intellectual Property is currently owned by the Sellers.

(b)    Trademarks:

(i)    Schedule 3.12(b) contains a complete and accurate list of all registered and applied for Transferred Trademarks, including for each applicable trademark or service mark, trademark registration numbers and registration dates, as applicable (the "Registered Trademarks").

(ii)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, and except as set forth on Schedule 3.12(b), all of the material Registered Trademarks are subsisting and in full force and effect.

(iii)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, and except as set forth on Schedule 3.12(b), no material Registered Trademark is the subject of any opposition, invalidation or cancellation proceeding, in each case which is pending and unresolved, and no such action has been threatened in writing during the past twelve (12) months.

(c)    Copyrights:

(i)    Schedule 3.12(c) contains a complete and accurate list of all registered Transferred Copyrights, including title, registration number and registration date (the "Registered Copyrights").

(ii)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, all of the Registered Copyrights are in full force and effect.

(d)    Patents:

(i)    Schedule 3.12(d) contains a complete and accurate list of all issued Transferred Patents, including owner, patent number and issuance date (the "Registered Patents").

(ii)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, all of the Registered Patents are subsisting and in full force and effect.

(e)     Except as set forth on <u>Schedule 3.12(d)</u>, to the Knowledge of the Sellers, during the past twelve (12) months, there has not been and there is not now any actual unauthorized use, infringement or misappropriation of any of the Owned Intellectual Property by any third party, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)     Except as set forth in <u>Schedule 3.12(f)</u>, during the past twelve (12) months, the Sellers have not brought any actions or lawsuits that are pending and unresolved alleging infringement, misappropriation or other violation of any of the Owned Intellectual Property by any third party. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and except as set forth in <u>Schedule 3.12(f)</u>, to the Knowledge of Sellers, no Person is infringing upon any Owned Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and to the Knowledge of the Sellers, the Sellers have not entered into any Contract granting any third party the right to bring infringement actions with respect to any of the Owned Intellectual Property that will survive the Closing. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, to the Knowledge of the Sellers there is no pending claim or claim threatened in writing with respect to the Owned Intellectual Property: (i) contesting the right of the Sellers to use, exercise, sell, license, transfer or dispose of any of the Owned Intellectual Property; or (ii) challenging the ownership, validity or enforceability of any of the Owned Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and to the Knowledge of the Sellers, no Owned Intellectual Property is subject to any outstanding order, judgment, decree, stipulation or agreement related to or restricting in any manner the use, licensing, assignment, transfer or conveyance thereof by the Sellers.

(g)     <u>Schedule 3.12(a)</u> contains a listing of all material Contracts to which the Sellers are a party that relates to the settlement of any claims related to the Owned Intellectual Property (including co-existence agreements).

(h)     Except as set forth on <u>Schedule 3.12(a)</u>, and to the Knowledge of the Sellers, the operation and conduct of the Acquired Businesses as currently conducted by the Sellers, including the Sellers' marketing, license, sale or use of any products or services anywhere in the world in connection with the Acquired Businesses has not, in the last twelve (12) months, and does not as of the Closing Date infringe, misappropriate or violate any Intellectual Property Rights of any third party, in each case except as would not, individually or in the aggregate, reasonably be expected to be have a Material Adverse Effect. To the Knowledge of the Sellers, there is no pending claim or claim threatened in writing alleging that the operation of the Acquired Businesses (including the Sellers' marketing, license, sale or use of any products or services anywhere in the world in connection with the Acquired Businesses) as currently conducted by the Sellers infringes, misappropriates or otherwise violates any Intellectual Property Rights of any third party or violates any Contract with any third party to which the Sellers are a party or by which they are bound, in each case except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(i)      Except as set forth in Schedule 3.12(a), to the Knowledge of the Sellers, the Sellers have the full right, power and authority to sell, assign, transfer and convey all of their right, title and interest in and to the Transferred Intellectual Property to Purchaser, and upon Closing, Purchaser will acquire from the Sellers good and marketable title to the Owned Intellectual Property, free of Encumbrances (other than Permitted Encumbrances).

(j)      Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, and to the Knowledge of the Sellers, except as set forth in Schedule 3.12(a), the Sellers have secured from each present or former employee, officer, director, agent, outside contractor or consultant of the Sellers who contributed to the development of any material Owned Intellectual Property on behalf of the Sellers a written and enforceable agreement that contain (A) a non-disclosure obligation with respect to the Sellers' confidential information and (B) a valid assignment to one or more of the Sellers of all rights, title and interest in and to such Owned Intellectual Property, unless in respect of assignment agreements, a Seller owns such Owned Intellectual Property by operation of Law. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, the Sellers have taken commercially reasonable and appropriate steps to protect, maintain and preserve the confidentiality of any material trade secrets included in the Owned Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, any disclosure by the Sellers of such trade secrets to any third party has been pursuant to the terms of a written agreement with such third party.

(k)      To the Knowledge of the Sellers, all material software owned, licensed, used, or otherwise held for use in the Acquired Assets and the Acquired Businesses is in good working order and condition and is sufficient in all material respects for the purposes for which it is currently used in the Acquired Assets and the Acquired Businesses, except in each case as would not reasonably be expected to be material to the Sellers and their respective Subsidiaries taken as a whole. To the Knowledge of the Sellers, the Sellers have not experienced any material defects in design, workmanship or material in connection with the use of such software that have not been corrected. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, and to the Knowledge of the Sellers, no such software contains any computer code or any other procedures, routines or mechanisms which may: (i) disrupt, disable, harm or impair in any material way such software's operation, (ii) cause such software to damage or corrupt any data, storage media, programs, equipment or communications of the Sellers or their clients, or otherwise interfere with the Sellers' operations as currently conducted, or (iii) permit any third party to access any such software to cause disruption, disablement, harm, impairment, damage erasure or corruption (sometimes referred to as "traps", "viruses", "access codes", "back doors" "Trojan horses," "time bombs," "worms," or "drop dead devices"). The computer software, computer hardware, firmware, networks, interfaces and related systems (collectively, "Computer Systems") used in the Acquired Businesses are sufficient in all material respects for the Sellers' current needs in the operation of the Acquired Businesses as presently conducted, and, to the Knowledge of the Sellers, in the past twelve (12) months, there have been no material failures, crashes, security breaches or other adverse events affecting the Computer Systems which would,

individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Acquired Businesses. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, the Sellers take commercially reasonable steps to provide for the back-up and recovery of material data and have implemented disaster recovery plans, procedures and facilities and, as applicable, have taken reasonable steps to implement such plans and procedures. The Sellers have taken reasonable actions designed to protect the integrity and security of the Computer Systems and the information stored therein from unauthorized use, access, or modification by third parties.

(l)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and to the Knowledge of the Sellers, all Owned Intellectual Property is subsisting, valid and enforceable.

(m)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, and to the Knowledge of the Sellers, no domain name or social media account included in the Transferred Intellectual Property has been, during the past twelve (12) months, or is now involved in any dispute over its ownership or use. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Businesses, and to the Knowledge of the Sellers, Sellers have information sufficient to access, operate, and control all social media accounts and domain names included in the Transferred Intellectual Property. All domain names and social media accounts included in the Transferred Intellectual Property are set forth on Schedule 3.12(m).

**Section 3.13    Compliance with Laws; Permits**.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or as related to, or as a result of, the filing or pendency of the Bankruptcy Cases, the Sellers are in compliance, in all material respects, with all Laws applicable to the Acquired Assets. Except as related to or, as a result of, the filing or pendency of the Bankruptcy Cases, since June 30, 2024 (i) none of the Sellers has received any written notice of, the material violation of any Laws, and (ii) to the Knowledge of the Sellers, no event has occurred or circumstance exists that (with or without notice, passage of time, or both) would constitute or result in a failure by any Seller or its Subsidiaries to comply, in any material respect, with any applicable Law, the failure of which would result in a Material Adverse Effect. Except as related to, or as a result of, the filing or pendency of the Bankruptcy Cases or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no investigation in relation to any actual or alleged material violation of Law by any Seller or its Subsidiaries is pending or, to the Knowledge of the Sellers, threatened, nor since June 30, 2024 has any Seller or any of its Subsidiaries received any written notice from any Governmental Authority indicating an intention to conduct the same.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or as related to, or as a result of, the filing or pendency of the Bankruptcy Cases, all material Permits required for any Seller and its

Subsidiaries to conduct the Acquired Businesses as currently conducted by the Sellers are valid and in full force and effect (each a "Material Permit"). Since June 30, 2024, to the Knowledge of the Sellers, it has received no notice that any event has occurred that, would reasonably be expected to result in the revocation, cancellation, modification, suspension, lapse, limitation, or non-renewal of any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Business as currently conducted by the Sellers or that relate to the Acquired Assets. Since June 30, 2024, each Seller and its Subsidiaries have complied in all material respects, and are currently in compliance in all material respects, with all Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Acquired Businesses as currently conducted by the Sellers, and have made all appropriate filings for issuance or renewal of such Permits. No Litigation is pending or, to the Knowledge of the Sellers, threatened to terminate, revoke, limit, cancel, suspend or modify any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Acquired Businesses as currently conducted by the Sellers, and which would have a Material Adverse Effect, and none of the Sellers has received written notice from any Governmental Authority that (i) any such Permit will be revoked or not reissued on the same or similar terms, (ii) any application for any new Permit by any Seller or their respective Subsidiaries or renewal of any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Acquired Businesses as currently conducted by the Sellers will be denied, or (iii) the Permit holder is in material violation of any Permit or Permits that, individually or in the aggregate, are material to the operation of the Acquired Assets and the Acquired Businesses as currently conducted by the Sellers.

**Section 3.14    Brokers**. Except for Moelis & Company, all of whose fees and expenses will be borne solely by Sellers, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

**Section 3.15    No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such Express Representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of such Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to such Seller, the Acquired Businesses, such Seller's other businesses, the other Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis & Company) or in that certain datasite administered by Datasite (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of such Seller or any of its Affiliates or Advisors. Without limiting the foregoing, no Seller or any of its Advisors nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information,

including any information presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

**Section 4.1    Organization and Qualification**. Purchaser is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transaction by this Agreement.

**Section 4.2    Authorization of Agreement**. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

**Section 4.3    Conflicts; Consents**. Assuming that (i) the Sale Order and all other requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the

creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its subsidiaries, except, in the case of clauses (A) through (B), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

Section 4.4    **Financing**. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Acquired Assets and the related Assumed Liabilities. Purchaser's ability to consummate the Transactions is not contingent upon its ability to secure any financing or to complete any public or private placement of securities prior to or upon Closing.

Section 4.5    **Brokers**. The Purchaser has no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

Section 4.6    **Solvency**. Purchaser is, and immediately after giving effect to the Transactions the Purchaser shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and mature.

Section 4.7    **SEC Reports; Undisclosed Liabilities**.

(a)    Since June 30, 2024, Purchaser has timely filed or furnished, as applicable, all Purchaser SEC Reports. Each Purchaser SEC Report complied, as of its filing date (or, if amended or superseded by a filing prior to the date of this Agreement, on the date of such amended or superseding filing) or in the case of registration statements, on the date of effectiveness thereof, in all material respects with the then applicable requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act, to the extent applicable. As of its filing date (or, if amended or superseded by a filing prior to the date of this Agreement, on the date of such amended or superseded filing) or in the case of registration statements, on the date of effectiveness thereof, each Purchaser SEC Report did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Purchaser is, and since June 30, 2024 has been, in compliance in all material respects with the applicable provisions and requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act and the listing standards and rules of The Nasdaq Global Market ("Nasdaq"). Since the filing date of Purchaser's most recent Form 10-K or Form 10-Q, no events, facts or circumstances have occurred such that management

23

would not be able to complete its assessment of the effectiveness of Purchaser's internal control over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act when next due, and conclude, after such assessment, that such system was effective. There are no outstanding or unresolved comments received from the SEC with respect to the Purchaser SEC Reports or any registration statement filed by Purchaser and to the knowledge of Purchaser, none of the Purchaser SEC Reports is the subject of ongoing SEC review or investigation. No Subsidiary of Purchaser is, or since June 30, 2024 has been, required to file any forms, reports or documents with the SEC that have not otherwise been filed.

(b)      The consolidated financial statements (including any related notes and schedules) of Purchaser and its Subsidiaries filed with the Purchaser SEC Reports (i) complied, as of their respective dates of filing with the SEC, in all material respects with the published rules and regulations of the SEC with respect thereto during the periods and at the dates indicated (except as may be indicated in the notes thereto or as otherwise permitted by Form 10-Q with respect to any financial statements filed on Form 10-Q); (ii) were prepared in accordance with GAAP (except as may be indicated in the notes thereto or as otherwise permitted by Form 10-Q with respect to any financial statements filed on Form 10-Q) applied on a consistent basis during the periods involved; and (iii) fairly present, in all material respects, the consolidated financial position and consolidated results of operations and cash flows of Purchaser and its consolidated Subsidiaries as of the dates thereof or for the periods then ended (subject, in the case of the unaudited financial statements, to normal and recurring year-end adjustments described therein). None of Purchaser or its Subsidiaries is a party to, or has any obligation or other commitment to become a party to, any "off balance sheet arrangement" (as defined in Item 303(a) of Regulation S-K promulgated by the SEC) that has not been so described in the Purchaser SEC Reports.

(c)      Purchaser has established and maintains "disclosure controls and procedures" and "internal control over financial reporting" (in each case as defined pursuant to Rule 13a-15 and Rule 15d-15 promulgated under the Exchange Act). Purchaser's disclosure controls and procedures are designed to ensure that (i) all material information required to be disclosed by Purchaser in the reports and other documents that it files or furnishes pursuant to the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC; and (ii) such material information is accumulated and made known to the Chief Executive Officer and Chief Financial Officer of Purchaser, as appropriate to allow timely decisions regarding required disclosure and to make the certifications required under the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act. Since June 30, 2024, the principal executive officer and principal financial officer of Purchaser have made all certifications required by Rules 13a-14 and 15d-14 under the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act, and the statements contained in any such certifications were true, correct and complete as of their filing dates. Neither Purchaser nor its principal executive officer or principal financial officer has received notice from any Governmental Body challenging or questioning the accuracy, completeness, form or manner of filing of such certifications.

(d)    Purchaser has established and maintains a system of internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that are designed to ensure reasonable assurance regarding the reliability of Purchaser's financial reporting and the preparation of Purchaser's financial statements for external purposes in accordance with GAAP. Since June 30, 2024, neither Purchaser nor Purchaser's independent registered public accounting firm has identified or been made aware of (A) any material weakness in the system of internal control over financial reporting, including the design and operation thereof, used by Purchaser and its Subsidiaries that has not been subsequently remediated; (B) any fraud or illegal act that involves Purchaser's management or other employees who have a role in the preparation of financial statements or the internal control over financial reporting utilized by Purchaser and its Subsidiaries; or (C) any claim or allegation regarding any of the foregoing and Purchaser has disclosed based on its most recent evaluation of Purchaser's internal control over financial reporting prior to the date hereof, to Purchaser's auditors and the audit committee of Purchaser's board of directors, all matters described by the immediately preceding clauses (A) through (C). To the knowledge of Purchaser, since June 30, 2024, neither Purchaser nor any of its Affiliates has identified or been made aware of any material illegal act or fraud related to the business of Purchaser or its Subsidiaries.

(e)    Neither Purchaser nor any of its Subsidiaries has any Liabilities or obligations of any nature (whether accrued, absolute, contingent, fixed or otherwise) required to be reflected or reserved against on the balance sheet prepared in accordance with GAAP or notes thereto, other than Liabilities or obligations (i) reflected or otherwise adequately reserved against in the consolidated balance sheet (or the notes thereto) of Purchaser and its Subsidiaries as of June 30, 2024 or in the consolidated financial statements of Purchaser and its Subsidiaries included in Purchaser SEC Reports or described in the notes thereto; (ii) arising pursuant to this Agreement or the other Transaction Agreements or incurred in connection with the Transaction or the other transactions contemplated by the Transaction Agreements; (iii) incurred in the ordinary course of business consistent with past practice on or after June 30, 2024; or (iv) that has not had, and would not reasonably be expected to have a Material Adverse Effect.

**Section 4.8    No Additional Representations or Warranties**. Except for the representations and warranties contained in this Article IV, Sellers are not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser and acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

**Section 4.9    No Outside Reliance**. Notwithstanding anything contained in this Section 4.9 or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the Transactions. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is"

and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in any information presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of any Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future businesses, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of the Acquired Assets, the Acquired Businesses or any Seller, or the quality, quantity or condition of any Seller's (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets or the Acquired Businesses after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets or the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business associated with the Acquired Assets, including its results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the any information presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
### COVENANTS AND AGREEMENTS

**Section 5.1    Conduct of Sellers**. Except (A) as required by applicable Law, Order or a Governmental Body, (B) for any limitations or changes on operations as a result of a bankruptcy filing or otherwise imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (C) as expressly contemplated, required or permitted by this Agreement, (D) to the extent related to an Excluded Asset or an Excluded Liability, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not sell, lease, transfer or assign to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, and (E) Sellers shall use their commercially reasonable efforts to maintain the Acquired Assets in a manner consistent with past practice, in each case except as would not reasonably be expected to have a material detrimental effect on the Acquired Assets.

**Section 5.2     Bankruptcy Actions.**

(a)     The Sellers shall seek on an expedited basis if necessary, entry of the Sale Order, the Bidding Procedures Order, and any other necessary orders by the Bankruptcy Court to consummate the Closing as soon as reasonably practicable following the execution of this Agreement, subject to the terms of the Bidding Procedures Order and Sale Order. Sellers shall consult with Purchaser and its Representatives concerning the Bidding Procedures Order, the Sale Order, any other orders of the Bankruptcy Court relating to the Transaction. Purchaser shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser; provided, however, in no event shall Purchaser or Sellers be required to agree to any amendment of this Agreement.

(b)     Subject to Section 5.3, from the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VII and (ii) the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)     Purchaser shall take actions that are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement. Purchaser shall not file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the Transaction, unless Sellers have taken action inconsistent with their obligations under this Agreement. In the event the entry of the Sale Order shall be appealed in relation to this Agreement, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

**Section 5.3     Alternative Transactions.**

(a)     From and after the date the Bidding Procedures Order is entered by the Bankruptcy Court and until the entry of the Sale Order, Sellers may, and may cause their respective Affiliates and Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with or for purposes of pursuing any Alternative Transaction in accordance with the Bidding Procedures Order. In addition, Sellers may supply information relating to the Acquired Assets and the Acquired Businesses to any other Person who may be or has expressed interest in being a prospective purchaser under an Alternative Transaction or who proposed to submit an Alternative Transaction.

(b)     If an Auction is conducted, and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bidding Procedures, be required to serve as the back-up bidder if Purchaser is the next highest or otherwise best bidder at the Auction (such party that is the next highest or otherwise best bidder at the Auction, the "Back-Up Bidder") and, if Purchaser is the Back-Up Bidder, Purchaser shall, notwithstanding Section 7.1(h), be required to keep its bid to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser in the Auction) open and irrevocable until the Back-Up Termination Date. Following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Purchaser, if Purchaser is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Sellers may seek authority to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser in the Auction) with the Back-Up Bidder.

(c)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(d)     Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(e)     Nothing in this Section 5.3 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

Section 5.4     **Cure Costs**. Subject to entry of the Sale Order and in connection with the assignment and assumption of the Assigned Contracts, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5(a), on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

Section 5.5     **Sale Order**. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the

terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liabilities.

**Section 5.6    Bankruptcy Court Milestones**. The Sellers shall comply with the following timeline (the "Bankruptcy Court Milestones"):

(a)    The Petition Date shall be no later than August 5, 2024;

(b)    Sellers shall file a motion to approve the Bidding Procedures, which shall contain this Agreement and which shall seek approval of the Bid Protections, no later than one (1) day after the Petition Date;

(c)    the Bankruptcy Court shall have entered an order approving the Bidding Procedures in a form satisfactory to Purchaser and the prepetition lenders no later than twenty-five (25) days after the Petition Date;

(d)    Sellers shall have delivered to Purchaser a true and correct version of the Schedules no more than twenty-five (25) days after the Petition Date;

(e)    Sellers shall have commenced an auction for the sale of the Acquired Assets no later than thirty-seven (37) days after the Petition Date; and

(f)    the Bankruptcy Court shall have entered an order approving the Sale no later than forty-five (45) days after the Petition Date;

(g)    the Sale shall be consummated no later than fifty-seven (57) days after the Petition Date.

**Section 5.7    Approval**. Sellers' obligations under this Agreement and in connection with the Transaction are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bidding Procedures Order and the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**Section 5.8    Access to Information**.

(a)     Sellers shall use commercially reasonable efforts to, prior to the Closing, provide to Purchaser, through its officers, employees and representatives (including their respective legal Advisors and accountants), reasonable access, during normal business hours, and upon reasonable advance written request, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Acquired Businesses, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). The information provided pursuant to this <u>Section 5.2</u> will be used solely for the purpose of consummating the transactions contemplated hereby, and will be governed by the Confidentiality Agreement. Purchaser will, and will cause their Advisors to, abide by the terms of the Confidentiality Agreement. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section and Purchaser may not rely on the accuracy of any such information.

(b)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Sellers prior to the Closing with respect to Sellers or the Transactions, in each case without the prior written consent of Sellers for each such contact.

**Section 5.9    <u>Employee Matters</u>**.

(a)     Prior to Closing, Sellers shall use commercially reasonable efforts to make available to Purchaser for interviews certain employees as requested in writing by Purchaser. Purchaser may extend to any employee employed by the applicable Seller a written offer of employment, for employment effective as of the Closing Date, in Purchaser's sole discretion ("<u>Transfer Offer</u>"); <u>provided</u> that Purchaser shall, and shall cause its Affiliates to, comply will all employment Laws, including anti-discrimination Laws, in connection with making such offers of employment. Employees who accept such Transfer Offers and begin employment with Purchaser or an Affiliate of Purchaser shall be collectively referred to herein as "<u>Transferred Employees</u>." Each of the Transferred Employees, shall be collectively referred to herein as "<u>Continuing Employees.</u>" Purchaser shall notify such Seller (i) with respect to: each employee to whom it made a Transfer Offer (no later than three Business Days after making such Transfer Offer), and (ii) in a reasonable timeframe (but in any event within three Business Days of receiving a response from the applicable Transferred Employee and no later than immediately prior to the Closing) with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by such Seller or any of its Affiliates that any or all employees employed by such Seller will accept the Transfer Offer, or that any Continuing Employee will continue in employment with Purchaser or any of its Affiliates following the Closing for any period of time. Purchaser shall provide the Seller with a list of the Transferred Employees three (3) days prior to the Auction. Purchaser shall carry out all necessary actions to effect the timely (as of the Closing Date) employment by

it of each Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee previously employed by such Seller shall cease to be an employee of such Seller and become an employee of the Purchaser on comparable terms.

(b)     The provisions of this Section 5.9 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Continuing Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 5.9 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 5.9, alter or limit Purchaser's or such Seller's ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(c)     For any Continuing Employees who are principally based outside the United States, the provisions of this Section 5.9 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

Section 5.10    **Further Assurances**. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

Section 5.11    **Tax Matters**.

(a)     Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions not to exceed capped amount to be agreed between Purchaser and SunPower Corporation prior to the Closing (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

(b)     For U.S. federal and applicable state and local income tax purposes, the Purchase Price (and all other relevant items treated as consideration for U.S. federal income tax purposes) shall be allocated to the Acquired Assets (the "Asset Amount"). The Asset Amount shall be allocated consistent with the methodology set forth on Section 1060 of the Tax Code. Purchaser shall prepare a statement setting forth such allocation of the Asset Amount (the "Purchase Price Allocation Statement"). Purchaser shall deliver the Purchase Price Allocation Statement to Seller within 45 days after the Closing Date. Seller shall have thirty days after receipt of the Purchase Price Allocation Statement within which to review

the Purchase Price Allocation Statement. If Seller does not object in writing to the Purchase Price Allocation Statement during such 30-day period, the Purchase Price Allocation Statement shall set forth the final allocation of the Asset Amount for all Tax purposes (the "Purchase Price Allocation"). If Seller objects in writing, Purchaser and Seller shall attempt in good faith to resolve such objections within 15 days thereafter, but if Seller and Purchaser are unable to resolve such objections within such fifteen days, then any remaining items in dispute shall be resolved by a mutually agreeable accounting firm. Once the Purchase Price Allocation is finalized in accordance with the above procedures, the Purchase Price Allocation shall be binding upon the parties hereto for all Tax purposes unless otherwise required by applicable Law. The parties hereto shall report for Tax purposes, act for Tax purposes, and file Tax Returns, in all respects consistent with the Purchase Price Allocation.

(c)     Purchaser shall not make any election under Tax Code Section 338 or Tax Code Section 336 (or any similar provision under state, local or non-U.S. Law) with respect to the purchase of the Acquired Assets.

(d)     Without the prior written consent of Seller, Purchaser shall not, and, following the Closing, shall cause its Affiliates not to, (A) approach a Governmental Body with respect to any Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period (including the entrance into any voluntary disclosure or other similar agreement with any Governmental Body), (B) amend, file or re-file any Tax Return with respect to the Acquired Assets for a Pre-Closing Tax Period, (C) agree to waive or extend the statute of limitations relating to any Taxes with respect to the Acquired Assets for any Pre-Closing Tax Period, or (D) make, revoke or change any tax election with respect to the Acquired Assets with respect to, or that has a retroactive effect to, any Pre-Closing Tax Period, in each case, if any such action would reasonably be expected to impact a Consolidated Tax Return.

(e)     Notwithstanding any other provision in this Agreement to the contrary, Seller shall have the exclusive right to control in all respects, and neither Purchaser nor any of its Affiliates shall be entitled to participate in the preparation or filing of, or any dispute, audit, or other proceeding of any kind, with respect to any Consolidated Tax Return.

(f)     In the case of any Straddle Period, for all applicable purposes of this Agreement, the amount of any Taxes based on or measured by income, gross or net sales, receipts, transactions, proceeds, profits, payroll or similar items for the Pre-Closing Tax Period of such Straddle Period shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and the amount of other Taxes for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period; provided that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing Date, shall be allocated on a per diem basis.

(g)     Purchaser and Seller shall cooperate fully with each other, as and to the extent reasonably requested by the other Party, in connection with tax matters related to the Acquired Assets for a Pre-Closing Tax Period, including the preparation, filing and execution of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's reasonable request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding during normal business hours and making employees available (as reasonably requested) on a mutually convenient basis to provide additional information and explanation of any materials provided hereunder. Notwithstanding anything in this agreement to the contrary, in no event will Purchaser or any Affiliate of Purchaser have any rights with respect to (including the preparation thereof) or access to any Tax Return (including a Consolidated Tax Return) or other Tax information or workpapers of Seller and its Affiliates that do not relate exclusively to an Acquired Business or Acquired Asset; provided, that Seller shall use commercially reasonable efforts (at Purchaser's cost) to provide any information reflected in such Tax Returns or other materials that is reasonably relevant to the Acquired Businesses and reasonably requested by Purchaser.

**Section 5.12    Seller Guarantees**. Purchaser acknowledges that in the course of conduct of the business of Sellers, Sellers and their respective Affiliates may have entered into various arrangements (a) in which guarantees, letters of credit, sureties, bonds or similar arrangements were issued by any Seller or its Affiliates and (b) in which such Seller or its Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate the business of Sellers. The arrangements entered into by any Seller and its Affiliates referred to in the foregoing clauses (a) and (b), solely to the extent relating to any Acquired Assets or Assumed Liabilities and including those which are set forth in Section 5.12, are referred to as the "Seller Credit Support Obligations". It is understood that the Seller Credit Support Obligations are not intended to continue after the Closing. Purchaser agrees that it shall use its reasonable best efforts to obtain replacements for the Seller Credit Support Obligations (which shall include the full and unconditional release of such Seller and its Affiliates) that will be in effect at the Closing or, in the case of Seller Credit Support Obligations described in the foregoing clause (b), will use its commercially reasonable efforts to arrange for itself or one of its Subsidiaries to be substituted as the primary obligor thereon as of the Closing through an assumption, accession, acknowledgement or similar agreement (which shall include the full and unconditional release of Sellers and their respective Affiliates) with the beneficiary of the applicable Seller Credit Support Obligation. Whether or not Purchaser is able to satisfy the terms of the immediately preceding sentence, Purchaser shall indemnify Sellers and their respective Affiliates and Representatives from and against any and all Liabilities incurred by any of them relating to the Seller Credit Support Obligations. Purchaser agrees that, with respect to any Seller Credit Support Obligation, its reasonable best efforts pursuant to this Section 5.12 shall include, if requested, the execution and delivery by Purchaser, or by an affiliate of Purchaser acceptable to the beneficiary of such Seller Credit Support Obligation, of a replacement guarantee that is substantially in the form of such Seller Credit Support Obligation. All costs and expenses incurred in connection with providing the release or substitution of the Seller Credit Support Obligations shall be borne by Purchaser.

## ARTICLE VI
### CONDITIONS TO CLOSING

**Section 6.1**    <u>**Conditions Precedent to the Obligations of Purchaser and Sellers**</u>. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties.

**Section 6.2**    <u>**Conditions Precedent to the Obligations of Purchaser**</u>. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), at the Closing, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.14</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)    No Seller shall have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by such Seller under this Agreement on or prior to Closing without curing such breach prior to the Closing Date; and

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

**Section 6.3**    <u>**Conditions Precedent to the Obligations of Sellers**</u>. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), at the Closing, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)     Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date without curing such breach prior to the Closing Date; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.5</u>.

**Section 6.4     <u>Waiver of Conditions</u>**. Upon the occurrence of the Closing, any condition set forth in this <u>Article VI</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VI</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VII
### TERMINATION

**Section 7.1     <u>Termination of Agreement</u>**. This Agreement may be terminated at any time prior to the Closing only in accordance with this <u>Section 7.1</u>, and in no other matter:

(a)     by the mutual written consent of Sellers and Purchaser;

(b)     by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no Party may terminate this Agreement under this <u>Section 7.1(b)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before September 30, 2024 (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 7.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement; <u>provided</u> <u>further</u> that Sellers may extend the Outside Date up to an additional 60 days to the extent necessary to satisfy the conditions set forth in <u>Section 6.1</u> so long as the other conditions in <u>Article VI</u> (other than conditions that by their nature are to be satisfied at the Closing) have been satisfied or waived;

(d)     by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser

will have become untrue, in each case, such that the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser, then Sellers may not terminate this Agreement under this <u>Section 7.1(d)</u> unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 7.1(d)</u> will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of Sellers will have become untrue, in each case, such that the conditions set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this <u>Section 7.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 7.1(e)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)    by written notice from Sellers to Purchaser, if all of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.3</u>;

(g)    by written notice from Sellers to Purchaser, if SunPower Corporation or the board of directors (or similar governing body) of SunPower Corporation determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its fiduciary duties;

(h)    by written notice of either Purchaser or Sellers, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Back-Up Bidder at the Auction (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Back-Up Bidder, or (iii) Sellers consummate an Alternative Transaction with the Successful Bidder; or

(i)    by either Purchaser, if, following the Sale Hearing, the Purchaser is not the Successful Bidder or the Back-Up Bidder at the Auction;

(j)    by the Purchaser, if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is voided, reversed or vacated or is subject to a stay and is not re-issued or re-instated or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is voided, reversed or vacated or is subject to a stay and is not re-issued or re-instated.

**Section 7.2**     **Effect of Termination**. In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that this Section 7.2 and Article VIII shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

(a)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 7.1(g), Section 7.1(h), Section 7.1(i), or Section 7.1(j), then Sellers will pay to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed five hundred and fifty thousand United States Dollars ($550,000) ("Expense Reimbursement").

(b)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 7.1(g), Section 7.1(h), Section 7.1(i) or Section 7.1(j), Sellers shall pay to Purchaser a break-up fee in an amount equal to 3% of the Purchase Price (the "Breakup Fee"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Sellers. Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.2(b) are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Expense Reimbursement or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(c)     Subject in all cases to Section 8.11, prior to the Closing, in the event of any breach by any Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 7.1 and, if applicable, to receive the Expense Reimbursement or the Breakup Fee, as applicable, in accordance with Section 7.2(b). Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of any Agreement Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against Sellers under Sections 503 and 507(b) of the Bankruptcy Code in the Chapter 11 Cases.

## ARTICLE VIII
### MISCELLANEOUS

**Section 8.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms (such term to survive the applicable statute of limitations for any Tax covenant with respect to Consolidated Tax Returns), and if no term is specified, then for five (5) years following the Closing Date.

**Section 8.2    Expenses**. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses.

**Section 8.3    Notices**. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

c/o Complete Solaria, Inc.
45700 Northport Loop E,
Fremont, CA 94538
Attention:      Nick Santhanam
Email:          nick.santhanam@fernweh.com

with a copy to (which shall not constitute notice):

DLA Piper LLP (US)
1251 Avenue of the Americas,

New York, NY 10020
Attention:     Richard A. Chesley and Jamila Justine Willis
Email:          richard.chesley@us.dlapiper.com
                    jamila.willis@us.dlapiper.com

Notices to Sellers:

> SunPower Corporation, Systems
> 880 Harbour Way South, Suite 600
> Richmond, CA 94804
> Attention:     Chief Legal Officer
> Email:          legalnotices@sunpower.com

with copies to (which shall not constitute notice):

> Kirkland & Ellis LLP
> 609 Main Street
> Houston, TX 77002
> Attention:     Adam D. Larson, P.C.; Claire Campbell, P.C.
> Email:          adam.larson@kirkland.com; claire.campbell@kirkland.com

**Section 8.4    Binding Effect; Assignment**.

(a)     This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void.

(b)     In furtherance of the foregoing, Purchaser may, without the consent of Sellers, designate, in accordance with the terms of this paragraph and effective as of the Closing, one or more Persons who is a wholly-owned subsidiary of Purchaser to acquire all, or any portion of, the Acquired Assets and assume all or any portion of the Assumed Liabilities or to be jointly obligated to pay all or any portion of the Purchase Price; provided that for the avoidance of doubt, any such assignment of the payment obligation shall not relieve Purchaser of its obligation to deliver the Purchase Price under Section 2.1. The above designation may be made by Purchaser by written notice to Sellers at any time prior to the Closing Date. The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

**Section 8.5    Amendment and Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Party against which enforcement of such waiver is

sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

Section 8.6    **Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 8.7, the Non-Recourse Persons (as defined below) and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

Section 8.7    **Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute (as defined below) and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this Section 8.7 and shall be entitled to enforce this Section 8.7 as if a party directly hereto.

Section 8.8    **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 8.9    **Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.

Section 8.10    **Complete Agreement**. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

**Section 8.11** <u>**Specific Performance**</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 8.12</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 8.11</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 8.11</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Sellers from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 8.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 8.11</u> be used, alone or together with any other provision of this Agreement, to require Sellers to remedy any breach of any representation or warranty made by Sellers herein.

**Section 8.12** <u>**Jurisdiction and Exclusive Venue**</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute.

Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 8.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 8.13   Governing Law; Waiver of Jury Trial**.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.13(B)</u>.

**Section 8.14   No Right of Set-Off**. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

**Section 8.15   Counterparts and PDF**. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission

to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

Section 8.16    **Publicity**. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. The Sellers and Purchaser shall use reasonable efforts to resolve any objections to any press release or public announcement within twenty-four (24) hours after the request.

Section 8.17    **Bulk Sales Laws**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any Encumbrances or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

Section 8.18    **Fiduciary Obligations**. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of its estates.

Section 8.19    **Sellers' Representative**. Each Party agrees that SunPower Corporation has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, consents and determinations on behalf of the Sellers, including to make any waiver of any closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by SunPower Corporation on behalf of the Sellers.

Section 8.20    **Schedules**.

(a)    The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein

have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

(b)    The Sellers shall deliver to Purchaser a true and correct copy of the Schedules in accordance with the milestone set forth in Section 5.6.  From time to time prior to the Closing, Sellers may supplement or amend any of the Schedules (each a "Schedule Supplement"). Any disclosure in any such Schedule Supplement shall not be deemed to give rise to any Purchaser termination rights pursuant to Article VII.

## ARTICLE IX
### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 9.1**    **Certain Definitions**.

(a)    "Accounts Receivable" means, (a) the trade accounts receivable, and other rights to payment, of Sellers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered by Sellers, (b) the other accounts or notes receivable of Sellers and the full benefit of all security for such accounts or notes, and (c) any claim, cause of action, remedy or other right related to any of the foregoing, in each case, which are solely related to the Acquired Businesses and the Acquired Assets.

(b)    "Acquired Assets" shall have the meaning set forth in Section 1.1.

44

(c)  "Acquired Businesses" shall have the meaning set forth Section 1.1.

(d)  "Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(e)  "Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(f)  "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(g)  "Agreement" shall have the meaning set forth in the Preamble.

(h)  "Agreement Dispute" shall have the meaning set forth in Section 8.12.

(i)  "Assets Amount" shall have the meaning set forth in Section 5.11(b).

(j)  "Assigned Contracts" shall have the meaning set forth in Section 1.1(a).

(k)  "Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.4(a).

(l)  "Assumed Liabilities" shall have the meaning set forth in Section 1.3.

(m)  "Auction" shall have the meaning ascribed to it in the Bidding Procedures.

(n)  "Back-Up Bidder" shall have the meaning set forth in Section 5.2.

(o)  "Bankruptcy Code" shall have the meaning set forth in the Recitals.

(p)  "Bankruptcy Court" shall have the meaning set forth in the Recitals.

(q)  "Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, (i) in the form attached hereto as Exhibit B and, in any case, (ii) in form and substance satisfactory to Purchaser in its reasonable discretion; it being understood that Bidding Procedures in substantially the form of Exhibit B will be deemed satisfactory to Purchaser.

(r)  "Bidding Procedures Order" means the Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Authorizing the Debtors to

Enter into Stalking Horse Purchase Agreement with Bid Protections for Blue Raven and Other Assets; (C) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (D) Approving Assumption and Assignment Procedures; (E) Scheduling Sale Hearings and Approving the Form and Manner of Notice Thereof; (II) (X) Approving the Sale of the Debtors' Assets Free and Clear of Encumbrances, Claims, Interests and Encumbrances and (Y) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief.

(s)     "Blue Raven Business" means the solar business offered by Blue Raven HoldCo and its direct and indirect subsidiaries that provide simple ways to get solar technology to homeowners; provided that the Blue Raven Business does not include the business or assets of Albatross Software, LLC, a Delaware limited liability company ("Albatross Software") except that the Blue Raven Business includes a perpetual license to Albatross Software's customer management relationship CRM software platform known as "Albatross" and owns the improvements made to such software since October 04, 2023 (which is included on Schedule 1.1(a) attached hereto).

(t)     "Blue Raven HoldCo" means Falcon Acquisition HoldCo, Inc., a Delaware corporation.

(u)     "Breakup Fee" shall have the meaning set forth in Section 7.2(b).

(v)     "Business Day" means any day other than a Saturday, Sunday or other day on which banks in San Francisco, California are authorized or required by Law to be closed.

(w)     "Cash Consideration" shall have the meaning set forth in Section 2.1.

(x)     "Chapter 11 Cases" shall have the meaning set forth in the Recitals.

(y)     "Chosen Courts" shall have the meaning set forth in Section 8.12.

(z)     "Closing" shall have the meaning set forth in Section 2.3.

(aa)    "Closing Date" shall have the meaning set forth in Section 2.3.

(bb)    "Closing Date Payment" shall have the meaning set forth in Section 2.1.

(cc)    "Company Benefit Plans" means any "employee benefit plan" (as defined under section 3(3) of ERISA, whether or not subject to ERISA) or any agreement, plan, or practice providing for compensation, employee benefits, severance pay or benefits, change in control payments, equity awards, fringe benefits, or other remuneration or benefit of any kind, whether written or unwritten, funded or unfunded, for the benefit of any employee, contractor, advisor or other service provider of the Acquired Business that is sponsored, maintained, contributed to or required to be contributed to by any Seller or pursuant to which any Seller has any liability (contingent or otherwise).

(dd)    "Confidentiality Agreement" means that certain letter agreement, dated as of July 18, 2024, by and between Complete Solar and SunPower Corporation.

(ee)    "Consolidated Tax Return" means any Tax Return of the Seller Tax Group with respect to any U.S. federal, state or local or non-U.S. Taxes (including income Taxes) that are paid on an affiliated, consolidated, combined, unitary or similar group basis.

(ff)    "Continuing Employees" shall have the meaning set forth in Section 5.9(a).

(gg)    "Contract" means any written contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(hh)    "Cure Costs" shall have the meaning set forth in Section 1.3(a).

(ii)    "Cure Notice" shall have the meaning set forth in Section 1.5(a).

(jj)    "Dataroom" shall have the meaning set forth in Section 3.15.

(kk)    "Deposit" shall have the meaning set forth in Section 2.2(a).

(ll)    "Encumbrances" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, encumbrance, lien, pledge, option to purchase or lease, right of first offer or refusal, conditional sale or other title retention agreement or lease in the nature thereof, preemptive right (whether statutory or contractual), adverse claim (as defined in Section 8-102(a)(1) of the Uniform Commercial Code), any subordination arrangement in favor of another Person, security interest or agreement, easement or similar encumbrance, other than restrictions on transfer arising under applicable securities Laws, leases and licenses granted in the Ordinary Course, and any encroachment, defect in title, or right of way, including any agreement to give any of the foregoing in the future, in each case, that is not eliminated as of the Closing.

(mm)    "Enforceability Exceptions" shall have the meaning set forth in Section 3.2(c).

(nn)    "Environmental Laws" means all Laws relating in any way to pollution or protection of the environment (including, without limitation, ambient air, vapor, surface water, ground water, land surface or subsurface strata), management, use, preservation or reclamation of natural resources, the presence, management or release or threatened releases of, or exposure to, hazardous materials, or to human health and safety, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) (but only as such Law relates to or regulates workplace exposures to Hazardous Materials), each of their state and local counterparts or equivalents, each of their foreign and international

equivalents, and any environmental transfer of ownership notification or approval statute, as each has been amended and the regulations promulgated pursuant thereto.

(a)    "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(oo)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(pp)    "Escrow Agent" shall have the meaning set forth in Section 2.2(a).

(qq)    "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(rr)    "Excluded Assets" shall have the meaning set forth in Section 1.2.

(ss)    "Excluded Liabilities" shall have the meaning set forth in Section 1.4.

(tt)    "Expense Reimbursement" shall have the meaning set forth in Section 7.2(a).

(uu)    "Express Representations" shall have the meaning set forth in Section 3.15.

(vv)    "Fundamental Representations" shall have the meaning set forth in Section 6.2(a).

(ww)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(xx)    "Intellectual Property Licenses" means (i) any grant by any Seller to a third Person of any right to use any Intellectual Property Rights owned (or purported to be owned) by or licensed to any Seller, and (ii) any grant to any Seller of a right to use a third Person's Intellectual Property Rights, and in each case, including any amendments thereto.

(yy)    "Intellectual Property Rights" means, collectively, all intellectual property rights in any jurisdiction throughout the world, whether registered, unregistered, or registrable, including any and all of the following: (A) inventions, discoveries, improvements, ideas, know-how, methodology, models, algorithms, formulae, systems, processes, technology, whether patentable or not, and all patents, patent applications of any kind, industrial designs, utility models, and like rights, and all applications pertaining to

the foregoing, in any jurisdiction, including re-issues, continuations, divisionals, continuations-in-part, re-examinations, renewals and extensions; (B) rights in registered and unregistered trademarks, service marks, trade names, trade dress, logos, packaging design, slogans, product configurations, trade names and other indications of origin, and Internet domain names, and registrations and applications for registration of any of the foregoing and all goodwill associated therewith; (C) copyrights and registrations and applications for registration thereof, and copyrightable works and any other works of authorship in any medium, including applications or registrations in any jurisdiction for the foregoing and all moral rights in the foregoing; (D) trade secret and other rights in any information (including inventions, discoveries and invention disclosures (whether or not patented), formulae, patterns, compilations, programs, devices, methods, strategies, techniques, or processes), in each case that derives independent economic value, actual or potential, from not being generally known or readily ascertainable by others who can obtain economic value from its disclosure or use; (E) rights in software, including interpreted or compiled source code, object code, development documentation, programming tools, drawings, specifications, metadata and data; (F) data and database rights; (G) domain names, websites and social media accounts and identifiers, including, as applicable, the usernames and passwords associated therewith and all content contained therein; (H) any other intellectual property or proprietary rights of any kind, nature or description; and (I) any tangible embodiments of the foregoing (in whatever form or medium).

(zz)    "Interest" means any interest within the meaning of section 363(f) of the Bankruptcy Code, including any interest of a Governmental Authority, and all other interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of the Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal Law, whether known or unknown, legal or equitable, and all Liens, rights of offset, replacement Liens, adequate protection Liens, charges, obligations, or claims granted, allowed or directed in any Decree.

(aaa)    "Inventory" means all raw materials, work in progress, finished goods inventory.

(bbb)    "Intellectual Property Assignment Agreement" shall have the meaning set forth in Section 2.4(c).

(ccc)    "Knowledge of Sellers", or words of like import, means the actual knowledge, as of the date of this Agreement, without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Tony Garzolini, Eileen Evans and Shawn Fitzgerald, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(ddd)  "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, regulation or Order issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(eee)  "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, Tax, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(fff)  "<u>Material Adverse Effect</u>" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; <u>provided</u> that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "<u>Effect</u>") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers operate, including Effects arising from or relating to competition or Ordinary Course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any equipment or supplies necessary to or used in the provision of services by Sellers or any of their respective Subsidiaries (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations

issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii ) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 5.1 or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Sellers or their respective Affiliates with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Sellers or their respective Subsidiaries (or any of their assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business of Sellers; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv) (A) the commencement or pendency of the Chapter 11 Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of Sellers or their respective Affiliates, or (3) the assumption or rejection of any assigned contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or its Affiliates in compliance therewith; provided that any adverse Effect resulting or arising from any matter described in clauses (i) through (v) may be taken into account in determining whether there has been a Material Adverse Effect to the extent, and only to the extent, that such Effect has had a materially disproportionate adverse effect on Sellers relative to similarly situated participants in the industries and geographic areas in which Sellers operate (in which case only such incremental materially disproportionate adverse effect may be taken into account in determining whether there has been a Material Adverse Effect).

(ggg)    "New Homes Business" means the solutions offered by Sellers to builders and homeowners in the new homes market, including all-in-one solutions that include a full suite of renewable energy systems: solar, storage, EV chargers, software, and services.

(hhh)    "Non-Installing Dealer Business" means the sales business of Sellers through a network of non-installing dealers.

(iii)    "Non-Equity Assets" shall have the meaning set forth in Section 5.11(b).

(jjj)    "<u>Non-Recourse Person</u>" shall have the meaning set forth in <u>Section 8.7</u>.

(kkk)    "<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order).

(lll)    "<u>Ordinary Course</u>" means the ordinary and usual course of operations of the business of Sellers with respect to the Acquired Assets, as applicable and taken as a whole, taking into account the contemplation, commencement and pendency of the Chapter 11 Cases and past practice in light of the current pandemic, epidemic or disease outbreak; <u>provided</u> that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the Ordinary Course.

(mmm)"<u>Outside Date</u>" shall have the meaning set forth in <u>Section 7.1(c)</u>.

(nnn)    "<u>Party</u>" or "<u>Parties</u>" shall have the meaning set forth in the Preamble.

(ooo)    "<u>Permit</u>" means any permit, license, franchise, clearance, registration, certificate, approval, qualification, or authorization issued by any Governmental Body or accrediting organization.

(ppp)    "<u>Permitted Encumbrances</u>" means (i) Encumbrances for utilities and Taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable or that are being contested by appropriate proceedings, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, and (vii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(qqq)    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(rrr)    "<u>Personal Information</u>" means any information that enables, or could reasonably enable, a Person in possession thereof to identify a natural person or that is otherwise considered personally identifiable information, personal information, personal data or any other similar term under applicable Law.

(sss)    "<u>Pre-Closing Tax Period</u>" means any taxable period (or portion thereof) ending on or prior to the Closing Date and the portion through the end of the Closing Date of any Straddle Period.

(ttt)    "<u>Professional Fees Amount</u>" means an amount equal to all fees and expenses incurred and estimated to be incurred on or prior to the Closing Date (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of the Closing Date) by any professional retained pursuant to sections 327 and 1103 of the Bankruptcy Code in the Bankruptcy Cases.

(uuu)    "<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 2.1</u>.

(vvv)    "<u>Purchase Price Allocation</u>" shall have the meaning set forth in <u>Section 5.11(b)</u>.

(www)    "<u>Purchase Price Allocation Statement</u>" shall have the meaning set forth in <u>Section 5.11(b)</u>.

(xxx)    "<u>Purchaser</u>" shall have the meaning set forth in the Preamble.

(yyy)    "<u>Purchaser Group</u>" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(zzz)    "<u>Purchaser SEC Reports</u>" means all schedules, forms, statements, documents or reports filed or furnished by Purchaser with the SEC, as the case may be, together with all exhibits and schedules thereto and all information incorporated therein by reference.

(aaaa)    "<u>Related Agreements</u>" means the Assignment and Assumption Agreement, Intellectual Property Assignment Agreement, the TSA (if executed in connection with the Closing), and any certificates delivered pursuant to this Agreement.

(bbbb)    "<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposal, dumping, dispersing, leaching or migrating in, into, onto or through the indoor or outdoor environment.

(cccc)    "<u>Representatives</u>" of a Person means any officer, director, manager or employee of such Person or any investment banker, attorney, accountant, consultant, agent or other advisor or representative of such Person.

(dddd)    "<u>Retained Taxes</u>" means any Liability for Taxes (including the payment thereof) (i) attributable to the Acquired Assets for a Pre-Closing Tax Period as determined pursuant to <u>Section 5.11</u>, (ii) of any and all Sellers (or for which any Seller or any of their Affiliates are otherwise liable, including as a transferee, successor, by contract or otherwise pursuant to applicable Law, or arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having included or required to be included in any Tax Return related thereto), or (iii) in respect of any Excluded Assets.

(eeee)    "<u>Sale Order</u>" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the

Bankruptcy Code and (ii) approving and authorizing Sellers to consummate the Transactions, in form and substance reasonably acceptable to the Parties.

(ffff)    "SEC" means the U.S. Securities and Exchange Commission.

(gggg) "Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(hhhh) "Seller" and "Sellers" shall have the meaning set forth in the Preamble.

(iiii)    "Seller Credit Support Obligations" shall have the meaning set forth in Section 5.12.

(jjjj)    "Seller Tax Group" means any consolidated, combined, unitary or similar Tax group of which Seller or any of its Affiliates (other than Blue Raven HoldCo) is the common parent.

(kkkk) "Straddle Period" means any taxable period that includes (but does not end on) the Closing Date.

(llll)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other entity, whether incorporated or unincorporated, of which such first Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions.

(mmmm)    "Successful Bidder" means, if an Auction is conducted, the prevailing party at the conclusion of such Auction.

(nnnn) "Tax" or "Taxes" means any federal, state, local, non-United States or other tax of any kind, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(oooo) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(pppp) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(qqqq) "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(rrrr)    "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(ssss)    "<u>Transfer Offer</u>" shall have the meaning set forth in <u>Section 5.9(a)</u>.

(tttt)    "<u>Transfer Taxes</u>" shall have the meaning set forth in <u>Section 5.11</u>.

(uuuu) "<u>Transferred Employee Records</u>" means physical or electronic copies of all personnel records (including those as required by applicable Law and those pertaining to performance, training history, job experience and history, and for the three (3)-year period immediately preceding the Closing, compensation history) for the Transferred Employees, except where (i) the transfer or disclosure of such records is prohibited by applicable Law or would include medical records, or (ii) consent of the relevant employee is required by applicable Law but not given.

(vvvv) "<u>Transferred Employees</u>" shall have the meaning set forth in <u>Section 5.9(a)</u>.

(wwww)    "<u>Transferred Intellectual Property</u>" means any and all worldwide rights in and to all tangible and intangible interests, rights, or assets of the Sellers (whether arising under statutory or common law, contract, or otherwise), which include all of the following items owned (or purported to be owned) by the Sellers, for which any Seller is a licensee, sub-licensee, licensor, sub-licensor, assignee, or in which any Seller has an interest or right, in each case that is used or held for use by the Sellers in the Acquired Businesses or is otherwise related to the Acquired Businesses: (a) inventions, discoveries, processes, designs, tools & molds, techniques, developments and related improvements whether or not patentable; (b) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing (collectively, the "<u>Transferred Patents</u>"); (c) trademarks (whether registered, unregistered or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including IP Addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law) any applications and/or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing (collectively, the "<u>Transferred Trademarks</u>"); (d) work specifications, databases and artwork; (e) technical, scientific and other know-how and information (including promotional material), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, tools & molds, assembly procedures, or specifications; (f) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works (collectively, the "<u>Transferred Copyrights</u>"); (g) work for hire; (h) the Acquired Businesses' entire customer list and database (including (1) all lists of current and past customers of the Acquired Businesses, (2) any and all information relating in any way to the use of such lists for or by the Acquired Businesses, (3) personal information, such as name, address, telephone number, email address, website and any other database information and (4) customer purchase history at a transaction level (including with respect

to dollar amounts, dates, and items purchased) but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or financial information prohibited by law); (i) all assets used or useful by the Sellers, in connection with the Acquired Businesses, in the conduct of its business over the internet and/or in any other electronic medium, including any websites, social media sites and accounts (including the content contained therein, user names and passwords), diagrams, drawings, domain names, and all advertising and marketing materials and collateral (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs, tech packs, tools, molds, and specifications (including tech specifications) vendor and merchandise supplier data and information; (j) all goodwill, rights, contracts (including all licenses and sublicenses granted or obtained with respect thereto) and assets related to the foregoing; and (k) all other intellectual property and Intellectual Property Rights owned or purported to be owned by the Sellers, which are used in, held for use in, or relate to the Acquired Businesses; provided that the Transferred Intellectual Property shall not include any Excluded Assets.

(xxxx)   "TSA" has the meaning set forth in Section 2.4(d).

(yyyy)   "<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws.

(zzzz)   "<u>Willful Breach</u>" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

**Section 9.2    <u>Rules of Interpretation</u>**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and exhibit references contained in this Agreement are references to sections, clauses, Schedules and exhibits in or to this Agreement, unless otherwise specified. All exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or exhibits but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such

period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(i)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(j)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(k)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

57

**EXHIBIT A**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

[ATTACHED]

**EXHIBIT B**

**BIDDING PROCEDURES**

[ATTACHED]

**<u>Exhibit 3</u>**

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### NOTICE OF AUCTIONS FOR THE SALE OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to market and conduct an auction (the "Auction") to sell the Assets free and clear of liens, claims, encumbrances, and other interests (except as may be set forth in the Definitive Sale Documents), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the applicable sale proceeds.  The Auction (if any) will be governed by the bidding procedures approved pursuant to the Order and attached to the Order as Exhibit 1 thereto (the "Bidding Procedures").

Copies of the Order, the Bidding Procedures, and other documents related thereto, are available upon visiting the Debtors' restructuring website at https://dm.epiq11.com/SunPower.

**Any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.  The Bid Deadline is September 6, 2024, at 5:00 p.m. (Eastern Daylight Time).**

The Debtors intend to conduct the Auction (if required) at which they will consider Qualified Bids (as defined in the Bidding Procedures) submitted to the Debtors and their advisors, by and pursuant to the Bidding Procedures and as set forth in the Order.  The Debtors intend to commence the Auction (if applicable) on **September 10, 2024, at [10:00] a.m. (Eastern Daylight Time)**, either in-person or by

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, as applicable.

videoconference or such other form of remote communication established by the Debtors (to be communicated to Qualified Bidders in advance).

The Debtors reserve the right to modify the Bidding Procedures in accordance with the Bidding Procedures and the Order.

All requests directed to the Debtors in connection with the foregoing, or for further information regarding the Bidding Procedures and participation therein, or for further information regarding the Assets, must be directed to: Moelis & Company, LLC, the Debtors' proposed investment banker, at rick.polhemus@moelis.com, patrick.layton@moelis.com, bassam.latif@moelis.com, jared.dermont@moelis.com, and dave.mcguiness@moelis.com.  All Potential Bidders are instructed to review the Bidding Procedures in consultation with counsel.

**Exhibit 4**

**Notice of Winning Bidder**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### NOTICE OF WINNING BIDDER AND
### BACK-UP BIDDER FOR CERTAIN OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale or sales (the "Sale Transactions") of the Debtors' assets (the "Assets").

On **September 10, 2024, at 10:00 a.m. (Eastern Daylight Time)**, pursuant to the Order, the Debtors commenced the Auction either in-person or by videoconference or such other form of remote communication established by the Debtors.

At the conclusion of the Auction, the Debtors selected the following Winning Bidder and Back-Up Bidder:

| Assets | Winning Bidder | Back-Up Bidder | Proposed Bid Protections | Key Terms of Proposed Sale |
|---|---|---|---|---|
| [●] |  |  |  |  |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Motion, or the Bidding Procedures, as applicable.

The Sale Hearing to consider approval of the sale of the Assets to the Winning Bidder(s) at the Auction will be held before the Honorable [●], at the Court, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Courtroom #[●], Wilmington, Delaware 19801, on **September [17], 2024, at [●]:00 [a/p].m. (Eastern Daylight Time)**.

At the Sale Hearing, the Debtors will seek the Court's approval of the Winning Bid(s) and the designation of the Back-Up Bid(s) (if any) for the applicable Assets.  Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale(s) for the applicable Assets, and there will be no further bidding at the Sale Hearing.

If a Winning Bidder cannot or refuses to consummate the Sale Transaction following entry of the Sale Order because of the breach or failure on the part of the Winning Bidder, the Back-Up Bidder (if any) shall be deemed the new Winning Bidder and the Debtors shall be authorized, but not required, to close the applicable Sale Transaction with such Back-Up Bidder(s) on the terms and provisions of such applicable Back-Up Bid(s) without further order of the Court upon filing a notice with the Court providing for a three (3) business days period to object to such sale.

This notice is subject to the terms and conditions of the Motion and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents, including the Bidding Procedures, in their entirety.  Parties interested in receiving additional or other information regarding the proposed Sale Transaction or other disposition of the applicable Assets may make a written request to Epiq Corporate Restructuring, LLC ("Epiq") (the notice and claims agent retained in these chapter 11 cases) or by calling (888) 410-9433 or +1 (971) 298-7638 for calls originating outside of the U.S.

Copies of the Motion, the Order, the Bidding Procedures, this notice, and any other related documents are available:  (a) upon request to Epiq by calling  (888) 410-9433 or +1 (971) 298-7638 for calls originating outside of the U.S.; (b) by visiting the Debtors' restructuring website at https://dm.epiq11.com/SunPower; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

**<u>Exhibit 5</u>**

**Additional Stalking Horse Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF DESIGNATION OF
## ADDITIONAL STALKING HORSE BIDDER FOR THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale or sales (the "Sale Transactions") of the Debtors' assets (the "Assets").

**PLEASE TAKE FURTHER NOTICE** that, the Debtors have filed the *Declaration of Rick Polhemus in Support of Entry of Order (I) Approving the Debtors' Designation of an Additional Stalking Horse Bidder for the Assets, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief*, and a proposed form of an *Order (I) Approving the Debtors' Designation of an Additional Stalking Horse Bidder for the Assets, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief* contemporaneously herewith.

**PLEASE TAKE FURTHER NOTICE** that, the Order permitted the Debtors to offer a Break-Up Fee and Expense Reimbursement in an aggregate amount not to exceed three percent (3%) of the applicable Purchase Price.

**PLEASE TAKE FURTHER NOTICE** that, the Debtors hereby designate [●] to act as the Additional Stalking Horse Bidder for the Remaining Assets, with a Stalking Horse Bid in the amount of [●],

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Motion, or the Bidding Procedures, as applicable.

including [●] in cash consideration, substantially on the terms of and in accordance with the proposed Stalking Horse Agreement attached hereto as **Schedule 1**, subject to and in accordance with the terms of the Order.

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Order, the Stalking Horse Agreement provides for, among other things, a Break-Up Fee and Expense Reimbursement not to exceed three percent (3%) of the applicable Purchase Price in the aggregate.

**PLEASE TAKE FURTHER NOTICE** that, any objection to the designation of the Additional Stalking Horse Bidder or to the terms Bid Protections set forth herein and in the Stalking Horse Agreement (an "Additional Stalking Horse Objection") shall be filed **no later than three (3) business days after the filing of the Additional Stalking Horse Notice at 5:00 p.m. (Eastern Daylight Time)**.  If a timely Additional Stalking Horse Objection is filed, the Debtors are authorized to seek an expedited hearing with respect to the Additional Stalking Horse Objection on not less than three (3) calendar days' notice.

**PLEASE TAKE FURTHER NOTICE** that, absent a timely Additional Stalking Horse Objection, the Court may enter an order approving the Bid Protections set forth in the Additional Stalking Horse Notice and the designation of the Additional Stalking Horse Bidder.

**PLEASE TAKE FURTHER NOTICE** that the Debtors and the Additional Stalking Horse Bidder reserve all of their rights to amend, modify, change, revise, or otherwise alter in any respect the Stalking Horse Agreement in accordance with the terms of the Stalking Horse Agreement and the Order.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases are available: (a) free of charge upon request to Epiq Corporate Restructuring, LLC (the notice and claims agent retained in these chapter 11 cases) by (i) calling (888) 410-9433(toll free) or +1 (971) 298-7638 (International); or (ii) visiting the Debtors' restructuring website at https://dm.epiq11.com/SunPower; or (b) for a fee via PACER by visiting http://www.deb.uscourts.gov.

**<u>Schedule 1</u>**

**Stalking Horse Agreement**

**Exhibit 6**

**Cure Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## NOTICE OF POTENTIAL ASSUMPTION OR
## ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS OR LEASES

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Complete Solaria Stalking Horse APA, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures for the assumption or assumption and assignment of executory contracts and unexpired leases and granted related relief, as set forth in the Order.

Pursuant to the Order and by this notice (this "Cure Notice"), the Debtors hereby notify you that they have determined, in the exercise of their reasonable business judgment, that each executory contract or unexpired lease set forth on **Schedule 1** attached hereto (the "Potential Assumption List") may be assumed (and, if applicable, assigned) effective as of the date (the "Assumption Date") set forth in **Schedule 1** or such other date as the Debtors and the counterparty or counterparties to such executory contracts or unexpired leases may agree.

The Debtors believe that the party to which each applicable executory contract or unexpired lease may be assigned has the financial wherewithal to meet all future obligations under such contract or lease and the Debtors will, at the request of the applicable counterparty, use commercially reasonable efforts to provide evidence thereof to such applicable counterparty (and their counsel, if known) thereby demonstrating that the assignee of the contract or lease has the ability to comply with the requirements of adequate assurance of future performance.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Motion, or the Bidding Procedures, as applicable.

Parties objecting to the proposed assumption and assignment (including a Winning Bidder's proposed form of adequate assurance of future performance) must file and serve a written objection (each, a "Cure Objection") so that such objection is filed with the Court and **actually received by the following parties no later than September 16, 2024, at 5:00 p.m. (Eastern Daylight Time)** (the "Cure Objection Deadline"):  (a) the Debtors, SunPower Corporation, 880 Harbour Way South, Suite 600, Richmond, CA 94808, Attn.: Chief Legal Officer and Chief Transformation Officer; (b) proposed co-counsel to the Debtors (i) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois, 60654, Attn.:  Chad J. Husnick, P.C. (chad.husnick@kirkland.com), Jeffrey Michalik (jeff.michalik@kirkland.com), and Robert Jacobson (rob.jacobson@kirkland.com); (ii) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com) and Zachary R. Manning (zach.manning@kirkland.com);  and (iii) Richards, Layton & Finger, P.A., Attn.:  Mark D. Collins (collins@rlf.com) and Jason M. Madron (madron@rlf.com); and (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Richard L. Schepacarter (richard.schepacarter@usdoj.gov); and (d) counsel to the Creditors' Committee, [●]].

Absent a Cure Objection being timely filed, the assumption of each executory contract or unexpired lease may become effective on the Assumption Date set forth in **Schedule 1**, or such other date as the Debtors and the counterparty or counterparties to such executory contract or unexpired lease may agree.

If an objection is timely filed and not withdrawn or resolved, such objection will be heard at the Sale Hearing or on such other date and time as agreed to by the Debtors and the objecting party or ordered by the Court.  If such objection is overruled or withdrawn, the applicable executory contract or unexpired lease shall be assumed as of the Assumption Date set forth in **Schedule 1** or such other date as the Debtors and the counterparty or counterparties to such executory contract unexpired lease may agree.

## Schedule I

## Potential Assumption List