# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SUNPOWER CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11649 (CTG)<br><br>Jointly Administered |

### U.S. SPECIALTY INSURANCE COMPANY AND ITS AFFILIATED SURETIES' LIMITED OBJECTION TO THE DEBTORS' BID PROCEDURES MOTION (D.I. #15)

U.S. Specialty Insurance Company and its affiliated sureties, including but not limited to American Contractors Indemnity Company (collectively, "USSIC" or the "Surety"), by and through its undersigned counsel, hereby file this limited objection (the "Limited Objection") with respect to the *Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale Of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter Into a Stalking Horse Agreement and Provide Bid Protections, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling an Auction and Sale Hearing, (V) Approving Procedures for the Assumption and Assignment of Contracts, (VI) Approving the Sale of the Debtors' Assets Free and Clear, and (VII) Granting Related Relief* [Docket No. 15] (the "Bid Procedures Motion").

In support of this Limited Objection, USSIC attaches a *Declaration of Frank M. Lanak in Support of the Limited Objection to the Bid Procedures Motion*, and respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335). The location of the Debtors' service address for purposes of these chapter 11 cases is: 880 Harbour Way South, Suite 600, Richmond, CA 94804.

1

## I.  GENERAL BACKGROUND

1. On August 5, 2024 (the "Petition Date"), Sunpower Corporation and certain of its affiliates (collective each filed a voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. Prior to the Petition date, USSIC issued certain General Contractor bonds, as well as a Notary bond (collectively, the "Bonds"), on behalf of certain Debtors. *See Lanak Decl.* at ¶ 3.

3. In connection with USSIC's execution and/or issuance of the Bonds, certain of the Debtors and/or their non-debtor affiliates executed in favor of USSIC two General Indemnity Agreements (as redacted, the "Indemnity Agreements"). *Lanak Decl.* at ¶ 4, **Ex's. A, B.**

4. Both Indemnity Agreements, among other provisions, provide in pertinent part:

> The Undersigned agrees to exonerate, indemnify and hold the Surety harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature (including, but not limited to, interest, court costs and counsel fees) which arise by reason of, or in consequence of, the execution by the Surety of any Bond on behalf the Principal and whether or not the Surety shall have paid any sums in partial or complete payment thereof, including but not limited to: sums paid including interest, liabilities incurred in settlement of claims, expenses paid or incurred in connection with claims, suits, or judgments such Bonds; expenses paid or incurred in enforcing the terms of this Agreement; expenses paid or incurred in procuring or attempting to procure release from liability under its Bond by Surety; expenses incurred in recovering or attempting to recover losses or expenses paid or incurred; attorneys fees and all legal or professional services; adjustment of claims; premiums on Bonds issued by Surety on behalf of the Principal; or monies advanced or loaned.

*See Lanak Decl.* at ¶ 5.

5. In total, USSIC issued at least 137 Bonds on behalf of the Debtors and its non-debtor affiliates, with a total penal sum of no less than $1,709,000. *Lanak Decl.* at ¶ 6, **Ex. C.**

## II.     BASIS FOR OBJECTIONS

6.    The ability of a debtor to assume and assign a contract is not unlimited. The Bankruptcy Code specifically prohibits debtors from assuming certain contracts. Section 365 (c)(2) provides the following in pertinent part:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if— …
>
> (2) such contract is a contract to make a loan, or extend other debt financing or ***financial accommodations***, to or for the benefit of the debtor, or to issue a security of the debtor….

(emphasis added) (emphasis added).

7.    The Bankruptcy Code does not define the term "financial accommodation." *See* e.g. *In re Adana Mortg. Bankers, Inc*., 12 B.R. 977, 986 (Bankr. N.D. Ga. 1980) (regarding "financial accommodations" as used in Section 365(e)(2)(B)).

8.    However, in *In re Adana*, the Court found the following regarding guaranty agreements:

> The debtor contends that the Guaranty Agreements do not constitute contracts to make financial accommodations to or for the benefit of debtor. To the contrary, the facts show that the Guaranty Agreements are contracts to make financial accommodations to or for the benefit of debtor. First, the debtor asserts that the securities constitute a type of liability of the debtor. Second, GNMA is obligated to pay the securities holders if the debtor fails to do so. In other words, GNMA is required by the Guaranty Agreements to make payments promptly on liabilities of the debtor, should the debtor fail to make them. The obligation to pay money on the obligation of another is a financial accommodation.

*Id*. at 987.

9. Surety bonds are considered "financial accommodations" because they represent obligations to pay money based on the obligations of another. *In re Wegner Farms Co.*, 49 B.R. 440 (Bankr. N.D. Iowa 1985). The *Wegner Farms* Court explained that:

> Certainly a surety bond does not fit neatly within the framework of traditional debt financing. Nonetheless, as noted by the court in In re Adana Mortgage Bankers Inc., 12 B.R. 977, 987 (Bkrtcy.N.D.Ga.1980) (Adana I), even giving the term financial accommodation a narrow construction, "[t]he obligation to pay money on the obligation of another is a financial accommodation" within the meaning of section 365(c) and (e).

*Id*. at 444. Further, as set forth in *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990):

> This Court agrees with the finding in Wegner and Adana I that an obligation to pay the debts of another is a "financial accommodation" and as such is encompassed by Section 365(c)(2). Accordingly, the Court finds the Ohio Casualty surety bond to be a financial accommodation which cannot be assumed pursuant to Section 365(c)(2).

10. Here, the Surety issued Bonds on behalf of certain of the Debtors and/or their nondebtor affiliates by virtue of, among other things, the Indemnity Agreements. The Bonds and the Indemnity Agreements, without limitation, are financial accommodation contracts and therefore, they are not assignable by the Debtors at this time.

11. Moreover, the Bonds are not property of the Debtors or their estates and therefore cannot be assigned without the Surety's consent. "[T]he 'overwhelming weight of authority,' under both the Bankruptcy Act and Code holds that a contractor [principal] has no property interest in a surety bond issued by a third-party [surety] to guarantee the contractor's performance on its commercial or personal services contracts." *O'Malley Lumber Co. v. Lockard (In re Lockard)*, 884 F.2d 1171, 1177 (9th Cir. 1989). Moreover, because the Debtors have no property rights in the Bonds, the Debtors cannot simply transfer the Bonds to a winning bidder. The Bonds do not assure

performance of any party other than the named principal. In fact, the law of suretyship is clear that a surety is discharged from liability under its bond if there is an involuntary substitution of the principal under the bond, since such a change is a material modification to the underlying bonded contract that is prejudicial to the surety. *See, e.g., Becker v. Faber*, 19 N.E.2d 997, 999 (N.Y. 1939). Accordingly, the Bonds and surety's obligations thereunder are not assignable to a new principal without the surety's consent.

12. Recoupment is a creditor's right, long recognized in bankruptcy proceedings that is not in the nature of a mere lien, but is a defense to a claim for payment. *Lee v. Schweiker,* 739 F. 2d 870, 875 (3d Cir. 1984) ("[W]here the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim . . . ."). In other words, the recoupment is used to determine the proper liability on amounts owed. *Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993).

13. Setoff "gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor,' provided that both debts arose before commencement of the bankruptcy action and are in fact mutual." *In re University Medical Center,* 973 F.2d 1065, 1079 (3d Cir. 1992) (*quoting in re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990). While setoff rights are defined and delineated by applicable non-bankruptcy law, the Bankruptcy Code recognizes and preserves these rights: "11 U.S.C. § 553(a) provides that with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001) ("It is impossible for us to ignore the clear statement of § 553 that 'this title . . . does not affect any right of a creditor to offset . . . .'") (internal quotation source omitted).

14. Setoff "gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor,' provided that both debts arose before commencement of the bankruptcy action and are in fact mutual." *In re University Medical Center,* 973 F.2d 1065, 1079 (3d Cir. 1992) (*quoting in re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990). While setoff rights are defined and delineated by applicable non-bankruptcy law, the Bankruptcy Code recognizes and preserves these rights: "11 U.S.C. § 553(a) provides that with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001) ("It is impossible for us to ignore the clear statement of § 553 that 'this title . . . does not affect any right of a creditor to offset . . . .'") (internal quotation source omitted).

### III.    LIMITED OBJECTION

15. On August 6, 2024, the Debtors filed the Bid Procedures Motion.

16. The Bid Procedures Motion seeks entry of an order approving, *inter alia*, bidding procedures for the sale of three of the Debtors' core businesses on an expedited basis (the "Going-Concern Assets"), the approval of an asset purchase agreement submitted by Complete Solaria, Inc. (the "Stalking Horse") which contemplates the purchase of the Going-Concern Assets subject to a bidding process, and the assumption and assignment of certain assumed contracts and leases in connection with the sale to the Stalking Horse.

17. By way of this Limited Objection, the Surety does not object to the concept of the proposed sale of Debtors' assets or the concept of bidding procedures being approved, as contemplated in the Bidding Procedures Motion

18. The Surety hereby objects and puts all parties on notice that, *inter alia*, the Indemnity Agreement and Bonds cannot be sold, transferred and/or assumed and assigned without

6

the consent of the Surety, which consent is currently not granted by the Surety, but which may or may not be granted by the Surety, after the Surety has more information concerning a proposed sale.

19. Moreover, to the extent that the Debtors seek to assume and assign any of the Bonds or the Indemnity Agreements, such assumption and assignment is not allowed pursuant to 11 U.S.C. § 365(c)(2) (absent the Surety's consent). The Indemnity Agreements are both a form of "financial accommodation" contract through which the Bonds, among other things, are executed, issued and/or controlled, and thus all of these and related assets of the Surety may not be assumed or assigned without prior consent of the Surety.

20. Further, language should be added to the APA protecting those rights of the Surety's obligees and the Surety. In addition, the Surety objects to certain parts of the APA, upon which the Stalking Horse will proceed to purchase assets or, alternatively, upon which other bidders may base their purchase agreements. Surety therefore puts parties on notice regarding these issues.

21. First, the APA contemplates the Debtors continuing to operate for the benefit of the Purchaser under a de facto transition agreement in Section 1.5(e) of the APA. *See* ECF No. 15, **Ex. A**, at Section 1.5(e). As stated, however, the Purchaser cannot use the Bonds without USSIC's consent which is currently not being given. Accordingly, the Purchaser needs to provide an explanation on how they plan to replace the Surety or what adequate protection they can offer USSIC in the event Purchaser seeks to rely on the Bonds over USSIC' objection since at the point the Debtors could be skeleton of its former self. There should further be a requirement in the bid procedures order that if any Purchaser requires a transition agreement, said agreement should be filed with the Court and an opportunity be given to object thereto.

22. Second, the APA in Section 5.12 addresses Seller Credit Support Obligations. Specifically, this section describes these obligations in pertinent part as follows:

> Purchaser acknowledges that in the course of conduct of the business of Sellers, Sellers and their respective Affiliates may have entered into various arrangements (a) in which guarantees, letters of credit, sureties, bonds or similar arrangements were ***issued by any Seller or its Affiliates*** and (b) in which such Seller or its Affiliates are the primary obligors on other Contracts, in any such case to support or facilitates the business of Sellers.
>
> * * *
>
> It is understood that the Seller Credit Support Obligations are not intended to continue after the Closing. Purchaser agrees that it shall use ***its reasonable best efforts to obtain replacements*** for the Seller Credit Support Obligations….that will be in effect at the Closing or, in the case of Seller Credit Support Obligations described in the foregoing clause (b), will use ***its commercially reasonable efforts to arrange for itself or one of its Subsidiaries to be substituted as the primary obligor*** thereon as of the Closing through an assumption, accession, acknowledgement or similar agreement…with the beneficiary of the applicable Seller Credit Support Obligation.

(emphasis added).

23. The Surety objects to this section since any buyer should be required to replace the Bonds prior to Closing. However, if the Court disagrees to this, language should be added requiring the buyer to make efforts to replace the Bonds after Closing and to indemnify USSIC in connection with Purchaser's use of the Bonds. Further, it should be disclosed whether any Bonds are intended to part of subpart(b) of Section 5.12, although the Surety believes Bonds are not meant to be included therein.

25. Any buyer should be able to disclose how it intends to replace USSIC should USSIC not agree to issue bonds in connection with the buyer. Further, to the extent any buyer wishes seek to seek USSIC's consent to use its Bonds, adequate assurance information should be required to be given to USSIC as part of the bid procedures.

26. Also, the APA provides for the sale of certain books and records. *See* APA, 1.1. The APA should say if there is any claim against the Surety on the Bonds, the Debtors and/or the Purchaser should make books and records available to the Surety pertaining to the claim, and the Debtors or the Purchaser should be required to give the Surety notice if seeking to destroy and books and records.

27. Any sale of claims against the Surety or its bond beneficiaries should not be free and clear of their setoff and recoupment rights.

## **RESERVATION OF RIGHTS**

28. The submission of this Limited Objection by the Surety is not intended as, and shall not be construed as: (a) the Surety's admission of any liability or waiver of any defenses or limitation of any rights of Surety with respect to any claims against any one or more of the Bonds or under any indemnity agreement in favor of the Surety, including the Indemnity Agreements; (b) the Surety's waiver or release of any right to exoneration it may have against anyone with respect to any of the Bonds; (c) the Surety's waiver or release of its right to be subrogated to the rights of one or more of the parties paid in connection with the Bonds; (d) an election of remedy; or (e) consent to the determination of any of the Debtors' liability to the Surety by any particular court, including, without limitation, the Bankruptcy Court.

29. The Surety reserves the right to object and put forth any argument in relation to any sale proposed by the Debtors, after an auction or otherwise, and to raise any arguments by any other party in their objection(s) to the Motions or any future sale hearing.

30. The Surety reserves the right to object and put forth any argument in relation to any motion filed by the Debtors for the Bankruptcy Court's authorization of assumption and

assignment of executory contracts and unexpired leases, and to raise any arguments by any other party in their objection(s) to the Motion.

31. The Surety expressly reserves, and does not waive, any and all of its rights, claims, defenses, limitations, and/or exclusions in connection with its and any of the Debtors' or its affiliates' rights and obligations under the Indemnity Agreements, the Bonds, applicable law, or otherwise. Surety further reserves all rights to assert any and all such rights, claims, defenses, limitations and/or exclusions in any appropriate manner or forum whatsoever (including, without limitation, any of its rights to have any non-core matter relating to the interpretation of its contractual rights and Debtors' contractual obligations adjudicated by the United States District Court).

32. Surety further reserves all of its rights to raise any issues contained in this Supplemental Limited Objection and any other related issues in any procedurally appropriate contested matter and/or adversary proceeding, including, without limitation, (i) objections to confirmation of any plan; (ii) a separate adversary proceeding requesting any appropriate declaratory and/or injunctive relief; (iii) or an objection to any subsequent motion seeking approval of an asset sale to any prospective asset purchaser with respect to any contractual rights that may be adversely affected by a sale motion or the confirmation of any plan.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, USSIC respectfully requests that any order entered with respect to the Bid Procedures Motion be entered consistent with the Limited Objection for the reasons set forth above.

{SIGNATURE BLOCK ON FOLLOWING PAGE}

|  |  | **MCELROY DEUTSCH MULVANEY & CARPENTER, LLP** |
|---|---|---|
| Dated: August 26, 2024 | By: | */s/ Gary D. Bressler* |
|  |  | Gary D. Bressler (#5544) |
|  |  | Gaston P. Loomis (#4812) |
|  |  | 300 Delaware Avenue, Suite 1014 |
|  |  | Wilmington, DE 19801 |
|  |  | Telephone: 302-300-4515 |
|  |  | E-mail: gbressler@mdmc-law.com |
|  |  | gloomis@mdmc-law.com |

*Counsel to U.S. Specialty Insurance Company and its affiliated sureties*