**<u>Exhibit I</u>**

**Revised Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SUNPOWER CORPORATION, *et al.*,[1] | Case No. 24-11649 (CTG) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. 58, 188** |

**ORDER (I) AUTHORIZING AND APPROVING THE
SALE OF TCU SOLAR LOANS AND RIC DEPOSITOR MEMBERSHIP INTERESTS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of SunPower Corporation and its affiliates debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an order (the "Sale Order"): (a) approving the Purchase Transaction by and between Debtor SunPower Capital Services, LLC (the "Seller"), and GoodFinch SPV WL IV (SPWR), LLC and Solar Securitization Master Fund II, LP (each, a "Purchaser," and collectively, the "Purchasers") for (i)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SunPower Corporation (8969); SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335). The location of the Debtors' service address for purposes of these chapter 11 cases is: 880 Harbour Way South, Suite 600, Richmond, CA 94804.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion, the Term Sheet, the Purchase Agreements, or the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Further Hearing on the Motion, and (V) Granting Related Relief* [Docket No. 91] (the "Cash Collateral Order"), as applicable.

the TCU Solar Loans, and (ii) 100% of the limited liability company membership interests in SPWR RIC Depositor 2022-1, LLC (the "RIC Depositor Membership Interests," and together with TCU Solar Loans, the "Assets"), substantially in accordance to the terms contained in that certain term sheet attached as Exhibit 1 to the Sale Order (the "Term Sheet"); (b) authorizing and approving the Debtors to  enter into the loan sale and purchase agreements attached hereto as **Exhibit 2-A** and **Exhibit 2-B** and the membership interest purchase and transfer agreement attached hereto as **Exhibit 3** (together with all schedules, exhibits, and ancillary documents related thereto, as amended, modified, or supplemented from time to time, the "Purchase Agreements"); (c) authorizing the Debtors to sell each Asset to the applicable Purchaser free and clear of liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code (as defined herein) and the terms set forth in the Purchase Agreements; (d) granting related relief; and upon the Henry Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court (the "Sale Hearing"), and this Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT:**[3]

A.    <u>Notice</u>.  As evidenced by certificates filed with the Court [Docket No. 185], proper, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, (i) the Motion; (ii) the entry of this Sale Order; and (iii) the transactions contemplated under the Term Sheet and the Purchase Agreements have been provided to all parties entitled thereto.  Such notice constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding, the Motion and the entry of this Sale Order under Bankruptcy Code §§102(1), 363, and 365 and Bankruptcy Rules 2002 (including, without limitation, 2002(i)), 6004, and 6006 and Local Rule 2002-1(b).  No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion or the entry of this Sale Order need be given to any entity.

B.    <u>Disclosures</u>.  The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Purchase Transaction are sufficient under the circumstances.

C.    <u>Sale in Best Interests of the Debtors' Estates</u>.  The Debtors' determination that sale of the Assets through a private sale on the terms and conditions set forth in the Term Sheet is in the best interests of the Debtors' estates constitutes a valid and sound exercise of the Debtors'

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

business judgment.  The total consideration provided by the Purchasers for the Assets represents not only a fair and reasonable offer to purchase the Assets, but also the highest and best offer reasonably and practicably received by the Debtors for such Assets.  No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase one or all of the Assets for greater economic value to the Debtors' estates than the Purchasers.  The transactions contemplated under the Term Sheet, including the total consideration to be realized by the Debtors thereunder, (i) are the highest and best offer received for each applicable Asset by the Debtors and (ii) are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

        D.    <u>Good Faith</u>.  The sales process engaged in by the Debtors and the Purchasers, and the negotiation of the Purchase Transaction and the other transactions contemplated by the Term Sheet, was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  The Purchasers are purchasing the Assets in good faith and are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code.  No Purchaser or any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each such person is entitled to the full protections of section 363(m), and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that:  (1) the Purchasers recognized that the Debtors were free to deal with any other party interested in acquiring the applicable Assets; (2) all payments to be made by the Purchasers and other agreements or arrangements entered into, or to be entered into, by such Purchasers in connection with the Purchase Transaction and the other transactions contemplated by the Term Sheet have been disclosed; (3) the Purchasers have not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (4) the negotiation and execution of

the Term Sheet, including the applicable Purchase Transaction contemplated thereby, were at arms'-length and in good faith. There was no evidence of insider influence or improper conduct by the Purchasers or any of their affiliates in connection with the negotiation of the Purchase Transaction with the Debtors.

      E.    <u>No Collusion</u>. The Purchase Transaction and the other transactions contemplated by the Term Sheet cannot be avoided under section 363(n) of the Bankruptcy Code. None of the Debtors, the Purchasers, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Purchase Transaction or the other transactions contemplated by the Term Sheet to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

      F.    <u>Purchasers Not Successors</u>. By consummating the Purchase Transaction and the other transactions contemplated by the Term Sheet substantially pursuant to the Term Sheet, no Purchaser is a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between any Purchaser and any Debtor. By consummating the Purchase Transaction and the other transactions contemplated by the Term Sheet, no Purchaser shall be deemed to be holding itself out as a continuation of the Debtors based on the Purchase Transaction, the Purchase Agreements, the Term Sheet, any subsequent documentation entered into for purposes of consummating such transaction, or this Sale Order. No Purchaser is a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Purchase Transaction does not amount to a consolidation, merger, or *de facto* merger of any Purchaser and the Debtors. Neither the Purchasers nor any of their affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or

equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) or any Debtor's estate, except to the extent expressly provided in the Purchase Agreements.

G.    <u>Binding Agreement</u>.  Each Purchase Agreement is a valid and binding contract between the Seller and the applicable Purchaser and shall be enforceable pursuant to its terms.  The Purchase Agreements were not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  The Purchase Agreements and the Purchase Transactions themselves, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of each Purchase Agreement, the other agreements contemplated by the Term Sheet, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the applicable Purchaser, and each of their respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting encumbrances (collectively, the "<u>Bound Parties</u>"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The

provisions of this Sale Order and the terms and provisions of each Purchase Agreement and other agreements contemplated by the Term Sheet, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7. The rights and interests granted pursuant to this Sale Order, each Purchase Agreement, and each other agreement contemplated by the Term Sheet shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Purchase Agreements, each other agreement contemplated by the Term Sheet, and this Sale Order without the need for further order of the Court.

H.      <u>Free and Clear Sale</u>. The Debtors sell the Assets free and clear of all claims against the Debtors, their estates, or any of the Assets (except to the extent set forth in the Purchase Agreements) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied; *provided* that all liens, claims, encumbrances, and interests of which the Assets are sold free and clear pursuant to the Sale Order (including the Adequate Protection Liens) shall automatically attach to all proceeds of the applicable sale in the order of priority of such liens, claims, encumbrances, and interests, with the same validity, force, and effect which they had against the applicable Assets prior to the sale (including pursuant to the Cash Collateral Order). Those holders of claims or interests who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to Bankruptcy Code

section 363(f)(2). Those holders of claims or interests who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f), including that such holders of claims or interests are adequately protected by having their claims that constitute interests in the Assets, if any, attach to the proceeds of the Purchase Transaction with the same priority that existed immediately prior to the closing.

I.        If the Purchase Transaction was not free and clear of all claims, or if any Purchaser would, or in the future could, be liable for any of such claims (except to the extent set forth in the Purchase Agreement), such Purchaser would not have entered into and consummated the Purchase Transaction, thus adversely affecting the Debtors and their estates and creditors. In addition, the sale of the Assets other than pursuant to a transfer that is free and clear of all claims, interests, and encumbrances (except to the extent set forth in the Purchase Agreements) would be of substantially less benefit to the Debtors' estates. The total consideration to be provided under the Purchase Transaction reflects the Purchasers' reliance on this Sale Order to provide them, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the applicable Assets free and clear of all claims (except to the extent set forth in the Purchase Agreements).

J.        <u>Application of Proceeds</u>. On August 7, 2024, the Court entered the Cash Collateral Order. Pursuant to the Cash Collateral Order, the Assets constitute Prepetition Collateral and are subject to the Adequate Protection Liens and Prepetition Liens (in each case, as such terms are defined in the Cash Collateral Order). For the avoidance of doubt, the sale of the Assets is free and clear of such Adequate Protection Liens and Prepetition Liens, and all proceeds of the sale of the Assets shall be funded into and held in an account owned and controlled by the Debtors, which is subject to an Amended and Restated Deposit Account Control Agreement dated as of May 16, 2024 in favor of the First Lien Agent. All parties in interest reserve any right they may have to

object to, or otherwise contest, the appropriate allocation of sale proceeds, including as to the allocation of sale proceeds among the Debtors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.       The relief requested in the Motion is granted and approved to the extent indicated herein, and the Purchase Transaction contemplated thereby is authorized and approved as set forth in this Sale Order.

2.       All objections to the Motion or the relief requested therein that have not been withdrawn or otherwise resolved are overruled on the merits and denied.  All persons and entities with notice of the relief sought in the Motion and set forth in this Sale Order that failed to timely object thereto are deemed to consent to such relief, including for purposes of section 363(f)(2) of the Bankruptcy Code.

3.       Notwithstanding anything to the contrary contained herein, nothing in this Sale Order shall affect or limit the Official Committee of Unsecured Creditors' (the "Committee") challenge rights set forth in the Cash Collateral Order with respect to the validity, extent, and priority of the liens and claims purportedly held by the Prepetition Secured Parties. To the extent any proceeds of any sale of the Assets is paid to any Prepetition Secured Parties (other than amounts required to be paid pursuant to paragraph 21 of the Cash Collateral Order), nothing herein shall affect the Debtors' estates' clawback rights against such Prepetition Secured Parties to the extent the Committee successfully challenges such Prepetition Secured Parties' liens or claims in the manner set forth in any final Cash Collateral Order.

## Approval of the Sales

4.       Each Purchase Agreement and all other ancillary documents, including, without limitation, each other document contemplated by the Term Sheet or necessary or appropriate to

complete the transactions provided for in the Term Sheet, and all of the terms and conditions thereof, and the Purchase Transactions and related transactions contemplated therewith, are hereby approved in all respects, except as otherwise expressly set forth herein.  The failure specifically to include any particular terms of the Purchase Agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Transactions be authorized and approved in their entirety.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the sale of the Assets to the Purchasers pursuant to and substantially in accordance with the terms and conditions of the Purchase Agreements, (b) enter into all other agreements contemplated by the Term Sheet and consummate all other transactions contemplated by the Term Sheet, (c) close the Purchase Transactions as contemplated in each Purchase Agreement and this Sale Order, and (d) execute and deliver, perform under, consummate, and implement the Purchase Agreements, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreements, the Term Sheet, and such other documentation.

6.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any claims against any Debtor, any holders of claims against or on some or all of the Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchasers, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of these chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors'

cases, and any filing agents, filing officers, title agents, recording agencies, secretaries of state, and other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets.  The terms and provisions of the Purchase Agreements, each other agreement contemplated by the Term Sheet, and this Sale Order shall inure to the benefit of the Debtors, their estates and their creditors, the Purchasers and their Affiliates, and any other affected third parties, including all persons asserting any claims in the Assets to be sold pursuant to the Purchase Agreements, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.  This Sale Order shall survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.

## Transfer of the Assets

7.      The transfer of the Assets shall constitute a legal, valid, binding, and effective transfer of each such Assets and, upon the Debtors' receipt of the purchase price, shall be free and clear of liens, claims, and encumbrances.  Those holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Purchase Transaction are deemed to have consented to the Purchase Transaction being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Assets, if any, attach to the proceeds of the Purchase Transaction with

the same priority that existed immediately prior to the closing. Upon the closing, the Debtors shall transfer to the Purchasers the applicable Assets. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Assets shall be free and clear of liens and all interests, liabilities, obligations, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code); *provided* that all liens, claims, encumbrances, and interests of which the Assets are sold free and clear pursuant to the Sale Order (including the Adequate Protection Liens) shall automatically attach to all proceeds of the applicable sale in the order of priority of such liens, claims, encumbrances, and interests, with the same validity, force, and effect which they had against the applicable Asset prior to the sale (including pursuant to the Cash Collateral Order).

8.     All persons and entities holding liens or interests in the Assets arising under or out of, in connection with, or in any way relating to the Debtors or the transfer of such Assets to the Purchasers hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchasers or its successors or assigns, their property, or such persons' or entities' liens or interests in and to the Assets.

9.     Except as otherwise expressly provided in the Purchase Agreements, after the closing of the sale, the Debtors shall have no further liability with respect to the Assets, and any claims, whether administrative or otherwise, relating to or arising from such Assets after the closing of the sale asserted against the Debtors shall be deemed disallowed.

10.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to act to cancel any of the liens and other encumbrances of record.

11.     If any person or entity that has filed statements or other documents or agreements evidencing liens on, or interests in, any of the Assets shall not have delivered to the Debtors prior

to the closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to such Assets, the Debtors and the applicable Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to such Assets.

12.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreements.

## **Other Provisions**

13.     The Purchase Transaction and other transactions contemplated by the Purchase Agreements and the Term Sheet are undertaken by the Purchasers without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate any transaction shall not affect the validity of such transaction (including, for the avoidance of doubt, the sale of the Assets free and clear of all claims (unless otherwise assumed under, or permitted by, the Purchase Agreements), unless such authorization and consummation of such transaction

was stayed pending such appeal.  The Purchasers are good-faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Purchasers have not colluded with any of the other Purchasers, potential purchasers, or any other parties interested in the Assets, and therefore the sale of the Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

14.     The automatic stay pursuant to section 362 is hereby lifted to the extent necessary, without further order of this Court, to (i) allow the Purchasers to deliver any notice provided for in the Purchase Agreements and any ancillary documents and (ii) allow the Purchasers to take any and all actions permitted under this Sale Order, the Purchase Agreement, the other agreements contemplated by the Term Sheet, and any other ancillary documents in accordance with the terms and conditions thereof.

15.     The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Purchase Agreements, the Term Sheet, and this Sale Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Purchase Agreements, the Term Sheet, and this Sale Order and the relief granted pursuant to this Sale Order.

16.     From time to time, as and when requested by any party, each party to the Purchase Transaction and other agreements contemplated by the Term Sheet shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Purchase Transaction and other transactions contemplated by the

Term Sheet, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in a Purchaser its right, title and interest in and to the Assets.

17.     The parties to the Purchase Transaction and the other agreements contemplated by the Term Sheet may make any non-material modifications, amendments or supplements to such agreement and to any related agreements, documents or other instruments in accordance with the terms thereof without further order of this Court.

18.     Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.  Time is of the essence in closing the Purchase Transaction and the other transactions contemplated by the Term Sheet, and the Debtors and the Purchasers intend to close the Purchase Transaction and the other transactions contemplated by the Term Sheet as soon as practicable.

19.     Notwithstanding anything to the contrary herein, any payment made or to be made under this Sale Order shall not impair the First Lien Agent's rights under the order of the Court approving the use of cash collateral in these chapter 11 cases.

20.     The Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order and the Purchase Agreements entered into for purposes of consummating the Purchase Transaction, the other transactions contemplated by the Term Sheet, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Assets.

## Exhibit 1

**Term Sheet**

*Execution Version*

**PURCHASE AND SALE OF TCU SOLAR LOANS
AND 100% OF THE MEMBERSHIP INTERESTS
IN SPWR RIC DEPOSITOR 2022-1, LLC**

**Term Sheet**

*This Term Sheet sets forth the principal terms of a proposed purchase transaction between the parties described herein and is for discussion purposes only and does not purport to summarize all of the terms, conditions, covenants, representations, warranties and other provisions which would be contained in the definitive documentation for the transactions described in this Term Sheet.*

**TRANSACTION OVERVIEW**

**Solar Loans:**   Retail installment contracts and loans that were originated by the Seller and certain other wholly-owned subsidiaries of SunPower Corporation or acquired by the Seller (as defined below) in respect of the purchase and installation of a photovoltaic energy generating system and/or a system that stores energy generated by a photovoltaic generating system for use at a later time.

**Purchase Transaction:**   In consideration for the Purchase Consideration, the Purchasers will purchase from the Seller, and the Seller will sell to the Purchasers (1) the TCU Solar Loans on a whole loan, servicing-released basis, and (2) the RIC Depositor Membership Interests, on the terms and conditions set forth in this Term Sheet (such transactions collectively, the "***Purchase Transaction***").

**Purchasers:**   GoodFinch SPV WL IV (SPWR), LLC, a Delaware limited liability company, and Solar Securitization Master Fund II, LP, a Delaware limited partnership (together, the "***Purchasers***" and each a "***Purchaser***"). Each Purchaser will purchase 50% of the TCU Loans and 50% of the RIC Depositor Membership Interests.

**Seller:**   SunPower Capital Services, LLC, a Delaware limited liability company and an indirect wholly-owned subsidiary of SunPower Corporation, a Delaware corporation (the "***Seller***").

**TCU Solar Loans:**   $19,592,553 outstanding principal amount of Solar Loans owned by the Seller and mutually designated by the Purchasers and the Seller.

**Terms and Conditions**

| | |
|---|---|
| **RIC Depositor Membership Interests:** | 100% of the limited liability company membership interests in SPWR RIC Depositor 2022-1, LLC, a Delaware limited partnership (the "***Depositor***").

The Depositor owns 100% of the limited liability company membership interests in the Borrower, which is the borrower under the RIC Warehouse LSA.

The Borrower owns the trust certificate issued by the Underlying Trust evidencing a 100% ownership interest in the Underlying Trust, which owns a pool of Solar Loans (the "***RIC Solar Loans***") that were originated by and acquired from the Seller and certain other wholly-owned subsidiaries of SunPower Corporation and which are subject to security interests created under the RIC Warehouse LSA (as hereinafter defined). |
| **Purchase Consideration:** | The consideration to be paid to Seller with respect to the Purchase Transaction shall consist of the following (the "***Purchase Consideration***"):

Cash in an aggregate amount equal to $11,867,301 (the "***Cash Consideration***") to be paid by the Purchasers (as defined below) to the Seller at Closing. The Purchase Consideration will be allocated $11,367,301 in the aggregate to the purchase of the TCU Solar Loans (the "***TCU Loan Cash Consideration***") and $500,000 in the aggregate to the purchaser of the RIC Depositor Membership Interests (the "***RIC Depositor Cash Consideration***").

$53,524,187 of outstanding principal amount of the Existing RIC Warehouse Facility that has a lien on all the assets of the Borrower, the wholly-owned subsidiary of the Depositor, which shall remain outstanding (the "***RIC Depositor Debt Consideration***"). |

**PURCHASE TRANSACTION DOCUMENTATION**

**Documentation in Connection with TCU Solar Loans**

| | |
|---|---|
| **Loan Sale and Purchase Agreements:** | Each Purchaser will enter into a Loan Sale and Purchase Agreement between the Seller and such Purchaser, which will set forth the terms and provisions pursuant to which such Purchaser will purchase 50% of the TCU Solar Loans from the Seller in exchange for 50% of the TCU Loan Consideration. The terms and provisions of the Loan Sale and Purchase Agreements will be customary for a transaction of this type in a bankruptcy process, including minimal representations, no recourse and the only condition being bankruptcy court approval. |

**Terms and Conditions**

**Documentation in Connection with the RIC Depositor Membership Interests**

| | |
|---|---|
| **Membership Interest Purchase and Transfer Agreement:** | A Membership Interest Purchase and Transfer Agreement between the Seller and the Purchasers will set forth the terms and provisions pursuant to which each Purchasers will purchase 50% of the RIC Depositor Membership Interests from the Seller for 50% of the RIC Depositor Consideration. The terms and provisions of the Membership Interest Purchase and Transfer Agreement will be customary for a transaction of this type in a bankruptcy process, including minimal representations, no recourse and the only conditions being Lender and bankruptcy court approvals and the release of the Guarantor. |
| **Membership Interest Assignment:** | A Membership Interest Assignment between the Seller and the Purchasers under which (i) the Seller will assign and set over to each Purchaser 50% of the RIC Depositor Membership Interests, and (ii) each Purchaser will accept such assignment and assume and agree to perform when due all covenants, agreements, conditions, duties and obligations of the Seller as a member of the Depositor that arise from and after the effective date of the Membership Interest Assignment. |
| **Amendment to Depositor LLC Agreement:** | The limited liability company agreement or operating agreement of the Depositor will be amended as necessary to effect the withdrawal of the Seller as a member of the Depositor, to admit each Purchaser as a member of the Depositor and to make any other amendments that are deemed necessary and appropriate by the Purchasers to reflect the Purchase Transaction. |

**RIC WAREHOUSE FACILITY**

| | |
|---|---|
| **RIC Warehouse:** | A non-recourse loan made under a Loan and Security Agreement, dated as of June 30, 2022, among the Borrower, the lenders party thereto, Atlas Securitized Products Holdings, L.P., as Administrative Agent, and Computershare Trust Company, National Association, as Paying Agent, as amended by that certain First Amendment dated as of April 14, 2023, that certain Second Amendment dated as of June 29, 2023, that certain Third Amendment dated as of October 17, 2023, that certain Fourth Amendment dated as of December 22, 2023, that certain Fifth Amendment dated as of February 14, 2023, that certain Waiver dated as of April 26, 2024 and that certain Amendment and Waiver dated as of June 30, 2024 (the "***RIC Warehouse LSA***"). As of July [__], 2024, the outstanding principal balance of the Advances under the RIC Warehouse LSA was $[53,524,187]. |
| | Capitalized terms used in this Term Sheet with respect to the RIC Warehouse Facility but not specifically defined herein have the meaning given to such terms in the RIC Warehouse LSA. |
| **Administrative Agent:** | Atlas Securitized Products Holdings, L.P. |

**Terms and Conditions**

| | |
|---|---|
| **Lender:** | Atlas Securitized Products Funding 3, L.P. |
| **Borrower:** | SPWR RIC Borrower 2022-1, LLC, a Delaware limited liability company. |
| **Underlying Trust:** | SPWR RIC 2022-1 Trust, a Delaware statutory trust. |
| **Guarantor:** | SunPower Corporation, a Delaware corporation, in its capacity as the guarantor under the Guaranty in favor of the Administrative Agent (the "***Guarantor***"). |
| **Servicer:** | As of the Closing of the Purchase Transaction, Launch Servicing, LLC, a Delaware limited liability company, (the "***Servicer***") will be the master servicer of the TCU Solar Loans and the RIC Solar Loans pursuant to a new Master Servicing Agreement (the "***Launch MSA***") to be entered into among the Administrative Agent, the Purchasers and the Servicer.s |

**RIC WAREHOUSE FACILITY DOCUMENTATION**

| | |
|---|---|
| **Consent and Waiver:** | At Closing, the Lender and the Administrative Agent will (i) consent to the Purchase Transaction and waive any Default or Event of Default that would otherwise occur as a result of the Purchase Transaction, (ii) waive any Default or Event of Default that exists as of the date of completion of the Purchase Transaction and (iii) waive any Default or Event of Default that would otherwise occur after the date of completion of the Purchase Transaction as a result of an act or omission of any SunPower Entity other than the Depositor, the Borrower or the Underlying Trust. |
| **Release of Guarantor:** | At Closing, the Guaranty will be terminated and the Guarantor will be released from all liability under the Guaranty. |
| **Contribution of Additional Solar Loans:** | In lieu of the Purchasers assuming the obligations of the Guarantor under the Guaranty, the Purchasers will contribute the TCU Solar Loans to the Depositor at closing. The Depositor in turn will contribute the TCU Solar Loans to the Borrower, which in turn will contribute the TCU Solar Loans to the Underlying Trust. The TCU Solar Loans will be deemed Solar Loans under the RIC Warehouse LSA, become additional Collateral for the RIC Warehouse Facility and all Electronic Collateral Package Items relating to the TCU Solar Loans will be transferred into the E-Vault. Obligors under TCU Solar Loans will be directed to make all payments under their Obligor Loan Agreement to the Servicer's account designated in the Launch MSA and such Collections will be transferred to the Collection Account and constitute Available Funds for distribution in accordance with the Priority of Payments on the same basis as other Solar Loan Collections. |

**Terms and Conditions**

| | |
|---|---|
| **Hedging Agreements:** | The existing Hedging Agreements will remain in place and the Borrower will not be required to provide any additional Hedging Agreements otherwise required under the terms of the RIC Warehouse LSA, unless the Borrower, the Purchasers and the Administrative Agent and the Lender agree to a replacement Hedging Agreement on terms acceptable to each of them. |
| **Amendments to Facility Documents:** | The Purchasers, the Servicer, the Administrative Agent, the Lender, Computershare Trust Company, National Association and the Depositor will enter into amendments to the RIC Warehouse LSA and other Facility Documents (as defined in the RIC Warehouse LSA) at Closing to reflect the foregoing provisions of this Term Sheet with respect to the RIC Warehouse Facility. |

CONDITIONS PRECEDENT

| | |
|---|---|
| **Bankruptcy Court Approval:** | The bankruptcy court and any applicable lenders will have approved the Purchase Transaction and the other transactions contemplated by this Term Sheet. |
| **Release of Guaranty:** | The Guaranty will have been terminated and the Guarantor will have been released. |

MISCELLANEOUS

| | |
|---|---|
| **Legal Fees:** | Each party shall be responsible for its own legal fees and expenses in connection with the transactions described herein, subject to the Work Fee described below. |
| **Legal Documentation:** | All legal documentation described in this Term Sheet shall be executed and delivered by each applicable party thereto, satisfactory to each applicable party thereto, customary for transactions of this type in a bankruptcy process and shall contain minimal representations, no recourse or indemnity provisions applicable to Seller or any of its assets or its affiliates, and the only condition shall be Lender and bankruptcy court approvals. |
| **Payment of Purchase Consideration:** | Each Purchaser shall pay its portion of the Purchase Consideration due at Closing to the Seller by wire transfer of immediately available funds. |
| **Closing:** | The closing of the Purchase Transaction shall occur simultaneous with and on the same date the legal documentation is signed. |
| **Work Fee:** | Seller will pay Purchaser an upfront work fee in an amount of $250,000 (the "Work Fee") to cover the reasonable and documented professional fees of Purchaser, Administrative Agent, and Lender, with any excess to be turned over to the Seller at Closing. |

**Terms and Conditions**

| | |
|---|---|
| **Non-binding:** | This Term Sheet does not constitute, and is not intended to constitute, an offer or a legally binding obligation of or promise by any of the Seller, the Purchasers, the Guarantor, the Servicer, the Administrative Agent or the Lender to enter into any transaction or negotiate the terms of any transaction, and no legally binding obligations will be created, implied or inferred by this Term Sheet. The transactions described herein remain subject to (i) the Lender's internal approvals, and (ii) completion of business, financial and legal due diligence by the Purchasers. |

For the avoidance of doubt, the Seller reserves the right to amend or withdraw any motion to consummate the Purchase Transaction and any other transaction contemplated by this term sheet for any reason, including but not limited to, if the board of directors, board of managers, or such similar governing body or authorized representative of the Seller determines (i) that proceeding with the Purchase Transaction would be inconsistent with the exercise of its fiduciary duties or applicable law or (ii) in the exercise of its fiduciary duties, to pursue a transaction that is alternative to the Purchase Transaction.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date written below.

**SunPower Capital Services, LLC**

Signed by:

*Matt Henry*

B55C3AB2BB57488...

Name:   Matthew Henry

Title:    Chief Transformation Officer

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date written below.

**GoodFinch SPV WL IV (SPWR), LLC**

*Andrew Mills*

Name:    Andrew Mills
Title:    Authorized Signatory

**Solar Securitization Master Fund II, LP**

*Andrew Mills*

Name:    Andrew Mills
Title:    Authorized Signatory

## Exhibit 2-A

**Loan Sale and Purchase Agreement**

**LOAN SALE AND PURCHASE AGREEMENT**

Dated as of August [___], 2024

by and between

**SunPower Capital Services, LLC**

as Seller

and

SOLAR SECURITIZATION MASTER FUND II, LP

as Purchaser

**TABLE OF CONTENTS**

| SECTION | HEADING | PAGE |
|---|---|---|

ARTICLE 1. DEFINITIONS.................................................................................................... 1

Section 1.1    Defined Terms. ............................................................................................ 1
Section 1.2    Rules of Construction. ................................................................................. 9

ARTICLE 2. PURCHASE AND SALE OF SOLAR LOANS ................................................. 9

Section 2.1    [reserved] ................................................................................................... 9
Section 2.2    Conditions Precedent to Effectiveness.......................................................... 9
Section 2.3    Payment of Purchase Price and Confirmation............................................... 10
Section 2.4    Control of Purchased Loan. ......................................................................... 10

ARTICLE 3. TRUE SALE; GRANT OF SECURITY INTEREST; ENFORCEMENT................. 11

Section 3.1    True Sale. .................................................................................................. 11
Section 3.2    Grant of Security Interest. .......................................................................... 11
Section 3.3    Purchaser Rights. ...................................................................................... 12

ARTICLE 4. REPRESENTATION, WARRANTIES AND COVENANTS ............................... 12

Section 4.1    Seller Representations and Warranties.......................................................... 12
Section 4.2    Purchaser Representations and Warranties.................................................... 13

ARTICLE 5. COVENANTS ............................................................................................... 14

Section 5.1    Confidentiality. .......................................................................................... 14
Section 5.2    No Use of Non-Public Obligor Data. ............................................................ 17
Section 5.3    Access to Records. ..................................................................................... 17
Section 5.4    Tax Matters. .............................................................................................. 17

ARTICLE 6. BANKRUPTCY COURT MATTERS.................................................................. 18

Section 6.1    Bankruptcy Court Matters. .......................................................................... 18
Section 6.2    Notice of Purchase Required by Bankruptcy Court. ....................................... 18
Section 6.3    No Other Agreements. ................................................................................ 18

ARTICLE 7. MISCELLANEOUS ....................................................................................... 19

Section 7.1    Notices. .................................................................................................... 19
Section 7.2    Amendment; Waiver. .................................................................................. 20
Section 7.3    Cumulative Rights. ..................................................................................... 20
Section 7.4    Assignment. .............................................................................................. 20

| Section 7.5 | [reserved] | 20 |
| Section 7.6 | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. | 20 |
| Section 7.7 | Limitation of Liability. | 21 |
| Section 7.8 | Successors and Assigns. | 21 |
| Section 7.9 | Severability. | 21 |
| Section 7.10 | Entire Agreement. | 21 |
| Section 7.11 | No Joint Venture or Partnership. | 21 |
| Section 7.12 | Further Assurances. | 21 |
| Section 7.13 | Exhibits and Schedules. | 22 |
| Section 7.14 | Costs. | 22 |
| Section 7.15 | Counterparts; Imaged Copies; Electronic Execution. | 22 |
| Section 7.16 | No Petition. | 22 |
| Section 7.17 | Force Majeure. | 23 |
| Section 7.18 | No Recourse. | 23 |
| Section 7.19 | No Public Announcement. | 23 |
| Section 7.20 | Third-Party Beneficiaries. | 23 |

| Exhibit A | Form of Purchase Confirmation |
| Exhibit B | Forms of Obligor Loan Agreement |

| Schedule 1 | Purchased Loan Schedule |

THIS LOAN SALE AND PURCHASE AGREEMENT, dated as of August [__], 2024 (the "Effective Date"), by and between SunPower Capital Services, LLC, a Delaware limited liability company, as seller ("Seller") and SOLAR SECURITIZATION MASTER FUND II, LP, a Delaware limited partnership, as purchaser ("Purchaser").

RECITALS

WHEREAS, from time to time, Seller originated or otherwise acquired loans in accordance with its Credit Policy (as defined herein) as listed on Schedule 1 attached hereto (the "Purchased Loans"); and

WHEREAS, on August 5, 2024, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined herein) (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which is being administered jointly with the chapter 11 cases of certain of Seller's Affiliates (such Affiliates, together with the Seller, the "Debtors") under Case No. 24-11649 (CTG) (collectively, the "Bankruptcy Cases," and with respect to the Seller, the "Bankruptcy Case");

WHEREAS, on August 6, 2024, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of TCU Solar Loans and RIC Depositor Membership Interests Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* (the "Sale Motion");

WHEREAS, pursuant to the Sale Motion, on August [●], 2024, the Bankruptcy Court entered an order approving the terms of this Agreement and authorizing and directing Seller to consummate the transactions contemplated by this Agreement (the "Sale Order");

WHEREAS, in accordance with the Sale Order, Seller desires to sell, convey, transfer, assign and deliver to Purchasers, and Purchasers desire to purchase from Seller, the Purchased Loans, subject to the terms and conditions set forth herein and in the Sale Order; and

WHEREAS, the Purchased Loans shall be purchased by Purchasers pursuant to the Sale Order, free and clear of all Liens (as defined herein), all in the manner and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

ARTICLE 1.

DEFINITIONS

Section 1.1      Defined Terms.

As used in this Agreement, the following capitalized terms shall have the meanings set forth below:

"<u>ACH</u>" means automated clearing house, a clearing and settlement facility for the interchange of electronic debits and credits among financial institutions.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Persons means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Agreement</u>" means this Loan Sale and Purchase Agreement, including all exhibits and schedules attached hereto or delivered in connection herewith (including, without limitation, the Purchase Confirmation, and any other document together therewith, delivered to Purchaser from time to time as provided herein) as such agreement may be amended, supplemented or modified from time to time.

"<u>Alternative Transaction</u>" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, of stock or other equity interests in the Company or its subsidiaries or their respective assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"<u>Applicable Law</u>" means all federal, state and local laws, statutes, rules, regulations and orders, and all requirements of any Regulatory Authority having jurisdiction over a Person, to the extent applicable to the Person or Purchased Loan in question (including, without limitation, the underwriting, origination, servicing, ownership, collection, holding, acquisition and sale of such Purchased Loan).

"<u>Authoritative Electronic Copy</u>" means, with respect to any Obligor Loan Agreement stored in an electronic medium, the single electronic "authoritative copy" (within the meaning of Section 9-105 of the UCC) of such Obligor Loan Agreement (a) that constitutes the single authoritative copy of the record or records comprising the related chattel paper which is unique, identifiable and, except as otherwise provided in <u>clauses (c)</u>, <u>(d)</u> and <u>(e)</u> below, unalterable, (b) that identifies Purchaser as the sole assignee thereof, (c) copies or revisions to which that add or change an identified assignee can be made only with the consent of Purchaser, (d) for which any copy thereof (or any copy of a copy thereof) is readily identifiable as a copy that is not the authoritative copy and (e) for which any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

"<u>Bankruptcy Case</u>" has the meaning assigned to such term in the Recitals.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the Recitals.

"<u>Business Day</u>" means any day other than: (a) a Saturday or Sunday; (b) a legal or federal holiday; and (c) a day on which banking and savings and loan institutions in Sacramento, California or New York, New York are required or authorized by law or Regulatory Authority to be closed for business.

"<u>Collection Policy</u>" means the "ND / ID Dealer Onboarding," a complete and accurate copy of which has been delivered to Purchaser via the Data Room.

"Confidential Information" has the meaning set forth in Section 5.1(a) of this Agreement.

"Credit Approval Date" means, with respect to any Solar Loan, the date prior to such Solar Loan's Origination Date on which Seller granted its credit approval for the origination of such Solar Loan in accordance with Seller's Credit Policy.

"Credit Policy" means the "SunPower Credit Policy," a complete and accurate copy of which has been delivered to Purchaser via the Data Room.

"Cut-Off Date" means July 24, 2024.

"Data Breach" has the meaning set forth in Section 5.1(c).

"Data Room" means a file share site maintained by Seller and approved by Purchaser, and pursuant to which Purchaser has ongoing access.

"Defaulted Solar Loan" means any Purchased Loan as to which any of the following has occurred:

(a)    any Purchased Loans to which all or any portion of the scheduled installment payment is one hundred twenty days (120) or more past due as of its due date upon the close of the month,

(b)    an Insolvency Event relating to the related Obligor of such Purchased Loan has occurred,

(c)    the Master Servicer has determined in good faith in accordance with the Collection Policy that such Purchased Loan is not collectable, or

(d)    such Purchased Loan is fully or partially charged-off by the Master Servicer.

"Delinquent Solar Loan" means any Purchased Loan as to which, as of the Purchase Date, any amount of a scheduled payment remains unpaid for more than zero (0) days from the original due date for such scheduled payment and that is not a Defaulted Solar Loan; provided that, upon payment of such scheduled payment amount, such Purchased Loan shall no longer constitute a Delinquent Solar Loan.

"Discloser" has the meaning set forth in Section 5.1(a).

"Effective Date" has the meaning set forth in the introductory paragraph.

"Electronic Collateral Letter Agreement" means that certain letter agreement, dated as of the date hereof, by and among the Seller, as custodian, the Purchaser and E-Vault Provider.

"E-Vault" means a segregated electronic vault with the E-Vault Provider used to receive and hold the Vaulted Documents.

"E-Vault Provider" means eOriginal, Inc. as provider and operator of an electronic system that enables establishment and maintenance of the E-Vault.

"FICO Score" means, with respect to the Obligor of a Purchased Loan, the statistical credit score of such Obligor based on methodology developed by Fair Isaac Corporation and used by the applicable originator or its agents to determine credit risk when underwriting such Purchased Loan.  For purposes of clarification, the "FICO Score" of any Obligor shall mean the FICO Score as in effect on the Credit Approval Date of the applicable qualifying Obligor whose FICO Score was used to make the final underwriting decision during the loan application process, pursuant to the Credit Policy.

"GLB Act" has the meaning set forth in Section 5.1(b).

"Governing Documents" means, with respect to Seller, its articles or certificate of organization or formation and its operating agreement or limited liability company agreement, resolutions approving the transactions contemplated by this Agreement and a certificate of incumbency of the Responsible Officer of Seller executing and delivering this Agreement on behalf of Seller.

"Governmental Authorizations" means all franchises, permits, licenses, approvals, consents and other authorizations of all Regulatory Authorities.

"Insolvency Event" means, with respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under the Bankruptcy Code or any other applicable Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of sixty (60) consecutive days; or (b) the commencement by such Person of a voluntary case under any applicable Insolvency Law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or (c) the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or (d) the making by such Person of any general assignment for the benefit of creditors, or (e) the failure by such Person generally to pay its debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Insolvent" as to any Person, has the meaning set forth in Section 101(32) of the Bankruptcy Code.

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien or security interest (statutory or other), or preference, priority or other security agreement, charge or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing authorized by Seller of any financing statement under the UCC or comparable law of any jurisdiction).

"Loan Schedule" means the schedule of Purchased Loans attached hereto as Schedule 1.

"Master Servicer" means Seller in its capacity as the servicer of the Purchased Loans prior to the Purchase Date.

"Material Adverse Effect" means (x) with respect to any Person, any event or circumstance having or reasonably expected to have a material adverse effect on: (i) the business, assets, financial condition, properties or operations of such Person, taken as a whole, (ii) the rights and remedies of such Person with respect to matters arising under this Agreement or any other Program Agreement, taken as a whole or (iii) the ability of each of such Person to perform its material obligations under this Agreement or any other Program Agreement, (y) with respect to this Agreement or any other Program Agreement, any event or circumstance having or reasonably expected to have a material adverse effect on the legality, validity, binding effect or enforceability of this Agreement or any other Program Agreement and (z) with respect to the Purchased Loans, the validity, enforceability, or collectability of all or a material portion of the Purchased Loans, when taken as a whole.

"Non-Public Obligor Data" has the meaning set forth in Section 5.2.

"NPI" has the meaning set forth in Section 5.1(b).

"Obligor" means, with respect to any Solar Loan, each Person or other obligor (including any co-borrower, co-maker, co-signer or guarantor) who is obligated under the terms of such Solar Loan.

"Obligor Data" has the meaning set forth in Section 5.2.

"Obligor Loan Agreement" means the single Authoritative Electronic Copy of the electronic record that evidences a Purchased Loan, rendered in English or Spanish, forms of which are listed on Exhibit B attached hereto and complete and accurate copies of which have been delivered to Purchaser via the Data Room as of the Effective Date.

"OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"Origination Date" means, with respect to any Solar Loan, the first date on which such Solar Loan was fully executed.

"Party" means either Seller or Purchaser, and "Parties" means Seller and Purchaser.

"Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or other entity, including any government agency, commission, board, department, bureau or instrumentality.

"Principal Balance" means, with respect to any Purchased Loan, as of any date of determination, the outstanding principal amount thereof.

"Program" means the purchase program governed by the Program Agreements.

"Program Agreements" means this Agreement and the Electronic Collateral Letter Agreement.

"Purchase" means the transfer of the Purchased Loans from Seller to Purchaser on the Purchase Date.

"Purchase Confirmation" means with respect to the Purchase, the document to be provided by Seller to Purchaser pursuant to Section 2.3 hereof, a form of which is attached hereto as Exhibit A, including the Loan Schedule attached thereto.

"Purchase Date" means, with respect to any Purchased Loan, the Effective Date.

"Purchase Price" means, with respect to the Purchased Loans in the aggregate, the sum of $5,683,650.

"Purchased Loan" has the meaning assigned to such term in the recitals to this Agreement.

"Purchased Loan Collateral" has the meaning assigned to such term in Section 3.2(a).

"Purchaser" has the meaning set forth in the introductory paragraph.

"Purchaser Bankruptcy Case" has the meaning assigned to such term in Section 7.16.

"Purchaser Designated E-Vault" has the meaning assigned to such term in Section 2.4(c).

"Purchaser Related Party" means any of Purchaser's certificate holders, general or limited partners, equity holders, stockholders, controlling Persons, managers, members, directors, officers, employees, Affiliates, subsidiaries, financing sources, portfolio companies, attorneys and other representatives, and their successors, assignees and agents.

"Recipient" has the meaning set forth in Section 5.1(a).

"Records" means, with respect to any Purchased Loan, any loan applications, change-of-terms notices, credit files, servicing and other records, credit bureau reports or other documentation or information relating to or regarding such Purchased Loan (including computer tapes, magnetic files, and information in any other format).

"Regulatory Authority" means any international, federal, state, county, municipal or local regulatory agency or regulatory authority, agency, board, body, commission, instrumentality, court, tribunal or quasi-governmental agency or authority having jurisdiction over a Party, any Solar Loan or any Obligor.

"Related Documents" means, with respect to any Purchased Loan, the Required Loan Documents and all other agreements or documents evidencing, securing, guarantying, governing or giving rise to such Purchased Loan, including, without limitation, any third-party guarantees, any other credit enhancement rights, and any document obtained from Obligor or a third party with respect to the underwriting of such Purchased Loan.

"Related Property" means, with respect to a Purchased Loan, Seller's interest (in its capacity as a lender with respect to such Purchased Loan) in any property or other assets of Obligor thereunder pledged as collateral to secure the repayment of such Purchased Loan, including, without limitation, the Solar Energy System and all proceeds thereof.

"Representative" has the meaning set forth in Section 5.1(a).

"Required Loan Documents" means, for each Purchased Loan, the following documents or instruments:

(a)        the Obligor Loan Agreement, including regulatory disclosure statements applicable to such Purchased Loan (e.g., "truth-in-lending," "Gramm-Leach-Bliley" and "ECOA and FCRA" disclosures);

(b)        authorization for payment by ACH (if executed by the related Obligor on the Purchase Date);

(c)        the duly executed home improvement or installation contract;

(d)        UCC financing statements and fixture disclaimer filings (in each case, with evidence of recordation) covering the applicable product(s) that is/are the subject of such Purchased Loan (provided that for purposes of any verification by Purchaser prior to funding, proof of submission of such filings for recording shall be sufficient); and

(e)        any other written or electronic supplements, record, or, with respect to any Purchased Loan modified prior to purchase by the Purchaser, any amendment or modification agreement to the Obligor Loan Agreement evidencing such Purchased Loan.

"Responsible Officer" means any Senior Financial Officer, President, any Executive Vice President, Chief Financial Officer, Chief Risk Officer, Chief Credit Officer or Chief Compliance Officer, or any Senior Vice President of the Seller or any other officer that oversees the day-to-day management and operation of this Agreement or the Program.

"RIC Warehouse Facility" means the non-recourse loan made under a Loan and Security Agreement, dated as of June 30, 2022, among SPWR RIC Borrower 2022-1, LLC, the lenders party thereto, Atlas Securitized Products Holdings, L.P., as Administrative Agent, and Computershare Trust Company, National Association, as Paying Agent, as amended by that certain First Amendment dated as of April 14, 2023, that certain Second Amendment dated as of June 29, 2023, that certain Third Amendment dated as of October 17, 2023, that certain Fourth Amendment dated as of December 22, 2023, that certain Fifth Amendment dated as of February 14, 2024, that certain Waiver dated as of April 26, 2024 and that certain Amendment and Waiver dated as of June 30, 2024.

"Sale Motion" has the meaning assigned to such term in the Recitals.

"Sale Order" has the meaning assigned to such term in the Recitals.

"Sanctioned Country" means any country or territory that is the target of comprehensive, country-wide or territory-wide Sanctions, which as of the date of this Agreement comprise Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by a Sanctions Authority (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person owned 50% or more by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes administered or enforced from time to time a Sanctions Authority.

"Sanctions Authority" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state.

"Secondary Market Transaction" means (i) a capital markets transaction in which the Purchaser sells Purchased Loans, directly or indirectly, to an entity that issues or arranges for the issuance of asset-backed securities collateralized, in whole or in part, by such Purchased Loans or (ii) a sale or assignment of Purchased Loans by Purchaser.

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Related Party" means any of Seller's certificate holders, general or limited partners, equity holders, stockholders, controlling Persons, managers, members, directors, officers, employees, Affiliates, subsidiaries, financing sources, portfolio companies, attorneys and other representatives, and their successors, assignees and agents.

"Solar Energy System" means a photovoltaic energy generating system, which may consist of solar photovoltaic panels or modules, inverter(s), racking systems, wiring, electrical and mechanical connections, metering, monitoring and/or other distributed generation interconnect equipment, an optional battery storage device, smart thermostats, LED light bulbs, prepaid operations and maintenance agreements and related landscaping, electric vehicle charging system and/or roofing materials installed on or at a residence owned by an Obligor at the time of installation and any additional equipment or services related to installation.

"Solar Loan" means an installment loan or sales contract originated or acquired by Seller and used to finance the acquisition and installation of a Solar Energy System.

"Solar Loan File" means, with respect to a Solar Loan, the documents maintained by the Master Servicer in connection with such Solar Loan.

"Tax" or "Taxes" means all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, stamp, withholding, social security, unemployment, real property, personal property, alternative or add on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including unclaimed property and escheat payments, and also including any interest, penalties or additions thereto, whether disputed or not.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing supplied or required to be supplied to a Taxing Authority in connection with Taxes.

"Taxing Authority" means any Regulatory Authority exercising Tax regulatory authority.

"UCC" means the Uniform Commercial Code as in effect from time to time in each State as applicable to the respective actions of Seller or any Obligor relating to the creation, perfection, priority, validity and/or enforcement of the security interest granted by such Obligor to Seller under any Obligor Loan Agreement or by Seller to Purchaser hereunder, in each case, as applicable.

"Vaulted Documents" means items (a), (b) and (c), if applicable, of the definition of Required Loan Documents.

Section 1.2      Rules of Construction.

(a)      As used in this Agreement: (i) all references to the masculine gender shall include the feminine gender (and vice versa); (ii) all references to "include," "includes," or "including" shall be deemed to be followed by the words "without limitation"; (iii) references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (iv) references to "dollars" or "$" shall be to United States dollars unless otherwise specified herein; (v) unless otherwise specified, all references to days (other than Business Days), months or years shall be deemed to be preceded by the word "calendar"; and (vi) all references to "quarter" shall be deemed to mean calendar quarter.

(b)      The fact that any Party provides approval or consent shall not mean or otherwise be construed to mean that: (i) either Party has performed any due diligence with respect to the requested or required approval or consent, as applicable; (ii) either Party agrees that the item or information for which the other Party seeks approval or consent complies with any Applicable Law; (iii) either Party has assumed the other Party's obligations to comply with all Applicable Law arising from or related to any requested or required approval or consent; or (iv) except as otherwise expressly set forth in such approval or consent, either Party's approval or consent impairs in any way the other Party's rights or remedies under the Agreement.

ARTICLE 2.

PURCHASE AND SALE OF SOLAR LOANS

Section 2.1      [reserved]

Section 2.2      Conditions Precedent to Effectiveness.

The effectiveness of this Agreement shall be subject to the conditions precedent that:

(a)      Loan Schedule.  At least five (5) Business Days prior to the Purchase Date (or such shorter time period as mutually agreed upon between Seller and Purchaser), Seller shall have provided Purchaser with a proposed Loan Schedule.

(b)      Closing Documents.  The Purchaser shall have received, reviewed and approved on or before the Purchase Date, each in form and substance reasonably satisfactory to Purchaser, each of the Purchase Confirmation (including a final loan tape) and the Program Agreements, duly executed and delivered by the parties thereto, accurate and complete copies of Seller's Governing Documents and such other customary certificates and opinions as the parties hereto may agree.

(c)      No Default.  No event has occurred and is continuing that constitutes a default or material violation by any party under any of the Program Agreements, or which would, with notice or the lapse or time or both, constitute such a default or material violation thereof.

(d)      Representations and Warranties.  Each of the representations and warranties of Seller and Purchaser in Article 4 of this Agreement shall, as of the Effective Date, be true and correct in all

material respects, except to the extent such failure of the representations and warranties to be so true and correct, when taken as a whole, would not have a Material Adverse Effect.

(e)    Entry of the Sale Order.  The Bankruptcy Court shall have entered the Sale Order.

(f)    GF SPV WL IV Purchase Agreement.  The Loan Sale and Purchase Agreement by and between Seller, as seller, and GoodFinch SPV WL IV (SPWR), LLC, as purchaser, has been duly executed and delivered by each party thereto.

(g)    MIPTA.  The Membership Interest Purchase and Transfer Agreement by and between Seller, as seller, and Purchaser and Solar Securitization Master Fund II, LP, as purchasers, has been duly executed and delivered by each party thereto.

Section 2.3    Payment of Purchase Price and Confirmation.

In consideration of payment of the related Purchase Price by Purchaser, Seller hereby sells, transfers, assigns and otherwise conveys to Purchaser, without recourse, but subject to the terms of this Agreement, all of Seller's right, title and interest in, to and under the Purchased Loans and all Related Property, and Purchaser hereby purchases such Purchased Loans and shall pay to or at the direction of Seller the Purchase Price therefor.  Upon payment of the Purchase Price therefore on the Purchase Date, Purchaser shall become, for all purposes, the owner of such Purchased Loans and the related Purchased Loan Collateral as of the Cut-Off Date.  For the avoidance of doubt, any unpaid interest or fees that accrued but remain unpaid on a Purchased Loan prior to the Cut-Off Date shall be the property of the Purchaser. The Parties acknowledge and agree that the Purchase Price for each Purchased Loan reflects an arms-length negotiation, resolution and transaction.

Section 2.4    Control of Purchased Loan.

(a)    In connection with the sale and conveyance of the Purchased Loans, Seller agrees to promptly indicate or cause to be indicated in its books, records and computer files that the Purchased Loans have been sold to Purchaser and to cause the Authoritative Electronic Copies for the Purchased Loans to identify Purchaser as the assignee thereof and, at Purchaser's direction, any collateral assignee of Purchaser's as the holder of the Lien thereon.

(b)    Following the Purchase Date, Seller will promptly transfer all Records and Solar Loan files with respect to the Purchased Loans to Purchaser or its designee.

(c)    On the Purchase Date (i) custody of the Vaulted Documents related to each Purchased Loan shall be transferred by Seller to the "Computershare Vault Partition" under the RIC Warehouse Facility(the "Purchaser Designated E-Vault"), and control of such Vaulted Documents shall be transferred by Seller to Purchaser or its designee and (ii) Seller shall transfer all other Related Documents, to the extent not already transferred to such designated E-Vault, to Computershare Trust Company, National Association, as "Custodian" under the RIC Warehouse Facility, as Purchaser's designee. Following the purchase of the Purchased Loans hereunder, Seller shall not (x) revise or alter any electronic chattel paper evidencing such Purchased Loan unless the Purchaser has participated in such revision or alteration or (y) make any copy or duplicate of any such electronic chattel paper unless such copy or duplicate is readily identifiable as a copy or duplicate and not as the authoritative copy of such electronic chattel paper.  In addition, on the Purchase Date, Seller shall transfer all other Related Documents, to the

extent not already transferred to Purchaser's E-Vault, to Purchaser or its designee in .pdf format via a secured transfer protocol or such other electronic transfer process acceptable to Purchaser.

(d)     Seller shall deliver to Purchaser an IRS Form W-9 duly executed by Seller. Purchaser shall not deduct or withhold any amounts from the Purchase Price.

ARTICLE 3.

TRUE SALE; GRANT OF SECURITY INTEREST; ENFORCEMENT

Section 3.1     True Sale.

Each of Seller and Purchaser agree that the transactions contemplated hereby are intended to be and shall constitute sales of the Purchased Loans transferred pursuant to Article 2 above, and are not intended to be financings or loans by Purchaser to Seller.  The Parties shall treat such transactions as sales for tax, accounting and all other applicable purposes.  The sale of each Purchased Loan pursuant to Article 2 above transfers to Purchaser all of Seller's right, title and interest in and to such Purchased Loan and all Related Property, including, without limitation, the servicing rights, and Seller will not retain any residual rights with respect to any Purchased Loan.

Section 3.2     Grant of Security Interest.

(a)     Purchaser may file one or more UCC financing statements with respect to the sale of the Purchased Loans consistent with Section 9-109(a)(3) of the UCC.  In the event that the transactions contemplated hereby are construed to be financings by Purchaser to Seller or the Purchased Loans are determined or held to be property of Seller, then: (i) Seller hereby grants to Purchaser a present and continuing security interest in and to the following, whether now existing or hereafter created, (x) all Purchased Loans, (y) all of the Related Documents and Related Property for such Purchased Loans, and (z) all proceeds and rights to receive proceeds of the Purchased Loans (collectively, the "Purchased Loan Collateral"); (ii) this Agreement shall also be deemed to be a security agreement within the meaning of Article 9 of the UCC; (iii) the transfers of the Purchased Loans provided for herein shall be deemed to be a grant by Seller to Purchaser of a first priority lien upon and security interest in all of Seller's right, title and interest in and to the Purchased Loan Collateral; (iv) the Purchaser shall have control of the Obligor Loan Agreements related to the Purchased Loans that constitute "electronic chattel paper" or "electronic instrument" within the meaning of the UCC in all applicable jurisdictions and as to which there is only one Authoritative Electronic Copy that constitutes such "electronic chattel paper" for purposes of the UCC; (v) Purchaser is hereby authorized to take all necessary or appropriate actions to perfect its security interest in the Purchased Loan Collateral and may file financing statements on form UCC-1 naming Purchaser as secured party/buyer and Seller as debtor/seller, and identifying the Purchased Loan Collateral as collateral therein and, in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which the Purchased Loan Collateral relates; and (v) notifications to Persons holding such property and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of Purchaser for the purpose of perfecting such lien or security interest under the UCC.  Any assignment of the interests of Purchaser in the Purchased Loans pursuant to any provision hereof shall also be deemed to be an assignment of any lien or security interest created hereby in the Purchased Loan Collateral.

(b)        From and after the Purchase Date, Seller shall not create or permit any security interest in Purchased Loan Collateral, except in favor of Purchaser or as may be directed by Purchaser and, if necessary, shall direct the filing of any termination statements on form UCC-3 and modify any previously executed loan or security agreement to eliminate any security interest granted in the Purchased Loan Collateral, including without limitation any security interest in such Purchased Loan Collateral as proceeds or as after-acquired property.

(c)        To the extent consistent with this Agreement, Seller and Purchaser shall take such actions as may be deemed reasonably necessary or appropriate such that, if this Agreement were deemed to create a lien upon or security interest in the Purchased Loan Collateral and all such reasonably necessary or appropriate actions had been taken, such lien or security interest would be deemed to be a perfected security interest of first priority under Applicable Law and will be maintained as such throughout the term of this Agreement, including, without limitation, the execution and delivery by Seller to Purchaser of all assignments, security agreements, financing statements, control agreements and other documents as Purchaser reasonably requests, in form and substance reasonably satisfactory to Purchaser and at Purchaser's cost.

Section 3.3        Purchaser Rights.

Seller acknowledges that, from and after the Purchase Date, because it has sold the Purchased Loans to Purchaser, Purchaser shall have all the rights associated with such Purchased Loans, including the right to take any action against any Obligor for non-payment subject to the provisions of any servicing agreement in connection therewith and in accordance with Applicable Law.

ARTICLE 4.

REPRESENTATION, WARRANTIES AND COVENANTS

Section 4.1        Seller Representations and Warranties.

Seller hereby represents and warrants as of the Effective Date and as of the Purchase Date that:

(a)        Seller (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in good standing with every Regulatory Authority having jurisdiction over its activities, except, in the case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect with respect to Seller or the Purchased Loans.

(b)        Seller has all requisite limited liability company power and authority to own its properties, carry on its business as and where now being conducted and execute and deliver this Agreement, perform all of its obligations hereunder, and to carry out the transactions contemplated hereby.  This Agreement has been duly and validly authorized and executed and delivered by Seller and is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable Insolvency Laws.

(c)        Seller has, and has had, for the previous 12 months, all qualifications, regulatory permissions and/or licenses necessary for the origination of the Purchased Loans by Seller.

12

(d)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement nor compliance with its terms and conditions, conflict with, violate or result in the breach of, or constitute a default under or is prohibited by, or will result in the creation or imposition of any Lien on, the Purchased Loan Collateral (other than a Lien in favor of Purchaser).

(e)     Other than the Sale Order, no consent, approval, authorization, registration, filing or order of any court, Regulatory Authority or creditor is required for the execution, delivery and performance by Seller of, or compliance by Seller with, this Agreement, or the consummation of the sale of the Purchased Loans by Seller to Purchaser or other transactions contemplated hereby, or if any such consent, approval, authorization, registration, filing or order is required, Seller has obtained it or (if such requirement is not currently in effect) will have obtained it as of the Purchase Date.

(f)     The consummation of the transactions contemplated by this Agreement, the execution and delivery of this Agreement and compliance with the terms of this Agreement do not (i) conflict with, result in a breach of or constitute a default under, and are not prohibited by, Seller's Governing Documents or any Governmental Authorizations or (ii) except as would not reasonably be expected to have a Material Adverse Effect with respect to Seller or the Purchased Loans, taken as a whole, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, and are not prohibited by, any mortgage, indenture, deed of trust, loan or credit agreement or other agreement or instrument to which it is a party.

(g)     Seller has provided or made available to Purchaser or its advisor(s) true and accurate copies of the form Related Documents used by Seller with respect to each Purchased Loan as of the Purchase Date.

(h)     The execution, delivery and performance of this Agreement by Seller do not require compliance with any "bulk sales" laws or similar statutory provisions by Seller.

(i)     Other than Seller's Bankruptcy Case, there is no litigation or action at law or in equity pending, or to Seller's knowledge, threatened in writing, against Seller, and no proceeding or investigation of any kind is pending by any federal, state or local governmental or administrative body against Seller that (i) would reasonably be expected to have a Material Adverse Effect with respect to Seller, (ii) asserts the invalidity of this Agreement or any Purchased Loans, (iii) seeks to prevent the consummation of any of the transactions contemplated by this Agreement, or (iv) seeks any determination or ruling that would adversely affect the Purchased Loans.

Section 4.2     Purchaser Representations and Warranties.

As of the Effective Date and as of the Purchase Date, Purchaser hereby represents and warrants that:

(a)     Purchaser is duly formed, validly existing and in good standing under the laws of the jurisdiction of its organization and is in good standing with every regulatory body having jurisdiction over the activities of Purchaser, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect with respect to Purchaser.

(b)     Purchaser has all requisite power and authority to purchase and own the Purchased Loans, own its properties, carry on its business as and where now being conducted, execute

and deliver this Agreement, perform all its obligations hereunder, and to carry out the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Purchaser and is a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or general equitable principles (whether considered in a proceeding in equity or at law).

(c)       Purchaser will not be rendered Insolvent by the consummation of the transactions contemplated hereby.

(d)       No license, permit, consent, approval, authorization, registration, filing or order of any court or governmental or Regulatory Authority is required for the execution, delivery and performance by Purchaser of, or compliance by Purchaser with, this Agreement, or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization, registration, filing or order is required, either Purchaser has obtained the same or will obtain it.

(e)       The consummation of the transactions contemplated by this Agreement, the execution and delivery of this Agreement and compliance with the terms of this Agreement shall not materially conflict with, result in a material breach of, constitute a default under or be prohibited by, Purchaser's charter or other agreement relating to its organization.

(f)       There is no litigation or action at law or in equity pending or, to the best of Purchaser's knowledge, threatened against Purchaser and no proceeding or investigation of any kind is pending or, to the best of Purchaser's knowledge, threatened in writing, by any federal, state or local governmental or administrative body against Purchaser that would reasonably be expected to have a Material Adverse Effect with respect to Purchaser.

(g)       The execution, delivery and performance of this Agreement by Purchaser does not violate Applicable Law, except to the extent such violation would not reasonably be expected to have a Material Adverse Effect with respect to Purchaser.

(h)       The Purchaser, its Affiliates, and their respective officers, directors, and employees are not Sanctioned Persons.

ARTICLE 5.

COVENANTS

Section 5.1       Confidentiality.

(a)       In connection with this Agreement, a Party (the "Recipient") may receive or have access to certain information of the other Party (the "Discloser") including, though not limited to, records, documents, proprietary information, technology, software, trade secrets, financial and business information, or data related to such other Party's products (including the discovery, invention, research, improvement, development, manufacture, or sale thereof), processes, or general business operations (including sales, costs, profits, pricing methods, organization, employee or customer lists and process), whether oral, written, or communicated via electronic media or otherwise disclosed or made available to a Party or to which a Party is given access pursuant to this Agreement by the other Party, and any information obtained through access to any information, assets or information systems (including

computers, networks, voice mail, etc.) that, if not otherwise described above, is of such a nature that a reasonable person would believe to be confidential (together, "Confidential Information").  Without limitation of the foregoing, and notwithstanding anything to the contrary set forth herein, (i) the terms of this Agreement and the other Program Agreements, and (ii) the identity of the Parties, and the identity of Purchaser, the Purchaser Related Parties, the Seller Related Parties, their direct or indirect Affiliates and their respective investment advisors, shall also be deemed to be "Confidential Information" and information that is expressly understood to be confidential.  Recipient and each Representative (as defined below) shall protect the disclosed Confidential Information in compliance with its own policies and procedures governing the use and control of confidential information, including, without limitation, policies with respect to conflicts of interest, and by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination, or publication of the Confidential Information as Recipient uses to protect its own confidential information of a like nature. Recipient's obligations shall only extend to (i) information that is marked as confidential at the time of disclosure or (ii) information that is unmarked (e.g., orally, visually or tangibly disclosed) but which the Discloser informs the Recipient in writing that such information should be treated as confidential at the time of disclosure.  This Agreement imposes no obligation upon Recipient with respect to information that:  (1) was in Recipient's possession before receipt from Discloser (unless such information came into Recipient's possession subject to a duty of confidentiality under a separate, written confidentiality agreement, in which case such information shall be subject to the applicable terms and conditions thereof); (2) is or becomes available to and a matter of public knowledge through no violation of this Section 5.1(a) by Recipient; (3) is lawfully received by Recipient or any of its Affiliates or their respective Representatives from a third party that is not prohibited from disclosure of such Confidential Information by legal, contractual or fiduciary obligation; (4) is disclosed by Discloser to a third party without a duty of confidentiality on the third party; (5) is independently developed by Recipient or its Affiliates without reference to the Confidential Information; (6) is disclosed as required by Applicable Law, regulation, supervisory authority or by subpoena, order or request for information by judicial or governmental authority or other legal proceeding (including in connection with a regulatory examination of Purchaser or any of its Affiliates); provided, however, Recipient shall furnish only the portion of the Confidential Information which is legally required and will exercise its commercially reasonable efforts to assure that confidential treatment will be accorded the Confidential Information; or (7) is disclosed by Recipient with Discloser's prior written approval.  In addition to the foregoing, Purchaser covenants that it will not use, and will not permit any Affiliate to use, in violation of any Applicable Law, any material non-public information that has been provided to it by Seller in Purchaser's decision to invest in any securities issued by Seller, provided that the Solar Loans and the Purchased Loans shall not be considered securities for the purposes of this Section 5.1(a).  Recipient may disclose Confidential Information to (i) its Affiliates and its and its Affiliates' officers, directors, employees, trustees, members, partners, prospective purchasers or lenders in any Secondary Market Transaction, potential and existing funding sources (including, with respect to Purchaser, any potential or existing investor in, and Person acting as a trustee or service provider in connection with, asset-backed securities for which the Purchased Loans are included in the collateral or trust assets), advisors or representatives (including, without limitation, attorneys, accountants, insurers, rating agencies, consultants, bankers, financial advisors, custodians, servicers and backup servicers) (collectively, "Representatives") who need to have access to such Confidential Information.  Recipient shall be responsible for any breach of this Section 5.1 by any of its Representatives who have actually received Confidential Information.  Confidential Information shall include the terms and conditions of this Agreement and the other Program Agreements, except to the extent such terms and conditions are required to be disclosed pursuant to Applicable Law, including the Bankruptcy Code in connection with the Bankruptcy Case.

(b)     Solar Loan Files may include Confidential Information that also meets the definition of non-public personally identifiable information ("NPI") regarding an Obligor as defined by Title V of the Gramm-Leach-Bliley Act of 1999 and implementing regulations (collectively, the "GLB Act"). To the extent that Purchaser has access to NPI through Solar Loan Files or any other source, Purchaser agrees that notwithstanding any exception set forth in Section 5.1(a) above, such information will not be disclosed or made available to any third party, agent or employee for any reason whatsoever, other than with respect to: (i) Purchaser's Representatives on a "need to know" basis in order for Purchaser to perform its obligations under this Agreement and other agreements related to the Purchased Loans or Representatives under any Secondary Market Transaction, provided that such Representatives are subject to a confidentiality agreement which shall be consistent with and no less restrictive than the provisions of this Article 5; and (ii) as required by law (including in connection with a regulatory examination of Purchaser or any of its Affiliates) or as otherwise permitted by this Agreement or the GLB Act regarding "Privacy" of NPI, either during the term of this Agreement or after the termination of this Agreement, provided that, prior to any disclosure of NPI as required by Applicable Law, Purchaser shall, if permitted by Applicable Law, (A) not disclose any such information until it has notified Seller in writing of all actual or threatened legal compulsion of disclosure, and any actual legal obligation of disclosure promptly upon becoming so obligated, and (B) cooperate with Seller at Purchaser's expense to the fullest extent possible with all lawful efforts by Seller to resist or limit disclosure. To the extent that Purchaser maintains or accesses any NPI, Purchaser shall comply with all Applicable Law regarding use, disclosure and safeguarding of any and all consumer information and will maintain a comprehensive written information security program, in compliance with Applicable Law, which shall include all necessary measures, including the establishment and maintenance of appropriate policies, procedures and technical, physical, and administrative safeguards, to (w) ensure the security and confidentiality of the NPI, (x) protect against any foreseeable threats or hazards to the security or integrity of NPI, (y) protect against unauthorized access to or use of such information, and (z) ensure appropriate disposal of NPI. Each party shall be considered a "controller" of any personal data or NPI transferred under this Agreement, and nothing in this Agreement shall be construed to designate either party a "service provider," as those terms are defined by Applicable Laws related to privacy, data security, or the protection of personal data.

(c)     If a Party becomes aware of any unauthorized release or breach of NPI maintained by a Party ("Data Breach"), such Party agrees to immediately provide notice to the other Party of the same and shall specify the corrective action that was or will be taken. The breached or releasing Party shall assess the nature and scope of any Data Breach and specifically identify the NPI that has or may have been improperly accessed, released or misused. The breached or releasing Party shall take reasonable and appropriate steps to contain and control any Data Breach relating to the NPI and assist the other Party at the expense of the breached or releasing Party with all reasonably requested steps needed to notify Obligors of any such Data Breach.

(d)     Each Party agrees that, upon written request of the other Party, it will return or destroy all copies of Confidential Information provided by the other Party, without retaining any copies thereof, and destroy all copies of any analyses, compilations, studies or other documents prepared by it or for its use containing or reflecting any Confidential Information; provided, however, that each Party may retain such limited copies or materials containing Confidential Information of the other Party for customary document retention and audit purposes, as required by Applicable Law, and subject to the terms of this Agreement.

(e)     Neither Seller nor Purchaser shall make any public release of information regarding the matters contemplated by the Program Agreements without the prior written consent of the

other Party or as required by law, including, without limitation, as required by federal securities laws and the rules of any stock exchange.

Section 5.2      No Use of Non-Public Obligor Data.

In the course of purchasing and holding Purchased Loans, Purchaser may have access to certain information concerning Obligors. Such information could include any and all items included in a Solar Loan File and all information included in a listing for a Solar Loan (the "Obligor Data"). Certain of the Obligor Data is published in connection with a Solar Loan, and other information, included in certain documents in the Solar Loan File, is not publicly disclosed and may constitute NPI (collectively, "Non-Public Obligor Data"). Purchaser shall not utilize Non-Public Obligor Data for any purpose other than in connection with the transactions contemplated under this Agreement.

Section 5.3      Access to Records.

Seller understands and acknowledges that Purchaser or certain of Purchaser's Affiliates are subject to examination by Regulatory Authorities with authority over Purchaser or Purchaser's Affiliates. Seller agrees to use commercially reasonable efforts to cooperate with any legitimate examination or inquiry by any such government agencies having proper regulatory authority over Purchaser or Purchaser's Affiliates, at Purchaser's sole cost and expense. Seller further acknowledges that certain of Purchaser's Affiliates, as regulated financial institutions, may be required to engage in ongoing oversight of its relationship with Seller, including reviewing Seller's compliance with Applicable Law. With respect to audits and examinations related to this Agreement to be performed on Seller by a government agency with authority over Purchaser or certain of Purchaser's Affiliates, Purchaser shall provide Seller with as much prior written notice as reasonably practicable, and the costs of Seller incurred with any such audit or examination shall be at Purchaser's sole cost and expense.

Section 5.4      Tax Matters.

(a)      Any sales, use, purchase, transfer, recording, filing, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the transactions contemplated by this Agreement (the "Transfer Taxes") shall be borne and timely paid by Purchaser. Purchaser will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.

(b)      For U.S. federal and applicable state and local income Tax purposes, the Purchase Price shall be allocated among the Purchased Loans consistent with Section 1060 of the Code and by treating the book value on the books and records of the Seller of each Purchased Loan as such Purchased Loan's fair market value for purposes of such allocation (the "Purchase Price Allocation"). The parties hereto shall act for all Tax purposes, including filing Tax returns, consistently with the Purchase Price Allocation unless otherwise required by applicable law.

(c)      After the effectiveness of this Agreement, with respect to the Purchased Loans, none of Purchaser or its Affiliates shall take any action (including making any Tax election) with respect to a taxable period (or portion thereof) ending on or before the date of the effectiveness of this Agreement to the extent that such action is reasonably likely to result in an additional Tax liability for Seller.

ARTICLE 6.

BANKRUPTCY COURT MATTERS

Section 6.1      Bankruptcy Court Matters.

Purchaser and Seller each agree that they will promptly take such actions as are reasonably necessary to obtain entry of the Sale Order approving this Agreement and authorizing the Purchase, including, in the case of Purchaser, furnishing affidavits or other documents or information for filing with the Bankruptcy Court to, among other things, provide necessary assurances of performance by Purchasers under this Agreement and demonstrate that Purchaser is a "good-faith" purchaser under Section 363(m) of the Bankruptcy Code.  Purchaser shall consult with Seller prior to filing, joining in, or otherwise supporting in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Loans hereunder.  In the event the entry of the Sale Order is appealed, Seller and Purchaser shall use their respective commercially reasonable efforts to pursue or defend such appeal, as the case may be.

Section 6.2      Notice of Purchase Required by Bankruptcy Court.

The Parties acknowledge that under the Bankruptcy Code the sale of Purchased Loans is subject to entry of and, to the extent entered, the terms of an Order of the Bankruptcy Court approving the sale of the Purchased Loans.  The Parties acknowledge that to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Purchased Loans.  Nothing in this Agreement shall require Seller or its respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 6.3      No Other Agreements.

Seller represents that, as of the date of this Agreement, Seller is not a party to or bound by any agreement with respect to any sale, transfer or other disposition of any of the Purchased Loans in a transaction or series of transactions with one or more Persons other than Purchaser.

Section 6.4      Fiduciary Obligations.

Nothing in this Agreement, or any document related to the transactions contemplated herein and the Sale Order, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.  For the avoidance of doubt, until the effectiveness of this Agreement, Sellers retain the right to pursue any Alternative Transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

ARTICLE 7.

MISCELLANEOUS

Section 7.1      Notices.

All notices and other communications hereunder will be in writing and will be deemed to have been duly given when delivered in person, by facsimile or email with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties as follows:

if to Purchaser:

Solar Securitization Master Fund II, LP
150 California Street
Suite 1000
San Francisco, CA 94111
Attention: Manager
E-mail Address: notice@goodfinch.com

if to Seller:

Chief Transformation Officer
c/o Alvarez & Marsal North America, LLC
6060 Center Drive, Suite 950
Los Angeles, CA 90045
Attention:      Matthew Henry
Email:          mhenry@alvarezandmarsal.com

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attn:    Adam D. Larson, P.C.; Claire Campbell, P.C.
Email:   adam.larson@kirkland.com; claire.campbell@kirkland.com

or to such other address as the Party to whom notice is given may have previously furnished to the others in writing in the manner set forth above.  Any notice or communication delivered in person will be deemed effective upon delivery.  Any notice or communication sent by facsimile, email, or air courier will be deemed effective on the first (1st) Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent.  Any notice or communication sent by registered or certified mail will be deemed effective on the third (3rd) Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

Section 7.2    Amendment; Waiver.

Except as otherwise expressly provided herein, Purchaser and Seller may amend this Agreement, from time to time, in a writing signed by duly authorized representatives of Seller and Purchaser.  No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the Party against whom such waiver or modification is sought to be enforced.

Section 7.3    Cumulative Rights.

All rights and remedies of the Parties hereto under this Agreement shall, except as otherwise specifically provided herein, be cumulative and non-exclusive of any rights or remedies which they may have under any other agreement or instrument, by operation of law, or otherwise.

Section 7.4    Assignment.

The rights and obligations of either Party under this Agreement shall not be assigned without the prior written consent of the other Party, and any such assignment without the prior written consent of the other Party shall be null and void.  Notwithstanding the foregoing, this Section 7.4 shall not in any way prohibit or limit the ability of Purchaser (or any assignee or subsequent purchaser of Purchased Loans) to, or require Seller's consent to, directly or indirectly assign, pledge, hypothecate or otherwise dispose of Purchased Loans or its other rights under this Agreement relating to the Purchased Loans, subject to any applicable limitations thereon described in this Agreement or the other Program Agreements.

Section 7.5    [reserved]

Section 7.6    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD OTHERWISE DIRECT THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.

(b)    The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Purchase and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 7.1; provided, however, that if the Bankruptcy Case has closed, each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the other Party or any of its Representatives in any way relating to this Agreement or the Purchase, in any forum other than the courts of the State of New York sitting in the Borough of Manhattan, New York, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such New York state court or, to the fullest extent permitted by Applicable Law, in such federal court.  Each of the Parties agrees that a final judgment in any such action, litigation or proceeding

shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c) EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE AND AGREES THAT ANY COURT PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PURCHASE (AND AGREES THAT ANY SUCH DISPUTE SHALL BE DECIDED BY A JUDGE SITTING WITHOUT A JURY).

Section 7.7    Limitation of Liability.

EXCEPT FOR THE CONFIDENTIALITY AND DATA SECURITY OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS RESPECTIVE AFFILIATES, BENEFICIARIES, ASSIGNEES OR SUCCESSORS (BY ASSIGNMENT OR OTHERWISE) BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON FOR ANY LOST PROFITS, COSTS OF COVER, OR OTHER SPECIAL DAMAGES, OR ANY PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES, UNDER THIS AGREEMENT INCURRED OR CLAIMED BY ANY PARTY OR PERSON (OR SUCH PARTY OR ENTITY'S OFFICERS, DIRECTORS, STOCKHOLDERS, MEMBERS OR OWNERS), HOWEVER CAUSED, ON ANY THEORY OF LIABILITY.

Section 7.8    Successors and Assigns.

Subject to Section 7.4, this Agreement shall bind and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

Section 7.9    Severability.

Any part, provision, representation or warranty of this Agreement that is prohibited or not fully enforceable in any jurisdiction, will be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing either Party's rights hereunder or under the remaining provisions of this Agreement in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable in any respect any such provision in any other jurisdiction.

Section 7.10    Entire Agreement.

As of the Effective Date, Seller and Purchaser hereby acknowledge and agree that this Agreement, together with the exhibits hereto, represents the complete and entire agreement between the Parties, and shall supersede all prior written or oral statements, agreements or understandings between the Parties relating to the subject matter of this Agreement.

Section 7.11    No Joint Venture or Partnership.

Each Party (including any of its respective permitted successors and assignees) acknowledges and agrees that such Party will not hold itself out as an agent, partner or co-venturer of the other Party and that this Agreement and the transactions contemplated hereby including the payment of any fees, any expense reimbursement or any referral fee are not intended and do not create an agency, partnership, joint venture or any other similar type of relationship between or among the Parties.

Section 7.12    Further Assurances.

Each Party, upon the reasonable written request of the other Party, shall execute and deliver to such other Party any reasonably necessary or appropriate additional documents, instruments or agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement or the consummation of the transactions contemplated hereunder.  Each Party also agrees to perform its respective obligations under this Agreement in material compliance with Applicable Law and to reasonably cooperate in good faith with the other in resolving compliance with Applicable Law issues.

Section 7.13    Exhibits and Schedules.

The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 7.14    Costs.

Each of Purchaser and Seller shall bear its own costs and expenses in connection with this Agreement, including without limitation any commissions, fees, costs, and expenses, including those incurred in relation to due diligence performed or legal services provided in connection with this Agreement.  If any claim, legal action or similar proceeding is brought for the enforcement of this Agreement or because of a dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing Party, as and to the extent determined by the applicable court or judicial body, shall be entitled to recover reasonable attorneys' fees and other costs incurred in that claim, action or proceeding, in addition to any other relief to which such Party may be entitled.  The successful or prevailing Party, as used herein, shall mean the Party that substantially secures or receives the relief sought, whether by settlement, dismissal, summary judgment, judgment or otherwise, or the Party that most nearly prevails, even if such Party does not prevail in all matters.

Section 7.15    Counterparts; Imaged Copies; Electronic Execution.

This Agreement may be executed in multiple counterparts (including electronic PDF), each of which shall be an original and all of which taken together shall constitute but one and the same agreement.  The parties agree to electronic contracting and signatures with respect to this Agreement.  Delivery of an electronic signature to, or a signed copy of, this Agreement by facsimile, email or other electronic transmission (including, without limitation, Adobe "fill and sign" and DOCUSIGN) shall be fully binding on the parties to the same extent as the delivery of the signed originals and shall be admissible into evidence for all purposes.  The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Electronic Signatures in Global and National Commerce Act of 2000, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  Notwithstanding the foregoing, if any party shall request manually signed counterpart signatures to this Agreement, each of the other parties hereby agrees to provide such manually signed signature pages as soon as commercially reasonable.

Section 7.16    No Petition.

Notwithstanding any prior termination of this Agreement, Seller shall not, as to Purchaser (a) take any action to, or give or make any consent, instruction, vote, claim, approval, filing or notice to

commence (or oppose the dismissal of) any case, proceeding or other action under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization, rehabilitation, arrangement, adjustment, winding-up, liquidation, sequestration, dissolution, composition, or other relief with respect to Purchaser or any of the assets or debts of Purchaser (a "Purchaser Bankruptcy Case"), (b) join with, cause, solicit or instruct any Person to commence (or oppose the dismissal of) such a Purchaser Bankruptcy Case, (c) move, directly or indirectly, for appointment of a receiver, liquidator, assignee, trustee, custodian, examiner or sequestrator or similar official with respect to Purchaser or any of the assets or debts of Purchaser, or (d) seek any order relating to the winding up, liquidation or dissolution of Purchaser or a general assignment for the benefit of Purchaser's creditors.

Section 7.17    Force Majeure.

If any Party anticipates being unable or is rendered unable, wholly or in part, by an extreme and unexpected force outside the control of such Party (including, but not limited to, acts of God, legislative enactments, strikes, lock-outs, riots, acts of war, epidemics, fire, communication line or power failures, earthquakes or other disasters) to carry out its obligations under this Agreement, that Party shall give to the other Party in a commercially reasonable amount of time written notice to that effect, the expected duration of the inability to perform and assurances that all available means will be employed to continue and/or restore performance.  Upon receipt of the written notice, the affected obligations of the Party giving the notice shall be suspended so long as such Party is reasonably unable to so perform and such Party shall have no liability to the other for the failure to perform any suspended obligation during the period of suspension; however, the other Party may at its option terminate this Agreement.

Section 7.18    No Recourse.

Notwithstanding anything that may be expressed or implied in this Agreement, each Party agrees, on behalf of itself and its Affiliates, that this Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may only be brought against, the entities that are expressly named as Parties hereto.  Except to the extent a Purchaser Related Party or Seller Related Party is a named party to this Agreement or any other Program Agreement, no Purchaser Related Party shall have any liability to Seller or any of its Affiliates and no Seller Related Party shall have any liability to Purchaser or any of its Affiliates relating to or arising out of the Program Agreements, or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise.

Section 7.19    No Public Announcement.

Subject to compliance with the Bankruptcy Code in connection with the Bankruptcy Case, neither Purchaser nor Seller shall, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by law, in which case the other Party shall be advised and the Parties shall use their reasonable efforts to cause a mutually agreeable release or announcement to be issued.

Section 7.20    Third-Party Beneficiaries.

Seller and Purchaser hereby acknowledge and agree that the Underlying Trust, Borrower, Depositor, Trustee and Administrative Agent (as such terms are defined in the RIC Warehouse Facility) are

each a third-party beneficiary of this Agreement, and in entering into the RIC Warehouse Facility, the Administrative Agent is relying on its rights as a third-party beneficiary of this Agreement.  All rights provided to the Administrative Agent hereunder (except for those that by their teams expressly survive the termination of this Agreement) shall revert to Purchaser upon termination of the RIC Warehouse Facility.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have caused to be duly authorized, executed and delivered, as of the date first above written, this LOAN SALE AND PURCHASE AGREEMENT.

PURCHASER:

SOLAR SECURITIZATION MASTER FUND II, LP

By: Solar Securitization Program SMA GP, LLC,
    its general partner


By: _____
Name: _____
Title: _____

SELLER:

SUNPOWER CAPITAL SERVICES, LLC


By: _____
Name:
Title:

EXHIBIT A

FORM OF PURCHASE CONFIRMATION

PURCHASE CONFIRMATION

*Via E-mail*

Solar Securitization Master Fund II, LP
Attention: Andrew Mills
150 California Street, Suite 1000
San Francisco, CA 94111
Email: andrew@goodfinch.com

     This Purchase Confirmation (this "Confirmation"), dated as of August [__], 2024 (the "Purchase Date"), provides for the sale by SunPower Capital Services, LLC (the "Seller") to Solar Securitization Master Fund II, LP (the "Purchaser"), and the purchase by Purchaser from Seller, of the Solar Loans described on the Loan Schedule attached as Schedule 1 hereto (the "Related Purchased Loans") pursuant to the terms of the Loan Sale and Purchase Agreement (the "Loan Purchase Agreement"), dated as of the date hereof by and between Purchaser and Seller.  Capitalized terms that are used herein but are not defined herein shall have the respective meanings set forth in the Loan Purchase Agreement.

     Seller hereby sells, conveys, assigns and transfers to Purchaser without recourse and on a servicing released basis, all right, title and interest of the Seller in and to each of the Related Purchased Loans, including all collections received on and after the Purchase Date, all proceeds of the foregoing and all documents maintained as part of the related Solar Loan Files.

     Seller confirms that the conditions precedent set forth in Section 2.2 of the Loan Purchase Agreement have been satisfied as of the date hereof, unless waived in writing by Purchaser.

     Seller confirms that all representations and warranties applicable to the Related Purchased Loans set forth in Section 4.1 of the Loan Purchase Agreement are correct in all material respects, except to the extent such failure of such representations and warranties to be so true and correct, when taken as a whole, would not have a Material Adverse Effect, unless otherwise waived in writing by Purchaser.[1]

     Seller has delivered to Purchaser's Designated E-Vault all Vaulted Documents and to the Purchaser (or its designee) the other Required Loan Documents and any other Related Documents with respect to each Related Purchased Loan required to be delivered under the Loan Purchase Agreement.

     Purchaser shall make the payments required to be made to Seller under the Loan Purchase Agreement for the Related Purchased Loans in accordance with the instructions specified in writing by Seller.

     Summary data for the Related Purchased Loans sold pursuant to this Confirmation:

---

[1]     Any waived items to be detailed further.

[Unpaid Principal Balance:          $_____

                                    $_____

Accrued Interest & Fees:            $_____

Purchase Date Purchase Price        $_____]
Payment Amount:

[*Remainder of page intentionally left black; Signature page follows*]

In WITNESS WHEREOF, Seller has duly executed this Confirmation as of the Purchase Date referred to above.

SUNPOWER CAPITAL SERVICES, LLC
as Seller


By:_____

Name:
Its:

SCHEDULE 1 TO PURCHASE CONFIRMATION

<u>LOAN SCHEDULE</u>

[*See attached*]

EXHIBIT B

FORMS OF OBLIGOR LOAN AGREEMENT


[LIST OF FORMS TO BE COMPLETED]

SCHEDULE 1 TO LOAN SALE AND PURCHASE AGREEMENT

LOAN SCHEDULE

[*See attached*]

**Exhibit 2-B**

**Loan Sale and Purchase Agreement**

**LOAN SALE AND PURCHASE AGREEMENT**

Dated as of August [___], 2024

by and between

**SunPower Capital Services, LLC**

as Seller

and

**GOODFINCH SPV WL IV (SPWR), LLC**

as Purchaser

**TABLE OF CONTENTS**

SECTION                                    HEADING                                              PAGE

ARTICLE 1. DEFINITIONS........................................................................................................ 1

Section 1.1    Defined Terms. ............................................................................................. 1
Section 1.2    Rules of Construction. .................................................................................. 9

ARTICLE 2. PURCHASE AND SALE OF SOLAR LOANS ................................................ 9

Section 2.1    [reserved] ...................................................................................................... 9
Section 2.2    Conditions Precedent to Effectiveness. ....................................................... 9
Section 2.3    Payment of Purchase Price and Confirmation. ........................................... 10
Section 2.4    Control of Purchased Loan. ......................................................................... 10

ARTICLE 3. TRUE SALE; GRANT OF SECURITY INTEREST; ENFORCEMENT ...................... 11

Section 3.1    True Sale. ...................................................................................................... 11
Section 3.2    Grant of Security Interest. ........................................................................... 11
Section 3.3    Purchaser Rights. ......................................................................................... 12

ARTICLE 4. REPRESENTATION, WARRANTIES AND COVENANTS ..................................... 12

Section 4.1    Seller Representations and Warranties. ........................................................ 12
Section 4.2    Purchaser Representations and Warranties. ................................................. 13

ARTICLE 5. COVENANTS ........................................................................................................ 14

Section 5.1    Confidentiality. ............................................................................................. 14
Section 5.2    No Use of Non-Public Obligor Data. ........................................................... 17
Section 5.3    Access to Records. ....................................................................................... 17
Section 5.4    Tax Matters. .................................................................................................. 17

ARTICLE 6. BANKRUPTCY COURT MATTERS .................................................................. 18

Section 6.1    Bankruptcy Court Matters. .......................................................................... 18
Section 6.2    Notice of Purchase Required by Bankruptcy Court. .................................... 18
Section 6.3    No Other Agreements. .................................................................................. 18

ARTICLE 7. MISCELLANEOUS ............................................................................................. 19

Section 7.1    Notices. ......................................................................................................... 19
Section 7.2    Amendment; Waiver. .................................................................................... 20
Section 7.3    Cumulative Rights. ....................................................................................... 20
Section 7.4    Assignment. .................................................................................................. 20

Section 7.5       [reserved] ................................................................................................... 20
Section 7.6       Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ................................ 20
Section 7.7       Limitation of Liability. ...................................................................................... 21
Section 7.8       Successors and Assigns. ..................................................................................... 21
Section 7.9       Severability. .................................................................................................... 21
Section 7.10      Entire Agreement. ............................................................................................ 21
Section 7.11      No Joint Venture or Partnership. .......................................................................... 21
Section 7.12      Further Assurances. .......................................................................................... 21
Section 7.13      Exhibits and Schedules. ..................................................................................... 22
Section 7.14      Costs. ........................................................................................................... 22
Section 7.15      Counterparts; Imaged Copies; Electronic Execution. ................................................. 22
Section 7.16      No Petition. .................................................................................................... 22
Section 7.17      Force Majeure. ................................................................................................ 23
Section 7.18      No Recourse. ................................................................................................... 23
Section 7.19      No Public Announcement. ................................................................................... 23
Section 7.20      Third-Party Beneficiaries. .................................................................................. 23


Exhibit A         Form of Purchase Confirmation
Exhibit B         Forms of Obligor Loan Agreement

Schedule 1        Purchased Loan Schedule

THIS LOAN SALE AND PURCHASE AGREEMENT, dated as of August [__], 2024 (the "Effective Date"), by and between SunPower Capital Services, LLC, a Delaware limited liability company, as seller ("Seller") and GOODFINCH SPV WL IV (SPWR), LLC, a Delaware limited liability company, as purchaser ("Purchaser").

RECITALS

WHEREAS, from time to time, Seller originated or otherwise acquired loans in accordance with its Credit Policy (as defined herein) as listed on Schedule 1 attached hereto (the "Purchased Loans"); and

WHEREAS, on August 5, 2024, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined herein) (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which is being administered jointly with the chapter 11 cases of certain of Seller's Affiliates (such Affiliates, together with the Seller, the "Debtors") under Case No. 24-11649 (CTG) (collectively, the "Bankruptcy Cases," and with respect to the Seller, the "Bankruptcy Case");

WHEREAS, on August 6, 2024, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of TCU Solar Loans and RIC Depositor Membership Interests Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* (the "Sale Motion");

WHEREAS, pursuant to the Sale Motion, on August [●], 2024, the Bankruptcy Court entered an order approving the terms of this Agreement and authorizing and directing Seller to consummate the transactions contemplated by this Agreement (the "Sale Order");

WHEREAS, in accordance with the Sale Order, Seller desires to sell, convey, transfer, assign and deliver to Purchasers, and Purchasers desire to purchase from Seller, the Purchased Loans, subject to the terms and conditions set forth herein and in the Sale Order; and

WHEREAS, the Purchased Loans shall be purchased by Purchasers pursuant to the Sale Order, free and clear of all Liens (as defined herein), all in the manner and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

ARTICLE 1.

DEFINITIONS

Section 1.1      Defined Terms.

As used in this Agreement, the following capitalized terms shall have the meanings set forth below:

1

"ACH" means automated clearing house, a clearing and settlement facility for the interchange of electronic debits and credits among financial institutions.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Persons means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Loan Sale and Purchase Agreement, including all exhibits and schedules attached hereto or delivered in connection herewith (including, without limitation, the Purchase Confirmation, and any other document together therewith, delivered to Purchaser from time to time as provided herein) as such agreement may be amended, supplemented or modified from time to time.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, of stock or other equity interests in the Company or its subsidiaries or their respective assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"Applicable Law" means all federal, state and local laws, statutes, rules, regulations and orders, and all requirements of any Regulatory Authority having jurisdiction over a Person, to the extent applicable to the Person or Purchased Loan in question (including, without limitation, the underwriting, origination, servicing, ownership, collection, holding, acquisition and sale of such Purchased Loan).

"Authoritative Electronic Copy" means, with respect to any Obligor Loan Agreement stored in an electronic medium, the single electronic "authoritative copy" (within the meaning of Section 9-105 of the UCC) of such Obligor Loan Agreement (a) that constitutes the single authoritative copy of the record or records comprising the related chattel paper which is unique, identifiable and, except as otherwise provided in clauses (c), (d) and (e) below, unalterable, (b) that identifies Purchaser as the sole assignee thereof, (c) copies or revisions to which that add or change an identified assignee can be made only with the consent of Purchaser, (d) for which any copy thereof (or any copy of a copy thereof) is readily identifiable as a copy that is not the authoritative copy and (e) for which any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

"Bankruptcy Case" has the meaning assigned to such term in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

"Bankruptcy Court" has the meaning assigned to such term in the Recitals.

"Business Day" means any day other than: (a) a Saturday or Sunday; (b) a legal or federal holiday; and (c) a day on which banking and savings and loan institutions in Sacramento, California or New York, New York are required or authorized by law or Regulatory Authority to be closed for business.

"Collection Policy" means the "ND / ID Dealer Onboarding," a complete and accurate copy of which has been delivered to Purchaser via the Data Room.

2

"Confidential Information" has the meaning set forth in Section 5.1(a) of this Agreement.

"Credit Approval Date" means, with respect to any Solar Loan, the date prior to such Solar Loan's Origination Date on which Seller granted its credit approval for the origination of such Solar Loan in accordance with Seller's Credit Policy.

"Credit Policy" means the "SunPower Credit Policy," a complete and accurate copy of which has been delivered to Purchaser via the Data Room.

"Cut-Off Date" means July 24, 2024.

"Data Breach" has the meaning set forth in Section 5.1(c).

"Data Room" means a file share site maintained by Seller and approved by Purchaser, and pursuant to which Purchaser has ongoing access.

"Defaulted Solar Loan" means any Purchased Loan as to which any of the following has occurred:

(a)    any Purchased Loans to which all or any portion of the scheduled installment payment is one hundred twenty days (120) or more past due as of its due date upon the close of the month,

(b)    an Insolvency Event relating to the related Obligor of such Purchased Loan has occurred,

(c)    the Master Servicer has determined in good faith in accordance with the Collection Policy that such Purchased Loan is not collectable, or

(d)    such Purchased Loan is fully or partially charged-off by the Master Servicer.

"Delinquent Solar Loan" means any Purchased Loan as to which, as of the Purchase Date, any amount of a scheduled payment remains unpaid for more than zero (0) days from the original due date for such scheduled payment and that is not a Defaulted Solar Loan; provided that, upon payment of such scheduled payment amount, such Purchased Loan shall no longer constitute a Delinquent Solar Loan.

"Discloser" has the meaning set forth in Section 5.1(a).

"Effective Date" has the meaning set forth in the introductory paragraph.

"Electronic Collateral Letter Agreement" means that certain letter agreement, dated as of the date hereof, by and among the Seller, as custodian, the Purchaser and E-Vault Provider.

"E-Vault" means a segregated electronic vault with the E-Vault Provider used to receive and hold the Vaulted Documents.

"E-Vault Provider" means eOriginal, Inc. as provider and operator of an electronic system that enables establishment and maintenance of the E-Vault.

"FICO Score" means, with respect to the Obligor of a Purchased Loan, the statistical credit score of such Obligor based on methodology developed by Fair Isaac Corporation and used by the applicable originator or its agents to determine credit risk when underwriting such Purchased Loan.  For purposes of clarification, the "FICO Score" of any Obligor shall mean the FICO Score as in effect on the Credit Approval Date of the applicable qualifying Obligor whose FICO Score was used to make the final underwriting decision during the loan application process, pursuant to the Credit Policy.

"GLB Act" has the meaning set forth in Section 5.1(b).

"Governing Documents" means, with respect to Seller, its articles or certificate of organization or formation and its operating agreement or limited liability company agreement, resolutions approving the transactions contemplated by this Agreement and a certificate of incumbency of the Responsible Officer of Seller executing and delivering this Agreement on behalf of Seller.

"Governmental Authorizations" means all franchises, permits, licenses, approvals, consents and other authorizations of all Regulatory Authorities.

"Insolvency Event" means, with respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under the Bankruptcy Code or any other applicable Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of sixty (60) consecutive days; or (b) the commencement by such Person of a voluntary case under any applicable Insolvency Law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or (c) the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or (d) the making by such Person of any general assignment for the benefit of creditors, or (e) the failure by such Person generally to pay its debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Insolvent" as to any Person, has the meaning set forth in Section 101(32) of the Bankruptcy Code.

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien or security interest (statutory or other), or preference, priority or other security agreement, charge or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing authorized by Seller of any financing statement under the UCC or comparable law of any jurisdiction).

"Loan Schedule" means the schedule of Purchased Loans attached hereto as Schedule 1.

4

"Master Servicer" means Seller in its capacity as the servicer of the Purchased Loans prior to the Purchase Date.

"Material Adverse Effect" means (x) with respect to any Person, any event or circumstance having or reasonably expected to have a material adverse effect on: (i) the business, assets, financial condition, properties or operations of such Person, taken as a whole, (ii) the rights and remedies of such Person with respect to matters arising under this Agreement or any other Program Agreement, taken as a whole or (iii) the ability of each of such Person to perform its material obligations under this Agreement or any other Program Agreement, (y) with respect to this Agreement or any other Program Agreement, any event or circumstance having or reasonably expected to have a material adverse effect on the legality, validity, binding effect or enforceability of this Agreement or any other Program Agreement and (z) with respect to the Purchased Loans, the validity, enforceability, or collectability of all or a material portion of the Purchased Loans, when taken as a whole.

"Non-Public Obligor Data" has the meaning set forth in Section 5.2.

"NPI" has the meaning set forth in Section 5.1(b).

"Obligor" means, with respect to any Solar Loan, each Person or other obligor (including any co-borrower, co-maker, co-signer or guarantor) who is obligated under the terms of such Solar Loan.

"Obligor Data" has the meaning set forth in Section 5.2.

"Obligor Loan Agreement" means the single Authoritative Electronic Copy of the electronic record that evidences a Purchased Loan, rendered in English or Spanish, forms of which are listed on Exhibit B attached hereto and complete and accurate copies of which have been delivered to Purchaser via the Data Room as of the Effective Date.

"OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"Origination Date" means, with respect to any Solar Loan, the first date on which such Solar Loan was fully executed.

"Party" means either Seller or Purchaser, and "Parties" means Seller and Purchaser.

"Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or other entity, including any government agency, commission, board, department, bureau or instrumentality.

"Principal Balance" means, with respect to any Purchased Loan, as of any date of determination, the outstanding principal amount thereof.

"Program" means the purchase program governed by the Program Agreements.

"Program Agreements" means this Agreement and the Electronic Collateral Letter Agreement.

"Purchase" means the transfer of the Purchased Loans from Seller to Purchaser on the Purchase Date.

"<u>Purchase Confirmation</u>" means with respect to the Purchase, the document to be provided by Seller to Purchaser pursuant to <u>Section 2.3</u> hereof, a form of which is attached hereto as <u>Exhibit A</u>, including the Loan Schedule attached thereto.

"<u>Purchase Date</u>" means, with respect to any Purchased Loan, the Effective Date.

"<u>Purchase Price</u>" means, with respect to the Purchased Loans in the aggregate, the sum of $5,683,650.

"<u>Purchased Loan</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>Purchased Loan Collateral</u>" has the meaning assigned to such term in <u>Section 3.2(a)</u>.

"<u>Purchaser</u>" has the meaning set forth in the introductory paragraph.

"<u>Purchaser Bankruptcy Case</u>" has the meaning assigned to such term in <u>Section 7.16</u>.

"<u>Purchaser Designated E-Vault</u>" has the meaning assigned to such term in <u>Section 2.4(c)</u>.

"<u>Purchaser Related Party</u>" means any of Purchaser's certificate holders, general or limited partners, equity holders, stockholders, controlling Persons, managers, members, directors, officers, employees, Affiliates, subsidiaries, financing sources, portfolio companies, attorneys and other representatives, and their successors, assignees and agents.

"<u>Recipient</u>" has the meaning set forth in <u>Section 5.1(a)</u>.

"<u>Records</u>" means, with respect to any Purchased Loan, any loan applications, change-of-terms notices, credit files, servicing and other records, credit bureau reports or other documentation or information relating to or regarding such Purchased Loan (including computer tapes, magnetic files, and information in any other format).

"<u>Regulatory Authority</u>" means any international, federal, state, county, municipal or local regulatory agency or regulatory authority, agency, board, body, commission, instrumentality, court, tribunal or quasi-governmental agency or authority having jurisdiction over a Party, any Solar Loan or any Obligor.

"<u>Related Documents</u>" means, with respect to any Purchased Loan, the Required Loan Documents and all other agreements or documents evidencing, securing, guarantying, governing or giving rise to such Purchased Loan, including, without limitation, any third-party guarantees, any other credit enhancement rights, and any document obtained from Obligor or a third party with respect to the underwriting of such Purchased Loan.

"<u>Related Property</u>" means, with respect to a Purchased Loan, Seller's interest (in its capacity as a lender with respect to such Purchased Loan) in any property or other assets of Obligor thereunder pledged as collateral to secure the repayment of such Purchased Loan, including, without limitation, the Solar Energy System and all proceeds thereof.

"<u>Representative</u>" has the meaning set forth in <u>Section 5.1(a)</u>.

"Required Loan Documents" means, for each Purchased Loan, the following documents or instruments:

(a)       the Obligor Loan Agreement, including regulatory disclosure statements applicable to such Purchased Loan (e.g., "truth-in-lending," "Gramm-Leach-Bliley" and "ECOA and FCRA" disclosures);

(b)       authorization for payment by ACH (if executed by the related Obligor on the Purchase Date);

(c)       the duly executed home improvement or installation contract;

(d)       UCC financing statements and fixture disclaimer filings (in each case, with evidence of recordation) covering the applicable product(s) that is/are the subject of such Purchased Loan (provided that for purposes of any verification by Purchaser prior to funding, proof of submission of such filings for recording shall be sufficient); and

(e)       any other written or electronic supplements, record, or, with respect to any Purchased Loan modified prior to purchase by the Purchaser, any amendment or modification agreement to the Obligor Loan Agreement evidencing such Purchased Loan.

"Responsible Officer" means any Senior Financial Officer, President, any Executive Vice President, Chief Financial Officer, Chief Risk Officer, Chief Credit Officer or Chief Compliance Officer, or any Senior Vice President of the Seller or any other officer that oversees the day-to-day management and operation of this Agreement or the Program.

"RIC Warehouse Facility" means the non-recourse loan made under a Loan and Security Agreement, dated as of June 30, 2022, among SPWR RIC Borrower 2022-1, LLC, the lenders party thereto, Atlas Securitized Products Holdings, L.P., as Administrative Agent, and Computershare Trust Company, National Association, as Paying Agent, as amended by that certain First Amendment dated as of April 14, 2023, that certain Second Amendment dated as of June 29, 2023, that certain Third Amendment dated as of October 17, 2023, that certain Fourth Amendment dated as of December 22, 2023, that certain Fifth Amendment dated as of February 14, 2024, that certain Waiver dated as of April 26, 2024 and that certain Amendment and Waiver dated as of June 30, 2024.

"Sale Motion" has the meaning assigned to such term in the Recitals.

"Sale Order" has the meaning assigned to such term in the Recitals.

"Sanctioned Country" means any country or territory that is the target of comprehensive, country-wide or territory-wide Sanctions, which as of the date of this Agreement comprise Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by a Sanctions Authority (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person owned 50% or more by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes administered or enforced from time to time a Sanctions Authority.

"Sanctions Authority" means OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state.

"Secondary Market Transaction" means (i) a capital markets transaction in which the Purchaser sells Purchased Loans, directly or indirectly, to an entity that issues or arranges for the issuance of asset-backed securities collateralized, in whole or in part, by such Purchased Loans or (ii) a sale or assignment of Purchased Loans by Purchaser.

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Related Party" means any of Seller's certificate holders, general or limited partners, equity holders, stockholders, controlling Persons, managers, members, directors, officers, employees, Affiliates, subsidiaries, financing sources, portfolio companies, attorneys and other representatives, and their successors, assignees and agents.

"Solar Energy System" means a photovoltaic energy generating system, which may consist of solar photovoltaic panels or modules, inverter(s), racking systems, wiring, electrical and mechanical connections, metering, monitoring and/or other distributed generation interconnect equipment, an optional battery storage device, smart thermostats, LED light bulbs, prepaid operations and maintenance agreements and related landscaping, electric vehicle charging system and/or roofing materials installed on or at a residence owned by an Obligor at the time of installation and any additional equipment or services related to installation.

"Solar Loan" means an installment loan or sales contract originated or acquired by Seller and used to finance the acquisition and installation of a Solar Energy System.

"Solar Loan File" means, with respect to a Solar Loan, the documents maintained by the Master Servicer in connection with such Solar Loan.

"Tax" or "Taxes" means all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, stamp, withholding, social security, unemployment, real property, personal property, alternative or add on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including unclaimed property and escheat payments, and also including any interest, penalties or additions thereto, whether disputed or not.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing supplied or required to be supplied to a Taxing Authority in connection with Taxes.

"Taxing Authority" means any Regulatory Authority exercising Tax regulatory authority.

"UCC" means the Uniform Commercial Code as in effect from time to time in each State as applicable to the respective actions of Seller or any Obligor relating to the creation, perfection, priority, validity and/or enforcement of the security interest granted by such Obligor to Seller under any Obligor Loan Agreement or by Seller to Purchaser hereunder, in each case, as applicable.

"Vaulted Documents" means items (a), (b) and (c), if applicable, of the definition of Required Loan Documents.

Section 1.2    Rules of Construction.

(a)    As used in this Agreement: (i) all references to the masculine gender shall include the feminine gender (and vice versa); (ii) all references to "include," "includes," or "including" shall be deemed to be followed by the words "without limitation"; (iii) references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (iv) references to "dollars" or "$" shall be to United States dollars unless otherwise specified herein; (v) unless otherwise specified, all references to days (other than Business Days), months or years shall be deemed to be preceded by the word "calendar"; and (vi) all references to "quarter" shall be deemed to mean calendar quarter.

(b)    The fact that any Party provides approval or consent shall not mean or otherwise be construed to mean that: (i) either Party has performed any due diligence with respect to the requested or required approval or consent, as applicable; (ii) either Party agrees that the item or information for which the other Party seeks approval or consent complies with any Applicable Law; (iii) either Party has assumed the other Party's obligations to comply with all Applicable Law arising from or related to any requested or required approval or consent; or (iv) except as otherwise expressly set forth in such approval or consent, either Party's approval or consent impairs in any way the other Party's rights or remedies under the Agreement.

ARTICLE 2.

PURCHASE AND SALE OF SOLAR LOANS

Section 2.1    [reserved]

Section 2.2    Conditions Precedent to Effectiveness.

The effectiveness of this Agreement shall be subject to the conditions precedent that:

(a)    Loan Schedule.  At least five (5) Business Days prior to the Purchase Date (or such shorter time period as mutually agreed upon between Seller and Purchaser), Seller shall have provided Purchaser with a proposed Loan Schedule.

(b)    Closing Documents.  The Purchaser shall have received, reviewed and approved on or before the Purchase Date, each in form and substance reasonably satisfactory to Purchaser, each of the Purchase Confirmation (including a final loan tape) and the Program Agreements, duly executed and delivered by the parties thereto, accurate and complete copies of Seller's Governing Documents and such other customary certificates and opinions as the parties hereto may agree.

(c)    No Default.  No event has occurred and is continuing that constitutes a default or material violation by any party under any of the Program Agreements, or which would, with notice or the lapse or time or both, constitute such a default or material violation thereof.

(d)    Representations and Warranties.  Each of the representations and warranties of Seller and Purchaser in Article 4 of this Agreement shall, as of the Effective Date, be true and correct in all

9

material respects, except to the extent such failure of the representations and warranties to be so true and correct, when taken as a whole, would not have a Material Adverse Effect.

(e)    <u>Entry of the Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order.

(f)    <u>SSMF II Purchase Agreement</u>.  The Loan Sale and Purchase Agreement by and between Seller, as seller, and Solar Securitization Master Fund II, LP, as purchaser, has been duly executed and delivered by each party thereto.

(g)    <u>MIPTA</u>.  The Membership Interest Purchase and Transfer Agreement by and between Seller, as seller, and Purchaser and Solar Securitization Master Fund II, LP, as purchasers, has been duly executed and delivered by each party thereto.

Section 2.3    <u>Payment of Purchase Price and Confirmation</u>.

In consideration of payment of the related Purchase Price by Purchaser, Seller hereby sells, transfers, assigns and otherwise conveys to Purchaser, without recourse, but subject to the terms of this Agreement, all of Seller's right, title and interest in, to and under the Purchased Loans and all Related Property, and Purchaser hereby purchases such Purchased Loans and shall pay to or at the direction of Seller the Purchase Price therefor.  Upon payment of the Purchase Price therefore on the Purchase Date, Purchaser shall become, for all purposes, the owner of such Purchased Loans and the related Purchased Loan Collateral as of the Cut-Off Date.  For the avoidance of doubt, any unpaid interest or fees that accrued but remain unpaid on a Purchased Loan prior to the Cut-Off Date shall be the property of the Purchaser. The Parties acknowledge and agree that the Purchase Price for each Purchased Loan reflects an arms-length negotiation, resolution and transaction.

Section 2.4    <u>Control of Purchased Loan</u>.

(a)    In connection with the sale and conveyance of the Purchased Loans, Seller agrees to promptly indicate or cause to be indicated in its books, records and computer files that the Purchased Loans have been sold to Purchaser and to cause the Authoritative Electronic Copies for the Purchased Loans to identify Purchaser as the assignee thereof and, at Purchaser's direction, any collateral assignee of Purchaser's as the holder of the Lien thereon.

(b)    Following the Purchase Date, Seller will promptly transfer all Records and Solar Loan files with respect to the Purchased Loans to Purchaser or its designee.

(c)    On the Purchase Date (i) custody of the Vaulted Documents related to each Purchased Loan shall be transferred by Seller to the "Computershare Vault Partition" under the RIC Warehouse Facility(the "<u>Purchaser Designated E-Vault</u>"), and control of such Vaulted Documents shall be transferred by Seller to Purchaser or its designee and (ii) Seller shall transfer all other Related Documents, to the extent not already transferred to such designated E-Vault, to Computershare Trust Company, National Association, as "Custodian" under the RIC Warehouse Facility, as Purchaser's designee. Following the purchase of the Purchased Loans hereunder, Seller shall not (x) revise or alter any electronic chattel paper evidencing such Purchased Loan unless the Purchaser has participated in such revision or alteration or (y) make any copy or duplicate of any such electronic chattel paper unless such copy or duplicate is readily identifiable as a copy or duplicate and not as the authoritative copy of such electronic chattel paper.  In addition, on the Purchase Date, Seller shall transfer all other Related Documents, to the

extent not already transferred to Purchaser's E-Vault, to Purchaser or its designee in .pdf format via a secured transfer protocol or such other electronic transfer process acceptable to Purchaser.

(d)     Seller shall deliver to Purchaser an IRS Form W-9 duly executed by Seller. Purchaser shall not deduct or withhold any amounts from the Purchase Price.

ARTICLE 3.

TRUE SALE; GRANT OF SECURITY INTEREST; ENFORCEMENT

Section 3.1     True Sale.

Each of Seller and Purchaser agree that the transactions contemplated hereby are intended to be and shall constitute sales of the Purchased Loans transferred pursuant to Article 2 above, and are not intended to be financings or loans by Purchaser to Seller. The Parties shall treat such transactions as sales for tax, accounting and all other applicable purposes. The sale of each Purchased Loan pursuant to Article 2 above transfers to Purchaser all of Seller's right, title and interest in and to such Purchased Loan and all Related Property, including, without limitation, the servicing rights, and Seller will not retain any residual rights with respect to any Purchased Loan.

Section 3.2     Grant of Security Interest.

(a)     Purchaser may file one or more UCC financing statements with respect to the sale of the Purchased Loans consistent with Section 9-109(a)(3) of the UCC. In the event that the transactions contemplated hereby are construed to be financings by Purchaser to Seller or the Purchased Loans are determined or held to be property of Seller, then: (i) Seller hereby grants to Purchaser a present and continuing security interest in and to the following, whether now existing or hereafter created, (x) all Purchased Loans, (y) all of the Related Documents and Related Property for such Purchased Loans, and (z) all proceeds and rights to receive proceeds of the Purchased Loans (collectively, the "Purchased Loan Collateral"); (ii) this Agreement shall also be deemed to be a security agreement within the meaning of Article 9 of the UCC; (iii) the transfers of the Purchased Loans provided for herein shall be deemed to be a grant by Seller to Purchaser of a first priority lien upon and security interest in all of Seller's right, title and interest in and to the Purchased Loan Collateral; (iv) the Purchaser shall have control of the Obligor Loan Agreements related to the Purchased Loans that constitute "electronic chattel paper" or "electronic instrument" within the meaning of the UCC in all applicable jurisdictions and as to which there is only one Authoritative Electronic Copy that constitutes such "electronic chattel paper" for purposes of the UCC; (v) Purchaser is hereby authorized to take all necessary or appropriate actions to perfect its security interest in the Purchased Loan Collateral and may file financing statements on form UCC-1 naming Purchaser as secured party/buyer and Seller as debtor/seller, and identifying the Purchased Loan Collateral as collateral therein and, in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which the Purchased Loan Collateral relates; and (v) notifications to Persons holding such property and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of Purchaser for the purpose of perfecting such lien or security interest under the UCC. Any assignment of the interests of Purchaser in the Purchased Loans pursuant to any provision hereof shall also be deemed to be an assignment of any lien or security interest created hereby in the Purchased Loan Collateral.

(b)        From and after the Purchase Date, Seller shall not create or permit any security interest in Purchased Loan Collateral, except in favor of Purchaser or as may be directed by Purchaser and, if necessary, shall direct the filing of any termination statements on form UCC-3 and modify any previously executed loan or security agreement to eliminate any security interest granted in the Purchased Loan Collateral, including without limitation any security interest in such Purchased Loan Collateral as proceeds or as after-acquired property.

(c)        To the extent consistent with this Agreement, Seller and Purchaser shall take such actions as may be deemed reasonably necessary or appropriate such that, if this Agreement were deemed to create a lien upon or security interest in the Purchased Loan Collateral and all such reasonably necessary or appropriate actions had been taken, such lien or security interest would be deemed to be a perfected security interest of first priority under Applicable Law and will be maintained as such throughout the term of this Agreement, including, without limitation, the execution and delivery by Seller to Purchaser of all assignments, security agreements, financing statements, control agreements and other documents as Purchaser reasonably requests, in form and substance reasonably satisfactory to Purchaser and at Purchaser's cost.

Section 3.3        Purchaser Rights.

Seller acknowledges that, from and after the Purchase Date, because it has sold the Purchased Loans to Purchaser, Purchaser shall have all the rights associated with such Purchased Loans, including the right to take any action against any Obligor for non-payment subject to the provisions of any servicing agreement in connection therewith and in accordance with Applicable Law.

ARTICLE 4.

REPRESENTATION, WARRANTIES AND COVENANTS

Section 4.1        Seller Representations and Warranties.

Seller hereby represents and warrants as of the Effective Date and as of the Purchase Date that:

(a)        Seller (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) is in good standing with every Regulatory Authority having jurisdiction over its activities, except, in the case, where the failure to do so would not reasonably be expected to have a Material Adverse Effect with respect to Seller or the Purchased Loans.

(b)        Seller has all requisite limited liability company power and authority to own its properties, carry on its business as and where now being conducted and execute and deliver this Agreement, perform all of its obligations hereunder, and to carry out the transactions contemplated hereby.  This Agreement has been duly and validly authorized and executed and delivered by Seller and is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable Insolvency Laws.

(c)        Seller has, and has had, for the previous 12 months, all qualifications, regulatory permissions and/or licenses necessary for the origination of the Purchased Loans by Seller.

(d)     Neither the execution and delivery of this Agreement nor the consumption of the transactions contemplated by this Agreement nor compliance with its terms and conditions, conflict with, violate or result in the breach of, or constitute a default under or is prohibited by, or will result in the creation or imposition of any Lien on, the Purchased Loan Collateral (other than a Lien in favor of Purchaser).

(e)     Other than the Sale Order, no consent, approval, authorization, registration, filing or order of any court, Regulatory Authority or creditor is required for the execution, delivery and performance by Seller of, or compliance by Seller with, this Agreement, or the consumption of the sale of the Purchased Loans by Seller to Purchaser or other transactions contemplated hereby, or if any such consent, approval, authorization, registration, filing or order is required, Seller has obtained it or (if such requirement is not currently in effect) will have obtained it as of the Purchase Date.

(f)     The consummation of the transactions contemplated by this Agreement, the execution and delivery of this Agreement and compliance with the terms of this Agreement do not (i) conflict with, result in a breach of or constitute a default under, and are not prohibited by, Seller's Governing Documents or any Governmental Authorizations or (ii) except as would not reasonably be expected to have a Material Adverse Effect with respect to Seller or the Purchased Loans, taken as a whole, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, and are not prohibited by, any mortgage, indenture, deed of trust, loan or credit agreement or other agreement or instrument to which it is a party.

(g)     Seller has provided or made available to Purchaser or its advisor(s) true and accurate copies of the form Related Documents used by Seller with respect to each Purchased Loan as of the Purchase Date.

(h)     The execution, delivery and performance of this Agreement by Seller do not require compliance with any "bulk sales" laws or similar statutory provisions by Seller.

(i)     Other than Seller's Bankruptcy Case, there is no litigation or action at law or in equity pending, or to Seller's knowledge, threatened in writing, against Seller, and no proceeding or investigation of any kind is pending by any federal, state or local governmental or administrative body against Seller that (i) would reasonably be expected to have a Material Adverse Effect with respect to Seller, (ii) asserts the invalidity of this Agreement or any Purchased Loans, (iii) seeks to prevent the consummation of any of the transactions contemplated by this Agreement, or (iv) seeks any determination or ruling that would adversely affect the Purchased Loans.

Section 4.2     Purchaser Representations and Warranties.

As of the Effective Date and as of the Purchase Date, Purchaser hereby represents and warrants that:

(a)     Purchaser is duly formed, validly existing and in good standing under the laws of the jurisdiction of its organization and is in good standing with every regulatory body having jurisdiction over the activities of Purchaser, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect with respect to Purchaser.

(b)     Purchaser has all requisite power and authority to purchase and own the Purchased Loans, own its properties, carry on its business as and where now being conducted, execute

and deliver this Agreement, perform all its obligations hereunder, and to carry out the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Purchaser and is a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally or general equitable principles (whether considered in a proceeding in equity or at law).

(c)     Purchaser will not be rendered Insolvent by the consummation of the transactions contemplated hereby.

(d)     No license, permit, consent, approval, authorization, registration, filing or order of any court or governmental or Regulatory Authority is required for the execution, delivery and performance by Purchaser of, or compliance by Purchaser with, this Agreement, or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization, registration, filing or order is required, either Purchaser has obtained the same or will obtain it.

(e)     The consummation of the transactions contemplated by this Agreement, the execution and delivery of this Agreement and compliance with the terms of this Agreement shall not materially conflict with, result in a material breach of, constitute a default under or be prohibited by, Purchaser's charter or other agreement relating to its organization.

(f)     There is no litigation or action at law or in equity pending or, to the best of Purchaser's knowledge, threatened against Purchaser and no proceeding or investigation of any kind is pending or, to the best of Purchaser's knowledge, threatened in writing, by any federal, state or local governmental or administrative body against Purchaser that would reasonably be expected to have a Material Adverse Effect with respect to Purchaser.

(g)     The execution, delivery and performance of this Agreement by Purchaser does not violate Applicable Law, except to the extent such violation would not reasonably be expected to have a Material Adverse Effect with respect to Purchaser.

(h)     The Purchaser, its Affiliates, and their respective officers, directors, and employees are not Sanctioned Persons.

ARTICLE 5.

COVENANTS

Section 5.1     Confidentiality.

(a)     In connection with this Agreement, a Party (the "Recipient") may receive or have access to certain information of the other Party (the "Discloser") including, though not limited to, records, documents, proprietary information, technology, software, trade secrets, financial and business information, or data related to such other Party's products (including the discovery, invention, research, improvement, development, manufacture, or sale thereof), processes, or general business operations (including sales, costs, profits, pricing methods, organization, employee or customer lists and process), whether oral, written, or communicated via electronic media or otherwise disclosed or made available to a Party or to which a Party is given access pursuant to this Agreement by the other Party, and any information obtained through access to any information, assets or information systems (including

computers, networks, voice mail, etc.) that, if not otherwise described above, is of such a nature that a reasonable person would believe to be confidential (together, "Confidential Information").  Without limitation of the foregoing, and notwithstanding anything to the contrary set forth herein, (i) the terms of this Agreement and the other Program Agreements, and (ii) the identity of the Parties, and the identity of Purchaser, the Purchaser Related Parties, the Seller Related Parties, their direct or indirect Affiliates and their respective investment advisors, shall also be deemed to be "Confidential Information" and information that is expressly understood to be confidential.  Recipient and each Representative (as defined below) shall protect the disclosed Confidential Information in compliance with its own policies and procedures governing the use and control of confidential information, including, without limitation, policies with respect to conflicts of interest, and by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination, or publication of the Confidential Information as Recipient uses to protect its own confidential information of a like nature.  Recipient's obligations shall only extend to (i) information that is marked as confidential at the time of disclosure or (ii) information that is unmarked (e.g., orally, visually or tangibly disclosed) but which the Discloser informs the Recipient in writing that such information should be treated as confidential at the time of disclosure.  This Agreement imposes no obligation upon Recipient with respect to information that:  (1) was in Recipient's possession before receipt from Discloser (unless such information came into Recipient's possession subject to a duty of confidentiality under a separate, written confidentiality agreement, in which case such information shall be subject to the applicable terms and conditions thereof); (2) is or becomes available to and a matter of public knowledge through no violation of this Section 5.1(a) by Recipient; (3) is lawfully received by Recipient or any of its Affiliates or their respective Representatives from a third party that is not prohibited from disclosure of such Confidential Information by legal, contractual or fiduciary obligation; (4) is disclosed by Discloser to a third party without a duty of confidentiality on the third party; (5) is independently developed by Recipient or its Affiliates without reference to the Confidential Information; (6) is disclosed as required by Applicable Law, regulation, supervisory authority or by subpoena, order or request for information by judicial or governmental authority or other legal proceeding (including in connection with a regulatory examination of Purchaser or any of its Affiliates); provided, however, Recipient shall furnish only the portion of the Confidential Information which is legally required and will exercise its commercially reasonable efforts to assure that confidential treatment will be accorded the Confidential Information; or (7) is disclosed by Recipient with Discloser's prior written approval.  In addition to the foregoing, Purchaser covenants that it will not use, and will not permit any Affiliate to use, in violation of any Applicable Law, any material non-public information that has been provided to it by Seller in Purchaser's decision to invest in any securities issued by Seller, provided that the Solar Loans and the Purchased Loans shall not be considered securities for the purposes of this Section 5.1(a).  Recipient may disclose Confidential Information to (i) its Affiliates and its and its Affiliates' officers, directors, employees, trustees, members, partners, prospective purchasers or lenders in any Secondary Market Transaction, potential and existing funding sources (including, with respect to Purchaser, any potential or existing investor in, and Person acting as a trustee or service provider in connection with, asset-backed securities for which the Purchased Loans are included in the collateral or trust assets), advisors or representatives (including, without limitation, attorneys, accountants, insurers, rating agencies, consultants, bankers, financial advisors, custodians, servicers and backup servicers) (collectively, "Representatives") who need to have access to such Confidential Information.  Recipient shall be responsible for any breach of this Section 5.1 by any of its Representatives who have actually received Confidential Information.  Confidential Information shall include the terms and conditions of this Agreement and the other Program Agreements, except to the extent such terms and conditions are required to be disclosed pursuant to Applicable Law, including the Bankruptcy Code in connection with the Bankruptcy Case.

(b)     Solar Loan Files may include Confidential Information that also meets the definition of non-public personally identifiable information ("NPI") regarding an Obligor as defined by Title V of the Gramm-Leach-Bliley Act of 1999 and implementing regulations (collectively, the "GLB Act").  To the extent that Purchaser has access to NPI through Solar Loan Files or any other source, Purchaser agrees that notwithstanding any exception set forth in Section 5.1(a) above, such information will not be disclosed or made available to any third party, agent or employee for any reason whatsoever, other than with respect to: (i) Purchaser's Representatives on a "need to know" basis in order for Purchaser to perform its obligations under this Agreement and other agreements related to the Purchased Loans or Representatives under any Secondary Market Transaction, provided that such Representatives are subject to a confidentiality agreement which shall be consistent with and no less restrictive than the provisions of this Article 5; and (ii) as required by law (including in connection with a regulatory examination of Purchaser or any of its Affiliates) or as otherwise permitted by this Agreement or the GLB Act regarding "Privacy" of NPI, either during the term of this Agreement or after the termination of this Agreement, provided that, prior to any disclosure of NPI as required by Applicable Law, Purchaser shall, if permitted by Applicable Law, (A) not disclose any such information until it has notified Seller in writing of all actual or threatened legal compulsion of disclosure, and any actual legal obligation of disclosure promptly upon becoming so obligated, and (B) cooperate with Seller at Purchaser's expense to the fullest extent possible with all lawful efforts by Seller to resist or limit disclosure.  To the extent that Purchaser maintains or accesses any NPI, Purchaser shall comply with all Applicable Law regarding use, disclosure and safeguarding of any and all consumer information and will maintain a comprehensive written information security program, in compliance with Applicable Law, which shall include all necessary measures, including the establishment and maintenance of appropriate policies, procedures and technical, physical, and administrative safeguards, to (w) ensure the security and confidentiality of the NPI, (x) protect against any foreseeable threats or hazards to the security or integrity of NPI, (y) protect against unauthorized access to or use of such information, and (z) ensure appropriate disposal of NPI.  Each party shall be considered a "controller" of any personal data or NPI transferred under this Agreement, and nothing in this Agreement shall be construed to designate either party a "service provider," as those terms are defined by Applicable Laws related to privacy, data security, or the protection of personal data.

(c)     If a Party becomes aware of any unauthorized release or breach of NPI maintained by a Party ("Data Breach"), such Party agrees to immediately provide notice to the other Party of the same and shall specify the corrective action that was or will be taken.  The breached or releasing Party shall assess the nature and scope of any Data Breach and specifically identify the NPI that has or may have been improperly accessed, released or misused.  The breached or releasing Party shall take reasonable and appropriate steps to contain and control any Data Breach relating to the NPI and assist the other Party at the expense of the breached or releasing Party with all reasonably requested steps needed to notify Obligors of any such Data Breach.

(d)     Each Party agrees that, upon written request of the other Party, it will return or destroy all copies of Confidential Information provided by the other Party, without retaining any copies thereof, and destroy all copies of any analyses, compilations, studies or other documents prepared by it or for its use containing or reflecting any Confidential Information; provided, however, that each Party may retain such limited copies or materials containing Confidential Information of the other Party for customary document retention and audit purposes, as required by Applicable Law, and subject to the terms of this Agreement.

(e)     Neither Seller nor Purchaser shall make any public release of information regarding the matters contemplated by the Program Agreements without the prior written consent of the

other Party or as required by law, including, without limitation, as required by federal securities laws and the rules of any stock exchange.

Section 5.2    <u>No Use of Non-Public Obligor Data</u>.

In the course of purchasing and holding Purchased Loans, Purchaser may have access to certain information concerning Obligors.  Such information could include any and all items included in a Solar Loan File and all information included in a listing for a Solar Loan (the "<u>Obligor Data</u>").  Certain of the Obligor Data is published in connection with a Solar Loan, and other information, included in certain documents in the Solar Loan File, is not publicly disclosed and may constitute NPI (collectively, "<u>Non-Public Obligor Data</u>").  Purchaser shall not utilize Non-Public Obligor Data for any purpose other than in connection with the transactions contemplated under this Agreement.

Section 5.3    <u>Access to Records</u>.

Seller understands and acknowledges that Purchaser or certain of Purchaser's Affiliates are subject to examination by Regulatory Authorities with authority over Purchaser or Purchaser's Affiliates.  Seller agrees to use commercially reasonable efforts to cooperate with any legitimate examination or inquiry by any such government agencies having proper regulatory authority over Purchaser or Purchaser's Affiliates, at Purchaser's sole cost and expense.  Seller further acknowledges that certain of Purchaser's Affiliates, as regulated financial institutions, may be required to engage in ongoing oversight of its relationship with Seller, including reviewing Seller's compliance with Applicable Law.  With respect to audits and examinations related to this Agreement to be performed on Seller by a government agency with authority over Purchaser or certain of Purchaser's Affiliates, Purchaser shall provide Seller with as much prior written notice as reasonably practicable, and the costs of Seller incurred with any such audit or examination shall be at Purchaser's sole cost and expense.

Section 5.4    <u>Tax Matters</u>.

(a)    Any sales, use, purchase, transfer, recording, filing, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the transactions contemplated by this Agreement (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser.  Purchaser will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.

(b)    For U.S. federal and applicable state and local income Tax purposes, the Purchase Price shall be allocated among the Purchased Loans consistent with Section 1060 of the Code and by treating the book value on the books and records of the Seller of each Purchased Loan as such Purchased Loan's fair market value for purposes of such allocation (the "<u>Purchase Price Allocation</u>").  The parties hereto shall act for all Tax purposes, including filing Tax returns, consistently with the Purchase Price Allocation unless otherwise required by applicable law.

(c)    After the effectiveness of this Agreement, with respect to the Purchased Loans, none of Purchaser or its Affiliates shall take any action (including making any Tax election) with respect to a taxable period (or portion thereof) ending on or before the date of the effectiveness of this Agreement to the extent that such action is reasonably likely to result in an additional Tax liability for Seller.

ARTICLE 6.

BANKRUPTCY COURT MATTERS

Section 6.1     Bankruptcy Court Matters.

Purchaser and Seller each agree that they will promptly take such actions as are reasonably necessary to obtain entry of the Sale Order approving this Agreement and authorizing the Purchase, including, in the case of Purchaser, furnishing affidavits or other documents or information for filing with the Bankruptcy Court to, among other things, provide necessary assurances of performance by Purchasers under this Agreement and demonstrate that Purchaser is a "good-faith" purchaser under Section 363(m) of the Bankruptcy Code.  Purchaser shall consult with Seller prior to filing, joining in, or otherwise supporting in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Loans hereunder.  In the event the entry of the Sale Order is appealed, Seller and Purchaser shall use their respective commercially reasonable efforts to pursue or defend such appeal, as the case may be.

Section 6.2     Notice of Purchase Required by Bankruptcy Court.

The Parties acknowledge that under the Bankruptcy Code the sale of Purchased Loans is subject to entry of and, to the extent entered, the terms of an Order of the Bankruptcy Court approving the sale of the Purchased Loans.  The Parties acknowledge that to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Purchased Loans.  Nothing in this Agreement shall require Seller or its respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 6.3     No Other Agreements.

Seller represents that, as of the date of this Agreement, Seller is not a party to or bound by any agreement with respect to any sale, transfer or other disposition of any of the Purchased Loans in a transaction or series of transactions with one or more Persons other than Purchaser.

Section 6.4     Fiduciary Obligations.

Nothing in this Agreement, or any document related to the transactions contemplated herein and the Sale Order, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.  For the avoidance of doubt, until the effectiveness of this Agreement, Sellers retain the right to pursue any Alternative Transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

ARTICLE 7.

MISCELLANEOUS

Section 7.1        Notices.

All notices and other communications hereunder will be in writing and will be deemed to have been duly given when delivered in person, by facsimile or email with answer back, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties as follows:

if to Purchaser:

GoodFinch SPV WL IV (SPWR), LLC
150 California Street
Suite 1000
San Francisco, CA 94111
Attention: Manager
E-mail Address: notice@goodfinch.com

if to Seller:

Chief Transformation Officer
c/o Alvarez & Marsal North America, LLC
6060 Center Drive, Suite 950
Los Angeles, CA 90045
Attention:        Matthew Henry
Email:            mhenry@alvarezandmarsal.com

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attn:    Adam D. Larson, P.C.; Claire Campbell, P.C.
Email:   adam.larson@kirkland.com; claire.campbell@kirkland.com

or to such other address as the Party to whom notice is given may have previously furnished to the others in writing in the manner set forth above.  Any notice or communication delivered in person will be deemed effective upon delivery.  Any notice or communication sent by facsimile, email, or air courier will be deemed effective on the first (1st) Business Day at the place at which such notice or communication is received following the day on which such notice or communication was sent.  Any notice or communication sent by registered or certified mail will be deemed effective on the third (3rd) Business Day at the place from which such notice or communication was mailed following the day on which such notice or communication was mailed.

Section 7.2     Amendment; Waiver.

Except as otherwise expressly provided herein, Purchaser and Seller may amend this Agreement, from time to time, in a writing signed by duly authorized representatives of Seller and Purchaser.  No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the Party against whom such waiver or modification is sought to be enforced.

Section 7.3     Cumulative Rights.

All rights and remedies of the Parties hereto under this Agreement shall, except as otherwise specifically provided herein, be cumulative and non-exclusive of any rights or remedies which they may have under any other agreement or instrument, by operation of law, or otherwise.

Section 7.4     Assignment.

The rights and obligations of either Party under this Agreement shall not be assigned without the prior written consent of the other Party, and any such assignment without the prior written consent of the other Party shall be null and void.  Notwithstanding the foregoing, this Section 7.4 shall not in any way prohibit or limit the ability of Purchaser (or any assignee or subsequent purchaser of Purchased Loans) to, or require Seller's consent to, directly or indirectly assign, pledge, hypothecate or otherwise dispose of Purchased Loans or its other rights under this Agreement relating to the Purchased Loans, subject to any applicable limitations thereon described in this Agreement or the other Program Agreements.

Section 7.5     [reserved]

Section 7.6     Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD OTHERWISE DIRECT THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.

(b)     The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Purchase and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 7.1; provided, however, that if the Bankruptcy Case has closed, each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the other Party or any of its Representatives in any way relating to this Agreement or the Purchase, in any forum other than the courts of the State of New York sitting in the Borough of Manhattan, New York, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such New York state court or, to the fullest extent permitted by Applicable Law, in such federal court. Each of the Parties agrees that a final judgment in any such action, litigation or proceeding

shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE AND AGREES THAT ANY COURT PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PURCHASE (AND AGREES THAT ANY SUCH DISPUTE SHALL BE DECIDED BY A JUDGE SITTING WITHOUT A JURY).

Section 7.7     Limitation of Liability.

EXCEPT FOR THE CONFIDENTIALITY AND DATA SECURITY OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS RESPECTIVE AFFILIATES, BENEFICIARIES, ASSIGNEES OR SUCCESSORS (BY ASSIGNMENT OR OTHERWISE)  BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON FOR ANY LOST PROFITS, COSTS OF COVER, OR OTHER SPECIAL DAMAGES, OR ANY PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES, UNDER THIS AGREEMENT INCURRED OR CLAIMED BY ANY PARTY OR PERSON (OR SUCH PARTY OR ENTITY'S OFFICERS, DIRECTORS, STOCKHOLDERS, MEMBERS OR OWNERS), HOWEVER CAUSED, ON ANY THEORY OF LIABILITY.

Section 7.8     Successors and Assigns.

Subject to Section 7.4, this Agreement shall bind and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

Section 7.9     Severability.

Any part, provision, representation or warranty of this Agreement that is prohibited or not fully enforceable in any jurisdiction, will be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing either Party's rights hereunder or under the remaining provisions of this Agreement in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable in any respect any such provision in any other jurisdiction.

Section 7.10     Entire Agreement.

As of the Effective Date, Seller and Purchaser hereby acknowledge and agree that this Agreement, together with the exhibits hereto, represents the complete and entire agreement between the Parties, and shall supersede all prior written or oral statements, agreements or understandings between the Parties relating to the subject matter of this Agreement.

Section 7.11     No Joint Venture or Partnership.

Each Party (including any of its respective permitted successors and assignees) acknowledges and agrees that such Party will not hold itself out as an agent, partner or co-venturer of the other Party and that this Agreement and the transactions contemplated hereby including the payment of any fees, any expense reimbursement or any referral fee are not intended and do not create an agency, partnership, joint venture or any other similar type of relationship between or among the Parties.

Section 7.12     Further Assurances.

Each Party, upon the reasonable written request of the other Party, shall execute and deliver to such other Party any reasonably necessary or appropriate additional documents, instruments or agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement or the consummation of the transactions contemplated hereunder.  Each Party also agrees to perform its respective obligations under this Agreement in material compliance with Applicable Law and to reasonably cooperate in good faith with the other in resolving compliance with Applicable Law issues.

Section 7.13      Exhibits and Schedules.

The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 7.14      Costs.

Each of Purchaser and Seller shall bear its own costs and expenses in connection with this Agreement, including without limitation any commissions, fees, costs, and expenses, including those incurred in relation to due diligence performed or legal services provided in connection with this Agreement.  If any claim, legal action or similar proceeding is brought for the enforcement of this Agreement or because of a dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing Party, as and to the extent determined by the applicable court or judicial body, shall be entitled to recover reasonable attorneys' fees and other costs incurred in that claim, action or proceeding, in addition to any other relief to which such Party may be entitled.  The successful or prevailing Party, as used herein, shall mean the Party that substantially secures or receives the relief sought, whether by settlement, dismissal, summary judgment, judgment or otherwise, or the Party that most nearly prevails, even if such Party does not prevail in all matters.

Section 7.15      Counterparts; Imaged Copies; Electronic Execution.

This Agreement may be executed in multiple counterparts (including electronic PDF), each of which shall be an original and all of which taken together shall constitute but one and the same agreement.  The parties agree to electronic contracting and signatures with respect to this Agreement. Delivery of an electronic signature to, or a signed copy of, this Agreement by facsimile, email or other electronic transmission (including, without limitation, Adobe "fill and sign" and DOCUSIGN) shall be fully binding on the parties to the same extent as the delivery of the signed originals and shall be admissible into evidence for all purposes.  The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Electronic Signatures in Global and National Commerce Act of 2000, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  Notwithstanding the foregoing, if any party shall request manually signed counterpart signatures to this Agreement, each of the other parties hereby agrees to provide such manually signed signature pages as soon as commercially reasonable.

Section 7.16      No Petition.

Notwithstanding any prior termination of this Agreement, Seller shall not, as to Purchaser (a) take any action to, or give or make any consent, instruction, vote, claim, approval, filing or notice to

commence (or oppose the dismissal of) any case, proceeding or other action under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization, rehabilitation, arrangement, adjustment, winding-up, liquidation, sequestration, dissolution, composition, or other relief with respect to Purchaser or any of the assets or debts of Purchaser (a "Purchaser Bankruptcy Case"), (b) join with, cause, solicit or instruct any Person to commence (or oppose the dismissal of) such a Purchaser Bankruptcy Case, (c) move, directly or indirectly, for appointment of a receiver, liquidator, assignee, trustee, custodian, examiner or sequestrator or similar official with respect to Purchaser or any of the assets or debts of Purchaser, or (d) seek any order relating to the winding up, liquidation or dissolution of Purchaser or a general assignment for the benefit of Purchaser's creditors.

Section 7.17    Force Majeure.

If any Party anticipates being unable or is rendered unable, wholly or in part, by an extreme and unexpected force outside the control of such Party (including, but not limited to, acts of God, legislative enactments, strikes, lock-outs, riots, acts of war, epidemics, fire, communication line or power failures, earthquakes or other disasters) to carry out its obligations under this Agreement, that Party shall give to the other Party in a commercially reasonable amount of time written notice to that effect, the expected duration of the inability to perform and assurances that all available means will be employed to continue and/or restore performance.  Upon receipt of the written notice, the affected obligations of the Party giving the notice shall be suspended so long as such Party is reasonably unable to so perform and such Party shall have no liability to the other for the failure to perform any suspended obligation during the period of suspension; however, the other Party may at its option terminate this Agreement.

Section 7.18    No Recourse.

Notwithstanding anything that may be expressed or implied in this Agreement, each Party agrees, on behalf of itself and its Affiliates, that this Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may only be brought against, the entities that are expressly named as Parties hereto.  Except to the extent a Purchaser Related Party or Seller Related Party is a named party to this Agreement or any other Program Agreement, no Purchaser Related Party shall have any liability to Seller or any of its Affiliates and no Seller Related Party shall have any liability to Purchaser or any of its Affiliates relating to or arising out of the Program Agreements, or in respect of any other document or theory of law or equity or in respect of any oral representations made or alleged to be made in connection herewith or therewith, whether at law or equity, in contract, in tort or otherwise.

Section 7.19    No Public Announcement.

Subject to compliance with the Bankruptcy Code in connection with the Bankruptcy Case, neither Purchaser nor Seller shall, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by law, in which case the other Party shall be advised and the Parties shall use their reasonable efforts to cause a mutually agreeable release or announcement to be issued.

Section 7.20    Third-Party Beneficiaries.

Seller and Purchaser hereby acknowledge and agree that the Underlying Trust, Borrower, Depositor, Trustee and Administrative Agent (as such terms are defined in the RIC Warehouse Facility) are

each a third-party beneficiary of this Agreement, and in entering into the RIC Warehouse Facility, the Administrative Agent is relying on its rights as a third-party beneficiary of this Agreement.  All rights provided to the Administrative Agent hereunder (except for those that by their teams expressly survive the termination of this Agreement) shall revert to Purchaser upon termination of the RIC Warehouse Facility.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have caused to be duly authorized, executed and delivered, as of the date first above written, this LOAN SALE AND PURCHASE AGREEMENT.

PURCHASER:

GOODFINCH SPV WL IV (SPWR), LLC

By: _____

Name: _____

Title: _____

SELLER:

SUNPOWER CAPITAL SERVICES, LLC


By: _____
Name:
Title:

EXHIBIT A

FORM OF PURCHASE CONFIRMATION

PURCHASE CONFIRMATION

*Via E-mail*

GoodFinch SPV WL IV (SPWR), LLC
Attention: Andrew Mills
150 California Street, Suite 1000
San Francisco, CA 94111
Email: andrew@goodfinch.com

This Purchase Confirmation (this "Confirmation"), dated as of August [__], 2024 (the "Purchase Date"), provides for the sale by SunPower Capital Services, LLC (the "Seller") to GoodFinch SPV WL IV (SPWR), LLC (the "Purchaser"), and the purchase by Purchaser from Seller, of the Solar Loans described on the Loan Schedule attached as Schedule 1 hereto (the "Related Purchased Loans") pursuant to the terms of the Loan Sale and Purchase Agreement (the "Loan Purchase Agreement"), dated as of the date hereof by and between Purchaser and Seller. Capitalized terms that are used herein but are not defined herein shall have the respective meanings set forth in the Loan Purchase Agreement.

Seller hereby sells, conveys, assigns and transfers to Purchaser without recourse and on a servicing released basis, all right, title and interest of the Seller in and to each of the Related Purchased Loans, including all collections received on and after the Purchase Date, all proceeds of the foregoing and all documents maintained as part of the related Solar Loan Files.

Seller confirms that the conditions precedent set forth in Section 2.2 of the Loan Purchase Agreement have been satisfied as of the date hereof, unless waived in writing by Purchaser.

Seller confirms that all representations and warranties applicable to the Related Purchased Loans set forth in Section 4.1 of the Loan Purchase Agreement are correct in all material respects, except to the extent such failure of such representations and warranties to be so true and correct, when taken as a whole, would not have a Material Adverse Effect, unless otherwise waived in writing by Purchaser.[1]

Seller has delivered to Purchaser's Designated E-Vault all Vaulted Documents and to the Purchaser (or its designee) the other Required Loan Documents and any other Related Documents with respect to each Related Purchased Loan required to be delivered under the Loan Purchase Agreement.

Purchaser shall make the payments required to be made to Seller under the Loan Purchase Agreement for the Related Purchased Loans in accordance with the instructions specified in writing by Seller.

Summary data for the Related Purchased Loans sold pursuant to this Confirmation:

---

[1]  Any waived items to be detailed further.

[Unpaid Principal Balance:          $_____

                                    $_____

Accrued Interest & Fees:            $_____

Purchase Date Purchase Price        $_____]
Payment Amount:

[*Remainder of page intentionally left black; Signature page follows*]

In WITNESS WHEREOF, Seller has duly executed this Confirmation as of the Purchase Date referred to above.

SUNPOWER CAPITAL SERVICES, LLC
as Seller

By:_____

Name:
Its:

SCHEDULE 1 TO PURCHASE CONFIRMATION

<u>LOAN SCHEDULE</u>

[*See attached*]

EXHIBIT B

FORMS OF OBLIGOR LOAN AGREEMENT


[LIST OF FORMS TO BE COMPLETED]

SCHEDULE 1 TO LOAN SALE AND PURCHASE AGREEMENT

LOAN SCHEDULE

[*See attached*]

**Exhibit 3**

**Membership Interest Purchase and Transfer Agreement**

**MEMBERSHIP INTEREST PURCHASE
AND TRANSFER AGREEMENT**

(SPWR RIC Depositor 2022-1, LLC)


between


SUNPOWER CAPITAL SERVICES, LLC,
as Seller,


and


GOODFINCH SPV WL IV (SPWR), LLC,
as a Purchaser,

and

SOLAR SECURITIZATION MASTER FUND II, LP,
as a Purchaser




Dated as of August [●], 2024

## TABLE OF CONTENTS

**Page**

**SECTION 1** INTERPRETATION ........................................................................... 3

**SECTION 2** PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS ............. 7

**SECTION 3** REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 8

**SECTION 4** REPRESENTATIONS AND WARRANTIES OF PURCHASERS .................... 11

**SECTION 5** CERTAIN MUTUAL COVENANTS .................................................... 12

**SECTION 6** BANKRUPTCY COURT MATTERS .................................................. 13

**SECTION 7** CLOSING ................................................................................ 14

**SECTION 8** TAXES ................................................................................... 15

**SECTION 9** MISCELLANEOUS ..................................................................... 17

**EXHIBIT A** – Form of Assignment and Assumption Agreement

**EXHIBIT B** – Transaction Documents

**EXHIBIT C** – Other Closing Documents

**EXHIBIT D** – Purchase Price Allocation

MEMBERSHIP INTEREST PURCHASE
AND TRANSFER AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AND TRANSFER AGREEMENT (as amended, amended and restated, modified, or supplemented from time to time, this "Agreement") is made as of this [●] day of August, 2024, by and among GoodFinch SPV WL IV (SPWR), LLC, a Delaware limited liability company ("GF SPV WL IV"), Solar Securitization Master Fund II, LP, a Delaware limited partnership ("SSMFII" and, together with GF SPV WL IV, "Purchasers" and each individually, a "Purchaser"), and SunPower Capital Services, LLC, a Delaware limited liability company ("Seller," and together with Purchasers, the "Parties," and each individually, a "Party").

## RECITALS

WHEREAS, Seller owns beneficially and of record all of the issued and outstanding limited liability company membership interests (the "Company Interests") of SPWR RIC Depositor 2022-1, LLC, a Delaware limited liability company and wholly-owned subsidiary of Seller (the "Company");

on August 5, 2024 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which is being administered jointly with the chapter 11 cases of certain of Seller's Affiliates (such Affiliates, together with the Seller, the "Debtors") under Case No. 24-11649 (CTG) (collectively, the "Bankruptcy Cases" and with respect to the Seller, the "Bankruptcy Case");

WHEREAS, on August 6, 2024, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of TCU Solar Loans and RIC Depositor Membership Interests Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* (the "Sale Motion");

WHEREAS, pursuant to the Sale Motion, on August [●], 2024, the Bankruptcy Court entered an order approving the terms of this Agreement and the Transaction Documents (as defined herein) and authorizing and directing Seller to consummate the transactions contemplated by this Agreement (the "Sale Order");

WHEREAS, in accordance with the Sale Order, Seller desires to sell, convey, transfer, assign and deliver to Purchasers, and Purchasers desire to purchase from Seller, all of the Company Interests, subject to the terms and conditions set forth herein and in the Sale Order; and

WHEREAS, the Company Interests shall be purchased by Purchasers pursuant to the Sale Order, free and clear of all Encumbrances (as defined herein), all in the manner and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, promises and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, hereby agree as follows:

## SECTION 1
## INTERPRETATION

1.1    <u>Definitions</u>.  Whenever used in this Agreement, the following words and phrases shall have the respective meanings ascribed to them as follows.

"<u>Action</u>" means any claim, action, charge, complaint, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"<u>Affiliate</u>" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Alternative Transaction</u>" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, of stock or other equity interests in the Company or its Subsidiaries or their respective assets, in a transaction or series of transactions with one or more Persons other than Purchasers.

"<u>Assignment and Assumption Agreement</u>" means the assignment and assumption agreement providing for the transfer of the Company Interests by Seller to Purchasers, in the form attached as <u>Exhibit A</u> hereto, to be entered into by Purchasers and Seller on the Closing Date.

"<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Books and Records</u>" means all documents, files, books and records that are used, held for use or intended to be used in, or that arise out of, the Company Group, including correspondence (including with any Governmental Authority), copies of any applicable Tax Returns and related Tax records, books of account, ledgers, financial and accounting records, financial statements and strategic plans.

"<u>Borrower</u>" means SPWR RIC Borrower 2022-1, LLC, a Delaware limited liability company, which is a direct wholly-owned Subsidiary of the Company and is the borrower under the RIC Warehouse Facility.

"<u>Claim</u>" means (a) a "claim" as defined in Section 101(5) of the Bankruptcy Code, or (b) any "adverse claims" as defined in Section 8-102 of the Uniform Commercial Code, offset rights, setoff rights, recoupment rights or defenses.

"Closing" has the meaning set forth in Section 7.1.

"Closing Date" has the meaning set forth in Section 7.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Recitals.

"Company Group" means, collectively, the Company, the Borrower and the Trust.

"Company Interests" has the meaning set forth in the Recitals.

"Company LLCA" means the Company's Limited Liability Company Agreement, dated as of March 7, 2020.

"Contracts" means any and all notes, bonds, mortgages, indentures, deeds, commitments, agreements, contracts, leases, powers of attorney, purchase orders, letters of credit, settlement agreements, franchise agreements, undertakings, covenants not to compete, employment agreements, licenses, instruments, obligations, understandings, policies, purchase and sales orders, quotations and other executory commitments to which the Company or any of its Subsidiaries is a party or of which the Company or any of its Subsidiaries is a beneficiary, or by which the Company's or any of its Subsidiaries' assets or properties are bound or subject, whether oral or written, express or implied.

"Debtors" has the meaning set forth in the Recitals.

"Encumbrances" means any Lien, Liability, collateral assignment, right of setoff, escrow, encumbrance, option, right of first refusal, transfer restriction, lease, indenture, security agreement, easement, covenant, condition, restriction, servitude, proxy, voting trust or agreement or any other similar agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, known or unknown.

"Equity Securities" means (a) any common, preferred, or other capital stock, limited liability company interest, membership interest, partnership interest, trust beneficial interest or similar security, (b) any warrants, options, or other rights to, directly or indirectly, acquire any security described in clause (a), (c) any other security containing equity features or profit participation features, (d) any security or instrument convertible or exchangeable, directly or indirectly, with or without consideration, into or for any security described in clauses (a) through (c) above or another similar security (including convertible notes), (e) any security carrying any warrant or right to subscribe for or purchase any security described in clauses (a) through (d) above or any similar security, and (f) any equity appreciation, phantom equity or similar rights valued in whole or in part in reference to the Company or its Subsidiaries.

"GF SPV WL IV" has the meaning set forth in the Preamble.

"Governing Documents" means (a) with respect to any corporation, its articles or certificate of incorporation and bylaws, (b) with respect to any limited liability company, its articles or certificate of organization or formation and its operating agreement or limited liability company

agreement or documents of similar substance, (c) with respect to any limited partnership, its certificate of limited partnership and partnership agreement or governing or organizational documents of similar substance and (d) with respect to any trust or other entity, governing or organizational documents of similar substance to any of the foregoing.

"Governmental Authority" means any federal, state, territorial, local, municipal, foreign, international or multinational government or political subdivision thereof, or any authority, agency or commission of such government or political subdivision, entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority or power, any court, tribunal, mediator, arbitrator or arbitral body or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law).

"Laws" means any statute, law (including common, statutory, civil, criminal, domestic and foreign law), ordinance, regulation, rule, code (including competition law or regulation, statutory instruments, guidance notes, circulars, directives, decisions, rules and regulations), Order, legislation, constitution, treaty, convention, judgment, decree, or other requirement or rule of law of any Governmental Authority.

"Liability" means any unsatisfied debt, Claim, liability, obligation, assessment, Tax, cost, expense, loss, expenditure, charge, fee, penalty, fine, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Liens" means any mortgage, hypothecation, deed of trust, pledge, lien, security interest, conditional or installment sale agreement or other title retention agreement, exaction, imposition, levy, charge, assessment, or other Claims of third parties of any kind or nature, whether imposed by Law, Contract or otherwise, including, but not limited to, the Statutory Liens.

"Material Adverse Effect" means any result, change, event, fact, development, circumstance or occurrence that (a) would be reasonably expected to have, a material adverse effect on the business, assets, results of operations or financial condition of the Company and its Subsidiaries, individually or taken as a whole; or (b) results in Seller being unable to convey to Purchasers the Company Interests.

"Order" means any preliminary or permanent injunction or other order or decree of a Governmental Authority of competent jurisdiction.

"Parties" has the meaning set forth in the Preamble.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Petition Date" has the meaning set forth in the Recitals.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date.

"Purchase Price" has the meaning set forth in Section 2.2.

"Purchasers(s)" has the meaning set forth in the Preamble.

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents and advisors of such Person.

"RIC Warehouse Facility" means the non-recourse loan made under a Loan and Security Agreement, dated as of June 30, 2022, among the Borrower, the lenders party thereto, Atlas Securitized Products Holdings, L.P., as Administrative Agent, and Computershare Trust Company, National Association, as Paying Agent, as amended by that certain First Amendment dated as of April 14, 2023, that certain Second Amendment dated as of June 29, 2023, that certain Third Amendment dated as of October 17, 2023, that certain Fourth Amendment dated as of December 22, 2023, that certain Fifth Amendment dated as of February 14, 2024, that certain Waiver dated as of April 26, 2024 and that certain Amendment and Waiver dated as of June 30, 2024.

"Sale Motion" has the meaning set forth in the Recitals.

"Sale Order" has the meaning set forth in the Recitals.

"Schedules" means the disclosure schedules prepared by Seller and attached to and made a part of this Agreement.

"Securities Act" has the meaning set forth in Section 4.4.

"Seller" has the meaning set forth in the Preamble.

"Seller's Knowledge" or any other similar knowledge qualification with respect to Seller, means (a) the actual knowledge of [●], and (b) the knowledge that any such person would have based upon a reasonable due inquiry.

"SSMFII" has the meaning set forth in the Preamble.

"Statutory Liens" means any and all statutory Liens (and related Liabilities), including Tax, artisan's, carriers', warehousemen's, materialmen's and mechanics' Liens.

"Straddle Period" any Tax period that begins on or before the Closing Date and ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any other Person of which at least 50% of (a) the total Equity Securities or (b) the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled,

directly or indirectly, by the first Person or one or more of the other Subsidiaries of such first Person or a combination thereof.

"Tax" or "Taxes" means all federal, state, local and foreign taxes, charges, fees, imposts, levies or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, stamp, withholding, social security, unemployment, real property, personal property, alternative or add on minimum, estimated or other taxes, charges, fees, imposts, levies or other assessments, including unclaimed property and escheat payments, and also including any interest, penalties or additions thereto, whether disputed or not.

"Tax Return" means any report, return, information return, filing, claim for refund or other information, including any schedules or attachments thereto, and any amendments to any of the foregoing supplied or required to be supplied to a Taxing Authority in connection with Taxes.

"Taxing Authority" means any Governmental Authority exercising Tax regulatory authority.

"Transaction Documents" means, collectively, this Agreement and the other Contracts, documents and instruments identified on Exhibit B hereto, all of which shall be in form and substance satisfactory to Purchasers.

"Transactions" mean the transactions contemplated by this Agreement, the other Transaction Documents and the Sale Order.

"Transfer Tax" shall mean any and all transfer, documentary, excise, sales, use, value added, stamp, duty, registration, filing, real property transfer, recording, securities transaction or other similar Taxes and fees (including penalties and interest) if any, arising out of or in connection with the Transactions, including the sale of the Company Interests by Seller pursuant to this Agreement.

"Trust" means SPWR RIC Borrower 2022-1 Trust, a [Delaware] trust the sole beneficiary of which is the Borrower.

## SECTION 2
## PURCHASE, SALE AND ASSIGNMENT OF PURCHASED ASSETS

2.1    Sale of Company Interests.  Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, Seller hereby sells, conveys, transfers, assigns and delivers to each Purchaser, and each Purchaser hereby purchases and assumes from Seller, all of Seller's right, title and interest in, fifty percent (50%) the Company Interests (such that, collectively, Purchasers will purchase and assume from Seller 100% of the Company Interests).

2.2    Purchase Price.  The aggregate consideration provided by Purchasers for the Company Interests (the "Purchase Price") is equal to (a) cash in the aggregate amount of Five Hundred Thousand Dollars ($500,000), Two Hundred Fifty Thousand Dollars ($250,000) of which shall be paid by GF SPV WL IV and Two Hundred Fifty Thousand Dollars ($250,000) of which shall be paid by SSMFII and (b) the taking of the Company Interests subject to the outstanding

principal amount of the RIC Warehouse Facility in the amount of $[53,524,187], which shall remain a non-recourse obligation of Borrower and a Lien on all of the assets of Borrower that are subject to the pledge agreement relating to the RIC Warehouse Facility.

2.3    <u>Free and Clear</u>.  Seller shall distribute or otherwise apply <u>clause (a)</u> of the Purchase Price at the Closing as needed to permit the sale of the Company Interests to Purchasers free and clear of all Encumbrances other than restrictions on transfer pursuant to applicable securities Laws.

2.4    <u>Withholding</u>.  Purchasers will be entitled to deduct and withhold from any amount payable pursuant to this Agreement (including payments of the Purchase Price) such amounts as Purchasers (or any Affiliate thereof) shall reasonably determine is required to be deducted and withheld with respect to the making of such payment under the Code or any other provision of applicable Tax Law.  If Purchasers reasonably determine that they are required to withhold or deduct any amount they shall notify Seller and provide the basis for such deduction and withholding to Seller in writing at least five (5) days prior to making any such deduction and withholding and shall reasonably cooperate with Seller to mitigate such withholding or deduction.  To the extent that amounts are so withheld by Purchasers, such withheld amounts will be remitted by Purchasers to the applicable Governmental Authority and treated for all purposes of this Agreement as having been paid to Seller.  Notwithstanding the foregoing, Purchasers agree that no withholding shall be required if Seller (or its regarded owner) delivers a duly executed IRS Form W-9 on or prior to the Closing Date that shows Seller (or its regarded owner) is not subject to backup withholding tax.

**SECTION 3**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchasers as follows:

3.1    <u>Organization</u>.  Each of Seller and the Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has full limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted.  The Company is duly qualified or licensed to do business, and is in good standing, in each jurisdiction where the character of its properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified or licensed and in good standing would not reasonably be expected to have a Material Adverse Effect.  Seller has made available to Purchaser accurate and complete copies of the Governing Documents of the Company, as currently in effect.

3.2    <u>Ownership of Company Interests</u>.  Seller is the sole legal, beneficial, record, and equitable owner of the Company Interests, free and clear of any Encumbrances other than restrictions on transfer pursuant to applicable securities Laws.  The Company Interests were issued in compliance with applicable Laws and were not issued in violation of the Company LLCA or any other Governing Documents of the Company or any other Contract to which Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any Person.  There are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Company Interests.

3.3    <u>Authorization</u>.    Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance by Seller of this Agreement and such other Transaction Documents and the consummation of the Transactions have been duly authorized by all necessary limited liability company action on the part of Seller. This Agreement and the Transaction Documents have been duly executed and delivered by Seller and, assuming the due and valid authorization, execution and delivery by Purchasers of this Agreement and the Transaction Documents, constitute valid, legal and binding agreements of each Purchaser, enforceable against each Purchaser in accordance with their respective terms (except as may be limited by the exercise of judicial or administrative discretion in accordance with general equitable principles, particularly as to the availability of the remedy of specific performance or other injunctive relief).

3.4    <u>Non-Contravention</u>. Neither the execution and delivery by Seller of this Agreement nor the other Transaction Documents to which it is or will be a party, nor the consummation by Seller of the Transactions (a) conflicts with any provision of the Governing Documents of Seller, or (b) violates in any material respect any Law to which Seller, the Company or its Subsidiaries is subject, except for such violations as would not have a Material Adverse Effect.

3.5    <u>Subsidiaries</u>.

(a)    The Borrower is a direct Subsidiary of the Company and the Trust is direct Subsidiary of the Borrower and an indirect Subsidiary of the Company. Except for the Borrower and the Trust, the Company does not have any other direct or indirect Subsidiaries. Each of the Company's Subsidiaries is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Each of the Company's Subsidiaries has all requisite power and authority to own, lease and operate its material properties and to carry on its business as it is now being conducted. Each of the Company's Subsidiaries is duly qualified or licensed to do business, and is in good standing, in each jurisdiction where the character of its properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified or licensed and in good standing would not reasonably be expected to have a Material Adverse Effect. Seller has made available to Purchaser accurate and complete copies of the Governing Documents of each of the Company's Subsidiaries, as currently in effect.

(b)    All of the outstanding Equity Securities of each of the Company's Subsidiaries are owned by the Company, directly or indirectly, free and clear of any Lien, other than Liens granted in connection with the RIC Warehouse Facility and restrictions on transfer pursuant to U.S. securities Laws. All Equity Securities of the Company's Subsidiaries have been duly authorized and validly issued and are fully paid and non-assessable. None of the Equity Securities of the Company's Subsidiaries were issued in violation of any Contract to which any such Subsidiary is a party or any such Subsidiary's Governing Documents or was issued, sold, transferred or otherwise disposed of in violation of any preemptive right, right of first offer, right of first refusal or similar rights of any Person. Each such Equity Security of the Company's Subsidiaries was sold in compliance with all Laws and has been exempt from registration pursuant to the registration

provisions of applicable United States federal or state securities Laws, and no such Equity Securities were registered under any such act or Laws.

3.6    <u>Compliance with Law and Orders.</u>  The Company and each of its Subsidiaries is in compliance and has complied during the last 12 months in all material respects with all applicable Laws.  The Company and each of its Subsidiaries has implemented and maintain relevant policies and procedures in accordance with any requirements of any Governmental Authority and good industry practice designed to ensure their compliance with Law. There are no outstanding Orders or unsatisfied judgments, settlements, penalties or awards against or affecting the Company and any of its Subsidiaries, any of their properties or assets or any managers, officers or employees (in his or her capacity as such).  None of the Company, any of its Subsidiaries and Seller has received any notice, and to Seller's Knowledge no notice has been issued, from any Governmental Authority or other Person of any violation or alleged violation by any the Company, any of its Subsidiaries or any of their respective Representatives (relating to the business of the Company Group) of any Laws.

3.7    <u>Absence of Certain Changes</u>.  Since the Petition Date, other than commencement of Seller's Bankruptcy Case, there has not been any result, change, event, fact, development, circumstance or occurrence in respect of the Company Group that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

3.8    <u>Legal Proceedings</u>.  Except for Seller's Bankruptcy Case, there is no Action or Claim pending or, to Seller's Knowledge, threatened, against Seller, the Company or any of the Company's Subsidiaries that (i) relates to or may in any way affect the Company Group or the Company Interests, (ii) questions or challenges the validity of this Agreement, any Transaction Document or any of the Transactions, or (iii) may otherwise have a Material Adverse Effect.

3.9    <u>No Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Seller, the Company or any of the Company's Subsidiaries.

3.10    <u>Taxes</u>.

(a)    (i) All income and other material Tax Returns required to be filed by the Company or any of its Subsidiaries have been properly and timely filed and such Tax Returns were complete and accurate in all material respects; (ii) all income Taxes and other material Taxes required to be paid (whether or not shown on a Tax Return) by the Company or any of its Subsidiaries have been properly and timely paid to the applicable Taxing Authority; (iii) no audit relating to Taxes of the Company or any of its Subsidiaries by any Taxing Authority is currently pending or has been threatened in writing in any jurisdiction and not resolved; (iv) no written notice of any Tax deficiency or adjustment has been received by or on behalf of Seller (or Seller's regarded owner) in respect of the Company or any of its Subsidiaries in any jurisdiction; (v) there are no Contracts or waivers currently in effect that provide for an extension of time for the assessment or reassessment of any Tax that may be payable directly or indirectly by the Company or any of its Subsidiaries in any jurisdiction and not resolved; and (vi) there are no Liens for Taxes on the assets of the Company or any of its Subsidiaries as a result of the failure of Seller (or its regarded owner)

to pay any income Taxes or other material Taxes (other than, in each case, Taxes the nonpayment of which is permitted or required by the Bankruptcy Code).

(b)       The Company and each of the Subsidiaries of the Company (including the Trust) is an entity that is disregarded as separate from SunPower Corporation for U.S. federal income tax purposes.

3.11   No Additional Representations or Warranties.  Except for the representations and warranties expressly contained in this Section 3 (in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchasers have relied only on such Express Representations and warranties), Purchasers acknowledge and agree, on its own behalf and on behalf of their Affiliates, that Seller nor any other Person on behalf of Seller makes, and neither Purchasers nor any of their Affiliates have relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Company Interests, the Company's businesses or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis & Company) or in that certain datasite administered by Datasite (the "Dataroom") or elsewhere to Purchasers or any of their Affiliates or Representatives on behalf of Seller or any of its Affiliates or Representatives.  Without limiting the foregoing, Seller nor any of its Representatives nor any other Person will have or be subject to any Liability whatsoever to Purchasers, or any other Person, resulting from the distribution to Purchasers or any of their Affiliates or Representatives, or Purchasers' or any of their Affiliates' or Representatives' use of or reliance on, any such information, including any information presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchasers or any of their Affiliates or Representatives in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers hereby represent and warrant to Seller as follows:

4.1   Organization and Good Standing.  Each Purchaser is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.  Each Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of its assets or the operation of its business as presently conducted makes such licensing or qualification necessary, except for such failures to be so qualified or licensed that, individually or in the aggregate, have not had and would not have a material adverse effect on the ability of Purchasers to consummate the Transactions.

4.2   Authorization.  Each Purchaser has the requisite limited liability company power and authority to execute and deliver this Agreement and the Transaction Documents and to perform its obligations hereunder and thereunder, and the execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the Transactions by each Purchaser have been duly authorized by all necessary limited liability company action.  This

Agreement and the Transaction Documents will, at the Closing, have been duly and validly executed and delivered by each Purchaser and, assuming the due and valid authorization, execution and delivery by Seller of this Agreement and the Transaction Documents, constitute valid, legal and binding agreements of each Purchaser, enforceable against each Purchaser in accordance with their respective terms (except as may be limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application, heretofore or hereafter enacted or in effect, affecting the rights and remedies of creditors generally, and (b) the exercise of judicial or administrative discretion in accordance with general equitable principles, particularly as to the availability of the remedy of specific performance or other injunctive relief).

4.3    <u>Consents and Approvals</u>.  The execution and delivery of this Agreement and the Transaction Documents and the consummation of the Transactions does not and will not require Purchasers to make any filing with or give any notice to or obtain any consent, approval or authorization from any Person.

4.4    <u>Investment Purpose; Investigation</u>.  Purchasers are acquiring the Company Interests solely for their own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any other federal or state securities Laws.  Purchasers acknowledge that Seller has not registered the offer and sale of the Company Interests under the Securities Act or any other federal or state securities Laws, and that the Company Interests may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities Laws, as applicable. Each Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Each Purchaser is knowledgeable about the industries in which the Company operates and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchasers have been afforded access to the applicable books and records, facilities and personnel of the Company for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Company and are satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.5    <u>No Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Purchasers.

4.6    <u>No Additional Representations or Warranties</u>.  Except for the representations and warranties contained in <u>Section 3</u>, Purchasers are not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty with respect to Seller or with respect to any other information provided to Purchasers by Seller and acknowledge that neither Seller nor any other Person on behalf of Seller makes any other express or implied representation or warranty with respect to Seller or with respect to any other information provided to Purchasers by Seller.  Purchaser acknowledges and agrees to <u>Section 3.10</u>.

**<u>SECTION 5</u>**
**<u>CERTAIN MUTUAL COVENANTS</u>**

5.1     Further Assurances.  Subject to the terms and conditions of this Agreement, each of the Parties shall use commercially reasonable efforts to (a) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the Transactions and (b) cause the fulfillment at the Closing of all of the conditions to their respective obligations to consummate the Transactions.  At any time and from time to time after the Closing Date, at the other party's request and without further consideration, Seller, on the one hand, and each Purchaser, on the other hand, as applicable, shall promptly execute and deliver all such further agreements, amendments, modifications, certificates, instruments and documents and perform such further actions in order to fully consummate the Transactions and fully carry out the purposes and intent of this Agreement.

5.2     Access to Information.  Subject to any written confidentiality obligations that may be applicable to permitting access to or to information furnished to Seller by third parties that may be in Seller's possession from time to time, from and after the Closing, Seller will at Purchasers' expense (i) provide Purchasers and their Affiliates and Representatives with such information relating to the Company Interests, the Company and its Subsidiaries as Purchasers may from time to time reasonably request; and (ii) provide Purchasers and their Affiliates and Representatives reasonable access during regular business hours and upon reasonable notice to the Books and Records.  Except as provided by any Order of the Bankruptcy Court, any investigation pursuant to this Section 5.2 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business and operations of Seller.  Seller shall have the right to have a Representative present at all times during any such inspections, interviews and examinations.

## SECTION 6
## BANKRUPTCY COURT MATTERS

6.1     Bankruptcy Court Matters.  Purchasers and Seller each agree that they will promptly take such actions as are reasonably necessary to obtain entry of the Sale Order approving this Agreement and authorizing the Transactions, including, in the case of the Purchaser, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among other things, provide necessary assurances of performance by Purchasers under this Agreement and demonstrate that Purchasers are "good faith" purchasers under Section 363(m) of the Bankruptcy Code.  Purchasers shall consult with Seller prior to filing, joining in or otherwise supporting in any manner whatsoever any motion or other pleading relating to the sale of the Company Interests hereunder.  In the event the entry of the Sale Order is appealed, Seller and Purchasers shall use their respective commercially reasonable efforts to pursue or defend such appeal, as the case may be.

6.2     Notice of Transaction Required by Bankruptcy Court.  The Parties acknowledge that under the Bankruptcy Code the sale of Company Interests is subject to entry of and, to the extent entered, the terms of an Order of the Bankruptcy Court approving the sale of the Company Interests.  The Parties acknowledge that to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Company Interests.  Nothing in this Agreement shall require Seller or its respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

6.3    No Other Agreements.  Seller represents that, as of the date of this Agreement, Seller is not a party to or bound by any Contract with respect to any Alternative Transaction.

6.4    Fiduciary Obligations.  Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law.  For the avoidance of doubt, until Closing, Sellers retain the right to pursue any Alternative Transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

## SECTION 7
## CLOSING

7.1    The Closing.  The closing of the Transactions (the "Closing") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "Closing Date").  The Closing will take place by telephonic or electronic delivery or release of documents.  All of the Transactions shall be deemed to be consummated on a concurrent and simultaneous basis.  The Closing shall be effective as of 11:59 p.m. New York City time on the Closing Date.

7.2    Seller's Deliveries at Closing.  At the Closing, Seller shall deliver (or cause to be delivered) to Purchasers an executed counterpart of each Transaction Document that is identified in paragraph 1 of Exhibit B as being delivered by Seller.

7.3    Purchaser's Deliveries at Closing.  At the Closing, Purchasers shall deliver (or cause to be delivered) to Seller the following:

(a)    an executed counterpart of each Transaction Document that is identified in paragraph 2 of Exhibit B; and

(b)    the Purchase Price, paid by Purchasers to Seller or such other parties in accordance with Section 2.2.

7.4    Other Documents Delivered at Closing. At the Closing, executed copies of each of the following documents and instrument shall be delivered:

(a)    a termination and release, in form and substance reasonably satisfactory to Seller, in respect of (i) that certain Limited Guaranty, dated as of June 30, 2022, by and among SunPower Corporation in favor of Atlas Securitized Products Holdings, L.P ("Atlas"), (ii) that certain Loan Purchase Agreement, effective as of June 30, 2022, by and between SPWR RIC 2022-1 Trust, SunPower Capital Services, LLC, SunPower Corporation Systems and Blue Raven Solar, LLC and (iii) that certain Master Servicing Agreement, effective as of June 30, 2022 by and among SunPower Capital Services, LLC, the Borrower and Atlas; and

(b)    each document or instrument identified on Exhibit C to the extent agreed or finalized by the applicable parties, all of which shall be in form and substance reasonably satisfactory to Purchasers.

**SECTION 8**
**TAXES**

8.1    <u>Tax Treatment</u>.  The Parties acknowledge and agree that they intend that (i) the sale of the Company Interests shall be treated as an asset sale for U.S. federal income tax purposes and (ii) the Purchase Price is equal to the fair market value of the Company Interests for U.S. federal income tax purposes.  Neither the Seller nor Purchasers shall take a position that is inconsistent with such intended tax treatment, unless required by applicable Law and only after notifying the other Parties.

8.2    <u>Allocation of Certain Taxes</u>.  In the case of any Straddle Period, for all applicable purposes of this Agreement, the amount of any Taxes based on or measured by income, gross or net sales, receipts, transactions, proceeds, profits, payroll or similar items for the portion of such Straddle Period ending on the Closing Date (the "<u>Pre-Closing Straddle Tax Period</u>") shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and the amount of other Taxes for a Straddle Period that relates to the Pre-Closing Straddle Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period; *provided* that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing Date, shall be allocated on a per diem basis.

8.3    <u>Purchase Price Allocation</u>.  For U.S. federal and applicable state and local income Tax purposes, the Purchase Price shall be allocated among the Company Interests and the assets deemed purchased for U.S. federal income tax purposes consistent with the methodology set forth on <u>Exhibit D</u> and Section 1060 of the Code.  Purchasers shall prepare a statement setting forth such allocation (the "<u>Purchase Price Allocation Statement</u>").  Purchasers shall deliver the Purchase Price Allocation Statement to Seller within 90 days after the Closing Date. Seller shall have thirty days after receipt of the Purchase Price Allocation Statement within which to review the Purchase Price Allocation Statement.  If Seller does not object in writing to the Purchase Price Allocation Statement during such 30-day period, the Purchase Price Allocation Statement shall set forth the final allocation of the Purchase Price for all Tax purposes (the "<u>Purchase Price Allocation</u>").  If Seller objects in writing, Purchasers and Seller shall attempt in good faith to resolve such objections within 15 days thereafter, but if Seller and Purchasers are unable to resolve such objections within such fifteen days, then any remaining items in dispute shall be resolved by an independent accounting firm mutually agreeable to the parties.  Once the Purchase Price Allocation is finalized in accordance with the above procedures, the Purchase Price Allocation shall be binding upon the parties hereto for all Tax purposes unless otherwise required by applicable Law. The parties hereto shall report for Tax purposes, act for Tax purposes, and file Tax Returns, in all respects consistent with the Purchase Price Allocation and <u>Exhibit D</u>.

8.4    <u>Cooperation</u>.  Purchasers and Seller agree to use commercially reasonable efforts, upon reasonable request, and at the requesting party's expense for any out of pocket expenses, to furnish or cause to be furnished to each other, as promptly as reasonably practicable, such information and assistance relating to the Company Interests, the Company or its Subsidiaries as is reasonably necessary in connection with any Tax matters related to a Pre-Closing Tax Period or

Straddle Period, for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer of any governmental or regulatory inquiry relating to Tax matters. After the Closing, none of the Purchasers or their Affiliates shall take any action that binds the Company or its Subsidiaries (including making any tax election) outside the ordinary course of business with respect to a Pre-Closing Tax Period to the extent that such action is reasonably likely to result in an additional Tax liability for Seller (and, for the avoidance of doubt and notwithstanding anything herein to the contrary, neither Purchasers nor their Affiliates shall file any election to change the tax classification of any of the Company or its Subsidiaries with respect to a Pre-Closing Tax Period).

8.5    _Transfer Taxes_. All Transfer Taxes incurred in connection with the Transactions shall be paid by Purchasers when due. Purchasers will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.

8.6    _Tax Returns_. Purchasers, at their sole cost and expense, will prepare or cause to be prepared, and timely file or cause to be timely filed, all Tax Returns for the Company and its Subsidiaries that are required to be filed for any Straddle Period the due date of which (taking into account extensions of time to file) is after the Closing Date. All such Tax Returns will be prepared in a manner consistent with the past custom and practice of the Company and its Subsidiaries unless otherwise required by applicable Law or unless Seller consents to a deviation from past practice and custom (such consent not to be unreasonably withheld, conditioned or delayed). At least 30 days prior to the due date of any such Tax Return (taking into account extensions of time to file), Purchasers will submit such Tax Return to Seller for Seller's review, comment, and consent (such consent not to be unreasonably withheld, conditioned, or delayed). Seller shall be responsible for the portion of any Taxes shown as due and payable on any such Tax Return that are attributable to the portion of such Straddle Period that ends on the Closing Date (as determined pursuant to _Section 8.2_).

8.7    _Certain Tax Matters_. Without the prior written consent of Seller (such consent not to be unreasonably withheld, conditioned or delayed) or unless otherwise required by applicable Law, if any such action would reasonably be expected to increase the amount payable by Seller pursuant to _Section 8.6_, Purchasers shall not, and, following the Closing, shall cause their Affiliates not to, (A) approach a Governmental Authority with respect to any Taxes with respect to the Company or its Subsidiaries for any Pre-Closing Tax Period or Straddle Period (including the entrance into any voluntary disclosure or other similar agreement with any Governmental Authority), (B) amend, file (other than as set forth in _Section 8.6_) or re-file any Tax Return with respect to the Company or its Subsidiaries for a Pre-Closing Tax Period or Straddle Period, (C) agree to waive or extend the statute of limitations relating to any Taxes with respect to the Company or its Subsidiaries for any Pre-Closing Tax Period or Straddle Period, (D) settle any tax audit, proceeding, claim, or dispute with respect to the Company or its Subsidiaries for any Pre-Closing Tax Period or Straddle Period, or (E) make, revoke or change any tax election with respect to the Company or its Subsidiaries with respect to, or that has a retroactive effect to, any Pre-Closing Tax Period or Straddle Period.

## SECTION 9
## MISCELLANEOUS

9.1    <u>Survival of Representations and Warranties and Covenants</u>.    None of the representations and warranties contained in or made pursuant to this Agreement or any other Transaction Document shall survive the Closing.  The covenants and agreements contained in this Agreement shall survive the Closing in accordance with their terms.

9.2    <u>Expenses</u>.  Except as otherwise expressly provided herein or with respect to the $250,000 advanced from Seller to Purchasers as a "work fee" on August 5, 2025 to cover the reasonable and documented professional fees of Purchasers, and the Administrative Agent and lender(s) with respect to the RIC Warehouse Facility (any excess of which shall be returned to Seller at the Closing), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the Party incurring such costs and expenses.

9.3    <u>Interpretation</u>.  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein: (i) to Sections and Schedules mean the Sections of, and Schedules attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.  The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  The Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.4    <u>Entire Agreement</u>.  This Agreement and the Transaction Documents constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter (including any letter of intent, indication of interest and confidentiality agreement between Purchasers and Seller).  In the event of any inconsistency between the statements in the body of this Agreement and those in the Transaction Documents or Schedules (other than an exception expressly set forth as such in the Schedules), the statements in the body of this Agreement will control.

9.5    <u>Amendment and Modification; Waiver</u>.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not

expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No notice to or demand on one Party will be deemed to be a waiver of any obligation of that Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to herein.

9.6     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns (including any trustee or estate representative appointed in Seller's Bankruptcy Cases), subject to the entry and terms of the Sales Order; <u>provided</u>, <u>however</u>, that neither this Agreement nor any of its rights or obligations hereunder may be assigned or delegated with the prior written consent of Purchasers, in the case of an assignment or delegation by Seller, or Seller, in the case of any assignment or delegation by either or both Purchasers, and any attempted assignment or delegation without such prior written consent shall be null and void.

9.7     <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.8     <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)     THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD OTHERWISE DIRECT THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.

(b)     The Bankruptcy Court shall retain jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions and any and all proceedings related to the foregoing shall be filed only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 9.10</u>; <u>provided</u>, <u>however</u>, that if Seller's Bankruptcy Case has closed, each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the other Party or any of its Representatives in any way relating to this Agreement or the Transaction, in any forum other than the courts of the State of New York sitting in the Borough of Manhattan, New York, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such New York state court or, to the fullest extent permitted by applicable law,

in such federal court.  Each of the Parties agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE AND AGREES THAT ANY COURT PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT OR THE TRANSACTIONS (AND AGREES THAT ANY SUCH DISPUTE SHALL BE DECIDED BY A JUDGE SITTING WITHOUT A JURY).

9.9     <u>Severability</u>.  If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by applicable Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

9.10     <u>Notices</u>.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed given if delivered personally, by electronic mail (with an appropriate subject heading) or telecopy if receipt is confirmed, or mailed by registered or certified mail (return receipt requested) (as to the Parties, at the following addresses, or at such other address for a Party as shall be specified by notice pursuant to this paragraph):

|  |  |
|---|---|
| If to Purchasers: | c/o GoodFinch Management, LLC<br>150 California Street, Suite 1000<br>San Francisco, CA  94111<br>Attn:     Manager<br>Email:   notice@goodfinch.com |
| with a copy to (which shall not constitute notice): | Norton Rose Fulbright US LLP<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Attn:     Andrew Coronios<br>Email:   andrew.coronios@nortonrosefulbright.com<br>Tel:       212.408.5506 |
| If to Seller: | Chief Transformation Officer<br>c/o Alvarez & Marsal North America, LLC<br>6060 Center Drive, Suite 950<br>Los Angeles, CA 90045<br>Attn:     Matthew Henry<br>Email:   mhenry@alvarezandmarsal.com |
| with a copy to (which shall not constitute notice): | Kirkland & Ellis LLP<br>609 Main Street<br>Houston, TX 77002<br>Attn:     Adam D. Larson, P.C.; Claire Campbell, P.C. |

Email:   adam.larson@kirkland.com;
claire.campbell@kirkland.com

9.11    <u>Counterparts; Facsimile Copies</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed facsimile or .pdf copies of this Agreement shall legally bind to the same extent as original documents.

9.12    <u>Specific Performance</u>.  The Parties each acknowledge that the rights of each Party to consummate the Transactions are special, unique and of extraordinary character and that, in the event that either Party violates or fails or refuses to perform any covenant or agreement made by it in this Agreement, the non-breaching Parties may be without an adequate remedy at Law.  The Parties agree therefore that, in the event that any Party violates or fails or refuses to perform any covenant or agreement made by such Party in this Agreement, the non-breaching Party may, subject to the terms of this Agreement, institute and prosecute an Action in any court of competent jurisdiction to enforce specific performance of such covenant or agreement or seek any other equitable relief.  Seller and Purchasers further agree that neither of them shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 9.12</u>, and each of them irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the date first above written.

**<u>SELLER</u>:**

SUNPOWER CAPITAL SERVICES LLC

By: _____
     Name:
     Title:

**PURCHASERS:**

GOODFINCH SPV WL IV (SPWR), LLC

By: _____
     Name:
     Title:

SOLAR SECURITIZATION MASTER FUND II, LP

By: Solar Securitization Program SMA GP, LLC, its General Partner

By: _____
     Name:
     Title:

EXHIBIT A

FORM OF
ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTERESTS

This ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTERESTS (this "Assignment") is entered into as of August [●], 2024 by and among Solar Capital Services, LLC, a Delaware limited liability company ("Seller"), GoodFinch SPV WL IV (SPWR), LLC, a Delaware limited liability company ("GF SPV WL IV"), and Solar Securitization Master Fund II, LP, a Delaware limited partnership ("SSMFII" and, together with GF SPV WL IV, "Purchasers" and each individually, a "Purchaser").

RECITALS

WHEREAS, Seller owns, beneficially and of record, all of the issued and outstanding membership interests (the "Company Interests") of SPWR RIC Depositor 2022-1, LLC, a Delaware limited liability company and wholly-owned subsidiary of Seller (the "Company"), pursuant to the terms and conditions of the Company's Limited Liability Company Agreement, dated as of March 7, 2020 (the "Company LLCA");

WHEREAS, Seller and Purchasers have entered into that certain Membership Interest Purchase and Transfer Agreement, dated as of the date hereof (the "Purchase Agreement");

WHEREAS, capitalized terms used but not defined in this Assignment have the meanings assigned to such terms in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, among other things, Seller has agreed to sell, assign, and transfer to each Purchaser all of its right, title, and interest in and to fifty percent (50%) of the Company Interests to each Purchaser, and each Purchaser has agreed to accept fifty percent (50%) of the Company Interests; and

WHEREAS, in order to affect the sale, transfer, and assignment of the Company Interests to Purchasers, Seller and Purchasers are executing and delivering this Assignment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment and Acceptance.  Seller hereby sells, assigns, and transfers all of Seller's right, title, and interest in and to fifty percent (50%) of the Company Interests to each Purchaser, free and clear of all Encumbrances other than restrictions on transfer pursuant to applicable securities Laws.  Each Purchaser hereby accepts the assignment of Seller's right, title, and interest in and to fifty percent (50%) of the Company Interests, such that, collectively, Purchasers accept the assignment of Seller's right, title and interest in and to one-hundred percent (100%) of the Company Interests.  Purchasers agree to perform when due all covenants, agreements, conditions, duties and obligations of the Seller as a member of the Company that arise from and after the effective date of this Assignment.

A-1

2.      <u>Terms of the Purchase Agreement</u>.  This Assignment is made in accordance with, and is subject to, the terms and conditions of the Purchase Agreement and the Company LLCA. Nothing in this Assignment, express or implied, is intended to or shall be construed to modify, expand, or limit any of the terms of the Purchase Agreement.  Seller and Purchasers acknowledge and agree that no representations and warranties are made in this Assignment.  The representations, warranties, covenants and agreements contained in the Purchase Agreement shall not be superseded by this Assignment but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3.      <u>Further Assurances</u>.  Each of Seller and Purchasers shall execute and deliver, at the reasonable request of the other party or parties hereto, such additional documents, instruments, conveyances, and assurances and take such further actions as such other party or parties may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Assignment.

4.      <u>Successors and Assigns</u>.  This Assignment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

5.      <u>Amendment and Modifications</u>.  This Assignment may not be amended or modified in any manner other than by a written agreement signed by the party to be charged.

6.      <u>Governing Law</u>.

(a)      THIS ASSIGNMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS ASSIGNMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD OTHERWISE DIRECT THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.

(b)      The Bankruptcy Court shall retain jurisdiction to enforce the terms of this Assignment and to decide any claims or disputes which may arise or result from, or be connected with, this Assignment, any breach or default hereunder, or the Transactions and any and all proceedings related to the foregoing shall be filed only in the Bankruptcy Court, and the Seller and Purchasers hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9.10 of the Purchase Agreement; <u>provided</u>, <u>however</u>, that if Seller's Bankruptcy Case has closed, each party hereto irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the other party hereto or any of its Representatives in any way relating to this Assignment or the Transaction, in any forum other than the courts of the State of New York sitting in the Borough of Manhattan, New York, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such New York state court or, to the fullest extent

permitted by applicable law, in such federal court.  Each of the Parties agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)      EACH PARTY TO THIS ASSIGNMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE AND AGREES THAT ANY COURT PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT OR THE TRANSACTIONS (AND AGREES THAT ANY SUCH DISPUTE SHALL BE DECIDED BY A JUDGE SITTING WITHOUT A JURY).

7.      Counterparts; Facsimile Copies.  This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed facsimile or .pdf copies of this Assignment shall legally bind to the same extent as original documents.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Assignment as of the date first above written.

<b><u>SELLER</u>:</b>

SUNPOWER CAPITAL SERVICES LLC

By: _____
　　　Name:
　　　Title:

**PURCHASERS:**

GOODFINCH SPV WL IV (SPWR), LLC

By: _____
    Name:
    Title:


SOLAR SECURITIZATION MASTER FUND II, LP

By:    Solar Securitization Program SMA GP, LLC, its General Partner


By: _____
    Name:
    Title:

EXHIBIT B

Transaction Documents

1.  Transaction Documents to be delivered by Seller to Purchasers:

   (a)    Assignment and Assumption Agreement duly executed by Seller;

   (b)    Loan Sale and Purchase Agreement by and between Seller and GF SPV WL IV duly executed by Seller;

   (c)    Loan Sale and Purchase Agreement by and between Seller and SSMFII duly executed by Seller;

   (d)    an IRS Form W-9 establishing that Seller, or if Seller is a disregarded entity for U.S. federal income tax purposes, the regarded owner of Seller, is a U.S. person within the meaning of Section 7701(a)(30) of the Code and is not subject to backup withholding; and

   (e)    true, correct and complete copies of all Books and Records.

2.  Transaction Documents to be delivered by Purchasers to Seller:

   (a)    Assignment and Assumption Agreement duly executed by each Purchaser;

   (b)    Loan Sale and Purchase Agreement by and between Seller and GF SPV WL IV duly executed GF SPV WL IV;

   (c)    Loan Sale and Purchase Agreement by and between Seller and SSMFII duly executed by SSMFII.

EXHIBIT C

Other Closing Documents

1.  Loan Contribution Agreement between GF SPV WL IV and the Company.

2.  Loan Contribution Agreement between SSMFII and the Company.

3.  Loan Contribution Agreement between the Company and the Borrower.

4.  Loan Contribution Agreement between the Borrower and the Trust.

5.  Amended and Restated Loan and Security Agreement among the Borrower, Atlas Securitized Products Holdings, L.P., as Administrative Agent, Computershare Trust Company, National Association, as Paying Agent, and the lenders party thereto.

6.  Master Servicing Agreement among Launch Servicing, LLC, the Borrower, the Trust and Atlas Securitized Products Holdings, L.P., as Administrative Agent.

7.  Amended and Restated Backup and Successor Servicing Agreement among the Borrower, Launch Servicing, LLC, GreatAmerica Portfolio Services Group LLC and Credit Suisse AG New York Branch.

8.  Amended and Restated Verification Agent and Custodial Agreement among the Borrower, Atlas Securitized Products Holdings, L.P., as Administrative Agent, and Computershare Trust Company, National Association, as Custodian.

9.  GoodFinch Limited Guaranty Agreement among GF SPV WL IV, SSMFII and Atlas Securitized Products Holdings, L.P., as Administrative Agent.

10. Lockbox Account Control Agreement Termination (Corporation Systems) by Atlas Securitized Products Holdings, L.P., as Administrative Agent.

11. Lockbox Account Control Agreement Termination (Capital Services) by Atlas Securitized Products Holdings, L.P., as Administrative Agent.

EXHIBIT D

Purchase Price Allocation

Pursuant to <u>Section 8.3</u>, the Purchase Price shall be allocated among the Company Interests and the assets deemed purchased for U.S. federal income tax purposes consistent with Section 1060 of the Code and the following methodology:

| <u>Asset Category</u> | <u>Methodology</u> |
|---|---|
| Class I (Cash and Deposit Accounts) | The amount of such assets. |
| Class II (Actively Traded Personal Property) | The amount of such assets. |
| Class III (Accounts Receivable) | The book value of such assets on the books and records of the Company and its Subsidiaries. |
| Class IV (Inventory) | The fair market value of such assets. |
| Class V (Depreciable Tangible Property) | The book value of such assets on the books and records of the Company and its Subsidiaries. |
| Class VI and VII (Section 197 Intangibles and Goodwill and Going Concern Value) | The remaining amount (if any) to be allocated after making all of the allocations set forth above. |