1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                         .  Chapter 11
                                   .  Case No. 24-11649 (CTG)
4   SUNPOWER CORPORATION,          .
    *et al.,*                      .  Jointly Administered
5                                  .
                                   .  Courtroom No. 7
6                                  .  824 North Market Street
              Debtors.            .  Wilmington, Delaware 19801
7                                  .
                                   .  Monday, September 23, 2024
8   . . . . . . . . . . . . . . .  10:00 a.m.

9                       TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10                UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:          Jeffrey Michalik, Esquire
                              Chad Husnick, Esquire
13                            Robert Jacobson, Esquire
                              KIRKLAND & ELLIS LLP
14                            KIRKLAND & ELLIS INTERNATIONAL LLP
                              333 West Wolf Point Plaza
15                            Chicago, Illinois 60654

16                            Zachary Manning, Esquire
                              KIRKLAND & ELLIS LLP
17                            KIRKLAND & ELLIS INTERNATIONAL LLP
                              601 Lexington Avenue
18                            New York, New York 10022

19  (APPEARANCES CONTINUED)

20  Audio Operator:           Alyce Doody, ECRO

21  Transcription Company:    Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Debtors:          Mark Collins, Esquire
                             Jason Madron, Esquire
3                            Robert Stearn, Jr., Esquire
                             RICHARDS, LAYTON & FINGER P.A.
4                            920 North King Street
                             Wilmington, Delaware 19801
5
                             Tabitha De Paulo, Esquire
6                            KIRKLAND & ELLIS LLP
                             KIRKLAND & ELLIS INTERNATIONAL LLP
7                            609 Main Street
                             Houston, Texas 77002
8
   For the U.S. Trustee:     Richard Schepacarter, Esquire
9                            OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
10                           Lockbox 35
                             Wilmington, Delaware 19801
11
   For Bank of America:      Brian Resnick, Esquire
12                           DAVIS POLK & WARDWELL LLP
                             450 Lexington Avenue
13                           New York, New York 10017

14 For the Committee:        Steven Golden, Esquire
                             PACHULSKI STANG ZIEHL & JONES LLP
15                           919 North Market Street
                             17th Floor
16                           Wilmington, Delaware 19801

17 For the SEC:              William Uptegrove, Esquire
                             U.S SECURITIES AND EXCHANGE
18                              COMMISSION
                             950 East Paces Ferry Road, NE
19                           Suite 900
                             Atlanta, Georgia 30326
20
   For Maxeon Solar
21 Technologies:            Andrew Kissner, Esquire
                             MORRISON & FOERSTER LLP
22                           250 West 55th Street
                             New York, New York 10019
23

24

25

1  APPEARANCES (CONTINUED):

2  For the Securities
   Litigation Lead
3  Plaintiff:                    Michael Papendrea, Esquire
                                 LOWENSTEIN SANDLER LLP
4                                One Lowenstein Drive
                                 Roseland, New Jersey 07068
5
   For Complete
6  Solaria:                      Stuart Brown, Esquire
                                 DLA PIPER LLP (US)
7                                1201 North Market Street
                                 Suite 2100
8                                Wilmington, Delaware 19801

9  For Arch Insurance
   Company and Applied
10 Surety Underwriters:          Lisa Tancredi, Esquire
                                 WOMBLE BOND DICKINSON US LLP
11                               100 Light Street
                                 26th Floor
12                               Baltimore, Maryland 21202

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                PAGE

3    Agenda
     Item 6: Motion of Debtors for Entry of an Order          8
4            (I) Approving the Adequacy of the
             Disclosure Statement, (II) Scheduling a
5            Plan Confirmation Hearing and Setting
             Dates and Deadlines and Shortening
6            Notice with Respect Thereto, (III)
             Approving the Solicitation Packages and
7            Notice Procedures, (IV) Approving the
             Forms of Ballots and Notices in
8            Connection Therewith, and (V) Granting
             Related Relief [Docket No. 313; filed
9            September 6, 2024]

10           Court's Ruling:                                  33

11   Agenda
     Item 4: Motion of Debtors for Entry of an Order          35
12           (I) Approving Bidding Procedures and Bid
             Protections, (II) Scheduling Certain
13           Dates and Deadlines with Respect Thereto,
             (III) Approving the Form and Manner of
14           Notice Thereof, (IV) Approving the
             Complete Solaria Stalking Horse APA, (V)
15           Establishing Notice and Procedures for
             the Assumption and Assignment of
16           Contracts and Leases, (VI) Authorizing
             the Assumption and Assignment of Assumed
17           Contracts and Leases, (VII) Approving the
             Sale of Assets, and (VIII) Granting
18           Related Relief [Docket No. 15; filed
             August 6, 2024]
19
             Court's Ruling:                                 155
20
21

22

23

24

25

1                        INDEX

2  EXAMINATION:                                    PAGE

3      MATTHEW HENRY
       Cross-examination by Mr. Kissner            38
4
       DANIEL FOLEY
5      Cross-examination by Mr. Kissner            40
       Redirect examination by Mr. Brown           65
6      Redirect examination by Mr. Stearn          70
       Recross-examination by Mr. Kissner          71
7      Further redirect examination by Mr. Brown   75

8

9  DECLARATIONS:                                   PAGE

10 1) Rick Polhemus                                35

11 2) Matthew Henry                                36

12 3) Daniel Foley                                 40

13

14 EXHIBITS:                                       PAGE

15 Complete Solaria 10-K                           48

16 Quarter Conference Call Q-2 2024                57

17 Brand Framework Agreement                       77

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 10:01 a.m.)

2           THE COURT:  Please be seated.  Good morning.  We

3  are on the record in In Re SunPower Corporation, which is

4  Case No. 24-11649.

5           Mr. Michalik.

6           MR. MICHALIK:  Good morning, Your Honor.  Jeff

7  Michalik, Kirkland & Ellis, on behalf of the debtors.

8           So, we have plenty to discuss today.  So, I don't

9  want to take up too much time but I do think it makes sense

10  to just set the table for where we think today's hearing will

11  go.

12           THE COURT:  That actually would be quite helpful.

13  I think I know what is in front of me, what is not, but

14  making sure that I know that would be great.

15           MR. MICHALIK:  So, as Your Honor has heard, we

16  really have two twin pillars that are supporting our path to

17  confirmation. The first of which is the Moelis led sales

18  process.  That process has led us here today where we are

19  going to be seeking approval for two separate sales of the

20  debtors assets.  The first is the debtors interest in

21  SunStrong and the portfolio of loans.

22           As Your Honor may recall, that is the debtors

23  financing arm of the business that has not really been

24  operational since we filed.  The other one is the stalking

25  horse, which, you know, was filed with the bid procedures on

1   our first day and we have put through the process to

2   determine that that has been the winning bidder and we are

3   ready to seek approval of that.  There is an objection

4   outstanding on that one which we will turn over to our

5   colleagues at our left to address at the appropriate time.

6          THE COURT:  So, just help me there; only one

7   outstanding objection or two?

8          MR. MICHALIK:  So, we have one outstanding

9   objection. The other one, we believe, we have resolution.  We

10   will read a statement into the record that we think resolves

11   that.

12          THE COURT:  Okay. I will be patient and find out

13   as we go.  That's not my strong suit.

14          MR. MICHALIK:  The other pillar supporting our

15   path to plan confirmation is our expedited plan process.  As

16   previewed last week, we are here today to seek conditional

17   approval of the disclosure statement so that we can get on

18   with solicitation with all parties rights reserved.

19          So, you know, I understand some parties will have

20   rights to reserve and statements to read into the record on

21   that one, but I think it makes sense to probably start there.

22   So, unless Your Honor has any questions generally, I am happy

23   to cede the podium to our newly minted partner, Zack Manning.

24          THE COURT:  Just so I follow, you're starting with

25   the disclosure statement provisional approval, what have you,

1   solicitation procedures, etc.

2           MR. MICHALIK:  Correct.

3           THE COURT:  Any objection to proceeding that way?

4       (No verbal response)

5           THE COURT:  Okay.  Seeing none, very happy to.

6           MR. MICHALIK:  Thank you, Your Honor.

7           THE COURT:  Thank you very much.

8           MR. MANNING:  Good morning, Your Honor.  Zack

9   Manning with Kirkland & Ellis on behalf of the debtors.

10           THE COURT:  Good morning. I neglected to say

11   congratulations.

12           MR. MANNING:  Thank you.  So, I am going to handle

13   Agenda Item 6, which is the disclosure statement motion filed

14   at Docket No. 313.  So, I would propose to first run through

15   the debtors presentation and then turn it over to other

16   parties, including the objectors, if that works for Your

17   Honor.

18           THE COURT:  Very well.

19           MR. MANNING:  All right.  So, with a last minute

20   objection deadline that we are hearing this on an expedited

21   basis, we only got four objections: one of which we have

22   resolved, three of which remain outstanding, and I will speak

23   to in just a moment.  Between the motion being filed and the

24   proposed order that we submitted overnight at Docket No. 591,

25   we have made some notable changes and I would like to briefly

1  walk through those now.

2         So, the first one, as we already noted, was that

3  we pivoted to seeking conditional or interim provisional

4  approval of the disclosure statement today and with that all

5  parties rights are reserved and all matters pending final

6  approval of the DS which we are seeking to have considered at

7  the confirmation hearing on October 18th.

8         Second, we have agreed to file a disclosure

9  statement supplement on October 3rd that sets for the

10 definitive scope and terms of the proposed plan releases.

11        Third, we now have Class V, that is the class of

12 general unsecured claims as a deemed rejecting class that

13 will not be solicited.  Instead, Class V holders will receive

14 the confirmation hearing notice, a notice of non-voting

15 status and a release opt-out form, and a letter from the

16 committee regarding the plan and the releases therein.

17        The debtors understand that the committee does not

18 object to this construct for purposes of interim DS approval,

19 subject to all parties rights being reserved pending final DS

20 approval.  And I will let the committees counsel confirm that

21 when they are up at the podium.  We would also make

22 conforming changes to the solicitation -- in the solicitation

23 version of the plan and disclosure statement. I did notice it

24 was not reflected in the proposed order we filed overnight.

25 So, we can file a revised proposed order just to tie that out

1  there.

2          Fourth, we had added language to the proposed DS

3  order regarding notice as to the treatment of certain Cigna

4  contracts which we understand resolves Cigna's objection

5  filed at Docket 458.

6          So, that leaves us with three outstanding

7  objections to interim approval of the disclosure statement.

8  So, the first is the securities litigation lead plaintiff's

9  objection that is filed at Docket 530; the U.S. Trustees

10  objection filed at Docket 557; and the SEC's objection filed

11  at Docket 563.

12          So, as to the securities plaintiff we partially

13  resolved his objection with language to be inserted into the

14  solicitation version of the disclosure statement and that is

15  just in relation to the securities -- as a description of the

16  securities litigation.  I would also just note for the record

17  that no class has been certified in the securities

18  litigation, so the lead plaintiff is not acting as a class

19  representative, just acting on behalf of himself at this

20  juncture.

21          As to the rest of the securities plaintiff's

22  objection, as well as the U.S. Trustees and the SEC's

23  respective objections, the issues that they raise are

24  generally confirmation issues.  They are not disclosure

25  statement issues and the debtors will, of course, address

1 confirmation issues in connection with the confirmation

2 hearing, but those issues aren't up for consideration or

3 decision today.  All I will say for now is that the debtors

4 disagree with the objectors description of the plan and the

5 plan releases, but, again, not an issue for today.

6         Turning to the disclosure itself, so a lot of the

7 objectors focused on the disclosure as to the proposed plan

8 releases. So, I will first note that the disclosure is

9 typical of the disclosure as to plan release that you see in

10 large typical Chapter 11 cases.  I think as a practical

11 matter here and elsewhere, plan releases are subject to

12 change based on ongoing negotiations between solicitation

13 being launched and the confirmation hearing as well as what

14 the Court determines at confirmation.

15         Here, we are going above and beyond by filing a DS

16 supplement on October 3rd that sets for the definitive scope

17 and terms of the proposed plan releases.  So, we are taking a

18 further step towards disclosure beyond what is typical in

19 this context. I would also emphasize, again, that the relief

20 that we are requesting today is interim approval of the

21 disclosure statement. The debtors are confident that the DS

22 satisfies the adequate information standard, but that

23 everyone's rights are reserved regarding final approval of

24 the disclosure statement at the hearing on October 18th.

25         So, that is all I have for now, but I just reserve

1   to respond to responses that other parties would make.

2            THE COURT:  Of course.  Let me hear from other

3   parties.

4            Mr. Golden.

5            MR. GOLDEN:  Thank you, Your Honor.  Steve Golden,

6   Pachulski Stang Ziehl & Jones, proposed counsel to the

7   committee.  Good morning, Your Honor.

8            Your Honor, briefly, just to take a key from Mr.

9   Manning, the committee does not oppose entry of the order,

10  but, as he said and as I will reiterate, we reserve all

11  rights in connection with final disclosure statement approval

12  and plan confirmation including the Class V deemed rejection

13  construct.

14           As noted last week and in our reservation of

15  rights that was filed at Docket No. 574, the committee had

16  and still continues to have grave concerns not only about the

17  process but as we continue to learn more facts its only clear

18  to the committee that the estates to have valuable claims

19  against numerous parties that simply cannot be released

20  absent material value coming into the estates.  But as Your

21  Honor, I think, noted last week, the committee does view this

22  process as, in essence, a fee option for the debtors to

23  continue to explore settlement with the committee with other

24  parties in interest in their requested expedited timeframe.

25           Candidly, Your Honor, having read the other

1  parties objections that are still pending, I don't know that

2  the committee actually disagrees with any of the points, but,

3  again, we are willing to work together, with the debtors, and

4  all parties rights will be reserved, including the

5  committees, upon the final approval so that we can continue

6  to pursue a potential settlement here.

7         As it has since formation, we will continue to

8  work towards that settlement and work towards consensus, but

9  if it cannot be reached, Your Honor, to be very clear, the

10  committee is fully prepared to bring these matters to the

11  Court through litigation.

12         So, Your Honor, thank you very much and we look

13  forward to continue working with the parties on this matter.

14         THE COURT:  Thank you, Mr. Golden.  I understand.

15         MR. GOLDEN:   Thank you, Your Honor.

16         THE COURT:  Mr. Schepacarter.

17         MR. SCHEPACARTER:  Thank you, Your Honor.  May I

18  please the Court, Richard Schepacarter for the United States

19  Trustee.

20         One of the aspects of this case, and I guess it

21  leads to the expedited nature of it, is that it changes, it

22  metamorphosizes, into something else as we go along even over

23  the weekend.  Our objection, sort of, remains the same and I

24  know Your Honor has read the objection. It's kind of lengthy

25  to a certain extent.  I think that we still highlight the

1   fact that -- we still have problems with the process being

2   too condensed.

3           THE COURT:  I understand.

4           MR. SCHEPACARTER:  But I think we still have

5   issues with respect to, as we said in our objection, the

6   releases. I think that is kind of highlighted a little bit

7   now that the unsecured creditors are now being deemed to

8   reject.  So, they are going to receive nothing at this point.

9           I just ask this question maybe rhetorically, but

10  given the fact that the committee still has potential claims

11  out there, if there is a recovery parties aren't going to be

12  able to vote on it even though I think the committee wants to

13  urge the opt-out. So, I don't know how that all falls out,

14  how that all falls together in the end.

15          THE COURT:  So, I have a little bit of the same

16  question, but what I understand the parties are saying is,

17  Judge, that may well be an issue at confirmation. If it is,

18  and that blows everything up, we understand, we think it

19  won't, but to the extent it does, it does.  We are prepared

20  to take our chances and proceed that way.

21          I guess my question for you is in a world in which

22  the parties who have economics in this are willing to take

23  that chance why shouldn't I -- and I say this not to minimize

24  your concerns, but in a world in which that is what the

25  parties are telling me what is there that is so systemic or

1  fundamental that I ought to, sort of, say in the matter of

2  the integrity of the process you can't do that.

3           MR. SCHEPACARTER:  I think it dovetails with our

4  objection, which our objection isn't -- the key part of our

5  objection is that the plan should not go forward because it's

6  a plan and a disclosure statement based on a plan that is not

7  confirmable so that it shouldn't go out -- even be --

8           THE COURT:  I understand, but the same principles

9  -- like under American Capital, right, what the Third Circuit

10 says is that a Court may cut this off at the pass, at the

11 disclosure statement stage if its facially non-confirmable,

12 but that is very much a may also. It seems to me you would

13 only do that if its unconfirmability were, sort of, fall off

14 a log obvious you would save everyone the trouble.

15          If it's a disputable question and it sort of

16 depends, and as you say -- look, the moving target nature of

17 this I get your frustration with.  I have been in the shoes

18 of a party that, you know, is trying to figure out where the

19 target is.  I understand your concerns.  It's also the nature

20 of the business though, right.

21          MR. SCHEPACARTER:  I understand that.  I see where

22 your "may" is.  My "may" is that I see it not so much fall

23 off the log obvious, and that is one reason why you would not

24 confirm -- not allow for the disclosure statement to go

25 forward.  The other portion of it would be, which is what I

1  am going to sort of highlight for Your Honor, is that because

2  of the releases and the exculpations and the plan settlement

3  and the injunction and things of that nature, that this

4  really shouldn't go forward at this point in time.

5          THE COURT:  See --

6          MR. SCHEPACARTER:  Now if Your Honor --

7          THE COURT:  -- can I just share my thoughts.  I am

8  not minimizing your concerns about all of that.  It seems to

9  me all of that is solvable with an appropriate crafted

10 confirmation order everyone of those concerns, I think, can

11 be solved, right.  If the releases are broader then the law

12 permits we will write a confirmation order that brings them

13 back to what is consistent with law.  If the exculpations

14 extend, you know, beyond what the Third Circuit in PWS

15 authorizes we will issue a confirmation order that says

16 notwithstanding anything in the plan, here is the scope of

17 the exculpation.

18          So, I understand your concerns. I am not

19 minimizing them, but it seems to me that this is the wrong --

20 stopping it in its tracks feels to me like the wrong tool to

21 solve what I think might well be without prejudice to

22 anyone's rights could well be real problems, but it's not

23 clear that we need to strangle it in its crib because its got

24 these problems.

25          Does that question, to the extent there is a

1  question in that, make any sense to you?

2          MR. SCHEPACARTER:  It does and I will ask Your

3  Honor this question.

4          THE COURT:  You're allowed to do that.  It's okay.

5          MR. SCHEPACARTER:  I know you have read our

6  objection and you've see all the grounds that we have covered

7  on that objection.  I think we covered it as substantial as

8  we can.  Some of it was based on the prior plan, again,

9  (indiscernible), but if Your Honor has read that, and I don't

10  want to belabor the point, after reading all of that is Your

11  Honor of the opinion or of the mindset to say, look, I have

12  read all the objections, I have looked at what you said about

13  releases, we can deal with that at confirmation, exculpation,

14  confirmation, plan settlement, injunction, all that we can do

15  -- basically telling me I understand what you are saying, but

16  you can sit down, Mr. Schepacarter, and say, look, I have

17  read everything, we will deal with it, and I --

18          THE COURT:  That is my reaction on having read it.

19  Now if you think I have missed something and there's

20  something that is not solvable with language in a

21  confirmation order I want to not run you over.

22          MR. SCHEPACARTER:  I understand.

23          THE COURT:  Based on my having reviewed the papers

24  it seemed to me, look, some of your objections are stronger

25  than others, but there are points here that -- look, the

1  parties are talking, I understand, I don't want to put a

2  thumb on the scale, I don't want to -- I want to be careful

3  about what is happening in the room that I'm not in and

4  pretending that I know what is going on there.

5          It seems to me -- I would encourage the parties to

6  continue to talk and if we get to a confirmation hearing and

7  there are disputes to resolve I am more then happy to do my

8  job, but I don't see, from my review of it, a problem that I

9  can't solve at the confirmation hearing with a pen.  That is,

10  at least, my reaction.  So, if that --

11          MR. SCHEPACARTER:  Again, let me ask a question.

12  If Your Honor -- if it turns out that the releases at the

13  time of confirmation shouldn't have been an opt-out, should

14  have been some sort of --

15          THE COURT:  Okay.  Let's talk about that.  Let me

16  say this to all parties.  This not a secret, I have before me

17  pending the question of opt-in, opt-out after Purdue Pharma.

18  Look, the safest thing to do if one -- because this is

19  expressly interim approval and no one is saying that the

20  approval of the procedures should have preclusive effect if

21  the parties want to go forward in the face of uncertainty

22  with an opt-out form I am not stopping you, but nor is the

23  approval going to preclude someone from coming in later and

24  saying that form of release is inappropriate.

25          So, look, if someone -- I am several days away

1  from a decision in the case that is pending before me and I

2  know that this case here is on a short timeline and no one is

3  going to wait for me, and I don't ask you to.  I guess all I

4  can say is in a world in which folks are proceeding in the

5  face of uncertainty the safest thing to do if one wants a

6  form of -- a ballot that would withstand no matter how that

7  comes out an opt-in is the safer thing to do.

8         If one goes forward with an opt-out form and by

9  the time we get to confirmation I've concluded that that is

10  not sufficient to manifest consent then those forms won't

11  manifest consent and those releases won't be effective.  So,

12  that is all I can tell you unfortunately. That is where I am.

13  If you want to wait three or four days until I resolve it you

14  may, but I don't think that works for anybody.  So, we are

15  all here doing the best we can.

16         All I can tell you is that the safest thing to do

17  would be an opt-in form. If you want to take your chances

18  that parties are entitled to.

19         MR. SCHEPACARTER:  I understand that.  Again, this

20  is -- I don't want to say its new territory, but its weird

21  territory.

22         THE COURT:  It is.  I hate saying here --

23         MR. SCHEPACARTER:  I feel like I am on the moon

24  and I should be on some other terraform.

25         THE COURT:  Look, everyone is doing the best they

1    can under the circumstances, right.  I understand your

2    position. I am not faulting you for making the arguments,

3    that is your job, but I do feel like what the debtors

4    position on all of this has been is we understand those

5    issues are out there, we are going to -- you know, this is

6    all interim, everyone's rights are reserved, but given the

7    shortness of time we have no choice but to charge ahead and

8    do our best to patch and fix as life evolves.

9            Again, if there are grownup parties with their

10    eyes open deciding to proceed that way, I am not inclined to

11    throw myself in the way.

12            MR. SCHEPACARTER:  I understand that, Your Honor.

13    As I have said, you know, we have problems with the releases,

14    the exculpations and the like. I guess if we are going

15    forward, we're going forward on an interim basis and that all

16    parties rights are reserved.  All of our objections are

17    reserved.  That may change, again, based on, as Your Honor

18    indicated, a decision may be forthcoming in a week or so.

19    That may change the parties way of thinking and way of

20    proceeding going forward especially in light of the fact that

21    the Class V claimants are now deemed to reject and are not

22    even having a ballot sent to them but are having the opt-out

23    form sent to them along with a letter that says the committee

24    says you should opt out.

25            THE COURT:  I understand.  If I were a better

1  person I would have issued the decision already, but we are

2  where we are.

3          MR. SCHEPACARTER:  Understood, Your Honor.  And

4  you are a better person.

5          Having said all of that and having this colloquy,

6  I don't have anything else to add.

7          THE COURT:  Look, as I've said before, these

8  observations are helpful to me.  I appreciate it, but all

9  your substantive rights are reserved, but as to disclosure

10  statement, subject to the caveats, none of it persuades me

11  that I need to stop the process in its tracks today.

12          MR. SCHEPACARTER:  Understood.  Thank you, Your

13  Honor.

14          THE COURT:  Thank you, Mr. Schepacarter.

15          MR. UPTEGROVE:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. UPTEGROVE:  William Uptegrove on behalf of the

18  United States Securiteis & Exchange Commission.

19          We filed an objection, which is at Docket No. 563,

20  to the disclosure statement and the motion seeking to approve

21  it.  I won't repeat what we say there, but I would like to

22  raise a few points and address some of the points that Your

23  Honor has just made with the U.S. Trustee, and would like

24  some leeway to sort of address the falling off the log issue.

25  Particularly, I wasn't aware that you were about to render a

1  decision on the opt-out, opt-in, but I think that you

2  probably have heard our positions before on this, but I would

3  like to have a little leeway.

4         THE COURT:  Certainly. One thing I do try to do is

5  make sure everyone has a chance to be heard.  So, you are

6  entitled to that.

7         MR. UPTEGROVE:  Thank you, Your Honor. So, the

8  gist of our objection is that the disclosure statement

9  describes a plan containing unconfirmable third-party

10  release.  Its unconfirmable for, at least, three reasons.

11  Before I go into that I want to address the issue of why we

12  should do it here, at least, kind of at a high level and then

13  I will get into it more as I go along. I think there is at

14  least three reasons for that before I get into my main three

15  reasons.

16         One is the potential unconfirmability.  Two is it

17  has to do with a solicitation. It kind of intersects with

18  solicitation and notice about whether the opt-out is

19  appropriate. I think that that matters here particularly --

20  on the record people have said rights are reserved, but I

21  believe there might need to be additional language to the

22  order approving the disclosure statement and the solicitation

23  procedures because some of that language may not be as clear

24  about the extent to which rights are reserved and I will get

25  into that.

1          The other thing, just a use of resources, as a

2 practical thing about, you know, if we are going to have this

3 fight at confirmation, if there is a particular area that is

4 just fall off the log obvious that the release in the plan --

5 the plan is unconfirmable because of the third party release

6 then why go forward and spend the resources of everyone, of

7 the debtor, the estate, other parties, the SEC, of having a

8 prolonged fight over this issue.

9          I think that there is different stakeholders here,

10 not just apparently the general unsecured creditors are now

11 in the same boat, but I think the shareholders, public

12 shareholders, are in a separate bucket from everyone else. I

13 think with them it is a lot clearer that its fall off the log

14 obvious that the plan is unconfirmable with respect to the

15 release and this is why, three reasons:

16          First, from the perspective of public shareholders

17 it is non-consensual.  In Purdue the Supreme Court was very

18 clear nothing in the bankruptcy code authorizes a third-party

19 release.  This Court has previously stated that it was

20 comfortable approving third party releases containing opt-out

21 provisions, at least in part, because the Court viewed a

22 third-party release to be like any other bankruptcy provision

23 that if people slept on their rights and did not return the

24 form their still bound.  Under that rationale, I would argue,

25 they were bound not because they consented but because the

1  plan was confirmed under Section 1129 and is, therefore,

2  binding under Section 1141 even if some parties don't

3  consent.

4         That is how bankruptcy works. Congress has made an

5  exception in the bankruptcy code to the usual contract

6  provision of consent.  To the extent a plan provision could

7  previously bind a non-consenting stakeholder in the way I

8  just described, our position is Purdue changed that.  Purdue

9  tells us that there is nothing in the bankruptcy code that

10 binds anyone to a third-party release.

11        So, this raises at least two questions.  First,

12 what is consent.  Second, what law governs the enforcement of

13 parties agreement manifested in the release.  Purdue, in my

14 view, stands for the proposition that the code doesn't answer

15 these questions.  One implication of that is that Courts

16 cannot use the code to enforce non-consensual releases.

17 Another implication is that any answers to those questions

18 must arise from non-bankruptcy law, most likely state

19 contract law.  That is also the conclusion --

20        THE COURT:  Let me stop you there.

21        MR. UPTEGROVE:  Sure.

22        THE COURT:  Are you aware of any jurisdiction that

23 has, sort of, idiosyncratic or surprising state law

24 requirements for the ordinary what counts as offer and

25 acceptance because you asked the choice of law question and

1   my usual choice of law is before I make myself dizzy over a

2   choice of law analysis I want to see that it matters to the

3   outcome.  I have looked at this question and I haven't found

4   anything that leads me to -- if you are aware of something, I

5   want to hear about it, but does my question make sense?

6           MR. UPTEGROVE:  I think so. If you are asking the

7   question is idiosyncratic out of the norm.  So, Judge Owens

8   in Emerge Energy set forward, and its in our objection those

9   elements that are in state law, if it is something that you

10  are saying is there a state that has something different then

11  that I am not aware of it.  That would be a choice of law

12  issue.

13          So, the closest one is, in her formulation, number

14  two and its whether or not there is some reason that the

15  person would know, right, that -- I just don't think for

16  shareholders here that you are going to find that regardless

17  of the loss because I don't -- I am not aware of that.  Even

18  if North Dakota had that --

19          THE COURT:  Right. I follow. Can I ask you the

20  same question I was asking Mr. Schepacarter.

21          MR. UPTEGROVE:  Sure.

22          THE COURT:  So, look, that question is in front of

23  me and everyone's rights on that are preserved.  Let's, for a

24  moment, imagine I don't resolve it between now and the

25  confirmation hearing, which I very much hope I will, but for

1  today's conversation imagine that I don't, and we're here at

2  the confirmation hearing and my ruling today is your rights

3  on that issue are fully preserved.  So, therefore, what -- my

4  question to you is what harm would I be causing to the

5  interest of the public shareholders or to the SEC, sort of,

6  derivatively on their behalf if what my ruling were today is

7  this disclosure statement can go out but its going out purely

8  on a provisional basis with all rights reserved and if you

9  persuade me at the confirmation hearing that the public

10  shareholders have not consented and, therefore, can't be

11  bound by the release the confirmation order will say nothing

12  herein shall bind any public shareholder to any third party

13  release.

14          If you are right and I were to say that at the

15  confirmation hearing, what harm would you have suffered by my

16  letting this go forward today?

17          MR. UPTEGROVE:  So, to the extent our rights are

18  reserved particularly with respect to the arguments on the

19  form and manner of notice and service here, if those things

20  are preserved probably the only ramification is --

21          THE COURT:  Waste of resources.

22          MR. UPTEGROVE:  -- waste of resources.

23          THE COURT:  I understand that. There my instinct

24  is they are grown up parties who are fiduciaries who are

25  making decisions with their eyes open knowing that at the end

1  of the day they could lose, but given the array of practical

2  options they face they have decided to go forward and take

3  their chances.  The question then to me is, is that so

4  irrational on their part that I need to stop them in their

5  tracks.  I will tell you my instinct to that is no.

6        I take your other arguments quite seriously. We

7  will see how this all comes out, but my instinct -- just so

8  you understand what the target is that you are shooting at, I

9  am not at all dismissive of your substantive points about the

10  releases.  Either the argument that the consensual releases

11  aren't a reasoned exercise of the debtors business judgment

12  and whatever, whatever flows from that the committee is going

13  to argue, you know, open mind there.

14        As to the so-called consensual releases, the

15  arguments that the mechanism doesn't adequately obtain

16  consent and, therefore, those releases may not be enforceable

17  total open mind there.  That is an issue that I am actively

18  thinking about, but I think at the same time what we are

19  dealing with here is a dynamic in which the debtor and the

20  committee, right, the people who have a principle economic

21  stake have both said to me, Judge, we get it, we want to go

22  forward and try to talk in the meantime.

23        Again, that doesn't mean that if we had a process

24  that threatened the integrity of the bankruptcy system I

25  would say, well, you guys agree so go ahead, but nothing --

1  so, I want to be listening to something that causes me to

2  stop, but the standard I think I am applying is do I have

3  something that is, sort of, so offensive as a matter of fair

4  process that I need to say the Court's imprimatur can't be on

5  this.  We have to stop it dead.  Nothing I have seen has led

6  me to have that reaction.  To the extent that is helpful to

7  understand where I am, that is where I am.

8          MR. UPTEGROVE:  Very helpful, Your Honor.  I think

9  for our purposes, as long as the understanding is, as I said,

10  for the issue of solicitation and notice that our rights are

11  reserved to argue the issue of form and manner of notice, I

12  think that works.  I also don't recall, and I don't know,

13  maybe we can work with the debtors afterwards, the way the

14  order -- its some proviso language. I don't know if it's

15  there now.

16          THE COURT:  If the order doesn't do what you just

17  said, I would encourage the parties to talk. I am seeing

18  nods. I think that is what the debtor intends the order to

19  do.  So, if there is a wordsmithing issue, you know, you all

20  will do better than I will at fixing it.

21          MR. UPTEGROVE:  So, I will not belabor the point

22  about the release.  I understand the Court's position on

23  that.  So, we had a separate issue that we raised in our

24  objection which had to do with document retention.  In light

25  of the impending sale this is something that has been highly

1  present on our minds for many weeks and we have been working

2  and having conversations with the debtor on that issue and

3  those have been productive.  We have been provided with some

4  representations about the status of the document preservation

5  and we have gotten some comfort from that.

6          THE COURT:  Can I stop you there because I saw

7  this objection in the disclosure statement objection, but is

8  this, in principle, a disclosure statement issue or a sale

9  objection?

10          MR. UPTEGROVE:  Its not an objection to the sale

11  because we actually think we have come up with a protocol

12  that is going to go forward that we are going to be

13  comfortable with, but we haven't, and I guess we could have

14  done a reservation of rights there, our bigger issue right

15  now is going forward of not just with the sale, because we

16  have worked with the debtor on some of the issues about on

17  the closing date what is going to happen with the documents,

18  but after that when the plan administrator comes in an

19  everything else what is going to happen with the documents.

20  So, I think that is a confirmation issue but it is such an

21  important critical thing for us we wanted to flag it now and

22  put it on Your Honor's radar.

23          THE COURT:  Unless someone wants to tell me that I

24  should do anything that prejudices your rights in that regard

25  let's assume that they are fully preserved.

1           MR. UPTEGROVE:  That's it.  Unless you have any

2   further questions --

3           THE COURT:  No, this is helpful. I appreciate it.

4           Anyone else with respect to disclosure issues?

5           Mr. Papendrea.

6           MR. PAPENDREA:  Yes, Your Honor.  Thank you.  Its

7   Michael Papendrea from Lowenstein Sandler on behalf of the

8   plaintiff in the securities litigation pending in the U.S.

9   District Court for the Northern District of California under

10  Case No. 22-956.  Thank you for entertaining my appearance

11  remotely given the timeline here.

12          I am not going to belabor the point.  We have

13  heard the U.S. Trustee and the SEC both raise a substantially

14  similar issue.  That said, I just wanted to speak from the

15  perspective of the securities litigation lead plaintiff who,

16  you know, is Court appointed to act on behalf of the proposed

17  class. The concern we have here is, you know, we don't want

18  to see -- we understand their rights are reserved in

19  connection with the final objection deadline with respect to

20  disclosure statement and confirmation, but we are appearing

21  today because we simply don't want to see the cart leave the

22  barn in a process that, at least, from our perspective with

23  respect to our client's constituency is, you know, flawed out

24  of the gate.

25          Essentially, you know, the opt-out mechanism

1  process being proposed here is putting an impetuous on class

2  members who don't necessarily already have that impetus to

3  pay mind to an opt-out, non-voting notice that, you know,

4  right on its first page says you are not entitled to vote on

5  the plan, you're receiving nothing under the plan and even if

6  they actually received the notice on this timeline it,

7  essentially, gives them two weeks with respect to release

8  provisions that are currently not even established yet.

9          Frankly, we just see an issue right out of the

10 gate as to whether that can actually constitute consent.

11 That being said, we hear Your Honor and so long as all rights

12 are reserved in connection with the final objection deadline

13 I think we would want to take a close look at the

14 solicitation procedures order to make sure nothing in there

15 approves the form and manner of notice in that sense so as to

16 cut off those arguments.

17         You know, we would certainly argue for the opt-in

18 mechanism you kind of threw out there before, but we won't

19 push that issue today, Your Honor.  So, with that we will

20 take a look at the proposed order and proceed from there.

21         THE COURT:  Thank you, Mr. Papendrea.

22         Let me -- is there any other party in interest

23 that would like to be heard with respect to the provisional

24 approval of the disclosure statement?

25     (No verbal response)

1          THE COURT:  Let me hear from the debtor.

2          MR. MANNING:  Thank you, Your Honor.  For the

3   record, Zack Manning of Kirkland & Ellis, on behalf of the

4   debtors.

5          Let me just reiterate for everyone, everyone's

6   rights on all matters are reserved.  The SEC, the U.S.

7   Trustee, the committee, the securities plaintiffs, its full

8   reservation as described. To the extent folks want to

9   wordsmith some of the reservation of rights, happy to work on

10  that but we did file actually the proposed revised order we

11  filed last night, added a proviso specifically in relation to

12  the opt-out form. So, we think that is satisfactory, but,

13  obviously, happy to have a conversation.

14         I think at the end of the day all we are saying

15  here is let's give peace a chance.  We want to get to a

16  consensual resolution with as many parties as we can and we

17  are going to work on that, that is always the goal.  We will

18  arrive at the confirmation hearing on October 18th, sort of

19  with whatever we have in hand at that point.  To the extent

20  there are issues at that point we will address them then, but

21  for today we are just looking to launch solicitation so we

22  can get on with the process with everything that Your Honor

23  said.

24         So, I don't have anything else for the debtors

25  unless Your Honor has any questions.  We would ask you to

1    approve the motion with a revised proposed order to follow.

2           THE COURT:  Okay.  So, for the reasons that I

3    couldn't keep to myself throughout the colloquy, I will

4    approve the disclosure statement subject to all of those

5    caveats without prejudice to anyone's substantive rights with

6    respect to releases or any other confirmation issue and allow

7    a process to happen and hope that the parties engage in good

8    faith in an effort to resolve what they can and if they can't

9    at the confirmation hearing I will look at it and resolve

10   whatever disputes there are.  So, I am happy to allow that to

11   go forward.  We will enter the order.

12          MR. MANNING:  Thank you, Your Honor.

13          THE COURT:  Let me encourage you, in light of the

14   various objections, to see if you can meet and confer with

15   respect to a form of order.  So, you said you were submitting

16   a revised version.  In any event, if you could submit that

17   under certification, great.

18          Let me say this, if there are -- look, the debtor

19   has represented that this is entirely without prejudice to

20   anyone's substantive rights.  So, if we get to confirmation

21   and the debtor gets to this podium and tells me that the

22   entry of today's order prejudices someone's substantive

23   rights they are going to have an unhappy time at that podium.

24          MR. MANNING:  We are not going to do that.

25          THE COURT:  Okay. So, to the extent, you know, one

1  needs 17 provisions that say for the avoidance of doubt

2  notwithstanding anything stated herein this is without

3  prejudice, let the parties work through that if you can't

4  resolve a form of order the parties can submit competing

5  forms, but that seems to me that that shouldn't be necessary

6  in light of the clarity that thanks to the debtor everyone

7  agrees that this is without prejudice.  So, with that I will

8  enter the order and we will wait for a certification.

9          MR. MANNING:  That sounds good, Your Honor.  Thank

10  you.

11          The last thing I have, speaking of certifications

12  of counsel, we also filed yesterday certifications of counsel

13  in relation to the final cash management order and a third

14  interim cash collateral order at Docket Nos. 586 and 582

15  respectively.

16          THE COURT:  I have reviewed those before getting

17  on the bench and started the process in motion to get those

18  orders entered.  The terrific team here, I'm sure, will get

19  those entered promptly.

20          MR. MANNING:  Thank you, Your Honor.  With that, I

21  will turn the podium over to my partner, Ms. De Paulo, for

22  the next part of our agenda.

23          THE COURT:  Very well.  Thank you very much.

24          Ms. De Paulo.

25          MS. DE PAULO:  Good morning, Your Honor.  Tabitha

1   De Paulo from Kirkland & Ellis on behalf of the debtors.

2           I plan to proceed with the evidentiary portion

3   with respect to the sale orders and then was going to hand it

4   over to my colleague, Mr. Jacobson, to address those orders

5   if it's okay with Your Honor.

6           THE COURT:  Certainly.

7           MS. DE PAULO:  So, I would like to introduce a

8   couple of declarations that the debtors had submitted in

9   support of the sale orders.  The first is a declaration from

10  Rick Polhemus from Moelis & Company, the debtors investment

11  bankers, in support of the proposed orders. That was filed at

12  Docket No. 587.  Mr. Polhemus is present in Court today and

13  available to answer any questions. The debtors would request

14  that the Court admit Mr. Polhemus's declaration into

15  evidence.

16          THE COURT:  Is there any party in interest that

17  would like to be heard with respect to the admission into

18  evidence of Mr. Polhemus's declaration that is filed at D.I.

19  587?

20      (No verbal response)

21          THE COURT:  The declaration will be admitted.

22      (Polhemus declaration received into evidence)

23          THE COURT:  Is there any party in interest that

24  wishes to cross-examine Mr. Polhemus with respect to the

25  matters set forth in his declaration?

1        (No verbal response)

2             THE COURT:  Okay.  Seeing none, you can proceed.

3             MS. DE PAULO:  Thank you, Your Honor.

4             The second declaration is from Mr. Matthew Henry,

5    the debtors chief transformation officer, that was filed at

6    Docket No. 588.  Mr. Henry is also present in Court today and

7    available to answer questions. Otherwise, the debtors would

8    request that the Court admit Mr. Henry's declaration into

9    evidence.

10            THE COURT:  Okay.  So, let me ask this question:

11   Is there any party in interest that would like to be heard

12   with respect to the introduction into evidence of the

13   declaration of Matthew Henry that is docketed at D.I. 588?

14       (No verbal response)

15            THE COURT:  Seeing none, the declaration will be

16   admitted.

17       (Henry declaration received into evidence)

18            THE COURT:  Is there any party in interest that

19   wishes to cross-examine Mr. Henry with respect to the matters

20   set forth in the declaration?

21            So, Mr. Henry can come to the stand.

22            Ms. Barksdale, if you would swear the witness.

23             MATTHEW HENRY, WITNESS, SWORN

24            THE COURT REPORTER:  Please state your full name

25   and spell your last name for the record.

1          THE WITNESS:  Matthew Henry, H-E-N-R-Y.

2          THE COURT REPORTER:  You may be seated.

3          THE COURT:  Counsel, you can introduce yourself,

4   but then hold on a moment before you begin the cross-

5   examination.

6          MR. KISSNER:  Certainly.  Andrew Kissner of

7   Morrison & Foerster on behalf of Maxeon. I just have a couple

8   of questions.

9          THE COURT:  Okay.

10          MR. STEARN:  Your Honor, if I may for the record,

11   Bob Stearn from Richards Layton & Finger on behalf of the

12   debtors.  May I please the Court. I will be handling Mr.

13   Henry's examination on behalf of the debtors.  So, if I rise

14   to object that will be why.

15          THE COURT:  Very well.  Thank you, Mr. Stearn.

16          In case there is anyone who isn't familiar, we are

17   required under various rules to limit remote participation in

18   hearings that are evidentiary to, essentially, parties and

19   their representatives.  So, we are in the process of moving

20   out of the Zoom those who are not.  Anyone is welcome to be

21   here in Court, we are just dealing with the Zoom issues.  So,

22   if you want to understand the delay, that is what is going

23   on.

24      (Pause in proceedings)

25          THE COURT:  Mr. Kissner, you may proceed.

1        MR. KISSNER:  Thank you.

2                    CROSS-EXAMINATION

3   BY MR. KISSNER:

4   Q    Good morning, Mr. Henry. I just have a couple of

5   questions for you.

6        So, one of the assets the debtors intend to sell are

7   the SunPower brand name and related trademarks, correct?

8   A    That is correct.

9   Q    Is that okay if I refer to those as the SunPower marks,

10  you will know what I'm talking about?

11  A    Yes.

12  Q    After the sale did the debtors intend to cease

13  operations once its closed?

14  A    Yes.

15  Q    So, fair to say the debtors are not going to continue

16  using the SunPower marks after the sale closes?

17  A    That is correct.

18            MR. KISSNER:  Thanks.  That is all I have.

19            THE COURT:  Okay.  Mr. Stearn, anything further?

20            MR. STEARN:  Just one second, Your Honor.

21        (Pause)

22            MR. STEARN:  Nothing from us, Your Honor. Thank

23  you very much.

24            THE COURT:  Okay.  Any other party in interest

25  wish to cross-examine Mr. Henry?

1      (No verbal response)

2          THE COURT:  Thank you for your testimony today.

3  You can step down.

4          THE WITNESS:  Thank you, Your Honor.

5      (Witness excused)

6          MS. DE PAULO:  Thank you, Your Honor.  We actually

7  have a representative of the stalking horse bidder here today

8  from Complete Solaria and they have also submitted a

9  declaration.  So, at this point I would propose to hand the

10 podium over to counsel for Complete Solaria, Mr. Brown, with

11 respect to that declaration.

12         THE COURT:  Very well.  Mr. Brown.

13         MR. BROWN:  Thank you, Your Honor.  For the record

14 Stuart Brown, DLA Piper, on behalf of the successful bidder,

15 Complete Solaria.

16         Your Honor, Docket No. 585, we filed the

17 declaration of purchaser representative Daniel Foley in

18 support of the debtors reply to Maxeon Solar Technology Ltd.,

19 objection to going concern sale to Complete Solaria, Inc.

20 Your Honor, we would move the admission of Mr. Foley's

21 declaration.

22         THE COURT:  Is there any party in interest that

23 would like to be heard with respect to the admission into

24 evidence of Mr. Foley's declaration that has been docketed at

25 D.I. 585?

1      (No verbal response)

2            THE COURT:  Seeing none, the declaration will be

3   admitted.

4      (Foley declaration received into evidence)

5            THE COURT:  Is there any party in interest that

6   wishes to cross-examine Mr. Foley?

7            Okay.  So, Mr. Foley, if you could come to the

8   stand.

9            Could you swear the witness, please.

10           THE COURT REPORTER:  Yes.

11                 DANIEL FOLEY, WITNESS, SWORN

12           THE COURT REPORTER:  Please state your full name

13   and spell your last name.

14           THE WITNESS:  Daniel Foley, F-O-L-E-Y.

15           THE COURT REPORTER:  You may be seated.

16           THE COURT:  Mr. Kissner, you can proceed.

17           MR. KISSNER:  May I approach the witness?

18           THE COURT:  You may.

19           MR. KISSNER:  Again, for the record, Andrew

20   Kissner of Morrison & Foerster on behalf of Maxeon.

21           We are good to go, everybody is --

22           THE COURT:  Yes.  You may proceed.

23                      CROSS-EXAMINATION

24   BY MR. KISSNER:

25   Q    Good morning, Mr. Foley.

1   A      Good morning.

2   Q      Thanks for being here.  I just have a couple of

3   questions about your declaration.

4          First, how long have you worked in your current role as

5   chief financial officer for Complete Solaria?

6   A      Approximately two and a half months.

7   Q      Approximately two and a half months.  Before then what

8   did you do?

9   A      Before that I was chief financial officer of a

10  manufacturing company in the Midwest.

11  Q      And you have worked in finance or the finance world for

12  about how long?

13  A      20 plus years.

14  Q      So, fairly experienced.  You have your declaration in

15  front of you.

16  A      I do.

17  Q      Could you turn to page 2, Paragraph 2, and let me know

18  when you are there?

19  A      I am there.

20  Q      So you see there is a sentence that begins "One of the

21  critical elements of the acquisition."  Do you see that?

22  A      Paragraph 2, correct?

23  Q      Yes, sir.

24  A      I do.

25  Q      So, your testimony is that:

1       "One of the critical elements of the acquisition was

2   the purchase of the SunPower name and related brand loyalty."

3       Do you see that?

4   A    I do.

5   Q    What do you mean by critical element of the

6   acquisition?  What does that mean?

7   A    It's a substantial portion of the value that we

8   assigned to the deal.

9   Q    Have you ever had the SunPower brand appraised?

10  A    We have not?

11  Q    Are you familiar with the asset purchase agreement?

12  A    I am.

13  Q    You have reviewed its provisions?

14  A    I have.

15  Q    To your understanding, does the asset purchase

16  agreement allocate any value towards the SunPower brand?

17  A    Not to my knowledge.

18  Q    Have you every undertaken any efforts to assign a value

19  to the SunPower brand?

20  A    I have not.

21  Q    And has anybody on your team done that at your

22  direction?

23  A    We have not.

24  Q    Still in Paragraph 2, the next sentence, your testimony

25  is:

1        "While the brand had certainly suffered as a result of

2    the company's financial condition, it nonetheless has an

3    important market value if properly managed."

4        Do you see that?

5    A    I do.

6    Q    So, you say the company's financial condition -- just

7    to make sure we're on the same page, the company is SunPower?

8    A    Correct.

9    Q    Okay.  So, you say the brand has suffered in value

10   because of SunPower's negative financial condition.  Is that

11   right?

12   A    Correct.

13   Q    In what way do you think its suffered in value?

14   A    Bankruptcy certainly would suffer -- make the brand

15   suffer in value.

16   Q    So, you think it's gone down as a result of SunPower's

17   lack of financial wherewithal to operate?

18   A    Yes.

19   Q    Would you agree then that the financial condition of a

20   company can have an impact on that company's brand name?

21   A    I do.

22   Q    So, if a company has poor financial condition, then its

23   brand or brands used by it could have a lower value?

24            MR. BROWN:  Objection. Lack of foundation.

25            MR. KISSNER:  Well, the witness has worked in

1  financing roles for over 20 years.  He is the CFO.  He says,

2  in his declaration, he is familiar with the brand and the

3  business.

4         MR. BROWN:  Sorry, Your Honor.  You're asking

5  questions generally about any company and if you want to

6  phrase it as a hypothetical, I guess that would be okay, but

7  you are not.  You are implicitly linking it to this company

8  and these facts and circumstances.  So, therefore, the

9  questions lack foundation.

10        THE COURT:  All right.  Well, it seems to me that

11  you should clarify whether you are asking about the

12  debtor/seller or asking a hypothetical question and we will

13  address an objection once we understand clearly what it is

14  the question is asking.

15        MR. KISSNER:  Sure.  Fair enough. I will rephrase.

16  BY MR. KISSNER:

17  Q    All else being equal, is it your experience that a

18  company in poor financial condition will have a lower brand

19  value?

20        MR. BROWN:  Objection.  Again, lacks foundation

21  whether this witness has ever had experience with companies

22  that are in distress or not.

23        THE COURT:  I will sustain it as far as it goes. I

24  think you can probably establish a foundation, but I don't

25  think you have.

1    MR. KISSNER:  I could and I can also move on.

2  BY MR. KISSNER:

3  Q    If we could go to Paragraph 3 in your declaration.  You

4  see the last -- well, the second to last full sentence that

5  starts with "BFA."  Do you see that?

6  A    I do.

7  Q    And BFA that is the brand framework agreement between

8  SunPower and Maxeon. Is that what you are referring to?

9  A    Correct.

10  Q    Have you ever read the BFA?

11  A    I have.

12  Q    So, you are familiar with its terms?

13  A    I am.

14  Q    Okay.  So, in the next sentence your testimony is:

15       "Further, there are certain restrictions and

16  requirements to maintain the brand quality under the BFA

17  including not using the marks in any manner that may

18  deteriorate the value of the marks, coordinating with Maxeon

19  on brand asset, strategy, and other matters that implicate

20  SunPower brands or any derivative thereof to promote the

21  worldwide brand value and mitigate any confusing uses of the

22  mark."

23       Do you see that?

24  A    I do.

25  Q    That is your testimony?

1   A      Yes.

2   Q      What -- so, would it be fair to say that one of the

3   things -- one of the things inherent in using a brand in a

4   way that doesn't deteriorate the value of the marks would be

5   being a responsible steward of the brand, is that fair? I am

6   just paraphrasing.

7   A      Yes.

8   Q      Would that mean not infringing on trademarks?

9   A      Yes.

10  Q      Would that mean not using a brand name in a way that

11  disparages other parties?

12  A      Yes.

13  Q      Would you agree that this entails basic quality control

14  over associated products under the brand name?

15  A      I do.

16  Q      I am going to show you something.

17         Can I approach?

18             THE COURT:  You may.

19  BY MR. KISSNER:

20  Q      Do you have the document I just handed up in front of

21  you?

22  A      I do.

23  Q      Do you recognize this?

24  A      I do.

25  Q      What is it?

1  A      This appears to be a 10-K.

2  Q      And for which year is it?

3  A      2023.

4  Q      If you could turn all the way back to the back page,

5  there is a certification of chief financial officer.  Do you

6  see that?

7  A      What page are we on here?

8  Q      The very last page of this.

9  A      Correct. Yes.

10  Q      So, there is a signature there from Brian Wuebbels.  Do

11  you see that?

12  A      I do.

13  Q      Who is he?

14  A      Brian Wuebbels is the former chief financial officer.

15  Q      So, he was your predecessor?

16  A      Yes.

17  Q      And then on the prior page there is a signature of a

18  Chris Lundell.  Do you see that?

19  A      I do.

20  Q      Who is Chris Lundell?

21  A      Former chief executive officer.

22  Q      Okay. Of Complete Solaria?

23  A      Of Complete Solaria.

24  Q      And then moving back a couple of pages to little page

25  number at the bottom 138, there is a signature at the top.

1  A      Yes, I see that.

2  Q      This is also signed by Chris Lundell, the chief

3  executive officer of Complete Solaria?

4  A      Former chief executive officer.

5  Q      Okay.  Do you believe this to be a true and correct

6  copy of Complete Solaria's 10-K for fiscal year 2023?

7  A      I do.

8  Q      And you said you have reviewed it before and you are

9  familiar with it?

10 A      I am.

11         MR. KISSNER:  I would move to admit into evidence

12 the statement of a party opponent.

13         THE COURT:  Any objection?

14         MR. BROWN:  No objection.

15         THE COURT:  The document is admitted.

16      (Complete Solaria 10-K received into evidence)

17 BY MR. KISSNER:

18 Q      So, I would just like you to turn -- we are not going

19 to spend a lot of time on this, but I would like you to turn,

20 let's call it, about two-thirds of the way through there is a

21 page number on the bottom, page 95.  Let me know when you get

22 there.

23 A      I am there.

24 Q      Do you recognize this page?

25 A      I do.

1    Q      Have you seen this before?

2    A      I have.

3    Q      What is this?

4    A      Which section are you referring to?

5    Q      Let's back up to page 94, how about the page prior.

6    A      Legal matters.

7    Q      Yes.  So, fair to say this is a summary of significant

8    legal matters pending against Complete Solaria as of the date

9    hereof?

10   A      Correct.

11   Q      So, on page 95, the second section, Solar Park

12   litigation.  Do you see that?

13   A      I do.

14   Q      Do you know who Solar Park is?

15   A      I do not.

16   Q      You do not.

17   A      No.

18   Q      So, you have -- so, is it fair to say that you are

19   unfamiliar with the Solar Park litigation?

20   A      I am.

21   Q      In that first paragraph it says:

22          "In January 2023, Solar Park Korea demanded

23   approximately $80 million."

24          Do you see that?

25              MR. BROWN:  Objection, Your Honor. The witness

1  testified he is not familiar with the litigation. The

2  document speaks for itself.

3           THE COURT:  What is your response?

4           MR. KISSNER:  My response would be that he is a

5  representative of the company. He says that he is familiar

6  with this. He is testifying on their behalf.  It seems

7  reasonable for the CFO to testify about the contents of a 10-

8  K.

9           MR. BROWN:  He didn't sign the 10-K, Your Honor.

10          THE COURT:  Look, the document is in evidence.

11 You are going to be welcome to make whatever argument you

12 want with respect to the document, but I am not sure

13 questioning the witness with respect to litigation he doesn't

14 know about is, otherwise, appropriate.  So, the document is

15 in.  You will have a chance to be heard about what it says,

16 but I'm not sure this is the forum.

17          MR. KISSNER:  Okay.  Fair enough.

18 BY MR. KISSNER:

19 Q    Can we go down to the bottom section of this page, you

20 see Siemens litigation.

21 A    I do.

22 Q    Now you know who Siemens is, right?

23 A    I do.

24 Q    Who is Siemens?

25 A    Large manufacturing electronics company.

1  Q     Okay.  Are they -- do you have an understanding of

2  their relationship to Complete Solaria?

3  A     Base level, but not detailed.

4  Q     To the extent of your understanding what is the nature

5  of their relationship with Complete Solaria?

6  A     I believe entity, Solaria, had a manufacturing panel

7  agreement with Siemens.

8  Q     Okay.  Are you aware that Siemens filed a lawsuit

9  against Complete Solaria?

10 A     I am.

11 Q     Do you know anything about that lawsuit?

12 A     That would be a question for our general counsel.

13 Q     That's fair.

14       Do you know at a high level the gist of the lawsuit,

15 what Siemens was accusing Complete Solaria of?

16 A     It predates me. I am not super familiar with the case

17 to be quite honest.

18 Q     And then just last question, do you know if Complete

19 Solaria was found liable to Siemens?

20 A     Yes.

21 Q     You can put away the 10-K for now.

22       Could we turn back to your declaration, to page 3,

23 Paragraph 6.

24 A     Okay.

25 Q     The final sentence of Paragraph 6 says:

1        "Complete Solaria is well positioned in the industry

2   and has ample experience through the preservation of its own

3   intellectual property to preserve and maximize the value of

4   the SunPower marks following its acquisition."

5        Do you see that?

6   A    I do.

7   Q    So it's your understanding that Complete Solaria, I'm

8   paraphrasing, its experienced enough, it knows what its doing

9   and so its going to be able to adequately exploit and

10  maintain the trademark. Is that the gist of this?

11  A    Correct.

12  Q    What is the basis for that understanding?

13  A    I am trying to understand your question.  What are you

14  -- can clarify for me?

15  Q    Sure.  So, maybe we can back up to the first paragraph

16  of your declaration.

17  A    Okay.

18  Q    The second sentence you say:

19       "I'm over 21 years of age and I make this declaration

20  based off my personal knowledge and participation in Complete

21  Solaria's efforts to purchase certain assets from SunPower

22  Corporation and its affiliated debtors."

23       Do you see that?

24  A    I do.

25  Q    Okay.  And how long did you say you have been with

1  Complete Solaria?

2  A     Approximately two and a half months.

3  Q     So, I guess what I am trying to figure out is what,

4  during the past two and a half months, gave rise to your

5  understanding that Complete Solaria is well positioned in the

6  industry, has ample experience through the preservation of

7  its own intellectual property to preserve and maximize the

8  value of the SunPower marks.

9  A     Well, part of that is based on the acquisition of

10 SunPower, if I am being completely honest.

11 Q     Okay.

12 A     It's a transformative acquisition for the company.

13 Q     Okay.  Can we go to the next paragraph, Paragraph 7.

14 The second full sentence you say:

15        "In particular, Complete Solaria has the necessary

16 resources, expertise, and intention to fulfill and honor all

17 the obligations set forth in the BFA."

18        Do you see that?

19 A     I do.

20 Q     And you said you have read the BFA?

21 A     Yes.

22 Q     And you are familiar with the obligations thereunder?

23 A     I am.

24 Q     I want to take this statement and I want to, sort of,

25 break it up.  So, you say that "Complete Solaria has the

1   necessary resources to fulfil and honor the obligations under

2   the BFA," right?

3   A     I do.

4   Q     What resources are those?

5   A     The 1,300 employees we are going to acquire with the

6   acquisition, the capital that we have raised for the deal to

7   move forward, the two principle legs.

8   Q     Okay.  And expertise, what is the expertise that

9   Complete Solaria has?

10  A     The amount of folks that we have got internally plus

11  those that we are bringing on board have, I think, ample

12  experience in marketing and branding.

13  Q     Then intent to honor and fulfill. I think that is easy,

14  but anything special meant by that?

15  A     Just normal course of business.  We have got some very

16  bright people.

17  Q     Okay.  And so, you have talked about these 1,300

18  employees, right?

19  A     I have, yes.

20  Q     And its also talked about in Paragraph 8 of your

21  declaration, right?

22  A     Yes.

23  Q     In Paragraph 8 you say:

24        "Complete Solaria has commenced a process of

25  interviewing existing employees of the debtors."

1      What does that mean to your knowledge, commenced a

2   process of interviewing?

3   A     So, we are interviewing individually all of the

4   employees that are coming over to Complete Solaria.

5   Q     1,300 of them?

6   A     All 1,300.

7   Q     Okay.  Sounds like quite the process.

8   A     It is.

9   Q     I'm glad I'm not part of that.

10      Have you made any job offers to any of these 1,300

11   employees?

12   A     Contingent job offers.

13   Q     Is there anything in the APA that requires you to

14   employ 1,300 employees?

15   A     That I am not aware of.

16   Q     Are you aware of anything in the APA that requires you

17   to employ any employees?

18   A     I am not.  I can't swear for certain that it is or is

19   not in the document.

20   Q     Do you know if you have committed anywhere in a writing

21   that you are, in fact, going to employ 1,300 employees?

22   A     Yes. I believe some employees have received contracts.

23   Q     Do you have a sense of about how many?

24   A     I do not.

25   Q     Not 1,300, fair?

1  A       Not all 1,300, no.

2  Q       I have one more.

3          May I approach again, Your Honor?

4              THE COURT:  You may.

5  BY MR. KISSNER:

6  Q       Do you recognize the document I have handed up to you?

7  A       I do.

8  Q       What do you recognize it to be?

9  A       It looks like it's a transcript form our 2-Q quarterly

10 conference call.

11 Q       Okay.  And you were a participant on this conference

12 call?

13 A       I did not speak on the conference call, so define

14 participant.

15 Q       Okay.  You see at the top there is a list of

16 participants and your name is there, right?

17 A       Correct.

18 Q       And then who is T.J. Rodgers?

19 A       T.J. Rodgers is the chairman and CEO of the company.

20 Q       Fair to say that T.J. Rodgers is a representative of

21 Complete Solaria?

22 A       He is.

23 Q       He has the ability to bind Complete Solaria?

24 A       He does.

25              MR. KISSNER:  I am going to offer this into

1  evidence as a statement of a party opponent.

2          THE COURT:  Any objection?

3          MR. BROWN:  Your Honor, I don't really -- yes, I

4  object to the admission.

5          THE COURT:  What is your basis?

6          MR. BROWN:  On the basis that its hearsay.  On the

7  basis that its not certified. I don't believe --

8          THE COURT:  So, the witness identified it as a

9  transcript of the call and it seems to me that your client

10 is, essentially, a party opponent with respect to these

11 matters just as you acknowledge with respect to the admission

12 of the prior document.  So, why isn't it an exception to

13 hearsay on the ground that it's a statement of a party

14 opponent.

15         MR. BROWN:  It may be, but its not a certified

16 transcript of the call, so --

17         THE COURT:  Does it need to be in order to satisfy

18 the exception to the hearsay rule?

19         MR. BROWN:  I will reserve that for redirect, Your

20 Honor.

21         THE COURT:  Okay.  Very well.  So, the document

22 will be admitted.

23      (Quarterly conference call minutes received into

24 evidence)

25         MR. KISSNER:  If it helps, for the record, I will

1   stipulate that we are not -- I am not going to seek to admit

2   the statements of operator whole farmer VP of sales.  I am

3   really just focused on Mr. Rodgers remarks.

4           THE COURT:  Okay.

5   BY MR. KISSNER:

6   Q    So, on page 1, Mr. Foley, could you go down to the full

7   paragraph at the bottom of the page?

8   A    Yes.

9   Q    This is a statement of Mr. Rodgers, right?  This is him

10  talking rather.

11  A    It is.

12  Q    Okay. He says:

13       "Our bid is $45 million for "certain assets" so this is

14  not about buying the company, buying everything in it, taking

15  over groups of people, its about assets that we want to brin

16  to Complete Solaria."

17       Do you see that?

18  A    I do.

19  Q    Do you have an understanding as to what Mr. Rodgers

20  meant by that?

21  A    I think you would have to ask him.

22           MR. BROWN:  Objection, Your Honor; speculation.

23           MR. KISSNER:  I just asked if he had an

24  understanding. It's a yes or no question.

25           MR. BROWN:  It calls for speculation.

1          THE COURT:  No.  If he has an understanding that's

2    something he can testify with respect to his knowledge.

3          MR. BROWN:  Thank you, Your Honor.

4          THE COURT:  I'm sorry, if you could answer yes or

5    no to whether you have an understanding.

6          THE WITNESS:  No.

7    BY MR. KISSNER:

8    Q     Do you have an understanding, generally, of Complete

9    Solaria's financial results for Q-2 2024?

10   A     I do.

11   Q     How would you characterize those results?

12   A     I am not trying -- I am trying to understand what this

13   pertains to.  So, can you help me here?

14   Q     Sure.  So, you have an understanding as to the

15   operating results for Complete Solaria for Q-2 2024, right?

16   A     Yes.

17   Q     I just want to know how would you characterize them if

18   I asked you at a party, if I said how is Complete Solar doing

19   in Q-2 2024, what would you say?

20   A     Well, the prior quarter of the company had run out of

21   cash due to a dispute with the debtors.  That was resolved,

22   so the company was restarting in Q-2.

23   Q     Did it turn a profit?

24   A     It did not.

25   Q     Did it have operating losses?

1  A      It did.

2  Q      Were they extensive?

3  A      Qualify extensive.

4  Q      Were they small, were they big?

5  A      Relative to a company its size, order of magnitude, I

6  mean that is a very broad question.

7  Q      Okay.  Fair.

8         Can we turn to page 4 of this transcript, about halfway

9  down the page.

10 A      Okay.

11 Q      To be clear, this is still Mr. Rodgers talking, right?

12 I just want to make sure I didn't lose my place.

13 A      Correct.

14 Q      You see in the middle of the page he says:

15        "So, this is has been a disaster."

16        Do you see that?

17 A      I do.

18 Q      Do you have an understanding as to what he is referring

19 to as a "disaster?"

20 A      Let me read the paragraph before.

21             THE COURT:  I apologize, you just lost me.  What

22 page are you on?

23             MR. KISSNER:  Its page 4.

24             THE COURT:  Got it.

25             MR. KISSNER:  Fifth paragraph down.

1          THE COURT:  Got it.  I apologize, you can

2   continue.

3          MR. KISSNER:  Not at all, Your Honor.

4          THE WITNESS:  I see it.

5   BY MR. KISSNER:

6   Q    Do you have an understanding as to what he is referring

7   to as being a "disaster?"

8   A    Yeah, I believe he is referring to the financial

9   results.

10  Q    Would you agree with Mr. Rodgers that the financial

11  results for Complete Solaria were a "disaster?"

12  A    I would not.

13  Q    You would not, why is that?

14  A    The company had gone through a pretty tough period and

15  emerged on the other side with fresh capital courtesy of T.J.

16  Rodgers.  So, from a positional standpoint the company was in

17  much better shape then it had been in the prior quarter. So,

18  I would not have referred to it as a disaster.

19  Q    Fair enough.  Two paragraphs down there is another, it

20  begins "I will make one comment here."  Do you see this?

21  A    I do.

22  Q    He says:

23      "This number, if you are an operating guy like me, you

24  tee off in that number and talk about it for the next two

25  hours. It's a horrible number."

1        Do you see that?

2   A    I do.

3   Q    Do you know what number he is referring to?

4   A    I don't.

5   Q    Is it maybe cash flow?

6   A    I do not know.

7   Q    Would you agree that there are a lot of "horrible

8   numbers" in connection with Q-2?

9   A    I would not.

10  Q    You would not.

11  A    No.

12        MR. KISSNER:  Thank you very much, Mr. Foley. I

13  have no further questions.

14        THE COURT:  Before we turn to redirect, is there

15  any other -- well, actually, is there any other party in

16  interest that wishes to cross-examine the witness?

17      (No verbal response)

18        THE COURT:  Okay. If not --

19        MR. STEARN:  Your Honor, if I might. I'm sorry,

20  Bob Stearn from Richards Layton & Finger. I am going to have

21  two questions for the witness, probably more appropriately --

22        THE COURT:  That's fine.

23        MR. STEARN:  I just wanted to --

24        THE COURT:  That's fine.  Mr. Brown, redirect.

25        MR. BROWN:  I was going to ask for a five-minute

1 recess, Your Honor.

2          THE COURT:  That seems like a fair ask.  The

3 witness is, of course, on the stand.

4          THE WITNESS:  I can't talk?

5          THE COURT:  I'm sorry.

6          THE WITNESS:  I can't talk?

7          THE COURT:  No.

8      (Laughter)

9          THE COURT:  Okay.  So, you remain on the stand.

10 So no one can talk to the witness about his testimony.  So,

11 its now 11:15, why don't we give you 10 minutes and we will

12 come back at 11:25.  Until then we are in recess.

13          MR. BROWN:  Thank you, Your Honor.

14      (Recess taken at 11:15 a.m.)

15      (Proceedings resumed at 11:26 a.m.)

16          THE COURTROOM DEPUTY:  All rise.

17          THE COURT:  Please be seated.

18          So, Mr. Brown, before we -- before you kick off, I

19 actually want to correct a ruling I made.  So, let me back up

20 because if Mr. Kissner wants to be heard on this, I want to

21 give him that chance. It seems to me that Mr. Brown was right

22 and that under Rule 804(b)(3) the statement -- I'm sorry,

23 (b)(1), the exception to the hearsay rule for a statement of

24 a party opponent does have a requirement that it be recorded.

25 I think Mr. Brown was right about that.

1          I don't think that I need to strike any of the

2   testimony because to the extent you were asking the witness -

3   - the witness was on the call, so to the extent you were

4   asking the witness about what he understood, I think that is

5   fair testimony but I think the document itself is not

6   properly admitted, but if you think I'm wrong about that let

7   me give you the chance to tell me.

8          MR. KISSNER:  Thanks, Your Honor.  For the record,

9   again, Andrew Kissner of Morrison & Foerster.

10          Where in the rule are you, 803?

11          THE COURT:  Right.  So, the exception, I take it,

12   is that you said he was a party opponent which I assume is

13   804(b)(1).

14          MR. KISSNER:  So, it's actually in the definition

15   of hearsay itself. Its in 801(d), statements that are not

16   hearsay.

17          THE COURT:  Okay.  Let's go back and look at that.

18   That is a declarant witness or that's (d)(2).

19          MR. KISSNER:  (d)(2), an opposing party statement

20   is offered against an opposing party and it was made by the

21   party of an individual representative capacity.  We laid the

22   foundation that Mr. Rodgers is a representative of Complete

23   Solaria.

24          THE COURT:  I see.  That is helpful.  So, you are

25   saying its outside the definition of hearsay under 801(d)(2).

1           Mr. Brown, do you dispute that?  This was the

2   basis, at some level, for my original ruling.  I just want to

3   get it right.

4           MR. BROWN:  No.  I don't dispute that, Your Honor.

5   I do dispute that its authenticated.

6           THE COURT:  And --

7           MR. BROWN: Its not a certified transcript of a

8   call if its not signed by anybody as being complete and

9   accurate.  Its --

10          THE COURT:  So, I took the -- the witness

11  testified that he recognized it and there is no reason, on

12  its face, it doesn't appear to be what it is. So, I will

13  overrule that.

14          So, I will go to where I was.  The document is

15  admitted.  The testimony all stands.  Thank you for that

16  correction.  Apologies for needing to work through that, but

17  more important to get it right.

18          MR. KISSNER:  Its important we get it right.

19  Thank you, Your Honor.

20          THE COURT:  Mr. Brown, let me give you the chance

21  to redirect.

22                    REDIRECT EXAMINATION

23  BY MR. BROWN:

24  Q    Good afternoon, Mr. Foley.  Stuart Brown, DLA Piper, on

25  behalf of Complete Solaria.

1       Let's start with this document.  I don't know if its
2   been marked 3, maybe, the transcript.

3   A     Yes.

4   Q     Have you read through this ever before?

5   A     I have not.

6   Q     And when counsel asked you to identify -- previously in
7   your testimony you -- how did you identify it?  What was the
8   basis for your identification?

9   A     My basis is the identification was the title in the
10  first page.

11  Q     When --

12  A     If I may add, I did not get a chance to review this.
13  You are correct, this is not, in my opinion, a final
14  transcript.

15  Q     I will move on.  Thank you.

16      Counsel asked you questions about your opinion about
17  the results of the second quarter of 2024.  Do you recall
18  that testimony?

19  A     I do.

20  Q     And you testified that you didn't believe that all of
21  the numbers were "horrible" for Q-2, is that right?

22  A     Correct.

23  Q     Was Q-2 the basis for the company's ability to raise
24  any money after Q-2?

25  A     It was not.

1  Q    Has the company raised any money following or after Q-2

2  beginning July 1st?

3  A    We have.

4  Q    How much has the company raised and under what

5  circumstances?

6  A    So, we had a July offering which was, essentially, a

7  restructuring of the old debt into new debt, new convertible

8  debt, and then we just raised an additional $66 million of

9  convertible debt in regards to this acquisition.

10 Q    And does the company presently have cash on hand?

11 A    It does.

12 Q    How much cash on hand does it have?

13 A    The company currently has $12 million of cash on hand

14 plus the $66 million that we just raised that is in escrow.

15 Q    Does the company have prospects to raise additional

16 capital in the future?

17 A    We do.

18 Q    Can you describe that?

19 A    Yes.  So, we have an equity line of credit with an

20 availability today of $27 million.  And we also intend to

21 file a shelf registration post the acquisition.

22 Q    I will ask you to look at page 4 of the supposed

23 transcript.

24 A    Yup.

25 Q    The second to bottom paragraph, in the middle there is

1  a sentence that says:

2       "We are excited to clean up and get rid of some of the

3  old logs, old jobs in the line, and get rid of some old

4  inventory, and decided to take the hit."

5       Do you know what that refers to?

6  A    I do.

7  Q    Can you explain it?

8  A    Yeah.  So, we have been in the process of for anything

9  that is sort of old jobs, old stuff as, what T.J. refers to,

10  our FAB, but really sort of jobs in process.  We have decided

11  to clean a lot of the old jobs out, to clean up the books.

12  Q    The paragraph above, the second to bottom line it says:

13       "After we paid off our old debt and paid off our

14  accounts payable to key vendors, we had $26 million left."

15       Do you see that?

16  A    I do.

17  Q    Can you explain what that refers to?

18  A    So, the -- when we did the restructuring of the debt in

19  July, we brought around $30 million of cash on the balance

20  sheet.  The time of the call was around $26 million.

21  Subsequent to that we had continued to pay down our vendors

22  and we're almost clear of all of our vendors with the

23  exception of a few tiny amounts.

24  Q    So, you said you have raised $46 million and you've

25  raised some additional capital and you have got prospects to

1 raise even more.  After you pay the purchase price, is it $45

2 million?

3 A    Correct.

4 Q    How much cash will the company have or how much in

5 commitments will it have for additional capital raised?

6 A    So, its $66 million with an additional $14 million.

7 Q    Less $45.

8 A    Less $45 -- incorrect, less $40 and a half. I have

9 already put $4 and a half million down in a deposit.

10 Q    Thank you for that clarification.

11     Do you have the declaration -- your declaration in

12 front of you.  I believe its Exhibit 1.

13 A    I do.

14 Q    Paragraph 3, please.  Third to the bottom line it says:

15     "Coordinating with Maxeon on brand assets, strategy and

16 other matters that implicate SunPower brand."

17     Do you see that?

18 A    I do.

19 Q    What does that mean, "coordinating with Maxeon?"

20 A    So, under the BFA, the prior BFA with SunPower as I

21 understand it, they had agreed to coordinate their marketing

22 efforts together.

23 Q    So, if the two companies do coordinate, they have

24 alignment in preserving and enhancing the value of the marks,

25 is that right?

1  A     They do.

2  Q     Does Complete Solaria have sufficient employes to

3  purchase these assets without hiring employees of the seller?

4  A     We do not.

5  Q     Is it your intention to hire as many employees as you

6  need to make sure that the purchaser is successful post-

7  closing?

8  A     It is.

9  Q     Following the closing, is it your understanding and

10  belief that Complete Solaria will be positioned for the

11  future to succeed?

12  A     It is.

13         MR. BROWN:  I have no further questions, Your

14  Honor.

15         THE COURT:  Okay.  Mr. Stearn.

16         MR. STEARN:  Thank you, Your Honor.  Once again,

17  Bob Stearn on behalf of the debtors.

18                    REDIRECT EXAMINATION

19  BY MR. STEARN:

20  Q     Following Mr. Brown's very helpful redirect I just have

21  one general question for you, sir, which is would Complete

22  Solaria purchase the SunPower business at issue if it didn't

23  believe it had the financial and intellectual wherewithal to

24  run it successfully and legally?

25  A     We would not.

 1          MR. STEARN:  Thank you, sir.

 2          Thank you, Your Honor.

 3          THE COURT:  Thank you, Mr. Stearn.

 4          Mr. Kissner, you can -- do you have re-redirect?

 5          MR. KISSNER:  Thank you, I have a brief recross.

 6                    RECROSS-EXAMINATION

 7  BY MR. KISSNER:

 8  Q    Do you still have the -- and for the record, Andrew

 9  Kissner, Morrison & Foerster.  Do you still have the

10  transcript in front of you?

11  A    I do.

12  Q    Okay.  Just to make sure I have this right, so at the

13  top there is a list of participants and Dan Foley, CFO, is

14  listed there, right?

15  A    Correct.

16  Q    You said you didn't actively participate on the call,

17  but you were on the call, right?

18  A    I was.

19  Q    And you have been through this transcript, does this

20  seem to comport with your recollection of the call?

21          MR. BROWN:  Objection, Yor Honor.  It

22  mischaracterizes the prior testimony as well as --

23          THE COURT:  So, the question is does it comport

24  with your recollection.  So is there any reason he can't

25  answer that question?

1          MR. BROWN:  No, I think he can.

2          THE COURT:  Okay.  You can answer that question.

3          THE WITNESS:  Yes.

4   BY MR. KISSNER:

5   Q    So, at the bottom of page 1, that last paragraph where

6   Mr. Rodgers begins with saying:

7        "And our bid is $45 million for certain assets, its not

8   about buying the company, buying everything in it, taking

9   over groups of people; its about certain assets that we want

10  to bring to Complete Solaria."

11       Do you see that?

12  A    I do.

13  Q    Do you recall Mr. Rodgers saying that?

14  A    I do.

15  Q    So, you have no reason to believe that he didn't, I

16  will phrase it that way?

17  A    I do not.

18  Q    Okay.  Then on page 4, and setting aside you disagree

19  with his characterization of the results, do you recall him

20  saying "this has been a disaster?"

21  A    I do, but I would qualify it with we managed to

22  actually reduce our operating losses during this period and

23  now have plenty of leverage.  When we come back to this

24  number we will better and more profitable then we were when

25  we hit $20 million the first time.

1  Q    I am going to move to strike everything after "Yes, I

2  do recall."

3        THE COURT:  I guess I will strike that as non-

4  responsive.  The document is in evidence so this is sort of

5  angels dancing on a head of a pin, but I think you are

6  technically correct.

7  BY MR. KISSNER:

8  Q    Then when he says "it's a horrible number" do you

9  recall him saying that?

10  A    I do and I still disagree with it.

11  Q    That's fair.

12        Finally, on the last page the third full paragraph from

13  the top, T.J. Rodgers, and it starts with "yeah."  Let me

14  know when you are there.

15  A    I'm there.

16  Q    Okay.  And he says:

17        "When Maxeon split out of SunPower they got the rights

18  to put SunPower on their products.  Obviously, they had to

19  have that.  They split out and they had to be able to use

20  their same manufacturing name, so there is a cloud over the

21  use of the word or the use of the trade name SunPower and its

22  contractual and its real."

23        Do you see that?

24  A    I do.

25  Q    Do you recall Mr. Rodgers saying that?

1  A      I do.

2  Q      So, you have no basis for thinking he didn't, in fact,

3  say that?

4  A      I don't, no.

5  Q      Okay.  And your disagreements with Mr. Rodgers aside,

6  does Mr. Rodgers have an understanding of the company's

7  financial performance?

8           MR. BROWN:  Objection.  There is no basis for this

9  witness to know if Mr. Rodgers understands (indiscernible) --

10           THE COURT:  He can answer the question whether he

11  knows what Mr. Rodgers thinks.

12           THE WITNESS:  I wouldn't want to speculate for Mr.

13  Rodgers.

14  BY MR. KISSNER:

15  Q      Okay.  Do you think he has an understanding of the

16  company's financial operations and results?

17  A      I do.

18           MR. KISSNER:  Thank you.  No further questions.

19           THE COURT:  Okay.

20           MR. BROWN:  Just one question.

21           THE COURT:  Yes.

22           MR. BROWN:  Maybe two.

23           THE COURT:  Mr. Brown, you are welcome to examine

24  the witness.

25           MR. BROWN:  Thank you, Your Honor.

1                       FURTHER REDIRECT EXAMINATION

2   BY MR. BROWN:

3   Q     Please turn to page 4 of the transcript.  You were

4   testifying about what is the fourth full paragraph, is that

5   right?

6   A     Correct.

7   Q     What were you about to tell us that will be responsive

8   to my question, but maybe not other counsel's question.

9   A     Yeah, so what I was trying to get across was even

10  though T.J. says it was a "disaster" I disagree because there

11  was material  improvement in the operating income of the

12  company because of an expense reduction that had occurred and

13  the real work that had been done internally to reduce

14  operating expense so that when the company emerged from the

15  prior debt issue it would have leverage to move upwards which

16  is halfway now occurring.

17  Q     The date of this transcript or this call of which this

18  is a transcript was, what's the date?

19  A     August 14th, 2024.

20  Q     And were you employed by Complete Solaria on that date?

21  A     I was.

22  Q     Based on your observations of Complete Solaria's

23  performance since your employment have you seen an upward

24  trajectory of its prospects?

25  A     I have.

1      MR. BROWN:  No further questions, Your Honor.

2      THE COURT:  Thank you.  Any other party in

3  interest have any further questions for the witness?

4      (No verbal response)

5      THE COURT:  Thank you for your testimony.  You can

6  step down.

7      (Witness excused)

8      THE COURT:  Mr. Stearn.

9      MR. STEARN:  Good morning still, Your Honor.  Just

10  need to round out the evidentiary record.  We would like to

11  introduce one document into the record for purposes of,

12  essentially, arguing the Maxeon objection.  That is the brand

13  framework agreement. Its attached to our reply. I can also

14  hand up a copy, whatever is most convenient for Your Honor.

15      THE COURT:  I have your -- actually no harm in

16  having a physical copy.

17      MR. STEARN:  Just because I have so many and you

18  have several nice folks in front of you, I am going to hand

19  up three.

20      THE COURT:  Very well.  Thank you very much.

21      MR. STEARN:  Thank you, Your Honor.  So, we would

22  respectfully move the brand framework agreement into evidence

23  as Debtors' Exhibit 1, I guess.

24      THE COURT:  Any objection?

25      UNIDENTIFIED SPEAKER:  No objection.

1          THE COURT:  Okay.  The brand framework agreement

2   will be admitted.

3        (Brand framework agreement received into evidence)

4          MR. STEARN:  Thank you, Your Honor. I will turn it

5   over to my colleague, Mr. Collins, I think, at this point --

6   no, I won't, I will turn it over to someone else.

7          THE COURT:  Very well. I'm happy to hear from

8   whoever wants to help me.

9          MR. STEARN:  Thank you.

10          THE COURT:  Thank you, Mr. Stearn.

11          MR. JACOBSON:  Good morning, Your Honor.  Rob

12   Jacobson, Kirkland & Ellis, on behalf of the debtors.

13          So, how I would propose to proceed is to talk a

14   little bit about the two asset sales. I will start first with

15   the SunStrong sale because I think they will move quickly and

16   then go to the going concern Complete Solaria sale.

17          So, this morning we filed a revised agenda which

18   shows that the debtors spent their time wisely over this

19   weekend and this morning resolving as many objections as we

20   possibly could, that effort was successful.  As I will

21   preview later, we were able to resolve the Taylor Morrison

22   objection.  I will get to that when I talk about the Complete

23   Solaria sale.  So, that just leaves the Maxeon objection.

24          So, turning towards the SunStrong sale just to

25   highlight a few points for the record on September 17th,

1  pursuant to the bidding procedures, the debtors filed a

2  notice of winning bidder and announced that Goodfinch and

3  HASI were the winning bidders for the SunStrong assets.  The

4  winning bidder notice is filed at Docket No. 546 and that

5  notice also attaches the form of the asset purchase

6  agreement.

7            On Septembrer 19th the debtors filed the SunStrong

8  sale order and that is at Docket No. 546.  Last night we

9  filed a further revised order at Docket No. 590 which

10 included a redline that highlighted a few key changes that

11 resolved informal comments that we received for the SunStrong

12 sale order.

13           We also filed a further revised order, I think,

14 actually during this hearing and that is at 596.  That

15 includes a couple of tweaks that we made really to the Cigna

16 objection.  That was our miss, we missed including a

17 paragraph, so we got that in this morning and we believe that

18 resolves Cigna's objection.

19           One other thing to flag about the order we

20 received during the hearing this morning, just one minor

21 comment related to Paragraph 28, and that is the paragraph

22 that deals with books and records of the debtors in relation

23 to what we call the service assets, so some of the assets

24 that are going to go over pursuant to the sale.  We just need

25 to take that language, talk about what the purchaser is and

 1  everyone's respective clients.  We fully expect to come back,

 2  file a revised form of order shortly after the hearing.

 3          THE COURT:  Okay.  For the record, to the extent

 4  things had been filed during the hearing I haven't read them.

 5          MR. JACOBSON:  Yes.  Fair enough.  I completely

 6  understand that, Your Honor.

 7          So, Your Honor, the revised form of order it

 8  reflects all comments received, all objections have been

 9  resolved with respect to the sale.  So, we would respectfully

10  request at this time entry of the sale order subject to us

11  filing a further revised order under certification of

12  counsel.

13          THE COURT:  Is there any party in interest that

14  objects?  This is the SunStrong sale, right?

15          MR. JACOBSON:  Yes, Your Honor.

16          THE COURT:  Is there any party in interest that

17  would like to be heard in opposition to approval of that

18  sale?

19      (No verbal response)

20          THE COURT:  Okay.  Seeing none, subject of course

21  to my actually looking at the order, and certainly the

22  absence of any objection, I am satisfied that the debtors ran

23  an appropriate process, exercised its reasonable business

24  judgment, and we will enter an appropriate order.

25          MR. JACOBSON:  Thank you, Your Honor.

1          So now turning to the complete Solaria sale. The

2   sale, as we have mentioned a number of times, is the

3   cornerstone of these Chapter 11 cases.  On September 16th the

4   debtors filed a winning bidder notice which announced

5   Complete Solaria as the winning bidder for the going concern

6   assets.  The winning bidder notice is filed at Docket No. 398

7   and that notice also attached a copy of the asset purchase

8   agreement.

9          On September 19th we filed a sale order at Docket

10  No. 545.  Then yesterday we filed a revised form of order at

11  Docket No. 592 that attached a redline as well showing the

12  changes that we had made over the course of the weekend to

13  resolve objections.  This morning, we filed a signed contract

14  schedule and that lists -- that schedule is attached as

15  Exhibit 2 to the sale order and is filed at Docket No. 594.

16  We also, I believe during this hearing, filed a revised sale

17  order with some minor tweaks as well to resolve some further

18  comments related to language that we included in the sale

19  order to deal with the surety bond issues.  That has all been

20  agreed.  Its been filed at Docket No. 595.

21          THE COURT:  Okay.  So hold on a se cond.  So, that

22  is helpful to understand.  So, the objection that we had from

23  the insurer that has now been resolved.

24          MR. JACOBSON:  Which insurer?

25          THE COURT:  The surety bond insurer.

1          MR. JACOBSON:  Yeah.  All the surety bond issues

2   have been taken care of in the sale order.

3          THE COURT:  Okay.  Very helpful.  Thank you, Mr.

4   Jacobson.

5          Can I ask this question, not to interrupt the

6   presentation, are you aware of an objection to the Complete

7   Solaria sale other than the Maxeon objection?

8          MR. JACOBSON:  Just to -- well, no, I am not.

9          THE COURT:  Okay.  Let me let you continue.  That

10  is helpful for me to wrap my brain around.

11         MR. JACOBSON:  I have had a bunch I have been

12  going through all weekend.

13         THE COURT:  I get it, everyone is working very

14  hard.  So, I appreciate it.

15         MR. JACOBSON:  Thank you, Your Honor.  So, as I'm

16  sure you are aware, we received a bunch of cure objections.

17  So, I just want to briefly talk about assigned contracts just

18  to clear up any confusion for folks listening on the line.

19         On September 4th we filed our cure notice.  We

20  also served it.  We did that over two filings and that is at

21  Docket No. 304 and 305. On September 10th, in accordance with

22  the bidding procedures, we also filed the supplemental cure

23  notice.  Also, in accordance with the bidding procedures, the

24  debtors served an adequate assurance package from Complete

25  Solaria and that was served on each of the counterparties who

1  at the time were contemplated to potentially be going over to

2  Complete Solaria in connection with this sale.

3            With respect to the cure objections, you know,

4  once we received them, the debtors have contacted each of the

5  cure objectors to adjourn the hearing on the cure objections

6  to October 7th and that has been reflected in the revised

7  agendas that we filed in advance of this hearing.  And as I

8  mentioned, we received approximately 55 cure objections, but

9  I want to point out that is set forth on Exhibit 2.

10            The debtors are only proposing to assume and

11  assign contracts for approximately about 10 of the contact

12  counterparties related to those 55 objections.  So, the

13  universe of objections that we need to resolve for purposes

14  of cure in relation to this sale is very, very small compared

15  to what has been filed.

16            I also want to just be clear that Paragraph 18 of

17  the sale order preserves the rights of contract

18  counterparties who have filed timely objections to the

19  proposed cure amounts, assumption and assignment, and

20  adequate assurance of future performance.  So, Paragraph 18

21  seeks to preserve those and hopefully we will resolve all

22  issues in advance of October 7th.

23            I just want to point out, because we have just a

24  small error on the agenda, that the rights of Tri-Pointe, New

25  Home Company, and FH2 Home Builders who filed objections

1  respectively at Docket No. 533, 532, and 527.  Their rights

2  are reserved as well. I think we had marked on the agenda

3  that those objections were fully resolved.  What we meant to

4  say was that they -- parts of them were resolved by language

5  in the sale order.  The cures will be heard on the 7th if

6  necessary.

7          THE COURT:  Okay.

8          MR. JACOBSON:  Last thing to point out about

9  contracts is that on Exhibit 2 we were very careful to notate

10  on a line item by line item basis which contracts are subject

11  to timely objections that will be continued to October 7th

12  and we thought that was just important to notate on the

13  schedules so that there was no confusion for folks.

14          Now, let me turn to the Taylor Morrison

15  resolution.  The debtors, the purchaser, and Taylor Morrison

16  have worked to come to a resolution on the objection.  We

17  were happy to do so this morning. I am going to read a quick

18  blurb into the record and then happy to answer any questions

19  about it.

20          So, to resolve the objections of Taylor Morrison,

21  filed at Docket Nos. 482 and 560, the debtors, Taylor

22  Morrison and the purchaser have agreed that they will enter

23  into a joint stipulation to reject the debtors contracts with

24  Taylor Morrison on an expedited basis so that the Court may

25  enter an order approving such stipulation by Friday,

1   September 27th, 2024.  As soon as reasonably practicable, the

2   debtors shall file a revised assigned contracts list, which

3   is Exhibit 2 to the sale order, that shall remove the Taylor

4   Morrison contracts from the assigned contracts list.

5           From the date hereof until the entry of the order

6   approving the stipulation and providing for the rejection of

7   the Taylor Morrison contracts, the debtors consent to lift

8   the automatic stay solely for the limited purpose of allowing

9   Taylor Morrison to find replacement vendors, including

10  equipment, installers, and other replacement vendors, to

11  complete ongoing projects.

12          THE COURT:  Okay.

13          MR. JACOBSON:  So, that is our resolution, Your

14  Honor.  We will anticipate filing the stipulation imminently

15  and then we are hopeful to have that entered on an expedited

16  basis if Your Honor permits.

17          THE COURT:  We will do our best once that comes

18  through.

19          MR. JACOBSON:  Thank you, Your Honor.

20          So, now the last thing to talk through are the

21  Maxeon issues and I will cede the podium to our colleagues at

22  Richards Layton to take us through that.

23          THE COURT:  Before we go there, let me ask this

24  question: Is there any party in interest other then Maxeon

25  that objects to the Complete Solaria sale?

1       (No verbal response)

2               THE COURT:  Okay.  So, we are down to that issue.

3   Very well. I am happy to hear from whoever can help me get

4   this right.

5               MR. JACOBSON:  Thank you, Your Honor.

6               THE COURT:  Thank you very much, Mr. Jacobson.

7               Mr. Collins.

8               MR. COLLINS:  Good morning, Your Honor. For the

9   record, Mark Collins of Richards Layton & Finger on behalf of

10  the debtors.

11              Given that its Maxeon's objection I will turn the

12  podium over to them to present their objection and then I

13  will reply.

14              THE COURT:  Very well.

15              MR. COLLINS:  Thank you.

16              THE COURT:  Thank you.

17              MR. KISSNER:  Good morning, Your Honor.  For the

18  record, Andrew Kissner of Morrison & Foerster on behalf of

19  Maxeon.

20              One housekeeping item, actually, you previously

21  moved the brand framework agreement into evidence.

22              THE COURT:  I didn't move anything.

23              MR. KISSNER:  Okay.  Sorry, the debtors had moved

24  into evidence.  My understanding from the client is that that

25  version that was admitted it might not have the right

1  schedules on it.  I am not sure that it becomes a material

2  fact today, but I would suggest that just for clarity of the

3  record perhaps after the hearing we can meet and confer and

4  figure it out.

5          THE COURT:  The parties can do that, that's fine.

6  I take it the provisions that are at issue today are the

7  provisions that we have got.

8          MR. KISSNER:  That is correct, but conceivably the

9  ruling today could impact rights to certain trademarks and so

10 the inaccuracies might actually have to do with the

11 trademarks that are listed.  So, just important going

12 forward.

13         THE COURT:  Very well.

14         MR. KISSNER:  So, I would like to start maybe with

15 first principles and I am assuming that Your Honor has reads

16 through the papers.  So, you understand where we sit.  I

17 think it's really important and, candidly, I hope helpful to

18 sort of start at the beginning.

19         There is a SunPower brand name and there are

20 associated trademarks, and the parties and the contract refer

21 to those as the SunPower marks.  There was a document, it was

22 the brand framework agreement, and it was entered into in

23 connection with the spinoff.  The brand framework agreement

24 it, essentially, split these marks in two.  It was an asset,

25 it was once held by one combined entity and then when Maxeon

1   was spun off they were now two entities.  They were charting

2   their own path and the brand framework said, hey, you guys

3   can each use these marks in different parts of the world and

4   then when you are done with it you have to give it back.

5           So, the effect of that, as a matter of property

6   law, is that there is a couple.  First is that what SunPower

7   got was a qualified ownership of the SunPower marks.  What do

8   I mean by "qualified."  Well, qualified is in contrast to the

9   idea of absolute ownership, right.  I absolutely own this

10  pen, right. I can use it, I can write with it, I can sell it,

11  I can throw it out if want to.  Nobody is going to come after

12  me and they can't because its mine, it belongs to me.  That

13  is absolute ownership.

14          There is also qualified ownership and qualified

15  ownership that means that, yeah, you might have titles to

16  something, you might have possession of it, you might even

17  have a usufruct, you are able to use it, I have always liked

18  that word, but you are not an absolute owner.  You ownership

19  and enjoyment of it its either limited in time, in use, or

20  its split with another person.  So, if we look at the rights

21  that were created in the SunPower marks, vis-à-vis SunPower,

22  they were qualified and actually in all three senses.

23          THE COURT:  Right. So, I get the bundle of sticks

24  point. I am with you that far.  Where I think your work is,

25  is explaining to me why the rights that the debtor has in

1   12.2 aren't part of the bundle of sticks.

2           MR. KISSNER:  Sure.  And I am happy to go there

3   now or I am happy to get there in due course.

4           THE COURT:  Whatever works for you.

5           MR. KISSNER:  Okay.  I won't keep you in suspense

6   for too long, but I will get there.  So, it's a limited

7   bundle of sticks to use the old analogy.

8           THE COURT:  I'm old.

9           MR. KISSNER:  No comment.

10          THE COURT:  More so every day.

11       (Laughter)

12          MR. KISSNER:  More so after this morning, I'm

13   sure.

14          So, that is SunPower's perspective.  Then there is

15   also a view from Maxeon's perspective, right, there is sort

16   of this yin and yang, this converse relationship whereas

17   SunPower has a qualified ownership. The necessary corollary

18   of that is that Maxeon has a property interest, right.  So,

19   that property interest, it manifests itself in a couple of

20   ways in this agreement but to be clear, with respect to these

21   property interests this agreement isn't executory.  Its

22   already done its work.

23          When it was entered into back in 2021 the work was

24   done. Maxeon was granted consent rights over a sale of the

25   marks to any other party and it had a conditional future

1   interest, that is what it would be called if we were in a

2   property class right now, in the marks.  Conditional, why,

3   because it wasn't absolute, it was triggered by another event

4   that happened at some time in the future.  Future, why,

5   because it doesn't have possession of the marks right now.

6   So, that is where the parties were before they entered into

7   bankruptcy.

8           So, now we are in bankruptcy and we still have no

9   property interests.  SunPower still has qualified ownership.

10  I think --

11          THE COURT:  Can I ask you this question: If you

12  are right about that why are you entitled to adequate

13  assurance of anything?

14          MR. KISSNER:  Well, adequate assurance or adequate

15  protection?

16          THE COURT:  Adequate assurance of future

17  performance.

18          MR. KISSNER:  If --

19          THE COURT:  If this is not an executory contract -

20  -

21          MR. KISSNER:  Oh, it's certainly an executory

22  contract with respect to other obligations going back and

23  forth, but in the sense that let's imagine that you had a

24  contract, I don't know, bequeathing a house or gifting a car

25  the language that says, you know, I hereby grant you an

1   ownership in my Audi Q5, right, that is already done. I have

2   signed it, its over.  We have moved past it.

3          If then in the next segment it says, by the way,

4   in exchange for you taking it to get detailed, and getting

5   the oil changed, in exchange for you agreeing not to take it

6   out of the state without my consent, you know what I am going

7   to do, I'm going to pay for the insurance, I am going to pay

8   for the registration, I'm going to pay for the title.

9          THE COURT:  I understand you could have a contract

10  that both grants a property interest and contains executory

11  obligations, but what the executory obligations that you owe

12  that are being assigned such that you would be entitled to

13  adequate assurance if not the underlying interest in the

14  marks.

15         MR. KISSNER:  So, there is a handful.  Starting

16  maybe backwards in the agreement, just because that is where

17  I opened it to, you have the indemnification provisions in

18  Article 11. I think that those, to the extent assumed and

19  assigned by the debtor, that would be an unfulfilled promise

20  and certainly they would feel entitled to sue us for breach

21  if we didn't live by our end of the bargain.  There are also

22  non-exclusive trademark licenses that are granted.

23         THE COURT:  I follow.

24         MR. KISSNER:  So --

25         THE COURT:  You have answered my question.  Thank

1  you.

2         MR. KISSNER:  And so -- but it's actually -- it's

3  a good transition to, I think, where we are right now because

4  they filed for bankruptcy, yes, but let's talk about what

5  they haven't done, right?  They haven't filed an avoidance

6  action, right, under Chapter 5, seeking to claw back this

7  property interest as a fraudulent transfer or a preference,

8  and I think we're outside of the preference window.   They

9  haven't sought to rescind the contract, right?  They haven't

10 sought to make a showing under Section 363(h) to sell a co-

11 owner's interest in a right.  They haven't filed any sort of

12 litigation actually challenging the validity of this

13 contract.  In the reply that was filed last evening, they

14 start to make some noises about this being, you know,

15 anticompetitive or an unlawful restraint on alienation, but,

16 you know, that's just words on a page in a reply.

17         There's been no serious affirmative effort by them

18 to undo this contract or really to take back what they gave

19 us, right?  It's ours.  And so, where it stands, maybe when I

20 sit down, I'll wake up and I'll see we got served with a, you

21 know, 548 action, I don't know, but that's not where we are

22 now, right?  And so what I think the line of unbroken

23 precedent going back to before there even was a Bankruptcy

24 Code says is that, if you have a contract and it's granted a

25 property right, the fact that you enter into bankruptcy, the

1  fact that you enter into the land of broken promises, doesn't

2  take it back.

3          THE COURT:  So I'm with you in the Chicago Board

4  of Trade point, I'm with you that far.

5          MR. KISSNER:  Okay.  And so here's another thing

6  they haven't done, right?  They haven't sought to reject the

7  contract either.  We don't have to get into rejection because

8  it's not a live issue, but the fact that they haven't sought

9  to reject it, they're in fact seeking to actively assume it

10 and assign it, right?  And so this sort of leads to the

11 circularity that sort of makes my brain hurt, right, is that

12 one of the conditions under 365 for assumption and assignment

13 of a contract, you brought up adequate assurance, another

14 thing that you have to do is you have to cure defaults, you

15 have to cure existing defaults, right?

16         And I don't think, until they are successful in

17 either rescinding the contract or declaring it void, I don't

18 think that there's really a reasonable basis to argue that

19 their intention to sell the marks, in violation of 4.5, and

20 their failure to honor the ROFR rights, those are breaches of

21 the contract, right?  They have --

22         THE COURT:  So now help me with 12.2.

23         MR. KISSNER:  Sure.

24         THE COURT:  So that -- I mean, I candidly was

25 surprised that you filed an objection that made no mention of

1  it.

2        MR. KISSNER:  Okay, that's fair.

3        THE COURT:  So -- and you've now spent 15 minutes

4  not talking about it.  So can you tell me what your answer

5  is?

6        MR. KISSNER:  Yeah.  So my answer is that there's

7  a difference between the contract and the underlying property

8  right, right?

9        And so let's look at 12.2 says.  12.2 sets forth a

10  rule and it sets forth an exception, right?  And so here's

11  the rule:  This agreement may not be assigned by either party

12  without prior written consent.  Here's the exception:

13  Notwithstanding the foregoing, either party may assign this

14  contract under various circumstances.

15        And there can be a debate as to whether those

16  circumstances are met, and maybe we'll get there --

17        THE COURT:  Okay.

18        MR. KISSNER:  -- maybe we won't, right?  Okay.

19        This is the language:  This agreement may not be

20  assigned.  This is about the ability to assign an agreement.

21        Let's look at Section 4.5, right?  Again, there's

22  a rule and there's an exception.  And let me know when you're

23  there, Your Honor.

24        THE COURT:  Okay.

25        MR. KISSNER:  And so 4.5 says -- and again, here's

1    the ruling:  "Neither party shall, unless approved by the

2    parties of the brand council sell" -- dot, dot, dot -- "or

3    otherwise dispose of any of its right, title, or interest in

4    or to any of the SunPower marks."

5          THE COURT:  Right.  12.2 speaks specifically to

6    what happens if there's going to be a sale of substantially

7    all, that's the more specific provision, it speaks to this

8    problem.  So explain to me why that doesn't control over the

9    general version.

10          MR. KISSNER:  Because 12.2 talks about assignment

11   of a contract, not a transfer of the underlying marks, and

12   there's a difference between this brand framework agreement

13   that talks about what the parties can or cannot do with these

14   property interests and actually selling the underlying

15   property itself.

16          To go back to the analogy that I used before,

17   right, where we agree to split usage of my car, right?  I

18   can't -- maybe I can transfer to a friend or to an assignee

19   or a successor the obligation to pay the insurance, pay the

20   title fees, do all this stuff as long as the judge, you know,

21   takes it to the car wash and takes good care of it, right?

22   But me assigning that contract isn't effect -- it isn't

23   effective to actually transfer title to the car, right?  If

24   you went to DMV and you said, hey, I have this executory

25   contract from Mr. Kissner, they'd say, okay, I can't register

1    this car in your name.

2          And so I'm not trying to be facetious, I just --

3          THE COURT:  No, look, I understand the notion, the

4    philosophical notion, the difference between a contract right

5    and a property interest.  To be candid, the distinction

6    approaches the philosophical pretty quickly, right?  Because

7    any property interest could be reconceptualized essentially

8    as a covenant not to sue and exactly how that distinction

9    works is pretty complex.  What we've got is essentially a

10   question of whether this agreement should be understood, when

11   you see 12.2, to be limited to not all of the rights acquired

12   under the contract, but just the executory rights that remain

13   in the hands of the parties.  And that's not conceptually

14   impossible, but it doesn't strike me as commercially the most

15   likely.

16          MR. KISSNER:  I respectfully disagree; I see it

17   completely differently.  And I think the plain language of

18   the contract actually supports it.  And part of why we didn't

19   address it in our sale objection is that I was honestly

20   shocked that they suggested that 12.2 that, again, relates to

21   assignment rights of a contract could somehow -- and, by the

22   way, the general provision, right, this contract cannot be

23   assigned unless this boilerplate somehow supersedes the

24   specific right, specific right -- and this is a mutual right

25   -- and it's not about rights in general, right, it's not

1  about assignment of the contract, this is about the sale,

2  assignment, transfer, license, or disposal of right, title,

3  or interest in or to the SunPower marks, right?  That is a

4  specific subset of the assets that are actually governed by

5  this agreement, and so it would read 4.5 out of the contract.

6  And I think it also --

7          THE COURT:  No, it wouldn't.  It would apply in

8  every single case except for the limited circumstances and

9  it's 12.2 applies.  So you couldn't just decide I'm going to

10 sell this and stay in business, you couldn't just sell this

11 without one of the specific events in 12.2 applying.  So

12 there's plenty of work to do in 4.5 even if 12.2 covers the

13 situation in the context of a change of control or sale of

14 substantially all.

15         MR. KISSNER:  Yeah, but I think -- I take your

16 point, Your Honor, but I think that that sort of ignores --

17         THE COURT:  What if there were a merger?

18         MR. KISSNER:  What --

19         THE COURT:  Imagine there were here, the parties

20 were agreeing -- you're sitting down at the beginning of this

21 and one of the things you're thinking about is what happens

22 if there's a merger between me and somebody else, right?  You

23 write 12.2 to deal with that problem, but if 4.5 means what

24 you say, then it can't transfer to the acquirer, right?

25         MR. KISSNER:  I agree, and I don't think that

1  that's at all a fantastical or --

2            THE COURT:  If you wanted --

3            MR. KISSNER:  -- illogical result --

4            THE COURT:  -- to solve that problem, wouldn't you

5  write language a lot like what's in 12.2?

6            MR. KISSNER:  I wouldn't.  I would write 4.5

7  because I think it's crystal clear, right?  Nobody can assign

8  the marks unless they consent.

9            And part of why I'm so sort of confident in this

10 position is because of -- let's think about what these assets

11 actually are, right?  It's not money in a bank account, it's

12 not my car, it's not even like a customer list; it's not

13 property plant and equipment, right?  These are trademarks,

14 right?  And particularly in not just the licensor/licensee

15 context, but also in the context of what are known as

16 trademark coexistence agreements, we talk about that a little

17 bit in our papers.  If you read through the jurisprudence and

18 the body of law on that, what becomes really clear -- and it

19 manifests itself, frankly, in all of the decisions that

20 spring forth from it, they're actually very logically

21 consistent because the common thread is that what is

22 paramount is the identity of your counterparty, right?

23 Because -- sorry, Your Honor.

24            THE COURT:  No, I understand, I understand that

25 and I get that point.  Can I ask you this question --

1          MR. KISSNER:  Certainly.

2          THE COURT:  -- this -- is this form of agreement

3   sort of an unusual -- this problem arises -- I mean, I

4   understand this was a spinoff, but this sort of situation of

5   I'm letting you use my mark under, you could call it a

6   license or whatever else, and we're dealing -- I don't want

7   you giving it -- you know, it's exclusive, you can't give it

8   to anybody else because for all the reasons usually

9   identified, we care who the user is, et cetera, but we deal

10  with the situation of change of control, merger, sale of

11  substantially all.  Is the language here that deals with this

12  both the limitation on use and the restriction on alienation,

13  but with the exception for the change of control and sale of

14  substantially all, is this language unusual, or is this

15  pretty standard?

16         MR. KISSNER:  I confess that I don't know, I

17  haven't -- I'm not an IP practitioner in my whole life.

18         THE COURT:  Well --

19         MR. KISSNER:  And I don't say that to be flippant

20  --

21         THE COURT:  -- no, I hear you.  It's just -- look,

22  this sort of -- I guess I'm interested, this sort of problem,

23  you would think, would arise outside of bankruptcy not

24  infrequently when you have a sale of a business that is the

25  holder of a mark, and I guess -- you know, you don't point me

1  to any case law, as far as I can recall, in which outside of

2  bankruptcy a court enjoined a transaction on the ground that

3  it purported to sell a trademark, you know, in connection

4  with a sale of substantially all in a way that violated, you

5  know, the general principle that you have an exclusive

6  license, but you can't sell it to some third party.

7          MR. KISSNER:  Certainly, I'm aware of none in this

8  coexistence framework, right?  And my understanding --

9          THE COURT:  Right, but --

10          MR. KISSNER:  -- is it's a bit bespoke --

11          THE COURT:  -- does this depend on the co --

12  that's actually my question, is there anything special about

13  the coexistence framework that ought to be different from

14  what happens any time you've got an exclusive use of a mark?

15          MR. KISSNER:  Well, I'm not sure that it's

16  exclusive right for all of the marks, right?  You actually

17  need to parse the agreement on a --

18          THE COURT:  Okay --

19          MR. KISSNER:  -- mark-by-mark basis --

20          THE COURT:  -- it doesn't even need to be

21  exclusive for this purpose, though, for the analysis, right?

22  The point is that -- all I mean is that it's not -- you can't

23  give it to some random person.

24          MR. KISSNER:  So it comes up quite frequently in

25  the licensor/licensee context, right?  And this is actually

1  where the Code comes in, where 365(c)(1) comes in, which says

2  -- and I think this is really important because people tend

3  to focus on one part of the sentence and not the other,

4  right?  And so what 365(c) says -- and I'll -- we can wait if

5  you want to go there.

6          THE COURT:  Let me make sure I understand.  I

7  think I know what the words say, but let me look at them.

8  Okay.

9          MR. KISSNER:  Okay.  So, (c), "The trustee" --

10  here SunPower, debtors -- "may not assume or assign any

11  executory contract," dot, dot, dot, "whether or not such

12  contract or lease prohibits or restricts assignment of rights

13  or delegation of duties if applicable law excuses the party,

14  other than the debtor, from accepting performance from" a

15  non-debtor, right?

16          And I think that when courts look at this and they

17  talk about it, and when we as practitioners engage with this

18  from day to day, I think the way we just read this is we go,

19  okay, trustee may not assume or assign a contract, blah,

20  blah, blah, blah, blah, if applicable law excuses the party,

21  but that's not what it says, right?  It says whether or not

22  such contract prohibits or restricts assignment or delegation

23  of duties, whether or not, then it may not be assigned if

24  applicable law excuses the non-debtor from accepting

25  performance from somebody other than the debtor, and the

1  paradigmatic example of that is in a license of intellectual

2  property.

3          (Pause)

4          THE COURT:  Okay.

5          MR. KISSNER:  And so where we -- you asked for a

6  case and so it's not one with this coexistence framework, but

7  I think the debtors cite to it as well, is in the <u>Trump</u>

8  <u>Entertainment</u> case, right?  And I think that that has a

9  pretty good recitation of how this works.  There's a federal

10  -- there's a background body of non-bankruptcy law that

11  excuses performance, right?  It excuses performance by a

12  party other than your contractual counterparty under a

13  license, under this idea that your identity of interest is of

14  paramount importance.  These are idiosyncratic things.  I

15  can't -- or Maxeon can't go out onto the open market and buy

16  another SunPower, right?  It's priceless; it has no price, it

17  can't be quantified.

18          And so you have a chorus of courts applying non-

19  bankruptcy law that apply the law of marks and they

20  consistently, in granting specific performance, right, in

21  granting injunctions, preliminary injunctions against

22  potentially infringing conduct, they do that not because

23  equitable remedies are favored.  In fact, it's the opposite,

24  right, and our system of legal remedies are favored.  The

25  reason why they do it is that they recognize these are

 1  idiosyncratic pieces of value and, if you cannot control who

 2  your counterparty is, what can they do?  They can destroy the

 3  mark, right?  They can abandon its use, they can start

 4  selling an inferior product under it; they can acquiesce to

 5  infringing uses by others, right?  And these are all things

 6  that can lead to a forfeiture of value.  And so those are

 7  respected within bankruptcy.

 8             So that's sort of where I come out on 12.2.

 9             THE COURT:  Okay.

10             MR. KISSNER:  And that's without even getting to

11  the factual questions as to whether this is applicable,

12  whether under the non-bankruptcy case law relating to changes

13  of control, whether that's been met.  I think those are

14  distinguishable, but I'm not sure that that's sort of where

15  the rubber meets the road today, but if you have questions

16  about that --

17             THE COURT:  Well, if you want to argue that it's

18  not met, you should do so.

19             MR. KISSNER:  Sure.  So let's look -- so I think

20  that -- so I think a couple observations.  First, I think

21  it's going to be the debtors' burden here to establish

22  through the evidence that there is a change of control that

23  is of the type contemplated in the contract.

24             THE COURT:  I think the relevant provision is (b),

25  the sort of sale of substantially all --

1          MR. KISSNER:  The sale of substantially all

2    assets.

3          THE COURT:  Right.

4          MR. KISSNER:  And so -- number one, so what does

5    the evidence say?  So, well, let's ask Mr. Rogers, the CEO of

6    SunPower -- or of Complete Solaria, what does he think he's

7    buying?  Did he think that he's buying the entire business?

8    Is he buying substantially all --

9          THE COURT:  So the argument is that it's through a

10   series of sales, and I think it's pretty clear from the

11   record in this case that there's not going to be anything

12   left of the debtor when these transactions are done, right?

13         MR. KISSNER:  Sure.

14         THE COURT:  So why doesn't that answer the

15   question?

16         MR. KISSNER:  Because, respectfully, those cases,

17   that body of law applies to situations that are not analogous

18   to this, right?  So if we're looking at, for example, are we

19   going to impose tax or regulatory liability that's triggered

20   under statute by a sale of all or substantially all assets,

21   then under -- you know, call it substance over form or a step

22   transaction-type analysis, it would make sense that if

23   liability is triggered on a sale of all or substantially all

24   assets, and let's say that you set a threshold, right, call

25   it whatever you want, 80 percent of the assets, right?  It's

1  like structuring with bank secrecy laws, right?  I can't just

2  go and deposit $9,999 every day to get around bank reporting

3  requirements, it's the same thing.  I can't just take my $100

4  million of assets and sell them to a hundred different buyers

5  for $1 million and say no tax liability, right?  No

6  triggering partnership dissolution rights, no triggering an

7  appraisal right, right?

8          And that's completely different than here where

9  they're basically saying that, oh, since the Complete Solaria

10 sale happens to be one of the last to close in a sequence,

11 and since there aren't going to be material assets left, it's

12 really a sale of all or substantially all assets.  That

13 doesn't really accord with me.

14         And let's look at what --

15         THE COURT:  Well, slow down a second.

16         MR. KISSNER:  Sure, sure.

17         THE COURT:  Do you disagree that what's being sold

18 is the only operating business of the debtors?

19         MR. KISSNER:  I think there's probably a

20 materiality threshold on that because like there are excluded

21 assets in the API --

22         THE COURT:  No, I understand that, but just in

23 plain English, sort of normal business terms, is there an

24 operating business, right?  I understand that's -- like

25 there's no formal definition of that, but we all kind of know

1  what it is.  Do you think there's an operating business other

2  than what's being sold?

3         MR. KISSNER:  After the final sale that Complete

4  Solaria closes, were it to close?

5         THE COURT:  Yes.

6         MR. KISSNER:  I don't think there would be a

7  material operating business left, no.

8         THE COURT:  And so just when you think about the

9  purpose of this sort of provision, just as an ordinary, sort

10 of common sense commercial matter, like this isn't -- we're

11 not talking here about -- and is there an operating business

12 today before anything has closed other than the Complete

13 Solaria -- other than the assets that are being sold here?

14         MR. KISSNER:  I believe so.  There's the PV module

15 reporting, all that that's being left behind, and I think

16 that's part of this SunStrong sale.  There was a loan book, I

17 would call that an operating business, right?  They're

18 financing.

19         I guess, if you want to talk about the purpose --

20 and, by the way, we don't have any evidence from the debtors

21 or otherwise on what the purpose is, but if we want to infer

22 based off of the background body of intellectual property law

23 why parties might draft a contract like this and why it might

24 be, as an IP counterparty, you might -- and this is just

25 assuming for the sake of argument that 12.2 has anything to

1  say about a sale of the marks and, obviously, I disagree --

2  but let's live in the world where 12.2 does have something to

3  say about it, I think it actually makes a lot of sense that a

4  contractual counterparty might feel better in a scenario

5  where all that's changing is a change of -- an actual change

6  of control, right?  Be that through a change of equity

7  ownership at the top of the structure or through a true sale

8  of all assets, right?  Because what we're getting at there is

9  that basically the form of the transactions shouldn't really

10  matter, it's the substance.

11         And so if this entire company writ large with the

12  executives, with the contracts, with the employees, with

13  everything that I've gotten comfortable with and done my due

14  diligence and underwritten them on, if they're truly only

15  just being sold at the top, the equity is changing hands, I

16  think that's a lot different than we're hacking up this

17  company, selling it for parts to disparate people and, oh,

18  since this happens to be the last one in the chain that

19  closes and it's substantially all the assets that remain, all

20  of a sudden you lose your rights, your negotiated rights over

21  who your counterparty is.  I just think that's -- I don't

22  know, I cannot imagine that being the reading of this

23  contract or the intention of the parties.

24         And I think if the shoe is on the other foot,

25  right, one of the things that I think gets lost in some of

1  the papers is that it's not like this was some one-way right

2  that was granted in favor of a capricious lender, right?

3  These are mutual obligations and benefits that go back and

4  forth to govern the amicable split of these two companies,

5  right?  And it's just -- it's consistent with this idea of

6  trademark law that it's you'll use it or you lose it.  You

7  can have it for a while; I get it back when you're done.

8          THE COURT:  Well, how do you explain that with --

9  so you're saying 12 -- so then why does 12.2 make any sense

10  at all?  Once you get back -- once you get back the mark,

11  what other obligations could you be giving to the buyer in a

12  sale of substantially all if they don't get the mark?

13          MR. KISSNER:  So there's a couple, so -- and one

14  is actually no longer operative because there was a

15  subsequent amendment to the contract that isn't relevant to a

16  current dispute, but this contract was amended to get rid of

17  certain restrictions set forth in -- sorry, wrong contract --

18  in section 6.1 of the agreement, which at the start had

19  imposed an exclusivity obligation --

20          THE COURT:  Okay.  And the parties amended that

21  and left 12.2 in, right?

22          MR. KISSNER:  I suppose.

23          THE COURT:  So why?  If 12.2 would no longer have

24  any work --

25          MR. KISSNER:  Well, six point --

1          THE COURT:  -- so shouldn't I conclude that 12.2

2   still has work to do after they took 6.1 out?

3          MR. KISSNER:  It does.  And there's other

4   provisions, I'll get there, but 6.1 wasn't just excised

5   wholesale, right?  What 6.1 was amended to say was that,

6   going forward, SunPower could use panels that were not sole

7   sourced from Maxeon, right?  That was the amendment.  6.1

8   still imposed other obligations and, in theory, in a true

9   change-of-control provision -- or change-of-control scenario,

10  if you were Maxeon, part of this is for your benefit, you

11  would want the buyer to still be bound.

12          And on the flipside, if the shoe was on the other

13  foot, right, if Maxeon was the one being sold, presumably

14  SunPower would also want the benefit of 6.1.  The other is

15  the mutual indemnification rights going back and forth.

16          THE COURT:  No, but -- so help me with this.  If

17  the buyer isn't getting the marks, why would they take this

18  contract?

19          MR. KISSNER:  Just because the buyer thinks

20  they're getting the marks, though, doesn't make it so, right?

21          THE COURT:  No, no, no, but if the parties -- what

22  you're talking about, and it's a fair and thoughtful

23  response, which is the parties reach an express agreement

24  about what obligations the buyer would have if there was a

25  sale, and none of that makes -- none of those obligations --

1  those obligations are premised on the notion that the buyer

2  also gets the marks.

3          MR. KISSNER:  So the other potential provision

4  would be the reversionary interest of the ROFR.  There is

5  law, right, out there that says that ROFRs are presumed to be

6  personal, and that's in contrast to options agreements.

7          So, if you were to construe this contract as

8  granting an option as opposed to a ROFR -- we think it's a

9  ROFR, but I'm not going to stand up here and say that

10  reasonable minds can't differ, it does use the term option to

11  purchase, right?  That's something that can be assigned,

12  that's something that has value, right?

13          THE COURT:  Okay.

14          MR. KISSNER:  So there's still work to do.  And,

15  by the way, the marks, right, like let's not lose sight, the

16  general rule is that there's a contract, and this contract

17  says a lot of things.  And so what the parties agreed to was

18  that, generally speaking, you cannot assign this contract,

19  any of it, right?  Provisions 1 through 12, you can't assign

20  it.  But maybe if there's a sale or a change of control,

21  we're going to examine that and, if it meets the criteria in

22  12.2, you can.

23          But, notwithstanding that, 4.5 says what you can't

24  do.  365(c)(1) says  that it doesn't even matter what the

25  contract says if federal trademark law or other non-

1  bankruptcy law would excuse you from accepting performance,

2  then, again, you don't have to accept performance under the

3  license, but I just -- I really, through clever --

4              THE COURT:  So can we talk about that for --

5              MR. KISSNER:  -- argument notwithstanding --

6              THE COURT:  -- can we talk about that for a

7  second?

8              MR. KISSNER:  Sure.

9              THE COURT:  So -- because one thing that I'm

10  struggling to wrap my brain around, right, imagine you've got

11  a contract that is expressly assignable, right?  By its

12  terms, if you sell it to Buyer A, B, or C, you're welcome to

13  sell.  Now, is your position that even though the contract

14  expressly permits the sale that if the owner of the mark,

15  right, who had licensed it, and the licensee is selling its

16  interest to someone to whom the contract says the licensee

17  can sell it, that the whether-or-not language means that

18  seller can come in and object?

19              MR. KISSNER:  That's our position.  And I'm not

20  aware of any law on this one way or another --

21              THE COURT:  Well, so another way to think about

22  this is, if you are exercising express contractual rights,

23  you're not -- that 365 is about the bankruptcy power, it's

24  about the power to override contract provisions, and that if

25  all you're doing is exercising contract provisions, you don't

1  need the bankruptcy power.  You're just assigning under non-

2  bankruptcy law and, therefore, the whether-or-not language is

3  beside the point.  Does that -- do you have a thought on that

4  question?  Because the question is, if the assignment is

5  expressly prohibited -- I'm sorry, expressly permitted such

6  that you don't need the Bankruptcy Code power to override

7  anti-assignment provisions, why can't you just assign it

8  without relying on 365?  And just say, under non-bankruptcy

9  law, this is an assignment.

10         MR. KISSNER:  So I think the -- what the Court

11 does -- and the case that I'm aware of that deals with this

12 is the Trump Entertainment Resorts case, right?  And so

13 there, you know, the court found that, sure, you can contract

14 around 365(c)(1), right?  And so there was expressly

15 delineated what you could do, when you could do it.

16         And so there I believe it was you could assign it

17 to the first lien lenders in connection with an enforcement

18 action.  And so then there was an examination is this -- the

19 first lien lenders, is it an enforcement action?  If it

20 isn't, then you can't, right?

21         THE COURT:  But if it is --

22         MR. KISSNER:  But if it is -- the court never --

23 and I'm not aware of anybody raising in that this whether-or-

24 not language, right?  And there's a difference between a

25 limitation on assignment -- and, actually, we're not the only

1  ones to struggle with this, right?  Actually, for a long

2  time, even at the circuit level, there was a large split that

3  I don't think was ever really resolved, it was just sort of

4  memory hold because we all moved on and the body of law

5  developed, but there was a whole debate as to what 365(c)(1)

6  even meant, right?  Because there was some question -- and I

7  think the First Circuit went one way, the Third the other --

8  there was this question as to whether (c)(1) meant anything

9  at all because there's other provisions of 365 that say, oh,

10  you can assign notwithstanding language in the contract

11  restricting assignment.

12          And what I believe it was the Third Circuit

13  observed, though, is that in (c)(1) there's this phrase that

14  does a lot of work, right?  It's whether or not -- whether or

15  not, or not, the contract permits assignment or delegation of

16  duties, right, there is an out if applicable law would excuse

17  you from accepting performance, right?

18          And so it's less about assignment and it's more

19  about whether you could be forced to accept performance.  And

20  so --

21          THE COURT:  Okay.  And are you talking about the

22  Trump Entertainment case, or are you referring to like --

23          MR. KISSNER:  I'm talking to --

24          THE COURT:  -- West Electronics --

25          MR. KISSNER:  -- fir principles -- to which?

1            THE COURT:  To like the West Electronics case --

2            MR. KISSNER:  Yeah, yeah, West Electronics, yeah.

3            THE COURT:  -- all those cases about actual versus

4    hypothetical in 365, that --

5            MR. KISSNER:  Yeah --

6            THE COURT:  Okay.

7            MR. KISSNER:  -- I'm talking about that body of

8    law where they were first actually confronting what this

9    provision actually means.  And it happens to be that Trump

10   was a manifestation of sort of this trademark question in the

11   context of licenses, but what 365(c)(1) is actually about is

12   it's not about anti-assignment provisions, right?  It's about

13   day one contract law, a personal services contract or

14   something where the identity of your counterparty is crucial

15   to the performance, you can be excused from accepting

16   performance, right?

17           THE COURT:  Okay.

18           MR. KISSNER:  And what the contract says is a

19   factor, right, to discerning the intent of the parties, but

20   it is not outcome-determinative, and that's what 365(c)(1)

21   says.

22           THE COURT:  Okay.

23           MR. KISSNER:  So we talked about 12.2.  That

24   relates to the contract itself, not to the underlying

25   ownership.  And so, if 12.2 doesn't apply, and it's our

1   position that it doesn't, then I think we're in the realm of

2   363, right?  Subsections (e) and (f), because Maxeon has an

3   interest, right, it has an interest in the marks.  It's been

4   granted by a contract that is no longer executory with

5   respect to that grant, they have not filed an avoidance

6   action; they have not moved to rescind it, right?

7           And so what does the Bankruptcy Code say in 363

8   about a sale of property that's subject to an interest,

9   right?  So (e) says that the Court may, among other things,

10  prohibit a sale as necessary to provide adequate protection.

11  And in the debtors' reply they barely mention adequate

12  protection at all, right?  It's actually relegated to a

13  footnote, footnote 19, that's paragraph 19 in their reply,

14  and what they say is -- and I'm paraphrasing -- that Maxeon

15  is adequately protected by the brand framework agreement,

16  which they maintain is going to stay in place, and by

17  Complete Solaria's financial strength and expertise in the

18  solar area, right?

19          And so I usually like to start with the facts and

20  then go for the law, but let me talk about the law first

21  because there's a whole body of case law out there that says

22  that parties in Maxeon's position can't be adequately

23  protected as a matter of law.  And I'm happy to talk about

24  those, but they're in our briefs.  It's the Dewey case with

25  the relocation of the Coyotes, who finally did actually end

1    up moving to Salt Lake City this upcoming season, but in the

2    Dewey case they tried to move them over the rights of the

3    NHL, who had an absolute right to place limitations on the

4    transfer of franchises in order to maintain competitive

5    balance, and also maintain the rights of third parties in

6    their market and the right to the goodwill that came from

7    having a hockey team in that market, right?

8          And the debtors and the proposed purchaser in that

9    case, they said, look, these are contractual provisions,

10   right, these are monetary obligations.  And they said, look,

11   you're adequately protected because you're going to charge a

12   relocation fee and, you know, if we need to, we can figure

13   out a claim for damages.

14         And what the court there said is they said -- is

15   the court said, no, right, this is a valid restraint on

16   alienation, if you want to call it that, it's a restriction

17   on transfer.  It was freely granted by each member franchise

18   in the National Hockey League as a condition of participation

19   right.  And it involves a relationship of such personal kind

20   and character that one would be entitled to specific

21   performance thereof outside of bankruptcy.  Therefore, there

22   cannot be adequate protection and I'm going to prohibit the

23   sale, right?

24         And so I can just imagine reading this reply,

25   right, the debtors say, oh, Maxeon is extracting value from

1  the estate, they're exercising a veto right, they're going

2  to, you know, hold up all this value for no consideration,

3  right?  And I can imagine that the debtors and the purchaser

4  in Dewey probably said the same thing, right?  They said, oh,

5  the NHL is engaging in rent-seeking behavior there and trying

6  to exploit a monopoly.  And the court said, look, these were

7  valid contracts that were entered into, they have a valid

8  purpose, they would be entitled to specific performance.

9  This isn't a matter of damages, right?  You can't just go out

10  and buy another Phoenix Coyotes on the market, right?  And,

11  therefore, you can't be adequately protected, so I'm going to

12  prohibit the sale.

13         The same thing in Chicago Board of Trade, right?

14  And actually I think that one, from the modern view, the

15  debtors in their reply, they distinguish Board of Trade a

16  little bit here by saying, oh, well, that was just a limited

17  consent right because it was conditioned upon paying off a

18  debt in full, that almost is more abhorrent to the modern

19  view because it would violate -- arguably, it takes a payment

20  of a prepetition claim out of the absolute priority rule,

21  right?  But what the Supreme Court there said is they said,

22  look, the member of the Board of Trade, he had a seat on the

23  exchange, and as the condition to participating in this

24  exchange, as a condition to this ownership right and his

25  seat, he agreed that he can't sell it if he hasn't paid off

1  his debts, and he also agreed that the other members of the

2  exchange, they could block that transfer if they hadn't been

3  paid.  And so the bankruptcy estate didn't have more than the

4  debtor had.

5          And I won't go chapter and verse down the list,

6  but what these cases show is that in a sale of an

7  idiosyncratic property interest that can't be replaced with

8  restrictions that were freely entered into by sophisticated

9  parties that there is no adequate protection, so it's

10 appropriate to prohibit the sale.

11         Again, that's as a matter of law.  The debtors

12 don't engage with that at all, right?  What they say is --

13 and so let's pretend that law doesn't exist, right?  I'm

14 going to meet the debtor on their own terms.  They say we're

15 adequately protected, and we're adequately protected by a

16 couple things, by the brand framework agreement remaining in

17 place, and then by Complete Solaria's expertise in the space

18 and --

19         THE COURT:  So can I pause you --

20         MR. KISSNER:  Sure.

21         THE COURT:  -- just as a matter of efficiency?

22 Look, I am tentatively persuaded that if I think of this as a

23 -- the brand as -- let me say it this way:  If the contract

24 doesn't permit the sale and it's not an executory contract,

25 if we're in that world and you argue that they are, and I'm

1  not -- I'm not sure you're right, but I'm thinking about

2  those points, but I think -- I tentatively think that, if

3  you're right about that, there's nothing in 363 that would

4  allow the debtor to sell the marks.  In a world in which the

5  contract wouldn't permit it, I think you're right, that would

6  give the debtor more than they had outside of bankruptcy and

7  I read Mission Products to prohibit that.

8            So I'm going to give the other side the chance to

9  persuade me that you're wrong about that, but I think for now

10  let's assume that you've -- that if you get through those

11  other doors, you've persuaded me on that and you don't need

12  to spend more time now on that point.

13            MR. KISSNER:  Okay.

14            THE COURT:  But if they persuade me the reserve,

15  you'll have plenty of time to get up and tell me why I was a

16  sucker for believing them.

17            MR. KISSNER:  Okay.  Is that your polite way of

18  saying you don't want to hear about adequate protection right

19  now?

20            THE COURT:  Exactly.

21       (Laughter)

22            THE COURT:  And I don't think it's necessary --

23            MR. KISSNER:  Okay, fair enough.

24            THE COURT:  -- because I'm tentatively persuaded

25  that you're right that if -- if it's an asset and the

1  contract says you can't sell it, then I'm not even -- I'm not

2  even sure it's an adequate protection point.  I don't know

3  how, if you have something -- you know, the Chicago Board of

4  Trade point that says the debtor can't have more than -- the

5  debtor-in-possession doesn't have more than the debtor had

6  beforehand strikes me as correct.

7          MR. KISSNER:  And the last thing before I sit

8  down, because I had it written down here and I'd be remiss to

9  not point out, germane to this question of contract versus

10  asset, right, just ask Complete Solaria, look at their APA.

11  What did they want to buy?  They wanted to buy the SunPower

12  marks, right?  They don't want to buy a brand framework

13  agreement.

14          I actually think that if they -- if they had their

15  druthers, right, they wouldn't be bound by this.  Why would

16  they want to be?  Why would they have to attend a brand

17  council and split decision-making with us, right?  So that's

18  not what they're interested in.  They're interested in buying

19  the marks.  And the APA, that evinces a distinction between

20  the contract and the asset, and so I think that's more in the

21  totality of the circumstances that show that they're

22  distinct.

23          But thank you very much, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Collins.

1      MR. COLLINS:  Thank you, Your Honor.  Again, for

2  the record, Mark Collins of Richards, Layton & Finger on

3  behalf of the debtors.

4      Your Honor, you have a copy the brand framework, I

5  believe.

6      THE COURT:  I do.

7      MR. COLLINS:  I want to spend just a few moments

8  starting back at the framework agreement because I think that

9  is kind of the roadmap on how we're proceeding here, and I

10 want to first take you to the third whereas clause of that

11 agreement.  And here the parties set forth the intent of this

12 agreement and it's very clear, it's to allocate ownership and

13 use of trademarks as set forth in the agreement.  And what

14 the agreement does is basically allocate license and

15 ownership rights worldwide for the SunPower marks.  Ownership

16 is critical, integral to the brand framework agreement, as

17 are the license rights that are contained in that agreement

18 as well.

19     I then want to take you to Section 2.4, the

20 reservation of rights, because I heard time and again from

21 Counsel to Maxeon this qualified ownership, their possessory

22 rights, this reversionary interest, making it sound like

23 there's somehow an owner currently of the U.S. marks.  I

24 think that's what he was saying.  But if you read the

25 reservation of rights, it's very clear.  It says, except for

1  those rights expressly assigned in 2.1, which is them

2  obtaining the rights to the mark outside the brand territory,

3  that means the rest of the world other than the United

4  States; 2.2, getting their ownership rights in the Maxeon

5  marks; and 3.1, which is, I believe -- let me look there real

6  quick -- a license to use the marks in the U.S. territories,

7  and some other things.  Those are the three paragraphs it

8  cites.  So, except for those rights, 2.1 --

9           THE COURT:  Right.

10          MR. COLLINS:  -- 2.2, and 3.1, that provision says

11  SunPower shall remain the sole and exclusive owner of all

12  right, title, and interest in and to the SunPower marks.

13  That's where we are.

14          I then want to turn to 12.2.  12.2 is clear on its

15  face that Maxeon provided advance consent to an assignment of

16  the brand framework agreement to a buyer of substantially all

17  of the assets.

18          THE COURT:  Right, but what's your response --

19  look, I understand at some level the response that what I'm

20  about to ask you is sort of deep in the weeds and

21  (indiscernible) but what is your basic response to his point

22  that what he says is, look, there are agreements under the

23  contract, those are executory, those would flow with an

24  assignment of the contract and separate from the agreements,

25  the assignment of the contract, as soon as this contract was

1  entered into, there was a conveyance of certain property

2  rights, and the assignment of the contract is a different

3  thing from the transfer of those property rights.

4          MR. COLLINS:  I would say that that would really

5  confuse the purpose and intent of 12.2.  12.2 is there for

6  when you're talking about a transaction of substantially all

7  of the debtors' assets, certainly changing the entire company

8  in that transaction, and it's hard to imagine that you could

9  assign the brand framework agreement, which includes the

10  allocation of the underlying ownership and license rights,

11  and not convey those ownership rights that are expressly set

12  forth in that very agreement.

13          I view the transfer of the title going to the

14  buyer as part and parcel of carrying out the purposes and

15  intent of a brand framework agreement when it was entered

16  into at the time of the spinoff.

17          THE COURT:  Okay.  So if you're right about that,

18  let's just play this out --

19          MR. COLLINS:  Yeah.

20          THE COURT:  -- then what is your response to the

21  whether-or-not language in 365(c)?

22          MR. COLLINS:  I view 365(c), Your Honor, as

23  dealing with license rights.  We're now talking about

24  ownership, right?  We own the marks in the U.S.; we have the

25  right to sell our marks to a buyer.

1           THE COURT:  All right.  Well, let's -- would that

2   be true if you didn't satisfy 12.2?

3           MR. COLLINS:  Yeah, I think it would.

4           THE COURT:  So --

5           MR. COLLINS:  These are owned -- these are owned

6   trademarks.  We're not talking about license rights.  We are

7   the licensor in this situation.

8           THE COURT:  So read 4.5 then and tell me, even if

9   you own the marks, why it wouldn't control.

10           MR. COLLINS:  4.5 is --

11           THE COURT:  If you weren't in the world of 12.2.

12           MR. COLLINS:  If we weren't in the world of 12.2,

13   then I do think 4.5 would be operable, and we have all of our

14   other arguments as to why 4.5 is not enforceable as written.

15           THE COURT:  Okay.  And so -- and I understand your

16   arguments about forfeiture and, you know, it's --

17           MR. COLLINS:  Blanket veto right --

18           THE COURT:  -- destructive of value, and I'll hear

19   you on that.  For this purpose, assume you're uphill --

20           MR. COLLINS:  Right.

21           THE COURT:  -- if you're to persuade me of those

22   things --

23           MR. COLLINS:  Right.

24           THE COURT:  -- but your -- I take it your core

25   argument is you don't need to persuade me of those things

1  because, even if that applies, 12.2 is essentially the more

2  specific provision that controls in this context, and that

3  the reference to assigning the agreement as an ordinary

4  commercial matter means not just the ongoing executory

5  obligations, but all of the rights provided under the

6  agreement.

7          MR. COLLINS:  Correct.  And when you look at --

8  and in 12.2 it talks about a sale of substantially all of the

9  assets, that is part of the defined term of change in control

10 transaction.  As we've heard from the buyer, the trademarks,

11 that which allows you to sell the product would not be going

12 to a buyer?  That makes no sense and how would you have a

13 sale of substantially all of the assets if you could not --

14         THE COURT:  Right, without the --

15         MR. COLLINS:  -- transfer your ownership interest

16 in the trademark.

17         THE COURT:  Of the thing that allows you to have a

18 business.

19         MR. COLLINS:  Correct.

20         THE COURT:  Okay.

21         MR. COLLINS:  And allows it to survive.

22         THE COURT:  Okay.

23         MR. COLLINS:  I will spend a moment, Your Honor,

24 on I think Counsel took --

25         THE COURT:  Can -- can I --

1          MR. COLLINS:  Yeah.

2          THE COURT:  -- just tease that out for a moment?

3          MR. COLLINS:  Sure.

4          THE COURT:  So with respect to the trademark -- I

5     see, no -- okay, but then I do run into the whether-or-not.

6     So, if you're right about that, 12.2 permits an assignment of

7     all of your rights that derive from this agreement in

8     connection with a sale that is a -- that satisfies the

9     requirements of 12.2 --

10          MR. COLLINS:  Correct.

11          THE COURT:  -- you still have -- you then run into

12     the 365 -- because you don't dispute that at least some

13     obligations under this agreement are executory because you're

14     moving to assume and assign it, right?

15          MR. COLLINS:  Correct.

16          THE COURT:  And this is a trademark agreement,

17     right, a trademark license where non-bankruptcy law generally

18     -- so the language of 365(c) is otherwise applicable, right?

19          MR. COLLINS:  Correct, with respect to those

20     aspects of the brand framework agreement where license rights

21     are at play.

22          THE COURT:  Right, okay.  And so, as to that, the

23     point that is made is the beginning language of 365(c) that

24     says the trustee may not assume or assign any executory

25     contract or unexpired lease of the debtor, comma, whether or

1  not such contract or lease prohibits the assignment if.

2          And so his point is, look, you've established

3  perhaps that the agreement does permit it, but 365(c) by its

4  terms says you can't assign it whether or not it can be --

5  whether or not the agreement permits it if non-bankruptcy law

6  would otherwise -- that's a surprising conclusion to me, but

7  --

8          MR. COLLINS:  And it flies in the face of case

9  law.

10          THE COURT:  Well, tell me what cases then.

11          MR. COLLINS:  The Trump case itself --

12          THE COURT:  Okay.

13          MR. COLLINS:  -- where Judge Gross -- it's -- he

14  says it so straightforwardly that it -- and this is true of

15  other cases -- you can contract around your rights under

16  365(c).

17          THE COURT:  Got it.

18          MR. COLLINS:  How could you not be able to do

19  that, right?  Parties have that right to do so.  These are

20  sophisticated parties; we're talking about a global business.

21  They even reference -- I think there's talk about their

22  365(n) rights.  They were fully aware of all of their --

23          THE COURT:  Okay.

24          MR. COLLINS:  -- legal rights and I think they

25  clearly have the right to contract around it, and that's

1  exactly what we did in 12.2.

2          Counsel, I think -- he equivocated on whether or

3  not this is a sale of substantially all of the assets.  We

4  have submitted the testimony of Mr. Henry on this point.  We

5  also cite in our brief a great deal of case law.  We think

6  that under any test that is used by courts or under the Model

7  corporation laws we need it, and we need it whether this is a

8  standalone transaction just looking at the Complete Solaria

9  transaction or, obviously, when you aggregate the sales that

10 are pending before Your Honor.

11         And Mr. Henry, in paragraph 9, says a number of

12 very beneficial things about the going concern sale that is

13 before Your Honor.  This is in paragraph 9, I think it's the

14 third or fourth sentence, quote, the stalking horse bidder

15 anticipates retaining up to 1300 employees, nearly 90 percent

16 of the employees anticipated to be hired by the buyers; they

17 are taking 88 percent of the contracts the debtors anticipate

18 assuming and assigning through this Chapter 11 case, I

19 believe that's 1100 contracts alone as part of the Complete

20 Solaria transaction; 100 percent of the property leases, I

21 believe there's four that are being assumed and assigned;

22 and, importantly, the going concern consideration.  When you

23 look at the total consideration the estate is receiving for

24 its going concern operating assets, 98 percent comes from

25 Complete Solaria.

1          THE COURT:  You're talking just about the purchase

2  price of what the auctions have yielded, is that --

3          MR. COLLINS:  For the operating assets.  I'm not

4  talking about the non-operating assets that were those

5  separate, kind of one-off transactions, we're talking about

6  really the heart and soul of the business, the operating

7  business.

8          Finally, we say that the going concern asset sale

9  in turn represents approximately 67 percent of the total

10  expected value of the debtors' assets.

11          And we cite a case by analogy because we're now --

12  the contract itself does not define what substantially all of

13  the assets means, so, by analogy, we look to case law.

14  California has a few cases.  Delaware, not surprisingly, has

15  a much more developed precedential cases on the issue of that

16  because it's so prevalent in our general corporation code.

17  But I want to turn to the one case, this is Thorpe, this is

18  the Thorpe case in the Delaware Chancery Court -- it's

19  actually a Delaware Supreme Court affirming the Court of

20  Chancery's finding that a sale of 68 percent of the company's

21  assets and the effect it would have on a radical

22  transformation of the company at issue with substantially all

23  of the assets.

24          We'd also note, and we've put this in our briefing

25  as well, the cases look to the underlying intent, purpose of

1   the company, and you would look at that and you determine is

2   the inherent -- and then what they actually use, the words

3   heart and soul of the business, is that being sold as part of

4   the transaction.  Here, I think it's without debate that

5   SunPower, as it exists, is being transferred to SunPower, all

6   of the operating -- virtually all of the operating assets are

7   going to the buyer.

8          Also in Mr. Henry's declaration -- again, I

9   believe this is un-refuted and un-rebutted testimony, all

10  that we heard contrary was a statement at, I guess it was a

11  shareholder telephone conference that talked about, hey,

12  we're not buying everything, I think he could have

13  interpreted that to mean we're not buying the equity, we're

14  doing an asset deal, but who knows.  In any event, I think

15  that's irrelevant and not helpful to the Court.

16         But, back to my point, turning to paragraph 16 of

17  Mr. Henry's declaration, it notes that -- and I'll just read

18  it entirely:  "The debtors intend to continue discussion with

19  parties who have expressed an interest in the debtors'

20  remaining assets, which constitute approximately ten percent

21  of the total expected value of the debtors' estate."  That is

22  what we're going to be left with following the Complete

23  Solaria sale, as well as the other sales.

24         THE COURT:  I see.  So, just so I understand the

25  math here, the Complete Solaria sale you say is 67 percent,

1   that means that the other sales that are in progress are --

2           MR. COLLINS:  Twenty percent?

3           THE COURT:  -- 23 percent, what have you --

4           MR. COLLINS:  Somewhere in that range.

5           THE COURT:  -- and that there remain ten percent

6   thereafter?

7           MR. COLLINS:  Yeah --

8           THE COURT:  Got it, okay.

9           MR. COLLINS:  -- exactly.  And then I also -- and

10  sorry for making you go back and forth on this, but the last

11  sentence of paragraph 9 of his testimony again is important,

12  again going to the heart and soul of this company.  It says,

13  "Upon closing of the going concern asset sale, the debtors do

14  not expect material operations to remain other than those

15  necessary to temporarily support the transition of the

16  business to Complete Solaria."

17          So, Your Honor, we believe it's, again, un-refuted

18  and un-rebutted, this is a sale of substantially all of the

19  assets, we're in Section 12.2 land, and Maxeon has given its

20  consent to assume and assign the rights and obligations in a

21  brand framework agreement to the buyer.

22          I can spend some time, Your Honor, on some of the

23  subparts of our brief where we talked about if the Court

24  reads 12.2 and 4.5 as being at odds with one another, we

25  again believe the specific overrides the general.  And I just

1   want to, if I could, just look at 4.5 of the agreement for a

2   second.  So I think I count in that section a lot of the

3   words "any" in there.

4            So 4.5, it says, "Neither party shall, unless

5   approved by the parties" -- we think we have that under 12.2

6   -- "sell, assign, transfer, license" -- I'll skip the

7   parenthetical -- "or otherwise dispose of any of its right,

8   title, or interest in or to any of the SunPower marks."

9            That is so broad it's covering potentially any and

10  all one-off transactions of a sublicense, a transfer of a

11  potential mark, granting a sublicense to a particular --

12           THE COURT:  Is your point that this is the more

13  general, is that where you're going?

14           MR. COLLINS:  Yes, yes --

15           THE COURT:  Okay, I understand that point.

16           MR. COLLINS:  -- exactly.  I'm sorry if I'm

17  confusing you --

18           THE COURT:  No, I'm a little slow, so I appreciate

19  it.

20           MR. COLLINS:  No -- yeah.  So by using the word

21  "any," it is just -- it's a very general provision, and

22  clearly 12.2 talks about a transaction of substantially all

23  of the assets, which we obviously have here, we believe.

24           We spoke about contracting around 365(c).  And, at

25  Your Honor's discretion, we do think, as -- that there is a

1    365(l) *ipso facto* component here if you take what Maxeon has

2    said in its own pleadings that they are allowed to veto any

3    sale of the debtors' assets, the marks, when we're in

4    financial distress -- well, they say that's the first part of

5    what's at issue.  They then say, when that happens, they use

6    5.2, the right of first refusal, to pick up the marks for

7    free, right?  That is a forfeiture of the debtors' value in

8    these trademarks, it arises when the debtor is no longer a

9    viable operating entity, and that meets both tests of 365(l),

10   both at --

11            THE COURT:  So do you -- can I -- I'm sorry for

12   taking you off track --

13            MR. COLLINS:  Yeah, fine.

14            THE COURT:  -- but with respect to 5.2, by its own

15   terms, do you think that this transaction triggers 5.2?

16            MR. COLLINS:  No.

17            THE COURT:  And why is that?

18            MR. COLLINS:  Because we're not discontinuing or

19   abandoning the marks.

20            THE COURT:  Okay, okay.

21            MR. COLLINS:  I mean, the sale is all about --

22            THE COURT:  Got it.

23            MR. COLLINS:  -- obtaining the value --

24            THE COURT:  Okay.  So 5.2 has been discontinued.

25   Okay, all right.

1                MR. COLLINS:  Right.

2                THE COURT:  So at some level, I don't need to

3     engage --

4                MR. COLLINS:  I don't think you need to --

5                THE COURT:  -- this question --

6                MR. COLLINS:  -- but if you --

7                THE COURT:  Okay.

8                MR. COLLINS:  -- thought --

9                THE COURT:  No, I appreciate it.

10               MR. COLLINS:  -- 5.2 was at issue, we think it's

11    void under 365(l).

12               THE COURT:  Okay.

13               MR. COLLINS:  I also want to just spend a moment

14    on looking at 4.5, if Your Honor thought it was applicable in

15    some regard.  What is at issue in 4.5 is a blanket consent

16    right, so it's really a veto right.  There are no guardrails

17    around that right.  Even in Dewey, the case that he talked

18    about, the NHL, they were talking about whether or not the

19    buyer had a good reputation, and there were issues in that

20    case about whether or not the buyer had satisfied the

21    reputational requirement in the NHL ownership guidelines, and

22    whether or not that buyer has sufficient financial

23    wherewithal to properly operate an NHL franchise.  The court

24    didn't get to that because it basically said 365(e) is --

25    we're done at 365(e) -- I'm sorry, yeah, 363(e).  There's no

1  way you can provide adequate --

2           THE COURT:  Assurance, right --

3           MR. COLLINS:  -- assurance for them --

4           THE COURT:  -- but can I ask you this.  Why --

5  assume you didn't have 12.2, if you didn't have 12.2, why

6  isn't Maxeon correct that giving you the right to sell when

7  you didn't have that right outside of bankruptcy, that

8  there's nothing in -- there's nothing in 363 that should give

9  the debtor -- let me start from the beginning.

10          Do you agree with the proposition that there's

11  nothing in Section 363 that gives the debtor the right to

12  sell an asset that outside of bankruptcy it doesn't have the

13  right to sell?

14          MR. COLLINS:  I guess I have to take exception --

15          THE COURT:  Other than -- other than the *ipso*

16  *facto* provision, right?  There's a provision of 363 that

17  invalidates *ipso facto* provisions with respect to sales.

18          MR. COLLINS:  I think property, owned property is

19  always alienable.  So I don't think there's anything --

20          THE COURT:  So you disagree with the proposition

21  that, outside of bankruptcy, there is such a restriction if

22  you own it?

23          MR. COLLINS:  On owned -- on owned intellectual

24  property, yes.

25          THE COURT:  Okay.

1          MR. COLLINS:  I think 365, at least I have always

2    thought it to be, is if we seek to assume and assign license

3    rights as a licensee, the mark is owned by somebody else,

4    then 365 comes into play.

5          THE COURT:  Right, but what if the owner of the

6    mark -- well --

7          MR. COLLINS:  Which is the debtors.

8          THE COURT:  -- I understand.  And there's --

9    there's -- this is what makes this sort of problem hard to

10   wrap your brain around, which is holding a license can at

11   times be viewed as a form of ownership, right?  It's

12   ownership of part of the intellectual property.  So you can

13   view that through the lens of assignment, right, I'm signing

14   a license agreement, or you could say I'm selling what was my

15   interest, right?  You gave me this stick out of the bundle

16   and I'm selling it.

17          And there's not a right or wrong answer to that --

18          MR. COLLINS:  I understand, and I understand your

19   point, Your Honor's point, but I think when you look at

20   what's really at issue and ownership rights and the ability

21   to convey them, as based in our law, I think that would

22   control.

23          THE COURT:  Okay, all right.  What else should I

24   understand so I don't get this wrong?

25          MR. COLLINS:  The only other point was, Your

1   Honor, we cite a lot of case law about an unfettered,

2   absolute consent veto right which causes a forfeiture is void

3   as an anti-alienation clause, we cite California law to that

4   point, we cite TUSA, we cite a Sixth Circuit BAP case, In re

5   Hake --

6           THE COURT:  And I take it, is that an argument

7   that's based on bankruptcy law or non-bankruptcy law?

8           MR. COLLINS:  Non-bankruptcy law.

9           THE COURT:  Okay.

10          MR. COLLINS:  We actually cite to the California

11  Code section Section 711, which notes -- and I'll quote it,

12  it says -- it's California Civil Code Section 711,

13  "Conditions restraining alienation, when repugnant to the

14  interest created, are void."

15          Now, the courts have interpreted that as leading

16  to kind of are there justifiable restrictions --

17          THE COURT:  Right.

18          MR. COLLINS:  -- does it make sense?  Here, there

19  is -- there's nothing to justify.  They have simply the veto

20  right and they're using it in order to trigger their rights

21  under the right of first refusal to pick it up for free.

22          Finally, Your Honor, we cite to 363(f)(4).  If

23  Your Honor views this as being subject to debate or a contest

24  on these rights, we think we can sell free and clear of this

25  bona fide under 363(f)(4) --

1          THE COURT:  So --

2          MR. COLLINS:  -- but, again, we don't think we

3   need to get there.

4          THE COURT:  Okay, okay.

5          MR. COLLINS:  That's all I have, Your Honor --

6          THE COURT:  All right.

7          MR. COLLINS:  -- unless Your Honor has more

8   questions.

9          THE COURT:  I don't.  Let me -- can we have a

10  housekeeping conversation for a moment?

11         MR. COLLINS:  Sure.

12         THE COURT:  So I do want to make sure I give the

13  opportunity to reply, but just in terms of timing because I

14  know I'm going to be yelled at by my fabulous judicial

15  assistant if I run through much more of lunch, is there

16  anything else on the agenda today beyond resolving this

17  issue?

18         MR. MICHALIK:  No.

19         THE COURT:  Okay, and let me ask this question.

20  In terms of getting you all a decision, is there, as a

21  commercial matter, a big difference between today and

22  tomorrow?  And, if the answer is yes, you should just tell me

23  I need to work fast.

24         MR. MICHALIK:  I think we'd prefer today.  We can

25  talk to the purchaser's counsel, but folks are chomping at

1  the bit to close this as soon as possible.

2          THE COURT:  Okay.  All right, okay.  So here's

3  what I'm going to do, unless someone feels otherwise.  I

4  propose that we take a half an hour, grab a quick lunch, I'll

5  hear the response.

6          I have a 3 o'clock -- I've got a 3 o'clock

7  argument.  What I'm -- what I'm going to do -- I don't know.

8  Let's take a break for lunch, let's come back at like 1:35.

9  Let's go as long as -- let's then see where we are.

10          So with that, until then, we're in recess.  Thank

11  you.

12          COUNSEL:  Thank you, Your Honor.

13      (Recess taken at 1:07 p.m.)

14      (Proceedings resumed at 1:42 p.m.)

15          THE COURT:  Okay.  So I'm happy to hear a reply.

16  And welcome back, everyone.  We're back on the record and

17  thanks for everyone's patience.

18          MR. KISSNER:  Thank you, Your Honor.  And for the

19  record, again, Andrew Kissner, Morrison Foerster.  It's

20  always good to have an audience with a full belly.

21          I will be brief, but I just want to level set here

22  for a second.  And we'll zoom out.  What are we really

23  talking about, right?  What's the paradigm that we're living

24  in?  And that's this, that applicable non-bankruptcy law,

25  specifically law of trademarks, but it could be any other

1   law, it's applicable non-bankruptcy law, under certain

2   circumstances it excuses acceptance of performance from a

3   party other than that with which you contracted, right?  And

4   there's a number of circumstances under which it's true, for

5   this one we're talking about trademark rights.

6           And I think I explained this morning and I think

7   in the case law, it's clear why, right?  Because trademarks

8   are unique rights, they're one of a kind, they're

9   irreplaceable, and so you're entitled to the benefit of your

10  bargain with the person with whom you bargained, right?

11          So now we're in bankruptcy, right?  And bankruptcy

12  law, it respects that distinction.  Bankruptcy law says that

13  generally we want debtors and estates to be able to sell

14  assets to maximize value, but that's not an absolute right

15  and that's not the only policy consideration that there is

16  because you could justify a whole host of things with it

17  maximizes value, right?

18          And so under certain circumstances, specifically

19  when not a contract, but applicable non-bankruptcy law

20  excuses you from accepting performance from somebody other

21  than the debtor, it upholds that distinction.

22          And the reasons aren't just those cited in

23  trademark law.  Actually, Mr. Collins, he talked about the

24  Dewey case, right?  And I think that wasn't about trademarks,

25  right, it was about a hockey team, but I think the concerns

1   there are actually pretty germane to what we have here,

2   right?  And so in Dewey, there was a gentleman, his name was

3   Mr. Balsillie -- if anybody saw the BlackBerry movie, it was

4   Glenn Howerton from Always Sunny, that was him, a real guy --

5   and he had this bugaboo, he really wanted to move hockey to

6   Hamilton, Ontario, and he tried all these ways over the years

7   to do it.  And he also had financial issues, he had gone --

8   been indicted for securities fraud, right?  And so there was

9   -- the point is this wasn't his first time at the rodeo,

10  right?  He had done it before.  And so he came to the NHL and

11  the Bankruptcy Court and he said I want to buy the Coyotes, I

12  want to take them to Canada, right?

13          He wasn't writing on a blank slate, there were

14  real financial and reputational concerns about him that led

15  the court to say, you know what, the NHL and the other member

16  franchises have the right to the benefit of their bargain,

17  the identity of their counterparty is important.  And here,

18  even though the court didn't reach it, there's findings in

19  there that says, yeah, these weren't just made-up concerns,

20  right?

21          And so why am I talking about this?  Because I

22  think that some of the facts that have been established from

23  the evidence, the uncontroverted evidence, show that these

24  concerns are germane here, right?  So what does the evidence

25  show here with respect to the proposed new counterparty?

1  Well, they have a brand new CFO; he started only a month or

2  so ago.  They've had significant operating losses.  And I

3  don't know if Your Honor still has the 10-K in front of you,

4  but I'd just like to -- I won't read this document chapter

5  and verse, I'm not a capital markets lawyer for a reason, but

6  if we could -- you know, if you turn to page 43, which is the

7  statement of -- it's the income statement, results of

8  operations for the prior two fiscal years, right.  I think

9  in the testimony and on redirect, I think what was elicited

10  from Mr. Foley was this idea that, you know, okay, we can

11  have a difference of opinion, you know, me and Mr. Rogers as

12  to whether there was a horrific court or whether it was a

13  disaster, but this was really a one-off thing, and we've

14  stopped the bleeding and we've fixed the things, but we look

15  -- for the last two fiscal years, full fiscal years for which

16  there's actual audited results of operations available, all

17  we have are huge operating losses:  In the fiscal year end

18  2022, a $28 million loss; fiscal year end 2023, $96 million

19  loss.  And so, yeah, they found some capitalization, they

20  found some financing to complete this sale, but it seems

21  that, you know, since Complete Solaria has been a publicly

22  traded corporation, they've had severe losses, right?  So

23  that's financial wherewithal.

24          Let's go to page 59 of the 10-K.  And here their

25  auditors, do you know what they stated?  They stated there's

1   substantial doubt about the ability -- the entity's ability

2   to continue as a going concern.  That means that when they

3   were sitting here -- and this is dated earlier this year,

4   right?  When they were sitting here in April of 2024, they

5   said, we have a substantial doubt as to whether Complete

6   Solaria is going to remain in business as a going concern for

7   the next 12 months, right?  So, again, financial wherewithal,

8   financial stability, the evidence suggests that it might not

9   be so cut-and-dry.

10          We also have testimony from Mr. Foley, right,

11  about how the value of a brand is tied not only to financial

12  stability and financial wherewithal, but that also -- and I'm

13  paraphrasing, but I think he agreed with my paraphrase that

14  being a good steward of IP is something that's important,

15  right, it's important to preserving a brand.

16          And if we turn to page 95 in the K, there's a

17  disclosure of significant litigation.  In fact, there was in

18  February one of Complete Solaria's contractual

19  counterparties, SolarPark Korea, sued it for trademark

20  infringement, for disparagement, and for a whole other host

21  of contractual remedies.  And before that ended up going to

22  arbitration, they were actually -- and this discloses that

23  the counterparty, SolarPark Korea, was able to obtain a

24  preliminary injunction, right, and as part of that there was

25  a finding that they were likely to succeed on the merit of

1  showing infringement of a trademark and disparagement.

2  Again, is that really good stewardship of intellectual

3  property?

4            And then another thing that Mr. Foley, he

5  testified to is he said that part of maintaining a good brand

6  is quality control, right?  The products to which we are

7  attaching these brand -- our brand -- to which we are

8  attaching our brand meets a minimum semblance of quality,

9  right?  And what happened?  Well, in Q1 of this year,

10 Complete Solaria was found liable for almost $7 million in

11 damage for delivering faulty systems to Siemens that didn't

12 meet spec and did not meet the minimum baselines of quality.

13           So, again, right, what's this adequate -- and I

14 won't talk about adequate protection, but, you know, the

15 debtors offer this idea that we're adequately protected here,

16 right, nothing to worry about.  And they point to financial

17 stability, they point to the fact that Complete Solaria has

18 the expertise and good IP stewardship to be able to do this,

19 right?  And what the evidence shows is that that's very, very

20 much in doubt.  And, even if it's not in doubt, I think it's

21 enough to show that this is not the counterparty with whom

22 Maxeon sat down a couple years ago and negotiated the brand

23 framework agreement and, as a matter of applicable non-

24 bankruptcy law, they're entitled to their choice of

25 counterparty in this very specific set of circumstances.  And

1    I think the evidence illuminates the concerns for which this

2    body of non-bankruptcy law exists are very germane here.

3            Briefly, I just want to go back to the Trump

4    Entertainment case that Mr. Collins talked about, we had a

5    colloquy about it, and I think that it helps illustrate why

6    12.2 doesn't do the work that the debtors think it does and

7    why Trump isn't the panacea to these issues, right?

8            So what Trump says, right, the court says that --

9    and, here, I'll get you the concise -- it's a pretty long

10    opinion, but what the court says is that parties can of

11    course contract around either (c)(1) or baseline law, right,

12    if there's -- and this is at -- it's Headnote 8, it's pin

13    cite 123, In re Trump Entertainment Resorts, Inc., 526 B.R.

14    116 at 123, and the court says that there must be some

15    express authorization from the licensor, such as a clause in

16    the license agreement itself, that would allow there to be a

17    derogation from the background trademark principle that

18    trademark licenses are exclusive, right?

19            And so how do we apply that to the brand framework

20    agreement and the actual license that's granted?  Well, let's

21    look at section 3.2 of the brand framework agreement.

22            And so to be clear, just so that we don't get

23    lost, right, so the brand framework agreement, it granted

24    ownership of trademarks in certain circumstances,

25    geographies, and times, and then there were also licenses of

1   those assigned trademarks back.  And so, in 3.2, there's a

2   license to SunPower, and Maxeon hereby grants to SunPower and

3   SunPower affiliates a nonexclusive, non-sublicensable, right?

4   And so, in the field of trademarks here, the ability to

5   sublicense and the ability to assign are essentially one and

6   the same.  And so if we're talking about specific prevailing

7   over the general, right, even granting that 12.2 is relevant,

8   12.2 is, I think -- I don't think it's controversial to say

9   that's a general assignment provision and then it dictates

10  the circumstances under which the agreement as a whole may be

11  assigned, this is a specific, specific intent that shows that

12  the license back to SunPower, it's non-sublicensable.

13          Then 4.5, again, specific versus general.  We

14  talked about this for a long time, but as I was listening to

15  your colloquy before, I was really struck by the exact

16  language that's used in 4.5, right?  It says, "Neither party

17  shall, unless approved by the parties," dot, dot, dot, "sell

18  or otherwise dispose of any of its right, title, or interest

19  in any of the SunPower marks."

20          It's talking about title to and interest in a

21  piece of property, an asset.  It's not about an assignment of

22  an agreement, right?

23          And, finally, let's go back to 12.2.  And I know

24  I've been harping on this, but I think the text and the words

25  and the structure here really matter.  What does it say,

1  right?  It's a rule and then it's an exception.  So the rule:

2  This agreement may not be assigned by either party without

3  the prior written consent.  That's the rule, right?  There's

4  an exception:  notwithstanding the foregoing -- that's what

5  it says, notwithstanding the foregoing, it doesn't say

6  notwithstanding anything herein to the contrary,

7  notwithstanding the other provisions of this agreement -- it

8  says, notwithstanding the foregoing sentence, this agreement

9  may be assigned under certain circumstances.

10         How can this general provision override the very

11  carefully reticulated ownership and licensing structure that

12  is set forth with particularity with respect to discrete

13  assets elsewhere in the agreement?  I think this would just

14  rip up all principles of contract interpretation as I know

15  them.

16         I want to quickly answer two questions -- or give

17  my view on two questions that you had for debtors' counsel

18  before.  First, you asked if section 5.2 has been triggered

19  by the events that have happened here.  And he said, no,

20  because we're not abandoning or discontinuing the marks.  But

21  the unrebutted testimony of Mr. Henry this morning was that

22  it was a couple things.  It was that after the -- assuming

23  the sale closes, once the sale is closed, the debtors will

24  cease operating, number one.  Number two is -- and pardon me

25  for stating the obvious, but included among the assets being

1  sold are the marks -- and, number two, after the sale closes
2  and after the debtors cease operating, they are no longer
3  going to use the marks.

4       And so if we read textually 5.2 of the agreement,
5  right, it says, "intends to discontinue use of," discontinue
6  use of, and we have unrebutted testimony, they're not going
7  to use them anymore.  So, 5.2 is triggered.

8       The other question that you had is you said are
9  there any provisions of 363 that allow the debtor to sell
10 something that they don't have.  And I think there's one --
11 and I don't think anybody said it's applicable here and there
12 hasn't been a showing here -- and that's when the debtor
13 sells the rights of a co-tenant, a tenant-in-common, or joint
14 owner, right?  That's -- but I think the presence of the
15 specific provision like --

16       THE COURT:  I understand your negative inference
17 on that --

18       MR. KISSNER:  Yeah.

19       THE COURT:  -- I get it.

20       MR. KISSNER:  And then, finally, I just want to
21 address this idea that this is a forfeiture here, right, that
22 to give impact to this contract would somehow effectuate a
23 forfeiture of value, and it would be abhorrent to the free
24 alienation of property rights and contrary to bankruptcy
25 policy.

1          Well, they keep talking about value and a

2    forfeiture of value here, but what I've heard is that nobody

3    has attempted to quantify how much these marks are worth,

4    right?  The APA doesn't allocate any value to it.  There's

5    insinuation, there's innuendo, right, in the pleadings that,

6    oh, you know, if these marks don't get sold or if the

7    contract is enforced, this all blows up and 1300 people lose

8    their job and we're all going home.  I haven't heard anything

9    in the record that actually says they're going to walk away

10   if they can't get fee simple title to these marks in the

11   United States, right?  There's nothing in the record that

12   supports that.  And so I think, when we talk about value, we

13   should be very clear about what's actually been established.

14         Setting that aside, though, this isn't a

15   forfeiture of value, right?  And in fact -- and the reason --

16   the reason why that's so is we have to take a step back and

17   think about -- and we say this in our papers and we lead with

18   it for a reason -- that U.S. trademark law is based off of

19   this principle of use it or lose it, right?  And it's not --

20   it's not like that throughout the whole world, not all

21   countries have this idea, but in the U.S. the idea is that to

22   prevent rent-seeking behavior, to prevent somebody from just

23   getting their hands on something valuable and sitting around

24   and not using it, we discourage that with trademarks.  And

25   so, if you're not actually using a mark in commerce for the

1  goods that are protected under that mark, then you lose it,

2  right?

3         And so what section 5.2 is designed to do, it's

4  not to effectuate a forfeiture in value, it's to prevent a

5  forfeiture in value because, if the other party doesn't have

6  the right to recoup those marks and reunify them as one, they

7  might be lost forever, and any Tom, Dick, or Harry off the

8  street can start selling SunPower branded solar panels that

9  are imported from God knows where, and there won't be any

10  recourse against it.  So it's designed to prevent a

11  forfeiture of value.

12         And more generally, you know, it's no more of a

13  forfeiture of value than it was in the Ground Round case for

14  the landlord.  The landlord said you can have this liquor

15  license for as long as the lease is in effect.  The tenant,

16  who operated the bar, they filed for bankruptcy.  The

17  landlord said you need to give the license back.  The tenant,

18  he could have gotten up here and I'm sure he did --

19  unfortunately, it was long enough ago there aren't ready

20  transcripts, but I'm sure they would have said -- or the

21  trustee -- this is a forfeiture of value, this rent-seeking

22  landlord is trying to get back, claw back for no additional

23  consideration this liquor license that can fetch a lot of

24  value for the estate and unsecured creditors, right?  That

25  was unavailing.

1          The golf club and all those members in <u>Magnus</u>,

2   right, it was a higher and better use of a debtor's golf

3   country club membership to be able to sell it off to the

4   highest bidder.  It would have created a higher dividend for

5   under-secured creditors in that case as well, right?  That

6   was a forfeiture of value.  It was these golf members and the

7   country club trying to take back for no consideration what

8   belonged to the debtor.  But, no, the court said you can't

9   sell what you don't have, right?

10         Your rights outside of bankruptcy are what they

11  are in bankruptcy unless you avoid, rescind, or otherwise

12  destroy the contract.  There's been no adequate showing of

13  that here.  And so I think this is a pretty open-and-shut

14  case and they can't sell the marks without our consent.

15         Unless you have any other questions, I have

16  nothing further.

17         THE COURT:  I don't.  That's very helpful.  Thank

18  you.

19         MR. KISSNER:  Thank you.

20         THE COURT:  Okay.

21         Anything further from anybody?  Mr. Collins?

22         MR. COLLINS:  No, Your Honor, I don't want to

23  belabor the record or kind of go back over the arguments I've

24  made.  I'm happy to answer any questions Your Honor has --

25         THE COURT:  No, I think -- look, I think I

1  understand where we are, and what I need to do is process and

2  get a decision to all of you --

3          MR. COLLINS:  Right.

4          THE COURT:  -- and I want to think about how to do

5  that in a way that's efficient, is commercial, and is

6  consistent with my 3 o'clock hearing.

7      (Laughter)

8          MR. COLLINS:  I guess I -- Your Honor, sorry to

9  interrupt --

10          THE COURT:  No, please.

11          MR. COLLINS:  -- I guess there is one thing that I

12  may have misstated to kind of close the argument that I made.

13          THE COURT:  Okay, you can --

14          MR. COLLINS:  And that is going back to the

15  reservation of rights in 2.4 of the brand framework

16  agreement.  It's very carefully drafted, 2.4.  When Your

17  Honor has it, I'll --

18          THE COURT:  Yeah, no, I see it.  Go ahead.

19          MR. COLLINS:  What I -- I guess all I wanted to

20  say was, what's noticeably absent from that is 4.5 or 5.2,

21  from the introductory sentence.  Except for those three other

22  sections, SunPower marks are owned exclusively by the

23  debtors, and 4.5 and 5.2 do not give the rights that Counsel

24  thinks they do.

25          THE COURT:  Okay, I understand that.  Okay.

1          MR. COLLINS:  Okay.

2          THE COURT:  Thank you, Mr. Collins, I appreciate

3 it.

4          Is there anyone else who I ought to hear from on

5 this issue?

6      (No verbal response)

7          THE COURT:  All right.  I am not going to be in a

8 position to get you a decision like before -- and read it

9 into the record before my 3 o'clock starts.  I probably need

10 like an hour to write and process and look at things again.

11          So what I'm -- and I don't mean to inconvenience

12 folks, but I've got a 3 o'clock, I hope that doesn't go that

13 long, what I propose to do is to come back on the record at

14 4:00 and give you a decision.  If I'm not -- if I'm going to

15 miss that deadline, we'll have something hit the docket so

16 that everyone gets an email and you'll see when.  I'm going

17 to do this today, I appreciate the commercial realities of

18 the world in which we're living and I want to be mindful of

19 them, while also being mindful of my obligation to get it

20 right, but I will try to get a decision read into the record

21 at 4:00.

22          No one needs to hang around here.  It's available

23 on Zoom.  The notion that you should all stick around so you

24 can hear me read doesn't seem like a fair ask of any of you.

25 So you're welcome -- if you're here, you're welcome here, but

1  you're also welcome to be on by Zoom, and I will do my best

2  to get back on the record at 4:00, I'll do my best.  If I

3  kick that a bit -- I'll try not to, but if I do, you've been

4  warned, but I will try my best to get you a decision at 4

5  o'clock, and then everyone can proceed however is appropriate

6  in light of the decision.

7          So any other questions or anything else I can do

8  to be helpful to the parties while we're here?

9          MS. TANCREDI:  Very quickly, Your Honor, and this

10  is more of a housekeeping matter.  I'm Lisa Tancredi, I'm

11  here on behalf of Arch Insurance Company and Applied Surety

12  Underwriters.  Our objection to the sale was designated in

13  the agenda as resolved and I just wanted to be clear, and I

14  think that this was said earlier, but that the resolution is

15  --

16          THE COURT:  Being documented.

17          MS. TANCREDI:  No, it's based upon and it's

18  contingent upon our cure objection being continued to the

19  next hearing date, which I think is already apparent --

20          THE COURT:  That's done.

21          MS. TANCREDI:  -- so I just wanted to clarify

22  that.

23          THE COURT:  Okay, yeah.  So the cure objections

24  are set for whenever they're set and so I don't think there's

25  -- I take it there's no dispute about Ms. Tancredi's point?

1        (No verbal response)

2            THE COURT:  Okay, debtor -- just for the record,

3   the debtor -- everyone at the debtors' table is nodding and

4   saying no, so I think we're good.

5            MS. TANCREDI:  Thank you.

6            THE COURT:  Thank you, Ms. Tancredi.

7            Okay, anything else that I can do to be helpful

8   before I actually sit down and try to do my job?

9        (No verbal response)

10           THE COURT:  Okay.  So thank you -- look, this is

11  interesting and it's been well presented, and I appreciate

12  all of the good lawyering that's done all around, both the

13  good lawyering reflected in the various agreements that have

14  been reached, which are much appreciated, and the good

15  lawyering where there haven't been agreements that have been

16  reached.

17           So I think I now know what I need to do, I'm going

18  to do my best to try to get it right, and I will see all of

19  you either here or by Zoom at 4 o'clock.

20           And, with that, we're adjourned.  Thank you.

21           COUNSEL:  Thank you, Your Honor.

22       (Recess taken at 2:04 p.m.)

23       (Proceedings resume at 4:00 p.m.)

24           THE COURT:  Good afternoon.  This is Judge

25  Goldblatt.  We are back on the record in SunPower and we're

1  here for the purpose of my giving you approval on the motion

2  to sell.

3            So this isn't going to be pretty, so my apologies

4  to all, but we'll do the best we can do.

5            So the debtor seeks approval of a going concern

6  sale of its principal operating assets to Complete Solaria,

7  Inc.  Many different objections were filed.  Certain

8  objections, related to cure amounts, have been adjourned to a

9  later hearing; other objections have been resolved

10  consensually through language that will be in the sale order.

11  The remaining objection is from Maxeon.

12            I actually agree with many of Maxeon's points

13  about both Sections 363 and 365 of the Bankruptcy Code.  I

14  will, nevertheless, overrule its objection and approve the

15  sale.  The reason for that is that I find Maxeon's reading of

16  the key agreement, the brand framework agreement, to be

17  contrary to what I find to be the most natural reading of the

18  terms of the agreement itself.

19            So a bit of context.  Maxeon was spun off of the

20  debtors in 2020.  At the time, the parties agreed to divide

21  ownership of the SunPower brand between the companies.

22  SunPower retained the right to use the brand name within the

23  United States; and Maxeon, which was, in effect, the SpinCo,

24  would have the rights to have the brand and its marks

25  everywhere else.

1          The terms of the parties' agreement was reflected

2    in the brand framework agreement, a copy of which was

3    admitted into evidence at the hearing today.  The agreement

4    did a number of things.

5          It did allocate ownership of the trademarks at

6    issue, dividing the marks between the parties.

7          The nub of Maxeon's argument is that the agreement

8    itself precludes either party from selling its part of the

9    trademark to another party without the consent of the brand

10   framework agreement counterparty.  These trademarks are

11   included among the assets that the debtor seeks to convey to

12   the buyer in the transaction that is before me.

13         And while the gist of what Maxeon is saying is

14   that, to the extent the debtor seeks to sell these assets

15   under 363, they have no power to override otherwise

16   enforceable agreements not to sell without their extent; and,

17   to the extent the debtor seeks to assign the agreement under

18   Section 365, the -- Maxeon's argument is that the assignment

19   is prohibited by Section 365(c)(1) because applicable non-

20   bankruptcy law would not require it to accept performance

21   from another party.  And as I said, while I don't agree with

22   -- while I don't disagree with either of those statements of

23   bankruptcy law, I do disagree about the way the brand

24   framework agreement works.

25         So the Court conducted an evidentiary hearing

1  earlier today.  I heard the live testimony from two

2  witnesses:  Matthew Henry of Alvarez & Marsal, who is the

3  Chief Transformation Officer of the debtor, as well as Daniel

4  Foley, who is the Chief Financial Officer of Complete

5  Solaria, the buyer.  I -- the Court admitted into evidence

6  the declaration of Rick Polhemus of Moelis, which was the

7  debtors' investment banker, several other documents were

8  admitted into evidence.

9          My findings and conclusions now are limited to the

10  disputed matters of the sale and not to every matter that can

11  be -- where the details can be filled in by the agreed order.

12          So the two most directly applicable provisions of

13  the agreement are Sections 4.5 and 12.2.

14          Section 4.5 is titled "Restrictions on Sale."  And

15  it provides that:

16          "Neither party shall, unless approved by the

17  parties or the brand counsel, sell, assign, transfer,

18  license" --

19          I'm skipping some words.

20          "-- or otherwise dispose of its right, title, or

21  interest in or to any of the SunPower marks or the assigned

22  SunPower trademarks to a third party, other than such party's

23  affiliate."

24          So it generally operates to preclude the

25  assignment or sale of the marks without counterparties'

1  consent.

2          Section 12.2 is called "Assignment."  And it

3  reads:

4          "This agreement may not be assigned by either

5  party without the prior written consent of the other party."

6          Then the next sentence says:

7          "Notwithstanding the foregoing, either party may

8  assign this agreement to an affiliate or to an acquirer or

9  successor-in-interest in connection with a change of control

10 of such party without the prior written consent of the other

11 party, provided that such party provides the other party with

12 written notice of any such assignment."

13         It goes on to say, "'Change of control' means,"

14 and there's a definition of "change of control" and -- I'm

15 sorry.  It says:

16         "'Change of control' means (a) The closing of a

17 merger, consolidation, or similar transaction" --

18         And it goes on to continue the definition of that.

19         "-- or (b) The sale of all or substantially all of

20 a party's assets."

21         And the relevant provision here is 12.2(b), the

22 argument being that what is before us involves the sale of

23 all or substantially all of the debtors' assets.

24         The parties have two starkly different views of

25 how these two provisions fit together.

1          Maxeon's view draws on what it describes as a

2    "sharp distinction" between intellectual property rights that

3    it views as property that was conveyed under the agreement

4    and other contractual obligations that it sees as executory

5    obligations under the contract.  In Maxeon's view, Section

6    4.5 applies to the property aspects of the agreement and, on

7    their reading, sort of come hell or high water, those

8    property rights cannot be sold without their consent.  The

9    executory aspects of the agreement are mere contract rights,

10   and they are subject to 12.2, and they can be conveyed if

11   there's a change of control or substantially all -- a sale of

12   substantially all, et cetera.  So Maxeon believes it has, in

13   effect, an absolute veto over a sale of the trademarks

14   themselves.

15          The debtor takes a different view of the

16   agreement.  It reads Section 4.5 to establish a generally

17   applicable rule, but it views Section 12.2 to be addressed to

18   the particular circumstances of a change in control or sale

19   of substantially all.  And in that particular situation, the

20   provisions of Section 12.2 are the applicable provisions.

21   Otherwise put, under the common canon of construction that

22   the specific will prevail over the general, the debtor argues

23   that Section 12.2 is specifically directed to a circumstance

24   like the one present here, in which the debtor is subject to

25   a change of control or proposes to sell substantially all of

1  its assets.  I'm persuaded that this is the better reading of

2  the agreement.

3        Maxeon's view requires one to assume that, when

4  the parties were writing this agreement, they had in mind the

5  distinction between those intellectual property rights that

6  fall into the abstract category of owned property, and that

7  Section 4.5 was focused on that category.  And this view

8  further assumes that the parties had in mind a separate

9  category that were contractual rights that were separate from

10  the owned property.  And Maxeon's view is that Section 12.2

11  applies only to these contract rights and not to the property

12  rights.

13        And in fairness to Maxeon, there are times when

14  legal scholars will draw on distinctions between property

15  rights and contract rights.  But particularly in a context

16  like this one, those distinctions are extremely fine, too

17  fine for one to conclude that parties to a commercial

18  agreement were relying on them.  So, as a matter of

19  contractual construction, I find it to be simply unreasonable

20  to believe that the parties to this agreement could have been

21  drawing the distinction that Maxeon urges.

22        To underscore that point, one would need to ask

23  whether a trademark license, as opposed to the ownership of

24  the underlying trademark, was a contract right or a property

25  right in the underlying intellectual property.  One could

1  make that argument either way, the license is one stick in a

2  bundle of sticks.  And that distinction ultimately devolves

3  into what is essentially a matter of abstract philosophy.

4  Parties could take any intellectual property right, after

5  all, and characterize it as a covenant not to sue, in which

6  case, it becomes a contract right.  Indeed, you could have

7  the same conversation about a real property lease.  Is that a

8  contract right or is that an interest in the underlying real

9  property?

10        So my fundamental point is that, when you read a

11  commercial agreement like the brand framework agreement, you

12  need to read it against the backdrop that these are

13  commercial parties seeking to give effect to a business

14  arrangement.  And in that context, the suggestion that 12.2

15  applies to what, from some like Aristotelian perspective,

16  would be viewed as contract rights, while Section 4.5 is

17  about the separate category of ownership interests, is just

18  not a commercially sensible way to make sense of the

19  agreement.

20        That conclusion is underscored by how nonsensical

21  it would even be to be addressing the contractual rights upon

22  a change of control or a sale of substantially all if those

23  were to be divorced from the right to use the intellectual

24  property.  None of the other rights in the agreement would

25  make any sense in a world in which the buyer would lose the

1  right to use the trademarks.

2        So, for those reasons, I conclude that the only

3  reasonable construction of the agreement is the one the

4  debtors offer, under which Section 4.5 generally prohibits

5  the sale of IP, but in which Section 12.2 provides a specific

6  exception in a situation in which there is a change of

7  control or a sale of substantially all of the debtors'

8  assets.

9        On the record before this Court, after today's

10  evidentiary hearing, I'm satisfied that the requirements of

11  that section are satisfied.  Whether the specific Complete

12  Solaria transaction is viewed in isolation or in conjunction

13  with the other sales that are now underway, the debtor is

14  selling substantially all of its assets under any of the

15  various definitions of "sale of substantially all" that any

16  of the parties has proposed.

17        With respect to the portion of the transaction in

18  which the debtor does intend to assign the executory

19  contract, I conclude that the requirements of Section 365(c)

20  are met.

21        The debtor, in fairness, has a reasonably

22  interesting argument from the language of Section 365(c)(1),

23  in which it points out that Section 365(c)(1) imposes

24  restrictions, quote:

25            "-- whether or not such contract or lease

1  prohibits or restricts the assignment of rights."

2        But I think it's clear from the case law that that

3  is about sort of permitting what are effectively implicit

4  anti-assignment provisions, not about overriding express

5  provisions that permit the assignment.

6        And there, both parties point me to Judge Gross'

7  thoughtful opinion in In Re Trump Entertainment Resorts,

8  which is at 526 B.R. 116 (Bankr. D. Del. 2015).  And that's

9  essentially the conclusion the Court reaches there.  He

10 finds, as the -- as Maxeon argues here, that federal

11 trademark law generally bans assignment of trademark

12 licenses, absent the licensor's consent because, in order to

13 ensure that all products bearing its trademark are of uniform

14 quality, the identity of the licensee is crucially important

15 to the licensor.

16        And that, as a general matter, is not disputed and

17 is a true statement.  As a general proposition, I don't think

18 anyone disputes that trademark licenses that are non-

19 assignable by their terms, that the anti-assignment provision

20 cannot be overridden under Section 365(c).  But the -- well,

21 Judge Gross goes on to say that:

22        "This is only a default rule, which the parties to

23 a license agreement are free to contract around."

24        And what I conclude is that Section 12.2 does

25 exactly that; it provides a basis to override limitations on

1  the ability to assign the agreement in circumstances that

2  involve a sale of substantially all.

3          That raises -- or that leaves, by my lights,

4  really only the questions of adequate assurance of future

5  performance under the contract.

6          To that regard, I credit the testimony of Mr.

7  Foley, who makes clear that the buyer will have both the

8  liquidity and other financial means to meet its obligations

9  and to perform under the contract.  While Maxeon capably

10 cross-examined Mr. Foley with evidence about prior litigation

11 and the like, none of that persuades me that -- or overcomes

12 the debtors' showing that the buyer will be able to meet its

13 obligations under the contract.

14          This -- the circumstances demonstrate and Mr.

15 Foley's testimony made clear that this is essentially -- the

16 buyer is a business that is, itself, being fundamentally

17 restarted.  It is taking most of the employees -- the record

18 suggests it's taking most of the employees from the debtor.

19 And nothing in the prior litigation provides any reason to

20 suggest that the buyer, following closing of the sale, will

21 not be a good steward of the intellectual property and live

22 up to the obligations that are -- that it is undertaking

23 under the parties' various agreements.

24          So, for those reasons -- apologies for the long-

25 winded recitation.  But for those reasons, I'm satisfied that

1  the debtor has met its burden of demonstrating the propriety

2  of the sale and I will enter an order so providing.

3        So can I answer any questions?  Yes, Mr. Kissner.

4        MR. KISSNER:  Thanks, Your Honor.  For the record,

5  Andrew Kissner, Morrison & Foerster, on behalf of Maxeon.

6        I guess our question would be one of the things in

7  the proposed form of order, they found -- or that they are

8  requesting from the Judge -- or from the Court --

9        THE COURT:  That's me --

10        MR. KISSNER:  -- is the --

11        THE COURT:  -- yep.

12        MR. KISSNER:  That's you.  Is the --

13        THE COURT:  Even after a long day.

14        MR. KISSNER:  Is the waiver of the 6004(h) stay

15  period.  We don't think that there's been a showing of that.

16  I think the fact that this was -- we disagree with the

17  ruling, of course, but respectfully, you know -- we respect

18  your decision.  But the fact that this did cause some

19  consternation and that this -- there is no clear black-letter

20  law here, we think that reasonable minds could disagree on

21  this and that there could be merits for an appeal.  I don't

22  know what my client wants to do.  But particularly, given

23  that they're asking for a 363(m) finding here, we would just

24  like some time to seek a stay pending appeal, if that's the

25  way to go.

 1            And I would just note that, under the third

 2    interim cash collateral order, they have a week to close, and

 3    so I think that's ...

 4            THE COURT:  So, look, I hear you.  I'm going to

 5    grant the waiver, not because I think that there is -- there

 6    are no arguments here.  I mean, I found what I found, but I

 7    am not -- I'm not minimizing the reasonableness of your

 8    arguments.  But I am satisfied on the whole record of this

 9    case.

10            So, I mean, look, in a perfect world, I would have

11    taken another day to craft a ruling that would have been less

12    garbled than what I just did.  And the reason I didn't is

13    because I'm satisfied on the record of this case that there

14    are exigencies that require moving quickly.  Indeed, that's

15    been much of the story of this case.  And so those same

16    reasons counsel in favor of granting the waiver and

17    permitting the order to be effective upon entry.

18            Obviously, if the District Court says otherwise,

19    then that is what it is.  But I'm not inclined and under the

20    circumstances here to stay it pending the District Court so

21    providing.

22            MR. KISSNER:  Understood.

23            And just for the clarity of the record then, I am

24    going to make an oral motion for a stay pending appeal.  And

25    I understand --

1          THE COURT:  Okay.

2          MR. KISSNER:  -- I think, about how you're rule,

3 but --

4          THE COURT:  If what -- yeah, if you wanted more

5 words from me, I would give them.  But I take it what you

6 need is me to have denied it, so that you can file a motion

7 for a stay, and that is so provided.

8          So the motion is denied.  I'm satisfied that

9 applying the equitable factors, that, while the likelihood of

10 success is not zero, it's mostly my concern for irreparable

11 injury on the other side, given the debtors' showing of a

12 tight budget and the need to move quickly; and so, for that

13 reason, I'll deny the stay.

14          MR. KISSNER:  Okay.  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Anything further from the debtor?

17          UNIDENTIFIED:  No, Your Honor.

18          THE COURT:  Okay.  So we will await an order,

19 which -- and we'll enter that upon it being -- upon receipt

20 of a certification.

21          And while we're here, is there any other party-in-

22 interest that would like to be heard on any matter?  Okay.

23 Anyone?  Counsel?

24          MR. MADRON:  Your Honor, just a procedural

25 question.

1    THE COURT:  Yes.

2    MR. MADRON:  For the record, Jason Madron of

3  Richards, Layton & Finger for the debtors.

4    We did file a proposed form of order this morning

5  during the proceedings, which I understand Your Honor may not

6  have had an opportunity to review.

7    THE COURT:  And I still have not.  So you have

8  filed a form of order that -- and you're -- are you

9  representing that that form of order addresses all of the

10  language changes and the like that have been requested and

11  that you've agreed to?

12    MR. MADRON:  Yes.  I am informed by our colleagues

13  by Kirkland, before they left, that that is the final form of

14  order.

15    THE COURT:  Okay.

16    MR. MADRON:  Would it be acceptable to upload that

17  to save --

18    THE COURT:  Yes.

19    MR. MADRON:  -- certification practice?

20    THE COURT:  Yeah.  Based on that representation --

21  and that representation is, effectively, that you're

22  certifying that it's been -- that everyone who has commented,

23  it reflects all of their changes and is agreeable to the

24  parties, obviously, reserving Maxeon's rights, I'm happy to

25  enter that form of order.

1          MR. MADRON:  Very good, Your Honor.

2          THE COURT:  So, if you upload it, we'll enter that

3   as soon as it's uploaded.

4          MR. MADRON:  When we get back to the office, we

5   shall do so, and we'll let chambers know when that is done.

6          THE COURT:  Okay.  Very well.

7          MR. MADRON:  Thank you very much, Your Honor.

8          THE COURT:  Thank you.

9          Any other party-in-interest wish to be heard while

10  we're here?

11      (No verbal response)

12         THE COURT:  Okay.  Seeing none.

13         Let me, again, thank the parties.  This was well

14  presented, and you've -- I can't say you've made my job easy,

15  but you've made it easier by presenting the issues very

16  capably, so you all have my thanks.

17         And with that, we're adjourned.  Thank you.

18         COUNSEL:  Thank you.  Thank you, Your Honor.

19      (Proceedings concluded at 4:20 p.m.)

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                September 24, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams               September 24, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16   /s/ Coleen Rand                      September 24, 2024

17   Coleen Rand, CET-341

18   Certified Court Transcriptionist

19   For Reliable

20

21

22

23

24

25