# Exhibit C

**EFiled:  Jul 14 2023 03:26PM EDT**
**Transaction ID 70395653**
**Case No. 2023-0136-MTZ**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JEFFREY EDELMAN, derivatively on behalf of Nominal Defendant SUNPOWER CORPORATION,

      Plaintiff,

    v.

TOTALENERGIES SE, TOTALENERGIES RENEWABLES USA, LLC, TOTALENERGIES GAZ & ELECTRICITÉ HOLDINGS SAS, TOTALENERGIES SOLAR INTL SAS, PETER FARICY, FRANCOIS BADOUAL, BERNADETTE BAUDIER, VINAYAK HEGDE, CATHERINE A. LESJAK, THOMAS R. McDANIEL, NATHALIE PORTES-LAVILLE, JULIEN POUGET, VINCENT STOQUART, DENIS TOULOUSE, FRANCK TROCHET, THOMAS H. WERNER, LAURENT WOLFFSHEIM, and PATRICK WOOD III,

      Defendants,

    -and-

SUNPOWER CORPORATION,

      Nominal Defendant.

C.A. No. 2023-0136-MTZ

**PUBLIC VERSION**
**DATED:  JULY 14, 2023**

## VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Jeffrey Edelman ("**Plaintiff**"), derivatively on behalf of Nominal

Defendant Sunpower Corporation ("**Sunpower**" or the "**Company**"), submits this

Verified Amended Stockholder Derivative Complaint against the defendants named herein for breach of fiduciary duty and unjust enrichment.

The allegations in this Complaint are based upon Plaintiff's personal knowledge as to himself, and upon information and belief, including the investigation of counsel, the review of publicly available information, and the review of books and records produced by the Company as of the date of this Complaint in response to Plaintiff's books and records demand under 8 *Del. C.* § 220 as to all other matters, all of which books and records are expressly incorporated into this Complaint. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case.

### SUMMARY OF THE ACTION

1.     SunPower is a solar technology and energy services company which offers solar, storage, and home energy solutions to customers primarily in the United States and Canada. Prior to the transaction at issue, it operated mainly through three business segments: (i) Residential; (ii) Light Commercial; and (iii) Commercial and Industrial Solutions (the "**CIS Business**").

2.     In fiscal 2011, two controlled subsidiaries of French energy giant TotalEnergies SE (formerly Total SE) ("**TotalEnergies**" or "**Total**"), acquired a majority interest in SunPower.

3.      Through its subsidiaries, TotalEnergies has owned 50.5% of the Company's outstanding stock voting power at all relevant times, making it Sunpower's controller as a matter of law.

4.      On February 6, 2022, the Company entered into an agreement with another controlled subsidiary of TotalEnergies under which that subsidiary bought the Company's CIS Business for $190 million in cash plus a potential $60 million earn-out subject to the timing and credit level of a potential solar investment tax credit ("**ITC**") extension (the "**Acquisition**"). The Acquisition closed on May 31, 2022.

5.      As a conflicted controller transaction, Defendants have the burden of demonstrating that the Acquisition was entirely fair to Sunpower. They will be unable to meet their burden.

6.      *First*, the Acquisition was the result of an unfair process dominated by the specter of TotalEnergies from the start. TotalEnergies actively engaged in the process and prevented higher valuations for the CIS Business at key points. The process was designed from the beginning to include a number of features that would operate to tamp down third-party interest in the CIS Business. Moreover, the Special Committee (defined below) deviated from the already skewed agreed-upon sale process to allow TotalEnergies to gain insight into its thinking, exert unfair pressure, and ultimately buy the CIS Business on the cheap.

7.     *Second*, even apart from a process designed to favor TotalEnergies, the consideration paid to the Company for the CIS Business was well below the Company's own internal valuations. Thus, Sunpower would have been in a better position if no deal had occurred. But, due to the fiduciaries' failure to stand up to TotalEnergies, walking away from the sale of the CIS Business was never truly an option. The result is a sale transaction at an unfair price.

## THE PARTIES

*Plaintiff*

8.     Plaintiff Jeffrey Edelman is, and at all relevant times was, a stockholder of Sunpower common stock.

*Nominal Defendant*

9.     Nominal Defendant Sunpower is a Delaware corporation that trades on the Nasdaq under the ticker symbol "SPWR."

*The Total Defendants*

10.     Defendant TotalEnergies is a *societas europaea* organized under the laws of the Republic of France.

11.     Defendant TotalEnergies Gaz & Electricité Holdings SAS (also known as Total Gaz Electricité Holdings SAS and formerly Total Gaz Electricité Holdings France SAS) ("**TotalEnergies Gaz**") is a *société par actions simplifiée* organized under the laws of the Republic of France. It is a subsidiary of and controlled by

{01921036;v1 }                                    4

TotalEnergies. Pursuant to the Affiliation Agreement (defined below) and its amendments, TotalEnergies Gaz has consented to jurisdiction in Delaware and agreed to service of process in any manner authorized by Delaware law.

12.     Defendant TotalEnergies Solar INTL SAS (formerly Total Solar INTL SAS, formerly Total Gas & Power USA, SAS) ("**TotalEnergies Solar**") is a *société par actions simplifiée* organized under the laws of the Republic of France. It is a subsidiary of and controlled by TotalEnergies Gaz, which as previously noted, is a subsidiary of and controlled by TotalEnergies. Pursuant to the Affiliation Agreement and its amendments, TotalEnergies Solar has consented to jurisdiction in Delaware and agreed to service of process in any manner authorized by Delaware law.

13.     Defendant TotalEnergies Renewables USA, LLC ("**TotalEnergies Renewables**") is a Delaware limited liability company that is a subsidiary of and controlled by TotalEnergies and which was the purchaser of the CIS Business in the Acquisition.

*The Individual Defendants*

14.     Defendant Peter Faricy ("**Faricy**") has been the Company's President and CEO and a director since April 19, 2021. He has been Chairman of the Board since November 1, 2021. Faricy lacks independence from TotalEnergies for the reasons described in the "Demand Futility" section below.

15.    Defendant Francois Badoual ("**Badoual**") was a director of the Company since before calendar year 2021 until September 23, 2022. He was a Board designee of TotalEnergies Solar. At the time that he was a director of the Company, Badoual was a longtime high-level TotalEnergies employee who relied upon TotalEnergies for his livelihood. Badoual's extensive ties to TotalEnergies were described on the Company's website (link, as captured from the Company website on November 12, 2020) as follows:

> Mr. François Badoual has served as President and Chief Executive Officer of Total Washington D.C. Representative Office, Ltd. since September 2019. From 2017 to 2020, he served as President and Chief Executive Officer of Total New Energies Ventures, Inc. From 2012 to 2017, he served as Chief Executive Officer of Total Energy Ventures, the corporate venture capital arm for the Total Group. Mr. Badoual also previously served as General Manager and Country Chairman for Total Exploration and Production - Algeria from 2009 to 2012, and as Deputy General Manager for Total Exploration and Production - Angola from 2006 to 2009. Mr. Badoual has held various other positions in the Total Group since 1990, and he has worked in France, Indonesia, United Arab Emirates, and Venezuela.

In light of his longtime professional ties to TotalEnergies and reliance upon TotalEnergies for his livelihood, there is reason to doubt that Badoual could bring to bear his independent business judgment on matters concerning TotalEnergies while he was a Company director. Badoual thus lacked independence from TotalEnergies.

16.    Defendant Bernadette Baudier ("**Baudier**") was a director of the Company from April 19, 2021 until April 21, 2022. She was a Board designee of

TotalEnergies Solar and TotalEnergies Gaz. At the time that she was a director of the Company, Baudier was a longtime high-level TotalEnergies employee who relied upon TotalEnergies for her livelihood. Baudier's extensive ties to TotalEnergies were described on the Company's website (link, as captured from the Company website on January 18, 2022) as follows:

> Bernadette Baudier has served as senior vice president, finance within the Gas, Renewables and Power division of Total SE since 2020. Previously, she served as senior vice president, corporate affairs of the Exploration and Production division of Total S.E. from 2016 to 2019, with responsibilities covering finance, compliance, legal, human resources, communication and information technology. From 2013 to 2016, Ms. Baudier was senior vice president for internal control and audit of the Total Group. Prior to those positions, Ms. Baudier held various other positions in finance within the Total Group, where she has been employed since 1988.

In light of her longtime professional ties to TotalEnergies and reliance upon TotalEnergies for her livelihood, there is reason to doubt that Baudier could bring to bear her independent business judgment on matters concerning TotalEnergies while she was a Company director. Baudier thus lacked independence from TotalEnergies.

17. Defendant Vinayak Hegde ("**Hegde**") has been a director of the Company since December 31, 2021.

18. Defendant Catherine A. Lesjak ("**Lesjak**") was a director of the Company since before calendar year 2021 until December 31, 2022.

{01921036;v1 }                                        7

19. Defendant Thomas R. McDaniel ("**McDaniel**") has been a director of the Company at all relevant times. McDaniel has been a director at a number of TotalEnergies' portfolio companies who lacks independence from TotalEnergies for the reasons described in the "Demand Futility" section below.

20. Defendant Nathalie Portes-Laville ("**Portes-Laville**") has been a director of the Company since October 20, 2021. She is a Board designee of TotalEnergies Solar. Portes-Laville is a longtime high-level TotalEnergies employee who lacks independence from TotalEnergies for the reasons described in the "Demand Futility" section below.

21. Defendant Julien Pouget ("**Pouget**") was a director of the Company from before calendar year 2021 until January 19, 2022. He was a Board designee of TotalEnergies Solar. At the time that he was a director of the Company, Pouget had served as Senior Vice President of TotalEnergies since January 1, 2017. In light of his longtime professional ties to TotalEnergies and reliance upon TotalEnergies for his livelihood, there is reason to doubt that Pouget could bring to bear his independent business judgment on matters concerning TotalEnergies while he was a Company director. Pouget thus lacked independence from TotalEnergies.

22. Defendant Vincent Stoquart ("**Stoquart**") has been a director of the Company since January 19, 2022. Stoquart is a longtime high-level TotalEnergies

employee who lacks independence from TotalEnergies for the reasons described in the "Demand Futility" section below.

23.     Defendant Denis Toulouse ("**Toulouse**") was a director of the Company since before calendar year 2021 until October 20, 2021. He was a Board designee of TotalEnergies Solar. At the time that he was a director of the Company, Toulouse was a longtime high-level TotalEnergies employee who relied upon TotalEnergies for his livelihood. Toulouse's extensive ties to TotalEnergies were described on the Company's website (link, as captured from the Company website on November 12, 2020) as follows:

> Mr. Denis Toulouse has served as senior vice president, corporate & project finance, of Total S.A. in Paris since April 2019. He previously served as senior vice president, mergers & acquisitions, of Total S.A. in Paris starting in 2016. From 2015 to 2016, Mr. Toulouse was chief financial officer of Total Gas & Power Ltd. in London. Mr. Toulouse joined Elf Aquitaine S.A.S. in 1991, prior to its acquisition by Total [in 2000], and held various positions in the marketing division of Total, including chief financial officer of Total Deutschland in Germany and chief financial officer of Total Belgium in Belgium.

In light of his longtime professional ties to TotalEnergies and reliance upon TotalEnergies for his livelihood, there is reason to doubt that Toulouse could bring to bear his independent business judgment on matters concerning TotalEnergies while he was a Company director. Toulouse thus lacked independence from TotalEnergies.

24.     Defendant Franck Trochet ("**Trochet**") was a director of the Company since before calendar year 2021 until March 31, 2022. He was a Board designee of TotalEnergies Solar. At the time that he was a director of the Company, Trochet was a longtime high-level TotalEnergies employee who relied upon TotalEnergies for his livelihood. Trochet's extensive ties to TotalEnergies were described on the Company's website (link, as captured from the Company website on November 12, 2020) as follows:

> Mr. Franck Trochet has served as vice president, finance, of Total Petrochemicals and Refining USA, Inc. in Houston since 2017. He held a similar role for Total's exploration and production and marketing and services divisions, as well as U.S. affiliates, since 2017. From 2013 to 2017, Mr. Trochet served as vice president, business control, for Total's refining and chemicals branch in Paris. He was part of the team that established Total's refining and chemicals branch in 2010 before being appointed as vice president, corporate affairs, of Total's polymers business unit in Brussels. Mr. Trochet joined the finance division of Elf Aquitaine S.A.S. in 1999, prior to its acquisition by Total [in 2000], and held various positions in the refining and marketing divisions of Total, including U.K. finance manager, until 2010.

In light of his longtime professional ties to TotalEnergies and reliance upon TotalEnergies for his livelihood, there is reason to doubt that Trochet could bring to bear his independent business judgment on matters concerning TotalEnergies while he was a Company director. Trochet thus lacked independence from TotalEnergies.

25.     Defendant Thomas H. Werner ("**Werner**") was a director of the Company since before calendar year 2021 until November 1, 2021. He was also the Company's CEO since before calendar year 2021 until April 19, 2021.

26.     Defendant Laurent Wolffsheim ("**Wolffsheim**") was a director from February 10, 2021 through September 23, 2022. He was a Board designee of TotalEnergies Solar. At the time that he was a director of the Company, Wolffsheim was a longtime high-level TotalEnergies employee who relied upon TotalEnergies for his livelihood. Wolffsheim's extensive ties to TotalEnergies were described on the Company's website (link as captured from the Company website on June 25, 2022) as follows:

> Laurent Wolffsheim has served as senior vice president, strategy growth & people within the Gas Renewables and Power division of Total since January 2021. Before that, he served as managing director of Total Exploration & Production Qatar, vice president budget & financial control for the Total group, strategic planning manager within the Refining & Chemicals division of Total, and managing director of Total Polska Sp. z o.o. Prior to those positions, Mr. Wolffsheim held various other positions within the Total group, where he has been employed since 1995.

In light of his longtime professional ties to TotalEnergies and reliance upon TotalEnergies for his livelihood, there is reason to doubt that Wolffsheim could bring to bear his independent business judgment on matters concerning TotalEnergies while he was a Company director. Wolffsheim thus lacked independence from TotalEnergies.

{01921036;v1 }                                        11

27.    Defendant Patrick Wood III ("**Wood**") was a director of the Company since before calendar year 2021 until March 31, 2022. From at least 2009 through at least 2019, Wood was a member of the prestigious National Petroleum Council (the "**NPC**") established at the request of President Harry S. Truman to represent the views of the oil and gas industry to the U.S. Department of Enaergy. Wood was a member of the NPC together with TotalEnergies CEO, non-party Patrick Pouyanné, for at least a year and with TotalEnergies President of Refining and Marketing, non-party Michel Bénézit, for at least six years. In addition, Wood's son, non-party Patrick Wood IV, was employed as a Business Strategy Intern in the Strategy & Joint Ventures Department at TotalEnergies in 2022, after Wood left the Board. This was a highly prestigious position that is not advertised to the public at large; indeed, a Google search for "'TotalEnergies 'business strategies intern'" returns only nine results (link, accessed June 29, 2023). In light of his personal and professional ties to TotalEnergies, there is reason to doubt that Wood could bring to bear his independent business judgment on matters concerning TotalEnergies while he was a Company director. Wood thus lacked independence from TotalEnergies.

## SUBSTANTIVE ALLEGATIONS

28.    TotalEnergies acquired a majority interest in the Company in 2011. In connection therewith, the Company and TotalEnergies (via its controlled subsidiary TotalEnergies Solar, then known as Total Gas & Power USA, SAS) entered into an

Affiliation Agreement dated April 28, 2011 (as amended, the "**Affiliation Agreement**"), to which TotalEnergies Gaz became a party in April 2021, and which remains in effect to this day. Contemporaneous with the Affiliation Agreement, the Company and TotalEnergies entered into the "Guaranty," wherein TotalEnergies guaranteed to the Company the performance of TotalEnergies, TotalEnergies Solar, and each of TotalEnergies' subsidiaries under the Affiliation Agreement; and further acknowledged that it owns 100% of the interest of TotalEnergies Solar through one or more wholly owned subsidiaries.

29.     Section 4.3(d) of the Affiliation Agreement provides in relevant part that so long as TotalEnergies (including its subsidiaries other than the Company) owns over 50% of the Company's stock voting power, neither the Company nor the Board may enter into any transaction which results in the sale of 10% of more of the Company's assets by value without first obtaining the affirmative vote or written consent of TotalEnergies Solar (which is controlled by TotalEnergies). This provision – the "**Veto Right**" – has remained in effect at all relevant times. The Affiliation Agreement does not provide that TotalEnergies Solar's approval may not be unreasonably withheld.

30.     In December 2020, TotalEnergies Solar and the Company entered into a Strategic Cooperation Framework Agreement (the "**Cooperation Agreement**"). The Company has not publicly filed a copy of the Cooperation Agreement on its

website or with the SEC. The Company's most fulsome disclosure of the contents

of the Cooperation Agreement was a summary in its Form 10-K for fiscal year 2021,

filed on February 25, 2022, the full extent of which is as follows:

### *Cooperation Agreement*

In December 2020, we entered into [the Cooperation Agreement] with Total that governs the ongoing relationship between us and Total with respect to development and sale of certain future commercial solar power projects. The Cooperation Agreement lays the foundation for the potential to jointly develop certain projects and allows us and Total to expand investments in solar power projects to provide for future opportunities and investment volume.

Among other things, the Cooperation Agreement provides for:

- our obligation to offer and ability to sell certain projects to Total at pre-agreed model metrics;

- our ability to obtain non-recourse financing of construction costs;

- our ability to obtain financing of development costs as various milestones in the project development cycle are achieved;

- exclusivity over our offering of various post-sale services for projects sold to Total or its affiliates; and

- our right to offer EPC services on certain downstream generation projects being developed by Total.

14

The Cooperation Agreement remains in effect until December 31, 2023, unless otherwise terminated.

31.     As such, the Cooperation Agreement allows TotalEnergies to exercise even greater control over the Company's operations, decisions concerning the sale of assets, financing sources, and other activities including what services the Company may offer to third parties.

████████████████████████████████████████████

32.     Sunpower had three directors who were "independent" from the Company within the meaning of Rule 5605(a)(2) of the Nasdaq listing standards in the period leading up to the closing of the Acquisition: defendants Lesjak, McDaniel, and Wood (together, the **"Independent Directors"**).[1] But independence from the Company is not the same as independence from TotalEnergies, and their subsequent conduct gives reason to doubt their independence from the Company's controller, as do McDaniel's longstanding business ties to TotalEnergies as described in the "Demand Futility" section below.

33.     ████████████████████████████████████████

████████████████████████████████████████████

---

[1] Defendants Lesjak, McDaniel, and Wood are referred to as the "Independent Directors" solely for consistency because ████████████████████ ████████████████ Plaintiff does not concede that they are independent of TotalEnergies.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

34.    ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

35.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

██████████████

36.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

37.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

38.

39.

40. ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

41. ███████████████████████████████

████████████████████████████████████

42.

43.

44.

45.

46.

47.

48.

49.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

50.    ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

51.    ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

52.

53.



54.

55.

56. ██████████████████████████████████████████

57.

58.

59. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

60. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

61. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

62. ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

63.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

64.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



65.

66.

67.

68.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

69. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

70. ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████

71.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

72.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

██████████████████████

73.　████████████████████████████████████████████

██████████████



██████████████████

74.　████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

75.

76.

77.

78.

79. ████████████████████████████████████

80. ████████████████████████████████████

81.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

82.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

83.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

84. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

85. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

86. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

87. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

88. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

89.

90. ██████████████████████████████████████████

91. ██████████████████████████████████████████

92.

93. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████

94. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████

95. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



96.     As reflected in the Company's Form 8-K filed on February 10, 2022, on February 6th TotalEnergies Renewables and the Company had entered into an agreement pursuant to which TotalEnergies Renewables acquired the Company's CIS Business.

97.     ███████████████████████████████████████████████████████ ████████████████████████████████ As reflected in the Company's Form 10-Q filed August 3, 2022, the Acquisition closed on May 31, 2022, upon which the Company received net cash consideration of $149.2 million and recorded a payable of $6.3 million to TotalEnergies.

98.     Pursuant to Section 2.02(b) of the purchase agreement, the Company would receive an earn-out only if the ITC Extension had been passed by both the United States House of Representatives and the United States Senate and signed into law by the President of the United States by June 30, 2022. As it happened, the Inflation Reduction Act provided a 30% ITC Extension but was signed into law on August 16, 2022 – meaning that the Company did not receive any earnout.

**THE ACQUISITION WAS NOT ENTIRELY FAIR TO SUNPOWER**

99.    Controller transactions are subject to entire fairness review. As such, the Acquisition is subject to entire fairness review.

***The Acquisition was the Result of an Unfair Process***

100.    The process approving the Acquisition was unfair to the Company and its public stockholders because it was not designed to maximize the sale price of the CIS Business but rather to suppress third-party bids and ensure that TotalEnergies – which had proposed to buy the CIS Business in the first place – emerged as the winner.

101.    An effective market check requires that interested bidders have a fair opportunity to present a higher-value alternative and the Special Committee have the ability to accept a higher-value deal. Here, an effective market check could not be conducted because the Project Odyssey process gave TotalEnergies extraordinary rights, the Special Committee did not have the authority to accept any deal without TotalEnergies' approval, and TotalEnergies never intended to allow the sale of the CIS Business to a third party.

102.    The Affiliation Agreement gave TotalEnergies the power to veto any sale of the CIS Business. At no point did the Board, the Independent Directors, or the Special Committee ask – or even consider asking – TotalEnergies to forego or refrain from exercising its Veto Right, and TotalEnergies never gave any assurance

that it would approve the sale of the CIS Business to a third party if that was the result of the process.

103.   TotalEnergies dictated the terms of the process from the outset. ████



104.   ████████████████████████████████████████████ was an unusual arrangement which quelled any chance to have a meaningful market check. Third parties otherwise interested in the CIS Business would be disinclined to disclose their valuations to a competitor and expend significant time and effort to

conduct due diligence, only to be topped by TotalEnergies with a marginally better offer.

105.   TotalEnergies had no intention to permit the sale of the CIS Business to a third party at a fair price. It intended to use a flawed market check process to justify buying the CIS Business at an unfairly low price. ███████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

106.   ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ This left no doubt that the Special Committee

could not commit to any offer without TotalEnergies' approval. Further dampening

the process, even though ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

107.    Furthermore, the CIS Business had significant contractual ties to

TotalEnergies, which was undesirable to any third party. █████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

{01921036;v1 }                                52

[REDACTED]

[REDACTED]

[REDACTED]

108.  Market participants were aware of TotalEnergies' intentions. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

109.  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

110. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

111. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

112.

113.

114. ████████████████████████████████████████████████

115. ████████████████████████████████████████████████





117. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

### *The Acquisition was Financially Unfair to the Company*

118. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

**DEMAND FUTILITY**

119.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

120.   Plaintiff brings this action derivatively and in the right and for the benefit of Sunpower to redress Defendants' breaches of fiduciary duties and other misconduct.

121.   Plaintiff is a Sunpower stockholder, was a Sunpower stockholder at the time of the wrongdoing alleged herein, and has been a Sunpower stockholder continuously since that time.

122.   Plaintiff will fairly and adequately represent the interests of Sunpower in enforcing and prosecuting its rights.

123.   As the result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action as doing so would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

124. At the time that Plaintiff originally commenced this derivative action on February 6, 2023, the Board consisted of eight directors: defendants *(i)* Faricy, *(ii)* Hegde, *(iii)* McDaniel, *(iv)* Portes-Laville, and *(v)* Stoquart, and non-parties *(vi)* Nathaniel Anschuetz ("**Anschuetz**"), *(vii)* Jonathan Bram ("**Bram**"), and *(viii)* Jonathan Fieldsend ("**Fieldsend**").[2]

125. Demand is excused because at least four directors – *i.e.,* at least half the Board as of when this derivative action was commenced – lack independence from TotalEnergies, which received a material benefit from the Acquisition by acquiring the Company's CIS Business at a bargain price and through an unfair process. In particular:

***Fieldsend, Portes-Laville and Stoquart***

126. Fieldsend, Portes-Laville, and Stoquart are all longtime high-level TotalEnergies employees who rely upon TotalEnergies for their livelihoods.

---

[2]The Board's composition changed after Plaintiff filed his original complaint. Non-party Steven Louden was appointed to the Board on March 14, 2023; McDaniel announced his resignation on March 20, 2023; and non-party Audrey Zibelman was appointed on May 18, 2023. This does not change the demand futility analysis because, among other things, this action has been continuously in litigation since the original complaint was filed; the Board in place as of when the original complaint was filed would have had ample opportunity to consider whether to bring this action; this Amended Complaint does not assert any new claims; and the two new defendants are wholly-owned subsidiaries of TotalEnergies, which already was a defendant.

Fieldsend's extensive ties to TotalEnergies are described on the Company's website

(link, accessed Jan. 20, 2023) as follows:

> Jonathan Fieldsend has served as vice president of corporate
> PPAs and renewables marketing at TotalEnergies since 2021. He
> has over 25 years of experience in energy marketing to both
> residential and business customers at TotalEnergies, during
> which time he helped develop TotalEnergies' UK gas and power
> marketing business, drove the transformation of TotalEnergies'
> French commercial gas and power marketing business, and
> launched TotalEnergies' commercial power marketing business
> in Spain. Mr. Fieldsend also set up TotalEnergies' distributed
> generation business outside the United States, launching "at
> scale" operations in Europe, Middle East, Southeast Asia, and
> China.

127.   Portes-Laville's extensive ties to TotalEnergies are likewise described

on the Company's website (*id.*):

> Nathalie Portes-Laville serves as a vice president in corporate
> and project finance for TotalEnergies SE, based in Paris, France.
> She has held various positions in finance within TotalEnergies
> for the past 15 years, first in mergers and acquisitions, then in
> strategy for the Marketing and Services division of
> TotalEnergies. She has also served as chief financial officer of
> TotalEnergies Marketing Puerto Rico, as head of individual
> shareholders' relations and as head of pension and employee
> benefits.

128.   Stoquart's extensive ties to TotalEnergies are also described on the

Company's website (*id.*):

> Vincent Stoquart has served as senior vice president of the
> Renewables division of TotalEnergies S.E. since December 6,
> 2021. From October 2019 to December 2021, he served as senior
> vice president, Refining and Petrochemicals Americas, and

president and chief executive officer of Total Petrochemicals & Refining USA, Inc. He was, during this period, also the country chair for TotalEnergies in the United States, based in Houston, Texas. Prior to that, Mr. Stoquart served as senior vice president, Polymers, of TotalEnergies Refining & Chemicals in Brussels, Belgium. From 2012 to 2017, Mr. Stoquart managed TotalEnergies's Flanders Refinery in Dunkirk, France, before joining TotalEnergies Global Services where he became president, TotalEnergies Learning Solutions. Mr. Stoquart began his career with TotalEnergies in 1998 as an engineering project manager at the Feluy Polymers Plant in Belgium, working as a production manager in various positions from 2002 to 2009 before being appointed as human resources and communications manager of the Feluy Plant in 2010.

129.   In light of their longtime professional ties to TotalEnergies and reliance upon TotalEnergies for their livelihoods, there is reason to doubt that Fieldsend, Portes-Laville, and Stoquart can bring to bear their independent business judgment in considering whether to bring a lawsuit challenging the Acquisition.

*Faricy*

130.   Faricy is employed by the Company as its President and CEO pursuant to an employment agreement dated March 20, 2021 providing that his employment is at will and may be terminated at any time. As such, Faricy's livelihood relies upon staying in the good graces of TotalEnergies, the Company's controller. In 2021, the Company paid Faricy $8,750,415 in total compensation, which is significantly greater than his compensation at his immediately prior position as Chief Executive Officer of Global Direct-to-Consumer at Discovery, Inc., where his total

compensation was $5,021,400 in 2020, $7,339,558 in 2019, and $4,827,963 in 2018. In light of his reliance upon TotalEnergies for his livelihood, there is reason to doubt that Faricy can bring to bear his independent judgment in considering whether to bring a lawsuit challenging the Acquisition.

### McDaniel

131.   McDaniel has been a director of at least three of TotalEnergies' portfolio companies: Sunpower, Tendril Networks, Inc. ("**Tendril**"), and Alquion Energies ("**Alquion**"). From November 2014 to November 2018, SunPower owned a minority stake in software developer Tendril, investing $23 million in three financing rounds. Sunpower and Tendril entered into a master services agreement whereby Tendril agreed to use up to $13 million of Sunpower's investment to develop solar software solutions products. Sunpower's investment in Tendril was part of TotalEnergies' plan to disrupt the modern energy grid by developing a single end-to-end solution of integrated solar, storage, and "grid edge" offerings. During this time, defendant McDaniel was not only a director of TotalEnergies-controlled Sunpower, but also Tendril's Chairman of the Board. Alquion Energies ("**Alquion**") is another TotalEnergies portfolio company. In 2014, Total Energy Ventures (the VC arm of TotalEnergies) invested an undisclosed amount in Alquion, a startup specializing in energy storage technology. TotalEnergies remains listed as a current investor in Alquion to this day (link, accessed June 29, 2023). McDaniel has been a

{01921036;v1 }                                    63

member of the Alquion's board of directors since September 2014.   Because McDaniel is a "repeat player" as a director in TotalEnergies' portfolio companies, there is reason to doubt that he could bring to bear his independent business judgment on matters concerning TotalEnergies.

*Anschuetz and Bram*

132.   Anschuetz is a principal of Global Infrastructure Partners (together with its controlled affiliates, "**GIP**"), which the Company's website describes as "a leading independent infrastructure fund manager which manages $84 billion for its investors." (link, accessed Jan. 20, 2023). Bram is GIP's founding partner and chairs the Investment Committee of GIP's credit funds. Over the past thirteen years, GIP and TotalEnergies have done billions of dollars in business together.

133.   In 2009, GIP formed Chesapeake Midstream Partners ("**Chesapeake Midstream**") as a joint venture with Chesapeake Energy Corp. In January 2010, Chesapeake Midstream entered into a 20-year gas gathering agreement with TotalEnergies under which TotalEnergies paid Chesapeake Midstream $800 million for a 25% non-operated interest in Barnett Shale oilfield acreage and agreed to provide $1.45 million in funding for future drilling and completion expenses, constituting total consideration of $2.25 billion. Because GIP owned 50% of Chesapeake Midstream at this time, the estimated benefit to GIP from the January 10, 2010 transaction between Chesapeake Midstream and TotalEnergies calculates

to $1.125 billion. In June 2012, Chesapeake Energy Corp. agreed to sell its 50% general partner interest in Chesapeake Midstream to GIP for $4 billion in cash, which GIP then sold to a third party in December 2012. In June 2014, GIP sold its 50% interest in Chesapeake Midstream.

134.   Pursuant to the gas gathering agreement, TotalEnergies was a customer of Chesapeake Midstream throughout the period when it was partially or completely owned by GIP. The economic value to GIP of Total's business with Chesapeake Midstream during the period in which GIP owned an interest in Chesapeake Midstream is reflected in the following table:

| Year | Revenue Attributable to Total (%) | Consolidated Revenue | Revenue Attributable to Total ($) | Annualized GIP Ownership[3] | Revenue to GIP |
|---|---|---|---|---|---|
| 2014 | 9.90% | $ 1,378,939,000 | $ 136,514,961 | 25% | $ 34,128,740 |
| 2013 | 9.60% | $ 1,073,222,000 | $ 103,029,312 | 50% | $ 51,514,656 |
| 2012 | 14.10% | $ 608,447,000 | $ 85,791,027 | 75% | $ 64,343,270 |
| 2011 | 14.00% | $ 565,929,000 | $ 79,230,060 | 50% | $ 39,615,030 |
| 2010 | 14.80% | $ 459,153,000 | $ 67,954,644 | 50% | $ 33,977,322 |
| **Total:** | | | **$ 472,520,004** | | **$ 223,579,018** |

135.   In September 2019, TotalEnergies closed its acquisition of Toshiba America LNG Corp., which allowed TotalEnergies to become a customer of the Freeport LNG Development LP export terminal on Quintana Island in Texas. The

---

[3] GIP's 2014 ownership is annualized to 25% to reflect that it owned 50% of Chesapeake Midstream from January through June 2014. GIP's 2012 ownership is annualized at 75% to reflect that GIP owned 50% of Chesapeake Midstream from January through June 2012 and 100% from July 2012 through December 2012.

deal was valued at $800 million, and included a 20-year tolling agreement for 2.2 million tonnes per annum of liquid natural gas from the third liquefaction train of the Freeport LNG terminal. TotalEnergies began purchasing liquid natural gas from Freeport LNG when the terminal's third liquefaction train was completed in May 2020. From 2015 to November 2021, GIP owned 27.5% of the limited partnership interests in Freeport LNG.

136.    In July 2021, TotalEnergies and GIP closed a transaction involving the Gladstone LNG joint venture in Australia valued at more than $750 million. Under the terms of the transaction, GIP would also receive a throughput-based tolling fee calculated based on the share of gas processed by TotalEnergies' wholly-owned subsidiary Total GLNG Australia ("**Total Australia**") through the downstream facilities over a 15-year period. Additionally, Total Australia would retain a 27.5% stake in Gladstone LNG. As such, GIP and Total are joint venturers and will continue to do business together in this venture for years to come.

137.    Upon completion of the Gladstone LNG transaction, TotalEnergies' CFO, non-party Jean-Pierre Sbraire stated, "*We have worked closely with GIP to achieve this infrastructure transaction* and are happy (with) this first collaboration with such an experienced infrastructure partner. This monetisation [sic] of infrastructure assets contributes to focusing further TotalEnergies' capital on core producing assets and fully reflects TotalEnergies' active portfolio management."

138. In May 2022, TotalEnergies entered into an agreement to acquire a 50% stake in Clearway Energy Group from GIP for (*i*) $1.6 billion plus (*ii*) GIP's controlled subsidiary GIP III Sol Acquisition, LLC ("**GIP Investor**") receiving 50% minus one share in non-party Sol Holding, LLC ("**Sol Holding**"), the Delaware limited liability company that is a controlled subsidiary of TotalEnergies and which holds a controlling 50.5% interest in the Company. As a result, GIP became the beneficial owner of approximately 25.3% of the Company.

139. In connection with acquiring an interest in Sol Holding, TotalEnergies Renewables and GIP Investor entered into a voting agreement dated September 12, 2022 (the "**Voting Agreement**") under which GIP received the right to appoint two directors to the Sunpower Board.

140. The Voting Agreement significantly limits the voting discretion of GIP's Board designees. Section 1 of the Voting Agreement provides in relevant part that each of TotalEnergies and GIP "shall cause its designees to the [Sunpower Board] to not take, consent to or approve (except when refraining from taking, consenting to or approving such action would, based on the advice of legal counsel, be inconsistent with such designee's fiduciary duties) any matter in such designees' capacities as members of the [Sunpower Board] not unanimously authorized" by Sol Holding's Board of Managers, which is appointed by TotalEnergies. As such, Anschuetz and Bram cannot disinterestedly consider whether to authorize the

Company to sue TotalEnergies in connection with the Acquisition, but must first seek the consent of Sol Holding's TotalEnergies-appointed managers or the advice of legal counsel.

141. Moreover, Section 2(a) of the Voting Agreement provides in relevant part that "for the avoidance of doubt, for purposes of the Affiliation Agreement, any… individual appointed to the [Sunpower Board] pursuant to this [Voting] Agreement shall be considered a Terra [*i.e.* TotalEnergies] Director (as such term is defined in the Affiliation Agreement)." The term "Terra Director" is defined in the Affiliation Agreement as any director who is designated by TotalEnergies or is an officer or employee of TotalEnergies. Because GIP's Board designees are deemed to be "Terra Directors" for purposes of the Affiliation Agreement, they do not qualify as "Disinterested Directors" which the Affiliation Agreement defines as directors who are "(i) an independent director within the meaning of Rule 5605(a)(2) of the listing standards of the Nasdaq *and* (ii) not a Terra Director." (emphasis added). Because this provision is conjunctive, the directors designated by GIP cannot be considered disinterested because pursuant to the Voting Agreement, they are deemed to have been appointed by TotalEnergies or to be officers or employees of TotalEnergies for purposes of the Affiliation agreement, the instrument that governs the relationship between TotalEnergies and the Company.

142.   In light of GIP's longtime and ongoing lucrative business dealings and co-investments with TotalEnergies, the limitations to Anschuetz and Bram's business judgment under Section 1 of the Voting Agreement, and GIP's agreement under Section 2(a) of the Voting Agreement that Anschuetz and Bram are not disinterested but rather will be treated as if they were appointed by TotalEnergies and/or officers or employees of TotalEnergies, there is reason to doubt that Bram and Anschuetz can bring to bear their independent business judgment in considering whether to bring a lawsuit challenging the Acquisition.

*     *     *

143.   Accordingly, there is reason to doubt that at least half the Board can disinterestedly consider a demand to pursue this action.

## COUNT I

### Breach of Fiduciary Duty for Adopting and Following an Unfair Process

### (Against Defendants Badoual, Baudier, Faricy, Lesjak, McDaniel, Pouget, Toulouse, Trochet, Werner, Wolffsheim, and Wood)

144.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

145.   Defendants Badoual, Baudier, Faricy, Lesjak, McDaniel, Pouget, Toulouse, Trochet, Werner, Wolffsheim, and Wood owed Sunpower fiduciary duties

{01921036;v1 }                                69

as directors of the Company. As such, they owed Sunpower the highest obligation of loyalty and good faith.

146.    Each of the foregoing defendants violated and breached their fiduciary duties of loyalty and good faith by adopting an unfair and deficient sales process for the CIS Business as set forth above. This was bad faith because the process was tilted in favor of TotalEnergies by design and gave TotalEnergies the ROFO without the Company receiving any consideration in return for this valuable right. Defendants Lesjak, McDaniel, and Wood compounded their breach of fiduciary duty knowingly exceeding their authority when they attempted to sell the CIS Business directly to TotalEnergies.

147.    As the direct and proximate result of these defendants' breaches of their fiduciary duties of loyalty and good faith, Sunpower has sustained significant damages by selling the CIS Business for an unfairly low price and these defendants are liable to the Company.

148.    Plaintiff, on behalf of Sunpower, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty for Approving the Acquisition

**(Against Defendants Badoual, Faricy, Hegde, Lesjak, McDaniel, Portes-Laville, Stoquart, Trochet, Wolffsheim, and Wood)**

149.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

150.   Defendants Badoual, Faricy, Hegde, Lesjak, McDaniel, Portes-Laville, Stoquart, Trochet, Wolffsheim, and Wood owed Sunpower fiduciary duties as directors of the Company. As such, they owed Sunpower the highest obligation of loyalty and good faith.

151.   Each of the foregoing defendants violated and breached their fiduciary duties of loyalty and good faith by approving the unfair Acquisition.

152.   As the direct and proximate result of these defendants' breaches of their fiduciary duties of loyalty and good faith, Sunpower has sustained significant damages by selling the CIS Business for an unfairly low price and these defendants are liable to the Company.

153.   Plaintiff does not seek, and disclaims, a double recovery for the same injury to the Company.

154.   Plaintiff, on behalf of Sunpower, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty

**(Against Total Energies, TotalEnergies Solar, and TotalEnergies Gaz)**

155.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

156.   TotalEnergies, through its controlled subsidiaries TotalEnergies Solar and TotalEnergies Gaz, controlled the Company immediately prior to the Acquisition via its ownership of 50.5% of the Company's stock voting power. TotalEnergies was thus the Company's controller as a matter of law at all relevant times.

157.   As the Company's controller, TotalEnergies owes Sunpower the highest obligation of loyalty and good faith.

158.   TotalEnergies, together with its controlled subsidiaries TotalEnergies Solar and TotalEnergies Gaz, violated and breached its fiduciary duties of loyalty and good faith as set forth above.

159.   As the direct and proximate result of these defendants' breaches of their fiduciary duties of loyalty and good faith, Sunpower has sustained significant damages as alleged herein and these defendants are liable to the Company.

160.   Plaintiff, on behalf of Sunpower, has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment

### (Against TotalEnergies and TotalEnergies Renewables)

161.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

162.   By their wrongful acts, TotalEnergies and TotalEnergies Renewables were unjustly enriched at the expense of and to the detriment of Sunpower by the amount that TotalEnergies' controlled subsidiary TotalEnergies Renewables underpaid for the Company's CIS Business.

163.   Plaintiff, on behalf of Sunpower, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Sunpower, demands judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties and unjust enrichment, together with pre- and post-judgment interest;

B.    Ordering rescissory relief and/or unwinding the Acquisition, or in the alternative and if appropriate and to the extent not otherwise inconsistent with Delaware law, to seek stockholder ratification of the Acquisition following full and fair disclosure of all material information;

C.    Awarding Sunpower the amount it sustained as a result of defendants' breaches of fiduciary duties and unjust enrichment;

D.    Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

Of Counsel:

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Daniel Tepper
Correy K. Suk
Cinar Oney
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500

**ROBBINS LLP**
Stephen J. Oddo
Gregory E. Del Gaizo
Eric M. Carrino
5060 Shoreham Place, Suite 300
San Diego, CA 92122
(619) 525-3990

Dated: July 7, 2023
Public Version Dated:  July 14, 2023

**ASHBY & GEDDES, P.A.**

 /s/ F. Troupe Mickler IV
Stephen E. Jenkins (#2152)
F. Troupe Mickler IV (#5361)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302) 654-1888

*Counsel to Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, I caused a copy of the foregoing documents to be served by File & Serve*Xpress* upon the following counsel of record:

Andrew D. Cordo
Lauren G. DeBona
Wilson, Sonsini, Goodrich & Rosati, P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801

Steven L. Caponi
Matthew B. Goeller
Megan E. O'Connor
K&L Gates LLP
600 N. King Street, Suite 901
Wilmington, DE 19801

*/s/ F. Troupe Mickler IV*
F. Troupe Mickler IV (#5361)