**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SUNPOWER CORPORATION, *et al.*,[1] | ) | Case No. 24-11649 (CTG) |
| Wind-Down Debtor. | ) | **Re: D.I. 1422, 1423, 2017** |

**THE PLAN ADMINISTRATOR'S PRE-TRIAL REPLY BRIEF IN RESPONSE TO THE *CDTFA'S BRIEF IN SUPPORT OF ITS TAX PROOFS OF CLAIM* [D.I. 2017] AND IN FURTHER SUPPORT OF (I) *THE PLAN ADMINISTRATOR'S OBJECTION TO PROOF OF CLAIM NO. 621 FILED BY THE CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION* [D.I. 1422], AND (II) *THE PLAN ADMINISTRATOR'S OBJECTION TO PROOF OF CLAIM NO. 622 FILED BY THE CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION* [D.I. 1423]**

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (DE Bar No. 2981)
Jason M. Madron (DE Bar No. 4431)
Zachary J. Javorsky (DE Bar No. 7069)
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
madron@rlf.com
javorsky@rlf.com

*Counsel to the Plan Administrator*

**DAKESSIAN LAW, LTD.**
Mardiros Dakessian (admitted p*ro hac vice*)
Benjamin Lee (admitted *pro hac vice*)
445 S. Figueroa Street, Suite 2210
Los Angeles, California 90071
Telephone: (213) 516-5500
Email: marty@dakessianlaw.com
benjamin@dakessianlaw.com

*Special California Tax Counsel to the Plan Administrator*

Dated: October 27, 2026
Wilmington, Delaware

[1] The Wind-Down Debtor in this chapter 11 case, along with the last four digits of the Wind-Down Debtor's federal tax identification number, is SunPower Corporation (8969) ("SunPower"). On February 18, 2025, the Court entered an order closing the chapter 11 cases of SunPower's debtor affiliates (collectively, the "Closing Debtors"). The Closing Debtors, along with the last four digits of the Closing Debtor's federal tax identification number, are: SunPower Corporation, Systems (8962); SunPower Capital, LLC (8450); SunPower Capital Services, LLC (9910); SunPower HoldCo, LLC (0454); SunPower North America, LLC (0194); Blue Raven Solar, LLC (3692); Blue Raven Solar Holdings, LLC (4577); BRS Field Ops, LLC (2370); and Falcon Acquisition HoldCo, Inc. (3335). The location of the Wind-Down Debtor's service address for purposes of this chapter 11 case is: 655 15th Street, NW, Suite 600, Washington, DC 20005, Attn: Mark Roberts, in his capacity as the Plan Administrator.

# TABLE OF CONTENTS


EXECUTIVE SUMMARY ........ 1

INTRODUCTION AND BACKGROUND ........ 4

ARGUMENT ........ 7

1. CDTFA failed to carry its initial burden that its tax assessment was reasonable and rational. ........ 7

   i. A projection of use tax errors on fixed assets based on total sales results in an assessment that is not reasonable and rational. (Corporation Audit Items 12A & 12B) ........ 7

   ii. A blanket 100% disallowance of MRD Exemption, after conceding that both entities are qualified persons, and failing to identify a single disqualifying transaction, produces an assessment that is not reasonable or rational. (Corporation and Systems – Audit Item 12D) ........ 9

   iii. A reliance on a prior audit percentage of error where the business has undergone several significant, material changes results in an assessment that is not reasonable or rational. (Corporation – Audit Items 12E & 12F) ........ 15

   iv. The addition of a markup on Systems' reported PV panel costs, where it has been conceded that Systems is not a manufacturer, produces an unreasonable and irrational result. (Systems – Audit Items 12A & 12B) ........ 17

2. Assuming arguendo that CDTFA's assessment is reasonable and rational, the Plan Administrator has met his burden of proof, by a preponderance of the evidence, of the correct amount of tax. ........ 24

   i. Alternative evidence may be considered to determine the correct amount of tax due. ........ 25

3. CDTFA's assertion of speculative new liabilities based on speculative and inapplicable new theories that were not included in its Notices of Determination is a red herring—the underlying issue is the determination of the correct amount of tax as asserted in its Claims. ........ 27

CONCLUSION ........ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Portillo v. Comm'r*,
932 F.2d 1128 (5th Cir. 1991) ....................29

**California Cases**

*Associated Beverage Co. v. State Bd. of Equalization*,
224 Cal. App. 3d 192 (1990) ....................9, 10

*Beatrice Co. v. State Bd. of Equalization*,
863 P.2d 683 (Cal. 1993) ....................22, 23

*Honeywell, Inc. v. State Bd. of Equalization*,
122 Cal. Rptr. 237 (Ct. App. 1975)....................17, 18, 30

*Appeal of Landeros*,
No. 2024-OTA-655P, 2024 WL 5154636 (Cal. Off. Tax App. Sept. 25, 2024) ....................1, 2

*Macrodyne Indus., Inc. v. State Bd. of Equalization*,
237 Cal. Rptr. 304 (Ct. App. 1987)....................23

*Mapo, Inc. v. State Bd. of Equalization*,
125 Cal. Rptr. 727 (Ct. App. 1975)....................23

*Mercedes-Benz v. State Bd. of Equalization*,
179 Cal. Rptr. 758 (Ct. App. 1982).) ....................23

*Montgomery Elevator Co. v. State Bd. of Equalization*,
173 Cal. Rptr. 632 (Ct. App. 1981)....................18, 30

*Mundy v. Superior Court*
37 Cal. Rptr. 2d 163 (Ct. App. 1995) ....................21

*Appeal of Myers*,
No. 2001-SBE-001, 2001 WL 37126924 (Cal. State Bd. Equalization May 31, 2001) ....................1, 2, 7

*Sampson v. Parking Serv. 2000 Com., Inc.*,
11 Cal. Rptr. 3d 720 (Ct. App. 2004) ....................21

*Appeal of Save Mart Supermarkets & Subsidiary*,
No. 2002-SBE-002, 2002 WL 245682 (Cal. State Bd. Equalization Feb. 6, 2002) ....................10, 11

*Appeal of Senehi d/b/a Barefoot Café*,
No. 2023-OTA-446P, 2023 WL 6560701 (Cal. Off. Tax. App. Jan. 24, 2023) ......................27

*Ste. Marie v. Riverside Cnty. Reg'l Park & Open-Space Dist.*,
206 P.3d 739 (Cal. 2009) ......................21

*Appeal of Talavera*,
No. 2020-OTA-022P, 2020 WL 3629619 (Cal. Off. Tax. App. Jan. 14, 2020.) ......................7

*Tidewater Marine Western, Inc. v. Bradshaw*,
927 P.2d 296 (Cal. 1996) ......................12

*Title Ins. Co. v. State Bd. of Equalization*,
842 P.2d 121 (Cal. 1992) ......................1, 28

*Todd v. McColgan*,
201 P.2d 414 (Cal. Ct. App. 1949) ......................1, 2, 7

*Wolski v. Fremont Inv. & Loan*,
25 Cal. Rptr. 3d 823 (Ct. App. 2005) ......................21

*Yamaha Corp. of America v. State Bd. of Equalization*,
960 P.2d 1031 (Cal. 1998) ......................23

**Federal Statutes**

11 U.S.C
§ 505(a) ......................5, 31

**California Statutes**

Cal. Gov. Code
§ 11342, subd.(g) ......................12

Cal. Rev. & Tax. Code
§ 6377......................10
§ 6377.1......................9, 10
§ 6487......................28, 31
§ 6829......................27, 30
§ 6904(a) ......................6, 24
§ 7081......................8, 25, 30
§§ 12421 through 12435 ......................28
§ 23649......................10

**Other Authorities**

2013 Cal. Assem. Bill No. 93, Cal. 2013-14 Reg. Sess. ......................10

BOE Bus. Taxes Comm. Tr., April 22, 2014, at 26, l. 22 *et seq*. ....11

Cal. Code Regs. tit. 1, § 250(a)(1) ....12

Cal. Code Regs. tit. 18, § 1521 ....6

Cal. Code Regs. tit. 18, § 1525.4 ....10

Cal. Code Regs. tit 18, § 1698.5(b)(1) ....8

Cal. Code Regs. tit. 18, § 30219(b)....7

Cal. Code Regs. tit. 18, § 35101 ....23

## EXECUTIVE SUMMARY[2]

To begin, CDTFA's position rests on the flawed presumption that its assessment is reasonable and rational. However, its Opposition Brief presents no argument or evidence that its assessment is either reasonable or rational. In fact, CDTFA's Opposition Brief merely parrots the alleged amounts assessed based on its hastily completed, flawed audit, including its use of total sales to estimate potential use tax errors, the inclusion of a markup on a construction contractor who is ***not*** the manufacturer of the fixtures it sold, the use of an unrepresentative prior audit percentage of error, and the 100% disallowance of the partial exemption for manufacturing, research and development, and electric power equipment, when CDTFA appears to concede that the Debtors have an applicable qualifying four-digit NAICS code, and that its business activities include the sale of electric power to customers through power purchase agreements ("PPAs"). As the parties agree, California tax laws govern this dispute regarding CDTFA's Proofs of Claim. This includes not only the relevant burden of proof and statute of limitations, but also the bar on assertions related to offsets or setoffs that were not pursued or raised in the administrative proceedings. (*See Title Ins. Co. v. State Bd. of Equalization*, 842 P.2d 121, 130 (Cal. 1992).) CDTFA's own auditor has testified that in conducting the "audit" for SunPower Corporation, Systems, "it took almost, like, really little time. Yes. Because we didn't do anything." (Dep. Tr. of Alan Liang, September 22, 2026, at 231, ll. 1–3 ("Second A. Liang Tr.").) Therefore, CDTFA has failed to meet its initial burden, and the assessment and the related Claims must be disallowed. (*Todd v. McColgan*, 201 P.2d 414, 418 (Cal. Ct. App. 1949); *Appeal of Myers*, No. 2001-SBE-001, 2001 WL 37126924 (Cal. State Bd. Equalization May 31, 2001); *Appeal of Landeros*, No. 2024-OTA-655P, 2024 WL 5154636 (Cal. Off. Tax App. Sept. 25, 2024).)

---

[2] Unless otherwise defined, capitalized terms used in this brief have the same meaning as in the Plan Administrator's Opening Brief.

Furthermore, the alleged "inadequate" business records do not give CDTFA a blanket license to issue an arbitrary and unreasonable assessment and shield it behind a presumption of correctness, especially where CDTFA did not avail itself of the available processes to ensure that any necessary documents were preserved. CDTFA is still required to meet its initial burden of proof that its assessment is reasonable and rational before the presumption of correctness attaches to its assessment and the burden is shifted to the taxpayer. (*Todd v. McColgan*, 201 P.2d at 514; *Appeal of Myers*, 2001 WL 37126924; *Appeal of Landeros*, 2024 WL 5154636.)

CDTFA begins by suggesting that the Debtors made decisions to "underreport $52,053,608.00 in sales," "exempt an entire block of $72,820,034.00 in sales," and "not report and remit sales tax due on asset sale(s) of approximately $100 million." (CDTFA Opp'n Br. at 5, para. 1.) However, the Debtors reported and remitted tax based on taxable sales in California. In its purported audit, CDTFA alleges unreported taxable sales based on flawed assumptions and unreasonable estimation methodologies. Furthermore, the Debtors did not exempt an entire block of $72,820,034 in sales. Instead, the Debtors identified transactions that were eligible for the California partial exemption for manufacturing, research and development, and electric power equipment (the "<u>MRD Exemption</u>"). Based on this identification of qualifying transactions, the Debtors claimed a partial exemption on their California sales and use tax returns.

Like its audit, CDTFA's Opposition Brief relies on supposition and obfuscation of the issues. The Debtors are not seeking general declaratory relief as CDTFA alleges, but a determination of the correct tax amount in this case and the corresponding Proofs of Claim. CDTFA's Proof of Claim No. 20008 is the subject of a separate objection and is outside the scope of this matter. CDTFA's remaining arguments about a purported "reservation of rights" do not

meet its present burden, which is to support its claims and provide sufficient evidence and argument to show that its assessment is reasonable and rational.

The issues in this case are surprisingly straightforward and uncomplicated:

1. Whether CDTFA has carried its threshold burden to show that the assessments in its Proofs of Claim are reasonable and rational, where its auditor has admitted several times that the method employed by CDTFA is inaccurate.

   a. Whether CDTFA's projection of use tax based on total sales, and its reliance on a prior audit percentage of error produces a reasonable and rational result where the business has undergone several significant, material changes.

   b. Whether the disallowance of 100% of the MRD exemption, after conceding that both entities are qualified persons, and failing to identify a single disqualifying transaction, produces a reasonable and rational result.

   c. Whether adding an additional markup on Systems' reported photovoltaic ("PV") panel costs, where it has been conceded that Systems is not a manufacturer, produces a reasonable and rational result.

2. Assuming arguendo that CDTFA's assessment is reasonable and rational, whether the Plan Administrator has met his burden of proof, by a preponderance of the evidence, of the correct amount of tax.

   a. Whether other evidence may be presented to determine the correct amount of tax due.

3. Whether the statute of limitations bars CDTFA from asserting additional liabilities based on new theories that were not included in its Notices of Determination.

Each of these will be discussed in further detail below.

## INTRODUCTION AND BACKGROUND

From its Opposition Brief, CDTFA's argument can be succinctly distilled as follows: the Plan Administrator has not met its burden of proof because they have not presented a complete set of documents including, without limitation, the Debtors' general ledger, trial balances, sales journals, purchase journals, cost accounting records, contract files, and purchase and sales invoices.

Furthermore, in its conclusion, CDTFA asserts a negative inference because the Debtors lack a complete set of available records during a time of great turmoil for the Debtors. However, as previously stated in the Plan Administrator's opening brief ("Opening Brief"), CDTFA did receive notice of, among other things, the filing of the Debtors' chapter 11 cases, the disclosure statement hearing, and the plan confirmation process,[3] and CDTFA never objected to the document retention policy (as others who received commensurate notice informally did to preserve their rights) contained in the *Amended Joint Chapter 11 Plan of SunPower Corporation and its Debtor Affiliates (Technical Modifications)*, filed October 17, 2024 [D.I. 829] (the "Plan") as approved and confirmed by the *Findings of Fact, Conclusions of Law, and Order Approving the Debtors' Disclosure Statement for, and Confirming the Amended Joint Chapter 11 Plan of SunPower Corporation and its Debtors Affiliates* [D.I. 872] (the "Confirmation Order"), and never issued a document preservation letter, subpoena, or formal investigative request to the Plan Administrator. The Plan Administrator was appointed on November 14, 2024. When the Plan Administrator used his business judgment to discontinue certain cloud services effective December 1, 2024 because the wind-down estate could not afford the astronomical cost of continuing to pay for them, he had no notice that CDTFA would file its Proofs of Claim, which it did not file until late January 2025.

---

[3] *See*, e.g., D.I. 790.

By contrast, CDTFA had notice of the Plan, knew it would file priority claims for alleged taxes due, and knew it needed certain documents in connection with its planned priority claims, but decided to do nothing at all to assist in meeting its burden of proof.

To the extent any necessary documents were not preserved, it was CDTFA, not the Plan Administrator, that failed to prioritize preserving them. Like the other parties referenced in the Opening Brief, CDTFA could have issued a document preservation letter, a formal investigative request, or negotiated document preservation language to protect its interests in the Plan and/or Confirmation Order. CDTFA's own auditor has admitted that CDTFA could "subpoena records" but it chose not to do so in this case because it did not feel "that was [*sic.*] necessary for subpoena." (Dep. Tr. of Alan Liang, July 22, 2026, at 93, l. 4 *et seq.* ("First A. Liang Tr.").) This decision was purportedly driven by the time pressure to complete the assessment, and belief that "given the fact that how long does it take to get a subpoena [*sic.*], I believe that wouldn't be something practical to do." (Second A. Liang Tr. at 237, ll. 1–4.)

CDTFA asserts in its conclusion that:

> [The Debtors] suggest hypothetical weakness and seek a full tax unwinding, which, in effect, is an overriding of the Revenue and Taxation Code. This goes outside the scope of 11 U.S.C § 505(a) ("amount or legality"). Section 505(a) authority does not extend so far as to overriding the Revenue and Taxation Code, such as the abating of tax interest; denying the right to appeal to Tax Court, or ordering the tax agency to accept a compromise.

(CDTFA Opp'n Br. at 24.)

It is unclear what CDTFA means in terms of "a full tax unwinding," "abating of tax interest; denying the right to appeal to Tax Court[;] or ordering the tax agency to accept a compromise." The Plan Administrator is seeking only an adjudication of the correct tax amount in this case, which falls squarely within the Court's authority under 11 U.S.C § 505(a). Should the Court grant the Plan Administrator's claim objection, it would not be "unwinding" a tax or rewriting

California's Revenue and Taxation Code—it would be determining the amount and legality of the tax liabilities at issue. Moreover, there is no "hypothetical weakness." Rather, the Plan Administrator has presented substantial evidence that CDTFA's claims are neither reasonable nor rational, and even if they were, the Plan Administrator has proven the correct tax amount by a preponderance of the evidence.[4]

Many of the disputed issues in CDTFA's claims are legal issues that do not require transaction-level documentation. For example, the erroneous addition of a markup to the reported PV panel costs for Systems (audit items 12A and 12B) does not require a review of evidence, but rather the application of California Code of Regulations, title 18, Section 1521 ("Regulation 1521").[5] This error is also the basis for the conclusion of the Plan Administrator's expert witness, Mr. James Levinson, that the Debtors *overpaid* the tax on this item on their original returns and would be entitled to a refund. (Dep. Tr. of James Levinson, September 22, 2026, at 95, ll. 10–18 ("First J. Levinson Tr.").) Furthermore, regarding the disallowance of the MRD exemption (audit item 12D), the CDTFA auditor admits that he disallowed the exemption because he believed the Debtors were not a "qualified person." (Second A. Liang Tr. at 283, ll. 17–25; 309–310, l. 24 *et seq*.) Thus, determining whether the Debtors are "qualified persons," under the relevant statute and regulation does not necessarily require the general ledger, trial balances, sales journals, purchase journals, cost accounting records, contract files, and purchase and sales invoices; all relevant information was available to CDTFA in publicly available filings.

[4] CDTFA argues that the appropriate relief for the Plan Administrator regarding any claimed overpayment is to file a claim for refund. (CDTFA Opp'n Br. at 73, para. 74.) To that end, the Plan Administrator's Opening and Reply Briefs constitute the Plan Administrator's claims for refund for all periods at issue because it satisfies all elements of California Revenue and Taxation Code section 6904(a). The Opening and Reply Briefs are "in writing" and state "the specific grounds upon which the claim is founded." As these briefs were or will be served and presented to the CDTFA, they are thus filed with the CDTFA and sufficiently put the CDTFA on notice of the Plan Administrator's claims for refund.

[5] Unless otherwise defined, hereafter, "Regulation" refers to California Code of Regulations, title 18.

There is one additional—and dispositive—threshold issue that also does not depend on those records: whether CDTFA's assessments were untimely. The Plan Administrator requested the entire audit file on May 1, 2026 (via a formal written document request propounded on CDTFA), including the statute of limitations waivers and valid powers of attorney authorizing the waivers. Together, these documents would establish the timeliness of the assessments. Despite the June 1, 2026, response deadline, and several follow-up requests, CDTFA only recently produced a complete set of waivers, but has yet to produce any valid powers of attorney, despite multiple requests to do so. Without valid powers of attorney that authorize these waivers, the assessments are undoubtedly untimely, CDTFA's claims fail in their entirety, and the Plan Administrator's requested relief must be granted in full.

## **ARGUMENT**

### 1. CDTFA failed to carry its initial burden that its tax assessment was reasonable and rational.

As previously stated, under California law, CDTFA has an initial burden of showing that its determination was reasonable and rational. (*See Todd v. McColgan*, 201 P.2d at 514; *Appeal of Myers*, 2001 WL 37126924; *Appeal of Talavera*, No. 2020-OTA-022P, 2020 WL 3629619 (Cal. Off. Tax. App. Jan. 14, 2020.) Once CDTFA has met this burden, "the burden of proof shifts to the taxpayer to establish that a result differing from respondent's determination is warranted." (*Appeal of Talavera*, 2020 WL 3629619.) The applicable burden of proof is by a preponderance of the evidence. (Cal. Code Regs. tit. 18, § 30219(b).)

#### i. *A projection of use tax errors on fixed assets based on total sales results in an assessment that is not reasonable and rational. (Corporation Audit Items 12A & 12B)*

Summary: *CDTFA's use of total **sales** to project from use tax errors on **purchases** (i.e., use) of fixed assets defies all logic and overinflates the alleged taxable measure. CDTFA's approach*

*produced an error rate that assumed the Debtors' fixed asset purchases had increased an astonishing and facially implausible 50 times over the previous period during a period where those purchases were in sharp decline. CDTFA's error projection is the quintessential example of arbitrary and capricious and produces a patently unreasonable audit result.*

CDTFA's Opposition Brief offers no argument or evidence that assessing use tax errors on fixed asset purchases based on total sales is reasonable and rational. Instead, CDTFA states, "Corporation did not produce books and records to the audit officer to corroborate purchases." (CDTFA Opp'n Br. at 21, para. 66.) Again, even in the absence of adequate books and records, the purpose of CDTFA's audit assessment is to determine the correct amount of tax liability, and the assessment must be reasonable and rational. (*See* Cal. Rev. & Tax Code § 7081.) Consistent with this principle, Regulation section 1698.5(b)(1) ("Regulation 1698.5") states, "[t]he purpose of an audit is to efficiently determine whether or not the amount of tax has been reported correctly based on relevant tax statutes, regulations, and case law." ***Here, CDTFA's own auditor recognized that this methodology did not produce an accurate result***. (Corporation Final Audit Results, CDTFA055016–055017.) Moreover, CDTFA's other witness referred to an audit estimation method resulting in increased asset purchases during a pre-bankruptcy period as a "red flag" to him and that in this case that was Mr. Liang's "judgment." (Dep. Tr. of William Kimsey, July 23, 2026, at 91, ll. 8–11 ("W. Kimsey Tr.").) According to Mr. Kimsey, the increase in asset purchases would have raised questions for him. (*Id.* at 102, ll. 18–20.) Therefore, CDTFA's claim, based on estimates of hypothetical use tax errors on fixed asset purchases using total sales, is neither reasonable nor rational and must be disallowed.

*ii.* *A blanket 100% disallowance of MRD Exemption, after conceding that both entities are qualified persons, and failing to identify a single disqualifying transaction, produces an assessment that is not reasonable or rational. (Corporation and Systems – Audit Item 12D)*

Summary*: The blanket disallowance of 100% of claimed MRD transactions, based on the premise that Corporation and Systems were not "qualified persons," with no evidence rebutting the qualified NAICS codes describing their business activities, is unreasonable, irrational, and arbitrary. This is especially true because CDTFA argues that Corporation engaged in manufacturing activities and allowed portions of MRD based on qualifying establishments within Corporation. Similarly, CDTFA's blanket 100% disallowance of Systems' claimed MRD exemptions is unreasonable, irrational, and arbitrary because it ignores the nature of Systems' business operations during the relevant Period at Issue.*

The partial exemption under California Revenue and Taxation Code section 6377.1 ("MRD Exemption") is available on purchases of "qualified tangible personal property" by a "qualified person" to be used primarily for a number of qualified uses, such as manufacturing, research and development, or as relevant here, the "generation or production, storage, or distribution of electric power, or as a research or storage facility for use in connection with those processes." As discussed above, the only contention that CDTFA has made in regard to denying the claimed MRD Exemption for both Corporation and Systems is that, allegedly, neither Corporations nor Systems is a "qualified person" for purposes of the MRD Exemption. (*See* Second A. Liang Tr. at 283, ll. 8–25.)

CDTFA argues, "Statutes granting exemption from taxation are to be strictly construed to avoid enlarging or extending beyond the plain meaning of the language used in granting it. *Associated Beverage Co. v. State Bd. of Equalization*, 224 Cal. App. 3d 192, 211 (1990)." (CDTFA Opp'n Br. at 20, para. 57.) While strict construction may apply regarding the tax credit

at issue in *Associated Beverage*, a liberal construction applies with respect to the MRD. The predecessor to both the Office of Tax Appeals and the CDTFA, the State Board of Equalization ("BOE"), stated in *Appeal of Save Mart Supermarkets & Subsidiary* that another manufacturing exemption upon which the MRD was closely patterned, and thus contains several substantially similar provisions[6] "should be interpreted liberally in favor of taxpayers in order to effectuate the purposes of the legislation." The BOE even went so far as to invalidate a tax agency regulation because "the regulation actually hinders such interpretation, and thus hinders the legislative purpose of encouraging manufacturing in the state." (*Appeal of Save Mart Supermarkets & Subsidiary*, No. 2002-SBE-002, 2002 WL 245682 (Cal. State Bd. Equalization Feb. 6, 2002).) As with former California Revenue and Taxation Code section 23649 (the Manufacturer's Investment Credit, or "MIC"), the Legislature's intent to encourage manufacturing by enacting the MRD Exemption is clearly outlined in the enabling legislation. California Assembly Bill No. 93, approved by Governor Jerry Brown on July 11, 2013, provides in section 1, "California's economic development policy should be to create good jobs with middle-class wages and benefits." (2013 Cal. Assem. Bill No. 93, Cal. 2013–14 Reg. Sess.) The legislative intent continues: "It is the intent of the Legislature to exempt manufacturing equipment from state sales and use taxes in order to make California more competitive in attracting new businesses to the state, and to bring California in line with the 48 other states that exempt manufacturing equipment from sales and use tax." (*Id.*)

As with the former MIC, the BOE also had an important role in the MRD exemption by adopting formal regulations to effectuate the intent of the Legislature. (Cal. Code Regs. tit. 18,

[6] The partial sales and use tax exemption under Cal. Rev. & Tax. Code § 6377.1 is substantially modeled on the prior exemptions under former Cal. Rev. & Tax. Code § 6377 and Cal. Rev. & Tax. Code § 23649, known as the Manufacturers' Investment Credit ("MIC") which allowed manufacturers to qualify for a partial exemption from sales and use tax, and manufacturers' income tax credits. This former law is the legislation discussed in *Appeal of Save Mart*. (*See* State Board of Equalization, Formal Issue Paper 14-001 at 2.)

§ 1525.4 ("Regulation 1525.4").) Recognizing the Legislature's clear directive to encourage manufacturing in California, BOE Member George Runner stated the following during the rulemaking process for Regulation 1525.4:

> . . . [M]y objective would be for us to interpret this [qualified person] as broadly as possible so that the greatest number of – of industry would be able to benefit that. That certainly is what I interpret the intent of the legislation – legislature to do, both from what came out of the legislature and what came out – what comes out of the Governor's office in regards to a broad benefit process here.

(BOE Bus. Taxes Comm. Tr., April 22, 2014, at 26, l. 22 *et seq*.)

Later in the meeting, BOE staff member Mr. Lawrence Mendel stated that "[w]e don't want the audit staff taking – taking too fine a look at whether it's in a qualifying NAICS code or not. We want it to be a reasonable interpretation." (*Id.* at 41, ll. 13–16.)

Thus, as the BOE articulated in *Appeal of Save Mart*, and in the rulemaking process for Regulation 1525.4, the MRD exemption should be interpreted liberally to effectuate the legislation's purpose of encouraging manufacturing and manufacturing jobs in California.

(1) SunPower Corporation

For Corporation, the evidence clearly demonstrates that Corporation was a qualified person. To begin, CDTFA has allowed approximately 35% of the MRD Exemption for Corporation, clearly demonstrating that it agreed that Corporation was a qualified person for purposes of the MRD exemption. However, CDTFA appears to take issue with the specific account in which some transactions were recorded.

Regulation 1525.4 clearly identifies that a "qualified person" is a person primarily engaged in (either as a legal entity or an establishment within a legal entity) a qualifying line or qualifying lines of business, including specifically enumerated NAICS codes 3111 to 3399, and 221114, **Solar Electric Power Generation**. In asserting that a markup was properly applied to the recorded

acquisition cost of fixtures, CDTFA alleges that the PV panels for Systems were acquired from a related company, Corporation, and questions whether the transactions were at arm's length. CDTFA's arguments on the markup issue, which is discussed further below, highlight the arbitrary, unreasonable, and capricious nature of CDTFA's assessment methodology of the 100% disallowance of the claimed MRD Exemption for Corporation. CDTFA's own witness even confirmed that this alleged requirement is a rule of general application that is not found in the text of Regulation 1521. (W. Kimsey Tr. at 132, ll. 7–19.) As this rule has not undergone the Administrative Procedure Act process, it is an invalid underground regulation and should not be followed or afforded any deference. (Cal. Code Regs. tit. 1, § 250(a)(1); *see Tidewater Marine Western, Inc. v. Bradshaw*, 927 P.2d 296, 305 (Cal. 1996) ["Accordingly, the DLSE's enforcement policy appears to be a regulation within the meaning of Government Code section 11342, subdivision (g), and therefore void because the DLSE failed to follow APA procedures."])

CDTFA's theory is that Systems acquired the PV panels it sold from the related manufacturer, Corporation, at minimal cost. However, this theory concedes that Corporation was a "qualified person" for purposes of the MRD Exemption as it was a **manufacturer.** CDTFA's audit workpapers illustrate that Corporation's disallowed MRD Exemption claims cover the periods from December 31, 2016, through December 31, 2019. (*See* CDTFA004040.) During this period, all the manufacturing operations were within Corporation.

Furthermore, CDTFA has conceded that the remaining elements to qualify for the MRD Exemption were met in this case. As the CDTFA's own auditor stated in his deposition:

> Q. Got it. So the other [MRD Exemption] requirements [i.e., other than "qualified person"] probably okay.
>
> A. Right, right. I mean, like, yeah, like what Jim [Levinson] was saying is, oh, they are R&D equipment. I'm not -- I agree with that; right? So I'm not disputing.

> Obviously he did a lot of research. Did good job on it. There are R&D equipment. I believe in that. That's fine.

(Second A. Liang Tr. at 283, ll. 17–25.)

The blanket disallowance of 100% of Corporation's claimed MRD Exemption, without any analysis or examination of the specific transactions for which the taxpayer claimed a partial exemption, further demonstrates that this portion of the assessment is unreasonable, irrational, and arbitrary. This arbitrariness is especially underscored when CDTFA argues, in the same breath, that Corporation engaged in qualifying manufacturing activities and allowed some of the MRD Exemption based on qualifying establishments within Corporation.

(2) <u>SunPower Corporation, Systems</u>

As discussed in the Plan Administrator's Opening Brief, and as conceded by CDTFA, the determination of whether a taxpayer is a "qualified person" can be done on an establishment basis. The focus again is on whether Systems or an establishment within Systems is a "qualified person," as CDTFA has conceded that the other two required elements, qualifying property and qualifying use, are met in this case. (Second A. Liang Tr. at 309–310 ["I think, generally speaking, that that's pretty much met as far as qualifying use, qualifying property. So the key is the qualifying person."].)

Again, Regulation 1525.4 provides:

> For purposes of this subdivision, "establishment" includes multiple or single physical locations, including any portion or portions thereof, and those locations or combinations of locations, including any portion or portions thereof, designated as a "cost center" or "economic unit" by the taxpayer, where a qualified activity is performed, and for which the taxpayer maintains separate books and records that reflect revenue, costs, number of employees, wages or salaries, property and equipment, job costing, or other financial data pertaining to the qualified activity. A physical location may be described in more than one NAICS code.

As it relates to Systems' business activities, the solar energy systems that sold electricity generated pursuant to a PPA were single or multiple physical locations where a qualified activity occurred, namely, the "generation or production, storage, or distribution of electric power." As will be explained by Mr. Archibald Gabriel, Mr. William Groen, and Mr. Drew Johnson, the Debtors, prior to 2022, were engaged not only in the design, construction, and operation of residential solar energy systems, but were also involved in both large utility-scale solar energy projects, as well as commercial and industrial solar energy systems. CDTFA's Opposition Brief illustrates that Systems claimed the MRD Exemption only between December 31, 2018, and March 31, 2022. (CDTFA Opp'n Br. at 19, para. 55.) This coincides with the period when the Debtors' business operations included a significant amount of non-residential solar energy projects.

Mr. Liang stated that when determining whether a taxpayer is a qualified person, even if it has a qualifying NAICS code, as Systems has done in this case, CDTFA must "look at the nature of the business." (Second A. Liang Tr. at 311, ll. 2–8.) Here, the nature of Systems' business, and the establishments contained therein, was solar electric power generation. This cannot reasonably be disputed. CDTFA even notes in its Opposition Brief that "PPAs are standard agreements in the solar industry." (CDTFA Opp'n Br, at 18, para. 54.)

Thus, the blanket 100% disallowance of Systems' claimed MRD Exemption is unreasonable, irrational, and arbitrary, and the portion of CDTFA's assessment, and its related claim, must be disallowed because CDTFA has not met its initial burden of showing that its assessment is reasonable and rational.

iii. *A reliance on a prior audit percentage of error where the business has undergone several significant, material changes results in an assessment that is not reasonable or rational. (Corporation – Audit Items 12E & 12F)*

Summary: *Using a prior audit percentage of error when CDTFA agrees the business has undergone several significant, material changes, and the taxpayer has not provided a written agreement, produces an unreasonable and irrational audit result.*

As previously discussed in the Plan Administrator's Opening Brief, CDTFA's Audit Manual outlines the requirements to apply a prior audit percentage of error ("PAPE"). In the reconvened deposition of CDTFA's auditor, Alan Liang, he admits that based on the language in CDTFA's Audit Manual, chapter 4, section 0405.33, the requirements were not met in this case.

> Q. Okay. So in your opinion, did Corporation meet the requirements under this audit manual section to use a prior audit percentage of error?
>
> A. Yeah. So if you go by exactly what it says here – right? – obviously is [*sic.*] not – there are some changes within the corporation.

(Second A. Liang Tr. at 183, ll. 4–12.)

The auditor also agrees that "PAPE cannot be used without the agreement of the taxpayer." (Second A. Liang Tr. at 190, ll. 19–20.) CDTFA's other witness referred to this as a "safeguard." (W. Kimsey Tr. at 114, l. 19.) However, CDTFA has not yet identified any document containing Corporation's written approval to apply the PAPE in this case. Furthermore, CDTFA admitted that the taxpayer did not agree to the use of a PAPE for the extended audit period. (Second A. Liang Tr. at 235, ll. 2–21.)

As discussed at length in the Plan Administrator's Opening Brief, a PAPE is inappropriate in circumstances like this case, where the business has undergone several material changes since the prior audit period. In the prior audit period, Corporation manufactured solar panels and sold them to its customers. After the spinoff of Maxeon in 2020, it was no longer manufacturing solar

panels. Corporation did not sell panels to Maxeon, so no sales for resale flowed from Corporation to Maxeon. CDTFA appears to misunderstand the Debtors' business activities in this regard, as the auditor believes the PAPE could just be adjusted to eliminate the sales to Maxeon. (Second A. Liang Tr. at 201, ll. 11–13.) While CDTFA deems the provisions in CDTFA Audit Manual, chapter 4, section 0405.33 to be things that are simply considered, the provisions clearly state that "[t]o qualify for the PAPE, the taxpayer must have at least one prior audit and ***must*** meet the conditions discussed in this section. The most recent prior audit and the subsequent two audits ***must*** indicate consistent operations, volume, and potential type of errors."

The plain language of the relevant CDTFA guidance clearly provides that taxpayers must meet the conditions contained therein, including "consistent operations, volume, and potential type of errors." There have been significant changes in the business operations between the prior audit period and the Period at Issue. The two changes, the spin-off of Maxeon, and the sale of the commercial and industrial business to Total, were discussed in the Plan Administrator's Opening Brief. Those facts are based not only on Mr. Gabriel's testimony, but also on the testimony of percipient witnesses, Mr. William Groen and Mr. Drew Johnson, who had personal knowledge from their prior employment at SunPower. These transactions were publicly reported and would have been identified through a review of the Debtors' public SEC filings or news releases.

The Department's own witness, William Kimsey, stated that following the audit manual was the best way to ensure fairness and uniformity in taxpayer audits. (W. Kimsey Tr. at 66, ll. 2–5.) Auditor Alan Liang admits that this did not happen here. (Second A. Liang Tr. at 183, ll. 7–9.) It is no wonder that the alleged resale error rate is inflated and exorbitant.

Because of significant, material changes in business operations, volume, and the potential types of errors, the specified conditions required to qualify for a PAPE are not met, and the portion of CDTFA's assessment that relies on applying a PAPE is unreasonable and irrational.

*iv. The addition of a markup on Systems' reported PV panel costs, where it has been conceded that Systems is not a manufacturer, produces an unreasonable and irrational result. (Systems – Audit Items 12A & 12B)*

<u>Summary</u>: *California law does not allow or require a markup on the recorded acquisition cost of fixtures acquired in completed condition. CDTFA's claim, which purports to increase the taxable measure by $52,053,608 or $4,367,327 in tax by adding markup to the reported acquisition costs, in addition to the already erroneously self-reported markup, results in an unreasonable, irrational assessment.*

CDTFA cites *Honeywell, Inc. v. State Bd. of Equalization*, 122 Cal. Rptr. 237 (Ct. App. 1975), in support of its argument that the addition of a markup to Systems' acquisition cost of PV panels. But *Honeywell* does not support the CDTFA's position. First, unlike in this case, the taxpayer in *Honeywell* was both the manufacturer ***<u>and</u>*** installing contractor under a lump sum contract, which requires application of the cascading markup rules. Here, it is undisputed that while Systems may be the installer under lump sum construction contracts, it is not the manufacturer. Thus, Regulation 1521's cascading markup rules do not apply, and the retail sales price is "deemed to be the cost price of the fixture to the contractor." CDTFA has conceded that Systems is not a manufacturer and separately argues that, for purposes of Audit Item 12D, Systems is not a manufacturer and therefore is not a qualified person. (*See* First A. Liang Tr. at 154, ll. 17–18.)

*Honeywell* also dealt with a very different issue from the case at bar: "did Board have power to determine that some portion of the control devices were 'fixtures' and levy and collect tax on such 'fixtures' as fixtures rather than as materials incorporated in real property." (*Honeywell,*

122 Cal. Rptr. at 241.) In other words, the taxpayer in *Honeywell* contended that the property at issue were "materials" and subject to more favorable tax treatment than the "fixtures" designation applied by the Board. Here, there is no dispute that the property in question are "fixtures." *Honeywell* did not address the issue presented here: whether CDTFA can apply to Systems the rules relating to contractors who are ***also*** manufacturers, where it is undisputed that Systems is ***not*** a manufacturer.

*Montgomery Elevator Co. v. State Bd. of Equalization*, 173 Cal. Rptr. 632 (Ct. App. 1981), is similarly distinguishable on the fact that the fixtures at issue in that case were also "self-manufactured by Montgomery for inclusion into the elevator system…." (*Id.* at 634.) Like *Honeywell,* this case is inapplicable to the present case because it is undisputed that Systems did not self-manufacture the fixtures it purchased in completed condition. If anything, these cases confirm the proper application of the cascading markup rules to contractors that are also manufacturers—a category that does not include Systems. The correct application of Regulation 1521 follows.

Understanding that many construction contractors did business using lump sum contracts, CDTFA promulgated Regulation 1521 to govern the California sales and use tax treatment for these taxpayers. Regulation 1521, subdivision (b)(2)(B) states:

(B) Fixtures.

> 1. In General. Construction contractors are retailers of fixtures which they furnish and install in the performance of construction contracts and tax applies to their sales of the fixtures.
>
> 2. Measure of Tax.
>
> a. In General. If the contract states the sale price at which the fixture is sold, tax applies to that price. If the contract does not state the sale price of the fixture, the sale price shall be deemed to be the cost price of the fixture to the contractor.

b. Determining Cost Price. If the contractor purchases the fixtures in a completed condition, the cost price is deemed to be the sale price of the fixture to him or her and shall include any manufacturer's excise tax or import duty imposed with respect to the fixture prior to its sale by the contractor.

If the contractor is the manufacturer of the fixture, the cost price is deemed to be the price at which similar fixtures in similar quantities ready for installation are sold by him or her to other contractors.

If similar fixtures are not sold to other contractors ready for installation, then the cost price shall be deemed to be the amount stated in the price lists, bid sheets or other records of the contractor.

If the sale price cannot be established in the above manner and the fixture is manufactured by the contractor, the cost price shall be deemed to be the aggregate of the following:

[1] Cost of materials, including such items as freight-in and import duties,

[2] Direct labor, including fringe benefits and payroll taxes,

[3] Specific factory costs attributable to the fixture,

[4] Any manufacturer's excise tax,

[5] *Pro rata* share of all overhead attributable to the manufacture of the fixture, and

[6] Reasonable profit from the manufacturing operations which, in the absence of evidence to the contrary, shall be deemed to be 5 percent of the sum of the preceding factors.

For simplicity, an illustration of these cascading rules for determining the taxable measure for a lumpsum construction contractor who is deemed the retailer of fixtures is included below.







Therefore, the regulation's plain language clearly sets out the framework for determining the applicable taxable measure for fixtures acquired in completed condition by a construction contractor who does not self-manufacture the fixtures. While CDTFA wrongly argues that the distinction between a "purchased fixture" and "self-manufactured fixture" is irrelevant,

Regulation 1521 clearly differentiates between non-manufacturing construction contractors and manufacturing construction contractors, as it specifically provides in the language that CDTFA omits from its brief: "***If the contractor is the manufacturer of the fixture,*** the cost price is deemed to be the price at which similar fixtures in similar quantities ready for installation are sold by him or her to other contractors." (Emphasis added.) CDTFA's position in its brief cannot be reconciled with the plain language of its own regulation. Indeed, if CDTFA's interpretation were correct, inclusion of these provisions in Regulation 1521 specifically applying to situations where the contractor is the manufacturer of the fixture would be rendered meaningless. It is a "settled rule" that statutory interpretation may not result in language being rendered superfluous. (*Sampson v. Parking Serv. 2000 Com., Inc.*, 11 Cal. Rptr. 3d 720, 730 (Ct. App. 2004); *Mundy v. Superior Court* 37 Cal. Rptr. 2d 163, 168 (Ct. App. 1995) ["we must strive to give effect and meaning to all parts of a law if possible and avoid interpretations which render statutory language superfluous."]; *Wolski v. Fremont Inv. & Loan*, 25 Cal. Rptr. 3d 823, 826 (Ct. App. 2005) [same]; *Ste. Marie v. Riverside Cnty. Reg'l Park & Open-Space Dist.*, 206 P.3d 739, 743 (Cal. 2009) [same].)

Contrary to CDTFA's assertion that "[t]he plan [*sic.*] language of the regulation describes acquisition cost which includes indirect cost in overhead," (CDTFA Opp'n Br. at 7, para 10), generally, for a lump sum construction contract that does not separately state the selling price of the fixture, "the sale price shall be deemed to be the cost price of the fixture to the contractor." (Regulation 1521, subd. (b)(2)(B)(2)(a).) Therefore, the next step is to determine the applicable "cost price." Regulation 1521 then provides that if the fixtures are purchased in completed condition, "the cost price is deemed to be the sale price of the fixture to him or her and shall include any manufacturer's excise tax or import duty imposed with respect to the fixture prior to its sale by the contractor." (Regulation 1521, subd. (b)(2)(B)(2)(b).)

Applying the relevant California law in this case, Systems is not a manufacturer of the PV panels it acquires in completed condition and is deemed the retailer of those panels in connection with its lumpsum construction contracts. Therefore, the sale price of the fixture, used to determine the taxable measure, is the contractor's cost price, which under the language in Regulation 1521, is the selling price of the fixture to the contractor, including any manufacturer's excise tax or import duty. CDTFA has not argued or presented any evidence that the selling price did not include the required excise tax or import duty. Instead, it argues that Systems cost price did not include indirect costs and markup. (CDTFA Opp'n Br. at 15, para. 36.)

Furthermore, CDTFA alleges that it must segregate panel pricing from construction contracts into components for services and tangible personal property to determine the price of fixtures. Regulation 1521 provides the mechanism to assist in separating the transaction and determining the applicable, reasonable selling price of fixtures that are provided in connection with lumpsum construction contracts. Again, under California law, for purposes of determining the relevant selling price of fixtures, the fixture's acquisition cost is **deemed** to be the sales price. Regulation 1521 does not require, or authorize, adding additional indirect costs and markup to the recorded acquisition costs. For a non-manufacturer contractor, Regulation 1521 plainly states, "**the cost price is deemed to be the sale price of the fixture to him or her** and shall include any manufacturer's excise tax or import duty imposed with respect to the fixture prior to its sale by the contractor." (Emphasis added.) There is no provision in California law that allows or requires a comparison between the acquisition cost and the fair market value of the fixtures. Even if such a provision existed, the evidence in the Plan Administrator's Opening Brief shows that the recorded per-unit cost of the PV panels for Systems exceeds the average per-unit selling price to unrelated third parties. (Plan Administrator Opening Br. at 43.)

CDTFA then alleges, without any evidence, that the transactions were not at arm's length. However, it is well established that the separate existences of affiliated legal entities must be respected under California tax law. For example, in *Beatrice Co. v. State Bd. of Equalization*, the California Supreme Court held that the separate existences of a parent corporation and its subsidiary had to be respected in determining whether a transfer of assets from one to the other constituted a taxable sale. (863 P.2d 683 (Cal. 1993); *accord Macrodyne Indus., Inc. v. State Bd. of Equalization*, 237 Cal. Rptr. 304 (Ct. App. 1987).) In *Mercedes-Benz v. State Bd. of Equalization*, the Second District Court of Appeal held that the separate existences of three corporate affiliates had to be respected in determining the use-tax base for TPP transferred among them. (179 Cal. Rptr. 758 (Ct. App. 1982).) The separate identities of affiliated legal entities may be disregarded only if respecting them would "ignore substance for form." (*Mapo, Inc. v. State Bd. of Equalization,* 125 Cal. Rptr. 727, 729 (Ct. App. 1975).) In making this determination, the primary factors to consider are whether distinct identities have been maintained and whether the affiliates have independent business purposes. (*Beatrice Co.*, 863 P.2d at 689.)

CDTFA has presented no evidence or argument that the two entities failed to maintain corporate formalities or lack independent business purposes. Instead, CDTFA relies on testimony from its witness, who has not conducted a sales and use tax audit since approximately 1989, for his interpretation of the goals of CDTFA's regulations. (CDTFA Opp'n Br. at 15, para. 40; W. Kimsey Tr. at 22, l. 2 *et. seq*.) CDTFA also cites Sales and Use Tax Annotation 190.0830 in support of its position. As provided in Regulation section 35101 (Cal. Code Regs. tit. 18, § 35101), "'Annotations' are summaries of the conclusions reached in selected legal rulings of counsel. Annotations do not embellish or interpret the legal rulings of counsel which they summarize and do not have the force and effect of law." (*See also Yamaha Corp. of America v. State Bd. of*

*Equalization*, 960 P.2d 1031, 1040 (Cal. 1998).) However, to the extent that Annotations are awarded some weight, Sales and Use Tax Annotation 190.0830 cited by CDTFA specifically identifies, "[t]he sale of shutters by taxpayer to the new company would be considered as arm's length transactions if taxpayer's sales to the new company are made at the same or equivalent price as its sales to unrelated stores. If such is the situation, sales to the new company may be treated in the same manner as taxpayer's sales to independent stores for sales and use tax purposes." Here, as discussed above, the sales to Systems were made at *higher* prices than the average sales to unrelated third parties. Furthermore, after Maxeon's spin-off in August 2020, the manufacturing entity (Maxeon) and the construction contractor entity (Systems) were no longer related.

Therefore, under the plain language of Regulation 1521, the recorded cost price is deemed to be the sales price of fixtures. Thus, as previously identified in the Plan Administrator's Opening Brief, the taxable measure for the sale of fixtures is simply the recorded acquisition cost without any additional markup.[7]

**2. *Assuming arguendo* that CDTFA's assessment is reasonable and rational, the Plan Administrator has met his burden of proof, by a preponderance of the evidence, of the correct amount of tax.**

CDTFA responds to the Plan Administrator's evidence of the correct tax amount by asserting that "Taxpayers rely on bare assertions and hearsay testimony, which is inadmissible." (CDTFA Opp'n Br. at 24.) This response mischaracterizes the Plan Administrator's evidence.

[7] As stated above, the Plan Administrator's Opening and Reply Briefs constitute the Plan Administrator's claims for refund for any overpayment related to Systems' overreporting related to the sale of fixtures. These briefs satisfy all elements required for claims for refund under California Revenue and Taxation Code section 6904(a). The Opening and Reply Briefs are "in writing" and state "the specific grounds upon which the claim is founded." Their service upon the CDTFA constitutes their filing and sufficiently puts the CDTFA on notice of the Plan Administrator's claims for refund.

The Plan Administrator's expert witness, James Levinson, will testify at trial as to the basis for his opinion on the correct amount of tax in this case. Mr. Levinson has an extensive background in California sales and use tax spanning nearly 40 years, including experience as an auditor for the BOE, the predecessor agency to CDTFA, and experience as an advisor to an elected member of the BOE. Mr. Levinson's experience also specifically includes working with companies in both the renewable energy and construction industries.

Mr. Levinson's opinion, which is summarized in the Plan Administrator's Opening Brief, is based on the types of relevant evidence that would reasonably be relied upon in forming an opinion on the correct amount of tax in this case. For example, Mr. Levinson's opinion is based on his review of the audit workpapers, which include schedules detailing the examination of the Debtors' records such as the Sabrix and Vertex reports and fixed asset schedules, in addition to CDTFA's own examination records contained in its audit workpapers, the public information and records (including power purchase agreements), and relevant California regulations. Furthermore, the Plan Administrator intends to include evidence from percipient fact witnesses who worked at SunPower during the relevant periods and can testify based on their personal knowledge.

Taxpayers are not limited to specific types of documentation to meet their burden of proof and may use alternative, relevant evidence, including expert opinion testimony, to determine the correct tax amount. This is especially true here because the disputed issues in CDTFA's claims are legal issues that do not necessarily require transaction-level documentation.

Because the Plan Administrator's Opening Brief presented those arguments and evidence in detail on the correct amount of tax on an issue-by-issue basis, they will not be repeated here.

*i. Alternative evidence may be considered to determine the correct amount of tax due.*

As mentioned above, California Revenue and Taxation Code section 7081 states:

> The Legislature finds and declares that taxes are the most sensitive point of contact between citizens and their government, and that there is a delicate balance between revenue collection and freedom from government oppression. It is the intent of the Legislature to place guarantees in California law to ensure that the rights, privacy, and property of California taxpayers are adequately protected during the process of the assessment and collection of taxes.
>
> The Legislature further finds that the California tax system is based largely on voluntary compliance, and the development of understandable tax laws and taxpayers informed of those laws will both improve voluntary compliance and the relationship between taxpayers and government. It is the further intent of the Legislature to promote improved voluntary taxpayer compliance by improving the clarity of tax laws and efforts to inform the public of the proper application of those laws.
>
> The Legislature further finds and declares that the purpose of any tax proceeding between the State Board of Equalization and a taxpayer is the determination of the taxpayer's correct amount of tax liability. It is the intent of the Legislature that, in furtherance of this purpose, the State Board of Equalization may inquire into, and ***shall allow the taxpayer every opportunity to present, all relevant information pertaining to the taxpayer's liability.***

(Emphasis added.)

The Legislature clearly intended that taxpayers be allowed to present "all relevant information" pertaining to the their liabilities. The Legislature did not intended to restrict taxpayers to documentary evidence such as the general ledger, trial balances, sales journals, purchase journals, cost accounting records, contract files, and purchase and sales invoices.

Furthermore, the CDTFA Audit Manual contains numerous provisions that discuss the use of alternative evidence when encountering missing or incomplete taxpayer records. For example, CDTFA Audit Manual, chapter 4, section 0405.34, states, "[w]hen a closed-out business retains no books and records for audit, CDTFA auditors may have to use other reliable sources of information to verify the taxpayer's reporting . . . ."

Therefore, any relevant evidence may be used to satisfy the required burden of proof. In addition, numerous precedential Office of Tax Appeals ("OTA") decisions have indicated that satisfying the required burden of proof in tax cases requires that "a party must establish by documentation ***or other evidence*** that the circumstances it asserts are more likely than not to be correct." (*Appeal of Senehi d/b/a Barefoot Café*, No. 2023-OTA-446P, 2023 WL 6560701 (Cal. Off. Tax. App. Jan. 24, 2023) [emphasis added].)

Here, although complete corporate books and records are unavailable, either CDTFA or the Plan Administrator may use relevant alternative evidence, whether documentation or otherwise, to meet the required burden of proof.

**3. CDTFA's assertion of speculative new liabilities based on speculative and inapplicable new theories that were not included in its Notices of Determination is a red herring—the underlying issue is the determination of the correct amount of tax as asserted in its Claims.**

The balance of CDTFA's arguments is a purported reservation of rights related to various other issues that it raises for the first time in its Opposition Brief. For example, CDTFA states in its conclusion that it reserves the right to seek an assessment under California Revenue and Taxation Code section 6829 ("Section 6829") for personal liability of a corporate officer. Section 6829, subdivision (c) states that "[p]ersonal liability may be imposed pursuant to this section, only if the department can establish….had included tax reimbursement in the selling price of, or added tax reimbursement to the selling price of, tangible personal property sold in the conduct of its business…or has included use tax on the billing and collected the use tax or has issued a receipt for the use tax and failed to report and pay use tax." Essentially, as provided in Section 6829, personal liability only attaches if the company collected the relevant tax, and failed to report and remit those taxes to CDTFA. In this case, CDTFA is asserting additional liabilities

based on theories that the taxpayer underreported its taxable gross receipts. There is no evidence or argument that the taxpayer collected tax on any of the disputed audit items. This argument avoids addressing the merits of an assessment that CDTFA cannot reasonably defend because it is patently unreasonable, irrational, arbitrary, and capricious.

CDTFA also alleges that there is some potential for additional assessment on unreported transactions related to the spin-off of Maxeon. This was a significant transaction reported publicly in the Debtors' SEC filings and in press releases. Furthermore, this transaction occurred in August 2020, years before CDTFA issued its Notice of Determination and filed the Claims at issue and there is no reason to believe that any taxable gross receipts were not included in the Debtors' sales and use tax returns. Regardless, the relevant statute of limitations for California sales and use tax is three years, as the Debtors filed sales and use tax returns for these periods. (Cal. Rev. & Tax. Code § 6487.) Although the Debtors signed statute of limitations waivers, those waivers have apparently since lapsed. Furthermore, the Plan Administrator has recently been informed that CDTFA does not have signed Power of Attorney forms for Corporation and Systems. As a result, the Plan Administrator plans to present evidence at trial that a number of the statute of limitations waivers were invalid because a corporate officer did not sign them. Based on these invalid waivers, all or part of the Corporation and Systems assessments are time-barred under the relevant statute of limitations, which renders CDTFA's claims, in whole or in part, invalid. Therefore, the statute of limitations has closed, and CDTFA is precluded from issuing a new Notice of Determination. CDTFA's own witness, Mr. Kimsey, is in accord. (W. Kimsey Tr. at 103, ll. 5–6.) The California Supreme Court explains, "[j]ust as the taxpayer is limited to the claims it may assert in the superior court to those pursued in the administrative proceedings, the Board should be limited in its assertion of setoffs in the superior court action to those deficiency assessments formally pursued

under Revenue and Taxation Code sections 12421 through 12435 . . . ." (*Title Ins. Co.*, 842 P.2d 121, 130.)

## CONCLUSION

"Men must turn square corners when they deal with the Government, it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens." (*Title Ins. Co.*, 842 P.2d 121, 130 [internal quotation marks omitted].)

This dispute can easily be resolved with a single threshold question that CDTFA has never answered: whether its assessments are reasonable and rational. Clearly, they are not. CDTFA's Opposition Brief offers no argument and no evidence that the methodology underlying Proof of Claim Nos. 621 and 622 produces a reasonable and rational measure of tax. Instead, it recites figures generated by a hastily completed audit that its own auditor repeatedly admitted was inaccurate. This is likely because, as the CDTFA's auditor testified, he "didn't do anything" for the Systems audit. (Second A. Liang Tr. at 230, ll. 1–3.) Such an "audit," performed hastily without proper analysis or application of the relevant California tax laws and untethered to the Debtors' business activities, is an unreasonable and irrational assessment, and the kind of "naked assessment without any foundation whatsoever" that forfeits any presumption of correctness. (*Portillo v. Comm'r*, 932 F.2d 1128, 1133 (5th Cir. 1991).) The absence of complete business records does not supply that missing showing. CDTFA failed to take action to ensure the preservation of records it knew it would need, declined to issue a subpoena or preservation demand, and now invokes a gap of its own making to cloak an arbitrary assessment in the presumption of correctness. Because CDTFA has not carried its initial burden, the assessments and the related Claims must be disallowed.

Each disputed component of CDTFA's assessment that forms the basis of its Claims independently fails the reasonable and rational standard. These unreasonable errors include:

1. Projecting use tax errors on fixed assets from total sales bears no relationship to the liability being measured and overstates the taxable base.

2. The blanket 100% disallowance of the MRD Exemption cannot be reconciled with CDTFA's concession that Corporation is a qualified person, as it partially allowed the MRD Exemption, and its failure to identify a single disqualifying transaction for Corporation and Systems or rebut the provided NAICS code describing the Debtors' business activities.

3. CDTFA's reliance on a prior audit percentage of error (PAPE) disregards the material changes in the Debtors' business—namely, the Maxeon spin-off and the sale of the commercial and industrial business—and is applied to the assessments without the taxpayer consent that CDTFA's own auditor acknowledged is required.

4. And finally, the additional markup on Systems' PV panel costs has no basis in California law, which deems the acquisition cost of fixtures purchased in completed condition to be the sale price and reserves manufacturer-markup treatment for contractors who self-manufacture — which CDTFA concedes Systems does not. *Honeywell* and *Montgomery*, each involving a self-manufacturing taxpayer, confirm rather than undermine the distinction CDTFA asks the Court to ignore.

Furthermore, even if the Court finds any portion of the assessments reasonable and rational, the Plan Administrator has met its burden on the correct amount of tax by a preponderance of the evidence. Taxpayers are not confined to transaction-level ledgers and invoices to meet their burden. California Revenue and Taxation Code section 7081 guarantees the opportunity to present all relevant information, and CDTFA's own Audit Manual contemplates reliance on alternative evidence where records are incomplete. The opinion of the Plan Administrator's expert, James Levinson—grounded in the audit workpapers, the Sabrix and Vertex reports, fixed asset schedules, the power purchase agreements, and the governing regulations—establishes the correct tax in this case and will be corroborated by percipient witnesses with personal knowledge of the Debtors' business operations during the Period at Issue.

Finally, CDTFA's purported reservation of rights, personal officer liability under California Revenue and Taxation Code section 6829, and potential assessments tied to the Maxeon spin-off and purchases of PV panels from other vendors are untimely, as they were absent from its Notices of Determination. This novel conjecture thus cannot rescue the Claims that it cannot defend on the merits. The Maxeon spin-off was publicly reported in 2020, the three-year limitations period of Section 6487 has run, and the waivers have lapsed. For the foregoing reasons, the Plan Administrator respectfully repeats its request that the Court:

1. Sustain the Plan Administrator's objections to Proof of Claim Nos. 621 and 622;

2. Determine, pursuant to 11 U.S.C. § 505(a), the correct amount of tax owed, if any, as established by the Plan Administrator's evidence;

3. Disallow the Claims to the extent they exceed that amount; and

4. Grant such other and further relief as the Court deems just and proper.

Dated: October 27, 2026
Wilmington, Delaware

Respectfully submitted,

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (DE Bar No. 2981)
Jason M. Madron (DE Bar No. 4431)
Zachary J. Javorsky (DE Bar No. 7069)
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
madron@rlf.com
javorsky@rlf.com

*Counsel to the Plan Administrator*

-and-

**DAKESSIAN LAW, LTD.**
Mardiros Dakessian (admitted p*ro hac vice*)
Benjamin Lee (admitted *pro hac vice*)
445 S. Figueroa Street, Suite 2210
Los Angeles, California 90071
Telephone: (213) 516-5500
Email: marty@dakessianlaw.com
benjamin@dakessianlaw.com

*Special California Tax Counsel to the Plan Administrator*